# UNITED STATES DISTRICT COURT

## SOUTHERN district OF west virginia

### AT BECKLEY

| | | |
|---|---|---|
| MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No.  5:10-0689 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| MASSEY ENERGY COMPANY, DON L. BLANKENSHIP, BAXTER F. PHILLIPS, JR., ERIC B. TOLBERT, RICHARD M. GABRYS, LADY BARBARA THOMAS JUDGE, DAN R. MOORE, JAMES B. CRAWFORD, ROBERT H. FOGLESONG and STANLEY C. SUBOLESKI, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

**NATURE OF THE ACTION**

1.     This is a securities class action on behalf of purchasers of the publicly traded securities of Massey Energy Company ("Massey" or the "Company") during the period from October 28, 2009 to April 21, 2010, inclusive (the "Class Period"), against Massey and certain of its officers and directors for violation of the Securities Exchange Act of 1934 (the "1934 Act").

2.     Prior to and during the Class Period, Massey claimed to be one of the safest mine operators in the industry, regularly touting its safety achievements and boasting of awards it had received based upon the purported safety of its operations.   Massey regularly told investors that safety was its number one priority.   The home page of its website even claimed that safety was the cornerstone of its success:

**Our Formula for Success**

**S-1 + P-2 + M-3 = Shareholder Value**
        At Massey, we have built the most successful and enduring coal mining company in Central Appalachia by adhering to three key operating standards: S-1, P-2 and M-3:

- ***S-1: Safety is job one.***
  ***As our members safely arrive on the job each morning, our first priority is to ensure that they go safely home each night. Our continuous safety innovations are evidence of our commitment to operating safe coal mines***.

- **P-2: Production standards lead the industry.**
  Massey promotes the application and implementation of best production practices. Extensive training and communication programs ensure that technological advancements are implemented in each of our resource groups.

- **M-3: Measurement data to inform company decisions.**
  •Massey's M-3 standard requires that managers receive timely, accurate measurement data related to the company's daily operations, enabling them to make the best decisions based on the best information.

        This proven formula has enabled us to endure and grow in both strong and weak energy markets over many years while other Central Appalachian coal companies have been less successful or have failed.  ***It is a hallmark of our***

*company and will continue to be our formula for generating long-term shareholder value*.

1.     In fact, safety at Massey's mines was repeatedly sacrificed so that aggressive production goals could be met.  Massey had received numerous undisclosed citations arising from serious uncorrected safety and other regulatory violations at surface and underground coal mines it operates in West Virginia and neighboring states.  Federal investigators would later discover scores of additional uncited safety violations at mines operated by Massey in West Virginia, Kentucky and Virginia.  In fact, the number of violations at Massey mines had dramatically spiked in 2009 as the Company ramped up production attempting to reverse a year-long slide in profitability during which its stock price had collapsed from more than $80 per share to as low as $10 per share.

2.     On April 5, 2010, an explosion at the Upper Big Branch mine near Montcoal, West Virginia, suddenly and tragically revealed the falsity of Massey's repeated representations about the safety of its mining operations.  Twenty-nine miners lost their lives in the deadliest U.S. mine accident in nearly 40 years.  Almost immediately, investigators pinpointed the likely cause of the explosion – unvented methane gas that had violently exploded in the mine, leaving trapped miners with no hope for survival.  "An explosion wouldn't have happened if [the mine] was operating safely," federal Mine Safety and Health Administration ("MSHA") administrator Kevin Stricklin told *The Wall Street Journal* the day after the incident.  "There are mines who take precautions ahead of time.  There are mines who spend the money and manpower to do it," added J. Davitt McAteer, head of MSHA during the Clinton Administration, in an April 6, 2010 report by the *Associated Press*.  "Those mines haven't been blown up."

3.     In the days following the tragedy, hundreds of incidents of uncorrected safety violations at Massey's operations would come to light, including more than 100 citations at the

Upper Big Branch mine alone.   These citations included violations for failing to properly control methane levels at the mine.   According to the MSHA website, 35 of the violations at the Upper Big Branch mine were deemed significant and substantial, which the agency defines as a violation "reasonably likely to result in a reasonably serious injury or illness."   Following the government's initial inquiry into the explosion, President Barrack Obama would accuse the Company of having "put their bottom line before the safety of their workers."

4.      The price of Massey common stock plunged following these revelations, causing hundreds of millions of dollars in losses to investors who had purchased the Company's shares in reliance on the integrity of the information it had provided and the completeness of its disclosures regarding the purported safety of its operations.   Massey's common stock plunged by more than 17% in the two days following the accident, when its stock price fell by $9.47, resulting in the immediate loss of $900 million in market capitalization.   As further revelations about the extent of Massey's uncorrected safety violations began to surface, and investors realized the problems were not limited to the Upper Big Branch mine and that the explosion there had resulted from deliberate inattention to mine worker safety, Massey's stock suffered further declines, causing additional injury to investors.

5.      On April 21, 2010, eight Massey mines were the target of surprise inspections by federal mine safety officials, as the Company tried to fend off mounting criticism that the mine tragedy had resulted from its willful disregard of safety regulations.   Then, after the market closed, Massey announced its first quarter earnings and told investors that it would take up to $150 million in charges in the second quarter to account for the potential costs and liabilities associated with the Upper Big Branch tragedy.   On these events, and despite the fact that the Company's first quarter earnings had purportedly beat the Street by $0.11 per share, Massey's stock fell to as low as $41.30 per share on April 22, 2010 before closing at $42.93 per share, a

one-day drop of nearly 2% that caused additional injury to plaintiff and other Class Period investors.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arose under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

7.     Venue is proper in this District pursuant to §27 of the 1934 Act.  The false and misleading statements alleged herein concern facts, transactions and occurrences in this District, including statements and omissions about the safety of Massey's mining operations, most of which occurred in this District.

8.     Massey's mining activities and operations are centered in Raleigh County, where the Upper Big Branch mine and 23 of the Company's other active mines are located.  Massey also operates 6 additional mines in this District, including three mines in each of Greenbrier and Wyoming counties.

## PARTIES

9.     Plaintiff Macomb County Employees' Retirement System purchased Massey securities as described in the attached certification and was damaged thereby.

10.     Defendant Massey produces, processes, and sells bituminous coal extracted from 56 mines in West Virginia, Kentucky and Virginia, and claims to be the largest coal company in Central Appalachia.  Twenty-four of those mines are located in Raleigh County.  Massey's corporate headquarters are located in Richmond, Virginia and its operational headquarters are in Julian, West Virginia.  The Company organizes its mining operations into 23 "Resource Groups," 17 of which are located in West Virginia.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "MEE."  As of March 31, 2010, there were approximately 95.2 million shares of common stock issued and outstanding.  The

Company maintains and regularly publicizes its website at www.masseyenergyco.com, where it publishes information material to potential investors.

11.     Defendant Don L. Blankenship ("Blankenship") is Massey's Chairman and CEO. Blankenship has been a Company director since 1996 and its CEO since November 2000. Blankenship has worked for Massey or its subsidiaries since 1982, and has been the Chairman and CEO of Massey's wholly owned subsidiary, A.T. Massey Coal Company, Inc., since 1992. Blankenship participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the improper press releases and SEC filings.

12.     Defendant Baxter F. Phillips, Jr. ("Phillips") is Massey's President and a member of its Board of Directors.   Phillips has been a director of the Company since 2007 and President since November 2008.   Phillips joined the Company in 1981 and was previously its Chief Administrative Officer and its Chief Financial Officer.   Phillips participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the improper press releases and SEC filings.   Phillips is also a member of the Safety, Environmental and Public Policy Committee of the Company's Board of Directors, which is charged with, among other responsibilities: reviewing the Company's safety performance, policies and practices; providing quarterly reports on the Company's compliance with worker safety rules and regulations; and "determin[ing] the specific content and organization of its mine safety reports to the Board to reasonably inform the Board regarding the Company's compliance with all applicable mine safety laws and regulations."

13.     Defendant Eric B. Tolbert ("Tolbert") is Chief Financial Officer and Vice President of Massey.   Tolbert participated in the making and issuance of the false and misleading statements alleged herein, including the preparation of the improper press releases and SEC filings.

14.     Defendant Richard M. Gabrys ("Gabrys") is a member of Massey's Board of Directors and its Safety, Environmental and Public Policy Committee.

15.     Defendant Lady Barbara Thomas Judge ("Judge") was, until her resignation on April 19, 2010, a member of Massey's Board of Directors and its Safety, Environmental and Public Policy Committee.

16.     Defendant Dan R. Moore ("Moore") is a member of Massey's Board of Directors and its Safety, Environmental and Public Policy Committee.

17.     Defendant James B. Crawford ("Crawford") is a member of Massey's Board of Directors and Chairman of its Safety, Environmental and Public Policy Committee.

18.     Defendant Robert H. Foglesong ("Foglesong") is a member of Massey's Board of Directors and its Safety, Environmental and Public Policy Committee.

19.     Defendant Stanley C. Suboleski ("Suboleski") is a member of Massey's Board of Directors and its Safety, Environmental and Public Policy Committee.

20.     The individuals named as defendants in ¶¶13-21 are referred to herein as the "Individual Defendants."

21.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Massey's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations

which were being made were then materially false and misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.     As alleged herein, each of the defendants acted with scienter in that each defendant knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted to state facts necessary to prevent them from being materially false and misleading under the circumstances.  Each defendant knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the making, issuance or dissemination of such statements or documents as a primary violation of the federal securities laws.  By virtue of their receipt or reckless disregard of information reflecting the true facts regarding Massey, their control over and or receipt and/or modification of Massey's materially misleading statements, and or their other associations with the Company, each defendant was privy to confidential information concerning Massey and knowingly or recklessly participated in the fraudulent scheme and conduct alleged herein.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure on behalf of all persons who purchased or otherwise acquired Massey publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court. Massey has over 95 million shares of common stock outstanding, owned by tens or hundreds of thousands of persons.

25. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of Massey publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

26. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

27. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

28. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known or reasonably available to them about Massey or which they were under a duty to disclose. Defendants' fraudulent scheme and course of business operated as a fraud or

deceit on purchasers of Massey publicly traded securities by: (i) deceiving the investing public regarding the safety of Massey's operations, its prospects and its business; (ii) artificially inflating the prices of Massey securities; (iii) inducing plaintiff and other members of the Class to purchase Massey publicly traded securities at inflated prices; and (iv) causing plaintiff and other members of the Class to suffer damages when the conditions concealed by the defendants' fraudulent scheme were revealed to the market, causing the prices of Massey securities to decline.

## BACKGROUND TO DEFENDANTS' SCHEME

29.     On January 19, 2006, a conveyer belt at the Aracoma Alma Mine No. 1 at Melville in Logan County, West Virginia caught fire, pouring smoke into a fresh air passageway that was supposed to be sealed so miners would have a safe route of escape.   Two miners became lost and disoriented in the smoke and died from carbon monoxide poisoning.   On December 23, 2008, the Aracoma Coal Company, a subsidiary of Massey, agreed to pay $4.2 million in criminal fines and civil penalties following a long-term investigation by MSHA and the FBI.   The global settlement was the largest financial settlement in the coal industry's history.

30.     Following the Aracoma mine tragedy, Massey repeatedly assured investors that it had a strong commitment to safety throughout its operations, and a proven track record of safety second to none in the industry.   In fact, the Company had a long history of ignoring mine safety regulations and delaying safety improvements that would interfere with its ability to pull coal out of the ground.

31.     At its 2009 Annual Meeting of Stockholders held on May 19, 2009, CEO Blankenship told investors that the Company had been able to improve its financial performance despite the significant financial burdens imposed by mine health and safety regulations:

Adjusted earnings before interest, taxes, depreciation and amortization improved to $640 million, a greater than 50% increase over 2007, reflecting and perhaps confirming Raymond Bradbury's view that a safe mine is a productive mine. *We set all of these financial records while improving upon our safety performance*.

In 2008 we achieved a new record low accident rate of 1.93, which was an improvement over our previous record in 2007 and significantly better than the industry average. *In fact 2008 was the fourth year in the last five years in which we have set a new record for safety performance*.

*As a company and as an industry, we have been successful in improving our safety performance because of our members' commitment, our investments and our continuous development and implementation of safety related innovations*.

Many industries have significantly higher accident rates than coal mining and *Massey is continually a leader among bituminous coal producers when it comes to safety*.

\*\*\*

Our members are another stake holder group that merits our highest priority and focus. We use the term member because a career at Massey is more than a job and a paycheck, each Massey miner is part of a team with a commitment to be a part of Massey, to improve how the job gets done and to give their best to ensure the continued success of the company.

*Their story and safety is our first concern and the responsibility of returning over 6000 people home from work each day trumps all other challenges in importance. We believe that our investments in safety improvements and our development of a culture of safety at Massey have made us a leader in the industry. Safety is a clear element of our long term success and our S1 or Safety is Job One Program is second to none*.

32.  Throughout the year, Massey repeatedly trumpeted positive safety news while refusing and failing to disclose widespread safety problems and uncorrected regulatory violations throughout its operations, including at the Upper Big Branch Mine.

**MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS AND FRAUDULENT SCHEME AND COURSE OF BUSINESS BY DEFENDANTS DURING THE CLASS PERIOD**

33.  The statements defendants made falsely touting Massey's mine safety compliance record and achievements remained uncorrected at the outset of the Class Period, and investors

- 10 -

continued to believe that the Company's operations were safe, such that the potential for a recurrence of the Aracoma mine accident was remote.

34.     On October 28, 2009, the first day of the Class Period, the Company reported its 3Q09 earnings, again trumpeting its ability to achieve positive financial results while maintaining a mine safety program that was second to none in the industry.   That same day, the Company issued a press release touting its receipt of a prestigious MSHA safety award.   The release, which was disseminated to the market via *PR Newswire* and other media outlets and market analysts, stated, in part:

**Massey Energy Becomes First Mining Company to Win Three Sentinels of Safety Awards in a Single Year**

**Massey Accepts Awards from the National Mining Association and the U.S. Mine Safety and Health Administration in Washington**

. . . Massey Energy today accepted three Sentinels of Safety Awards in Washington, DC.   The annual Sentinels of Safety award program recognizes achievement of outstanding safety records in America's mineral extractive industries.   The Sentinels of Safety awards program is co-sponsored by the National Mining Association (NMA) and the Mine Safety and Health Administration.   Massey is the first mining company ever to receive three of the mining industry's most prestigious safety awards in one year.

The three Massey facilities to receive the Sentinels of Safety awards include:

– Chess Processing, of Elk Run Coal Company, in the Large Coal Processing Facility Group

– Chesterfield Preparation Plant, of Omar Mining Company, in the Small Coal Processing Facility Group

– North Surface Mine, of Alex Energy, Inc., in the Small Surface Coal Group

*"At Massey Energy, we embrace our commitment to safety at all levels – from executive to miner.   The Sentinels of Safety awards reflect the Company's dedication to safety at all of our facilities," said Massey Chairman and CEO Don L. Blankenship.   "No coal company can succeed over the long term without a total commitment to safety.   More importantly, Massey is a family. We care about protecting our fellow members, which is why we strive to remain an industry leader in safety," added Mr. Blankenship.*

2008 marked the safest year in Massey history, and fifth straight year in which Massey's safety performance was stronger than the industry average. ***In fact, Massey's safety performance has been stronger than the industry average for 16 of the past 18 years***.

35.    On October 27, 2009, the Company issued a press release announcing its 3Q09 financial results, which was disseminated to the market via *PR Newswire* and other media outlets and market analysts.   The release included the following statements:

*Massey Energy Company* today reported net income of $16.5 million or $0.19 per share and EBITDA of $112.1 million for the quarter ended September 30, 2009. Massey also reported continuing strong cash generation as cash and restricted cash increased by $102.4 million.   Produced coal revenue for the quarter was $535.5 million.   These results compared to net income of $51.6 million or $0.61 per share, EBITDA of $158.7 million and produced coal revenue of $666.4 million in the third quarter of 2008.

\*\*\*

*Safety*

**Massey remains on track for another record year in terms of safety.** Through the first nine months of 2009, Massey reported a non-fatal days lost (NFDL) incident rate of 1.72.   The Company's previous best rate for a full year was 1.93, achieved in 2008.   By comparison, the bituminous coal industry average NFDL rate was 2.95 in 2008.

36.    On October 28, 2009, the Company conducted a regularly scheduled conference call with analysts and investors to discuss its 3Q09 financial results.   Seeking to bring further attention to its purportedly strong safety record, Massey timed its earnings release to coincide with the Sentinels of Safety award presentation.   At the outset of the conference call, Company President Phillips made the following statement:

Good morning and thank you for joining us.   This morning we are conducting our call from Washington DC, the location of the Sentinels of Safety Awards Ceremony.   Massey will be recognized as the recipient of three prestigious National Safety Awards later today.   The awards in today's ceremony are sponsored by the National Mining Association and the U.S. Mine Safety and Health Administration.   Massey is the winner of three of six awards in coal-related categories.  ***We understand that this is the first time a company has won three Sentinels of Safety Awards in the same year.   We are very proud of this accomplishment and our members who work so hard to make Massey's***

***mines among the safest in the industry***.  Because of the timing of the awards ceremony we will need to end our conference call about 10 minutes before 12:00 today.   Our presentation will be brief to allow time for your questions.

37.     Also on October 28, 2009, Massey filed its Report on Form 10-Q for its 3Q09, the period ending September 30, 2009, with the SEC.   The Report included Massey's financial results for the third quarter, and also purported to describe the material risks to Massey's business:

**Item 1A. Risk Factors**

We are subject to a variety of risks, including, but not limited to those referenced under the heading "Certain Trends and Uncertainties" of Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations of this Quarterly Report on Form 10-Q and those referenced herein to other Items contained in our Annual Report on Form 10-K for the year ended December 31, 2008, including Item 1. Business, under the headings "Customers and Coal Contracts," "Competition," and "Environmental, Safety and Health Laws and Regulations," Item 1A. Risk Factors, Item 3.  Legal Proceedings and Item 7.  Management's Discussion and Analysis of Financial Condition and Results of Operations, under the headings "Critical Accounting Estimates and Assumptions," "Certain Trends and Uncertainties" and elsewhere in Management's Discussion and Analysis of Financial Condition and Results of Operations.  Except as set forth under "Certain Trends and Uncertainties" and elsewhere under Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations of this Quarterly Report on Form 10-Q, we do not believe there have been any material changes to the risk factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2008.

38.     The Report on Form 10-Q failed to disclose any substantive information about the ongoing and uncorrected regulatory violations throughout Massey's mining operations, including at the Upper Big Branch Mine, rendering the risk disclosures and other statements in the 10-Q materially misleading and incomplete.

39.     Rather than making any substantive disclosure of the material risks to the Company's operations arising from the uncorrected regulatory violations then existing at its mines, the Report on Form 10-Q referred to and incorporated the risk warnings in the Company's

Report on Form 10-K for the 2008 fiscal year ending December 31, 2008, including the following generic and general warnings pertinent to mine health and safety requirements:

*Federal, state and local laws and government regulations applicable to operations increase costs and may make our coal less competitive than other coal producers.*

We incur substantial costs and liabilities under increasingly strict federal, state and local environmental, health and safety and endangered species laws, regulations and enforcement policies. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations. The costs of compliance with applicable regulations and liabilities assessed for compliance failure could have a material adverse impact on our cash flows, results of operations or financial condition.

New legislation and new regulations may be adopted which could materially adversely affect our mining operations, cost structure or our customers' ability to use coal. New legislation and new regulations may also require us, as well as our customers, to change operations significantly or incur increased costs. The United States Environmental Protection Agency (the "EPA") has undertaken broad initiatives to increase compliance with emissions standards and to provide incentives to our customers to decrease their emissions, often by switching to an alternative fuel source or by installing scrubbers or other expensive emissions reduction equipment at their coal-fired plants.

\*\*\*

*The Mine Safety and Health Administration ("MSHA") or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed, which could adversely affect our ability to meet our customers' demands.*

MSHA or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed. Our customers may challenge our issuance of force majeure notices in connection with such closures. If these challenges are successful, we may have to purchase coal from third-party sources to satisfy those challenges; negotiate settlements with customers, which may include price reductions, the reduction of commitments or the extension of the time for delivery, terminate customers' contracts or face claims initiated by our customers against us. The resolution of these challenges could have a material adverse impact on our cash flows, results of operations or financial condition.

\*\*\*

- 14 -

*Coal mining is subject to inherent risks, some for which we maintain third-party insurance and some for which we self-insure.*

Our operations are subject to certain events and conditions that could disrupt operations, including fires and explosions, accidental mine water discharges, coal slurry releases and impoundment failures, natural disasters, equipment failures, maintenance problems and flooding. We maintain insurance policies that provide limited coverage for some, but not all, of these risks. Even where insurance coverage applies, there can be no assurance that these risks would be fully covered by insurance policies and insurers may contest their obligations to make payments. Failures by insurers to make payments could have a material adverse effect on our cash flows, results of operations or financial condition. We self-insure our highwall miners and underground equipment, including our longwalls. We do not currently carry business interruption insurance.

40. The 2008 Report on Form 10-K's discussion of environmental safety and health laws and regulations that was referenced by and incorporated into the 3Q09 Report on Form 10-Q was similarly generic:

**Environmental, Safety and Health Laws and Regulations**

The coal mining industry is subject to regulation by federal, state and local authorities on matters such as the discharge of materials into the environment, employee health and safety, permitting and other licensing requirements, reclamation and restoration of mining properties after mining is completed, management of materials generated by mining operations, surface subsidence from underground mining, water pollution, water appropriation and legislatively mandated benefits for current and retired coal miners, air quality standards, protection of wetlands, endangered plant and wildlife protection, limitations on land use, and storage of petroleum products and substances that are regarded as hazardous under applicable laws. The possibility exists that new legislation or regulations may be adopted that could have a significant impact on our mining operations or on our customers' ability to use coal.

Numerous governmental permits and approvals are required for mining operations. Regulations provide that a mining permit or modification can be delayed, refused or revoked if an officer, director or a stockholder with a 10% or greater interest in the entity is affiliated with or is in a position to control another entity that has outstanding permit violations. Thus, past or ongoing violations of federal and state mining laws by individuals or companies no longer affiliated with us could provide a basis to revoke existing permits and to deny the issuance of addition permits. We are required to prepare and present to federal, state or local authorities data and/or analysis pertaining to the effect or impact that any proposed exploration for or production of coal may have upon the environment, public and employee health and safety. All requirements imposed by such

- 15 -

authorities may be costly and time-consuming and may delay commencement or continuation of exploration or production operations.  Accordingly, the permits we need for our mining and gas operations may not be issued, or, if issued, may not be issued in a timely fashion.  Permits we need may involve requirements that may be changed or interpreted in a manner that restricts our ability to conduct our mining operations or to do so profitably.  Future legislation and administrative regulations may increasingly emphasize the protection of the environment, health and safety and, as a consequence, our activities may be more closely regulated.  Such legislation and regulations, as well as future interpretations of existing laws, may require substantial increases in equipment and operating costs, delays, interruptions or a termination of operations, the extent of which cannot be predicted.

While it is not possible to quantify the expenditures we incur to maintain compliance with all applicable federal and state laws, those costs have been and are expected to continue to be significant.  We post surety performance bonds or letters of credit pursuant to federal and state mining laws and regulations for the estimated costs of reclamation and mine closing, often including the cost of treating mine water discharge when necessary.  Compliance with these laws has substantially increased the cost of coal mining for all domestic coal producers. We endeavor to conduct our mining operations in compliance with all applicable federal, state and local laws and regulations.  However, even with our substantial efforts to comply with extensive and comprehensive regulatory requirements, violations during mining operations occur from time to time.

***

Mine Safety and Health

Stringent health and safety standards have been in effect since Congress enacted the Federal Coal Mine Health and Safety Act of 1969.  The Federal Coal Mine Safety and Health Act of 1977 significantly expanded the enforcement of safety and health standards and imposed safety and health standards on all aspects of mining operations.  A further expansion occurred in June 2006 with the enactment of the Mine Improvement and New Emergency Response Act of 2006 ("MINER Act").

The MINER Act and related Mine Safety and Health Administration ("MSHA") regulatory action require, among other things, improved emergency response capability, increased availability of emergency breathable air, enhanced communication and tracking systems, more available mine rescue teams, increased mine seal strength and monitoring of sealed areas in underground mines, and larger penalties by MSHA for noncompliance by mine operators. Coal producing states, including West Virginia and Kentucky, passed similar legislation.  The bituminous coal mining industry was actively engaged throughout 2009 in activities to achieve compliance with these new requirements. These compliance efforts will continue into 2009.

In 2008, MSHA published final rules implementing Section 4 of the MINER Act that addressed mine rescue, sealing of abandoned areas, refuge alternatives, fire prevention and detection, use of air from the belt entry and civil penalty assessments. MSHA also provided guidance on wireless communication and electronic tracking systems and new requirements for the plugging of coal bed methane wells with horizontal branches in coal seams. Two additional regulations were also published related to measures to achieve alcohol and drug free mines and the use of coal mine dust personal monitors. In February 2009, the United States Court of Appeals for the District of Columbia Circuit held that the 2008 rules were not sufficient to satisfy the requirements of the Miner Act in certain respects, and remanded those portions of the rules to MSHA for reconsideration. New rules issued by the MSHA will likely contain more stringent provisions regarding training of rescue teams.

All of the states in which we operate have state programs for mine safety and health regulation and enforcement. Collectively, federal and state safety and health regulation in the coal mining industry is perhaps the most comprehensive and pervasive system for protection of employee health and safety affecting any segment of industry in the United States. While regulation has a significant effect on our operating costs, our United States competitors are subject to the same regulation.

We measure our success in this area primarily through the use of occupational injury and illness frequency rates. We believe that a superior safety and health regime is inherently tied to achieving productivity and financial goals, with overarching benefits for our shareholders, the community and the environment.

41. On February 2, 2010, the Company reported its financial results for fiscal year 2009, the period ending December 31, 2009, in a press release disseminated to the market via *PR Newswire* and other media outlets and market analysts. The release included the following statements:

Massey Energy Company today reported net income of $24.4 million or $0.28 per diluted share and EBITDA of $123.3 million for the fourth quarter of 2009. The earnings were generated from produced coal revenue of $498.7 million. By comparison, Massey generated net income of $47.7 million or $0.56 per diluted share and EBITDA of $144.3 million on produced coal revenue of $640.0 million in the fourth quarter of 2008.

Commenting on the Company's fourth quarter results, Massey's Chairman and Chief Executive Officer Don Blankenship said, "We were pleased with our control of costs and our positive cash generation during the fourth quarter in spite of very difficult market and operating conditions. We are pleased to have improved our market position, balance sheet and regional reserve position in

2009.  We look forward to continued improvement in all of these critical categories in 2010."

***

**Safety**

      Massey completed the safest year in Company history by achieving a non-fatal days lost (NFDL) incident rate of 1.67 in the full year 2009.  The Company's previous best rate for a full year was 1.93, achieved in 2008. By comparison, the bituminous coal industry average NFDL rate was 2.95 in 2008.

      "***We are extremely proud of our safety accomplishments in our operations," said Massey's President Baxter F. Phillips, Jr.  "Safety has long been our top priority.  Many of our operations worked the entire year without a single lost time incident.  We continue to make significant investments of time, personnel and capital to ensure that our mines are as safe as they can be and achieving this record low rate is a reflection of that commitment***."

      2009 was the sixth consecutive year and the seventeenth year in the past nineteen years in which Massey's NFDL incident rate was better than the bituminous coal industry average.

    42.    On February 3, 2010, the Company conducted a regularly scheduled conference call with analysts and investors to discuss its 2009 financial results.  At the outset of the call, Massey President Phillips again touted the purported safety of the Company's operations:

      Turning your attention to safety, ***we are extremely proud of our accomplishments in improving the safety of our members in our operations during 2009***.  We completed the safest year in Company history by achieving a nonfatal days lost, NFDL incident rate of 1.67 for the full year 2009.  Our Company's previous best rate for a full year was 1.93 achieved in 2008.  Many of our operations worked the entire year without a single lost time accident.  ***We continue to make significant investments of time, personnel and capital to ensure that our mines are as safe as they can be and achieving this record low rate is a reflection of that commitment***.  I know many of our operation managers and safety development group members will be listening to this call and I congratulate them on our safety record in 2009 and challenge them to continue this trend in 2010.

    43.    On March 1, 2010, the Company filed its report on Form 10-K regarding its fiscal 2009 operations and results.  As with Massey's prior year report, the 2009 Report on Form 10-K failed to disclose any substantive information about the ongoing and uncorrected regulatory violations throughout

- 18 -

Massey's mining operations, including at the Upper Big Branch Mine, rendering the risk disclosures and other statements in the 10-K materially misleading and incomplete.

44.    Rather than making any substantive disclosure of the material risks to the Company's operations arising from the uncorrected regulatory violations at its mines, the 2009 Report on Form 10-K merely repeated nearly verbatim the incomplete risk warnings contained in its prior year annual report, as previously alleged in ¶41.

45.    The 2009 Report on Form 10-K also repeated the generic discussion of environmental safety and health laws and regulations copied nearly verbatim from its prior year annual report, as previously alleged in ¶42.

46.    On March 16, 2010, Massey issued a press release announcing its intent to acquire Cumberland Resources Corporation and certain affiliated companies ("Cumberland"), which stated in part:

> Massey Energy Company announced today that it has signed a definitive agreement to purchase Cumberland Resources Corporation and its affiliated companies for $960 million in a combined cash and stock transaction. Cumberland is one of the largest privately held coal producers in the United States with 2009 produced coal revenue of $550 million generated from the production and sale of 7.8 million tons of high quality Central Appalachian coal. Massey will acquire Cumberland free of debt.
>
> ***
>
> Based in Abingdon, Virginia, Cumberland operates primarily underground coal mines in Southwestern Virginia and Eastern Kentucky.  Its assets include an estimated 416 million tons of contiguous coal reserves, a preparation plant in Kentucky served by the CSX railroad and a preparation plant in Virginia served by the Norfolk Southern railroad.  Of the estimated reserves, Massey believes more than half (216 million tons) have metallurgical coal qualities.
>
> Cumberland's existing operations currently produce both steam and metallurgical quality coals.  Approximately 4.8 million tons of its current annual production is of metallurgical quality of which 800,000 tons are currently being sold into the metallurgical coal market. Massey expects to be able to produce approximately 5.0 million tons of metallurgical quality coal annually with the existing Cumberland assets.  Massey does not expect any additional development capital would be required to reach this production target.

- 19 -

"We are extremely pleased with this acquisition opportunity and the value it represents for Massey stockholders," said Don Blankenship, Massey Energy Company's Chairman and Chief Executive Officer.   "The Cumberland assets and operations will be highly complementary to our existing base and fit well with our strategy in Central Appalachia. Cumberland's track record of low-cost production, their focus on underground mining and their low legacy liabilities are consistent with Massey's history and strategy.   We believe this acquisition is an excellent fit for Massey.   Our analysis shows it will be accretive to earnings per share beginning this year and we believe it will add significant shareholder value."

Massey believes it will achieve operating synergies when this transaction and the integration of the Cumberland operations are complete.   These synergies are expected to result from increased global marketing of metallurgical quality coal through Massey's established sales network, sharing of operational best practices, purchasing synergies and working capital optimization.

\*\*\*

Commenting on the transaction, Massey's President, Baxter F. Phillips, Jr. said, "Richard Gilliam, Chairman and CEO of Cumberland, and his team have done an excellent job in building a great company.   They have a tremendous workforce of over 1,000 talented and experienced miners and support staff that we will be proud to count among our Massey members.   We consider ourselves fortunate to have the opportunity for such a quality asset to become part of the Massey organization."

Under the terms of the agreement, the aggregate consideration to be paid by Massey is $960 million, consisting of $640 million in cash and $320 million in shares of Massey's common stock, calculated based upon the average closing price of Massey's common stock for the 20 trading days ending on the day prior to the closing of the acquisition, subject to adjustment for working capital.

The Purchase Agreement contains customary representations, warranties, covenants and conditions, as well as indemnification provisions subject to specified limitations.   The closing of the acquisition is subject to the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, certain third-party consents and other customary closing conditions.   The acquisition is expected to close in the second quarter of 2010.

47.   On March 22, 2010, Massey filed a Prospectus Supplement on Form 424B5

which, as amended on March 24, 2010, provided for the registration and offering of up to 9.75

million shares of Massey stock pursuant to a Registration Statement on Form S-3 filed on August

5, 2008 and was signed by defendants Phillips, Blankenship, Tolbert, Crawford, Foglesong,

Gabrys, Judge, Moore and Suboleski and Massey Controller David W. Owings and Massey

directors E. Gordon Gee and Bobby R. Inman (the "Offering").  The Prospectus Supplement

stated that the estimated net proceeds of $405 million from the Offering were intended to be used

to fund part of the purchase price for the Cumberland acquisition.  The Offering was

underwritten by UBS Investment Bank as lead underwriter and Stifel Nicolaus, FBR Capital

Markets, PNC Capital Markets LLC and Raymond James.

 48. The Prospectus Supplement stated the following with respect to the safety of

Massey's operations:

> **Strategy**
>
>  Our primary objectives are to capitalize on current market conditions and to continue to build upon our competitive strengths to enhance our position as one of the premier coal producers in the U.S. by:
>
>  ***Maintaining focus on high safety standards***.  We believe a safe mine is a profitable mine.  We strive to maintain safe operations and continue to develop and implement new safety improvement initiatives that exceed regulatory requirements.  For the year ended December 31, 2009, we recorded an all-time Company best Nonfatal Days Lost ("NFDL") rate of 1.67.  The bituminous coal mining industry average NFDL rate was 2.95 in 2008.  We continually review and update our safety procedures and equipment, and we believe our focus on high safety standards has resulted in fewer injuries and accidents and cost savings related thereto.

 49. The Prospectus Supplement and Registration Statement incorporated by reference

the risk disclosures included in the Company's prior reports on Form 10-K, as previously

alleged.  The Prospectus Supplement also included the following disclosure of potential risks

associated with Massey's mining operations:

> **Federal, state and local laws and government regulations applicable to operations increase costs and may make our coal less competitive than other coal producers.**
>
>  We incur substantial costs and liabilities under increasingly strict federal, state and local environmental, health and safety and endangered species laws, regulations and enforcement policies.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal

- 21 -

penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations.   The costs of compliance with applicable regulations and liabilities assessed for compliance failure could have a material adverse impact on our cash flows, results of operations or financial condition.

50.    On April 19, 2010, Massey announced the completion of the Cumberland acquisition in a press release that was published by *PR Newswire* and disseminated to the market thereafter by numerous media and analyst reports.   The release stated:

> Massey Energy Company announced today that it has completed its acquisition of Cumberland Resources Corporation and its affiliated companies for a purchase price of $640 million in cash, subject to working capital adjustments, and 6,519,034 shares of Massey common stock.   The number of shares issued was calculated by dividing $320 million by the average closing price of Massey common stock for the 20 trading days ending on April 16, 2010.   Cumberland was one of the largest privately held coal producers in the United States with 2009 produced coal revenue of $550 million generated from the production and sale of 7.8 million tons of high quality Central Appalachian coal.   Massey acquired Cumberland free of debt.
>
> The Cumberland operations include primarily underground coal mines in Southwestern Virginia and Eastern Kentucky.   The acquisition includes an estimated 416 million tons of contiguous coal reserves, a preparation plant in Kentucky served by the CSX railroad and a preparation plant in Virginia served by the Norfolk Southern railroad.   Of the estimated reserves, Massey believes more than half (216 million tons) have metallurgical coal qualities.   Including the acquired Cumberland reserves, Massey now has an estimated total reserve base of 2.9 billion tons, of which approximately 1.3 billion tons are of metallurgical quality.
>
> Massey President Baxter F. Phillips, Jr. has been the executive overseeing the Cumberland transaction since discussions were first initiated in January. Regarding the closing Phillips commented, "We are very pleased to conclude this acquisition and we look forward to integrating the Cumberland operations into our business.   We welcome Cumberland's workforce of over 1,000 talented and experienced miners and support staff and are proud to have them as part of the Massey organization."
>
> Massey's Chairman and CEO, Don Blankenship, was unable to attend the closing.   Speaking on his behalf, Phillips noted that Blankenship has been extremely enthusiastic about the transaction as he considers Cumberland to be a great asset and an excellent fit with Massey's business strategy.

51.     The foregoing statements were materially false and misleading because they misrepresented existing facts that were known to defendants or recklessly disregarded by them, or omitted to disclose facts that defendants were under a duty to disclose, or which defendants knew or disregarded were necessary to disclose in order to make the statements made not misleading to investors.  The facts and conditions not revealed by defendants included the following: (i) that Massey was not conducting its operations in compliance with statutes and regulations governing mine worker safety and, in fact, had numerous uncorrected safety violations throughout its mining properties, including at the Upper Big Branch mine; (ii) that defendants were deliberately permitting miners to work in unsafe conditions, such that it was only a matter of time before another accident like that at the Aracoma mine would occur, injuring or killing Massey employees and jeopardizing the Company's financial condition and overall operations; (iii) Massey's mines were not "among the safest in the industry," it was not "continually a leader among bituminous coal producers when it comes to safety," nor was its "first priority . . . to ensure that [its miners] go safely home each night"; (iv) the warnings that Massey "may" incur financial penalties or other liabilities in connection with safety violations at its mines were misleading because the warned-of risks had already manifested, and thus were not uncertain or potential future events, as the risk warnings claimed; (v) the Upper Big Branch mine explosion resulted from Massey's operation of the mine in an unsafe condition in violation of statutory and regulatory requirements and was not the result of an "inherent risk" of coal mining, such that the Company's "inherent risk" warning and other risk disclosures were insufficient to warn investors of the actual risks of tragedies like that which occurred at the Upper Big Branch mine; (vi) the ongoing violations at Massey's operations were not the result of actions "by individuals or companies no longer affiliated with" the Company; and (vii) Massey did not "continue to make significant investments of time, personnel and capital to ensure that [its]

mines are as safe as they can be," nor did its reported financial results or projections for future earnings reflect the true actual costs of safety compliance that defendants knew were required to comply with applicable laws and regulations or make its mines "as safe as they can be."

### THE CONCEALED CONDITIONS ARE GRADUALLY REVEALED, CAUSING DAMAGES TO PLAINTIFF AND OTHER CLASS MEMBERS

52. The market for Massey's securities was open, well-developed and efficient at all relevant times. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities in reliance upon the integrity of the market prices of Massey securities and market information relating to the Company. As a result of their purchases of Massey securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

53. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market by engaging in a course of conduct that artificially inflated the price of Massey's publicly traded securities and operated as a fraud or deceit on Class Period purchasers of Massey securities by misrepresenting the Company's business practices and the safety of its operations, the amount and source of its revenues, its compliance with legal and regulatory requirements, the risks to its present and future operations, and Massey's past performance and prospects for future success.

54. The false and misleading statements and omissions described above, including the concealed safety violations and related risks to Massey's operations, caused the Company's publicly traded securities to trade at artificially inflated prices during the Class Period. The tragic, and avoidable, explosion at the Upper Big Branch mine on April 5, 2010 shockingly and suddenly revealed the concealed safety risks to investors, causing the price of Massey stock to decline $9.47 over the next two days, a two-day drop that reduced the value of Massey's

common stock by more than 17%, resulting in an immediate loss of $900 million in market capitalization.   The intense focus on Massey's operations by government regulators and the worldwide media in the days following the mine explosion further revealed the extent and seriousness of the safety and regulatory violations affecting the Company's operations, causing additional losses in market value that injured investors as the market learned that the Company's repeated boasts about its safety programs were false, and that the risks to its operations were much greater than the Company had previously revealed.

55.     On April 6, 2010, the first trading day following the accident, the price of Massey common stock fell by $6.24, closing at $48.45 on extraordinary volume of 39.6 million shares, a one-day drop of 11.41% in value from its $54.69 closing price on the prior trading day.   On April 7, 2010, amid further revelations of the unsafe conditions in Massey's operations as rescue efforts for trapped and injured miners continued, Massey's stock price declined by another $3.23 on continued extraordinary trading volume of 37.1 million shares, a further one-day drop of 6.67% in market value.

56.     Almost immediately after the accident, numerous media reports were issued bringing Massey's repeated safety violations to light.   For example, an April 6, 2010 *Wall Street Journal* report on mine rescue operations noted that the Upper Big Branch mine "has a history of citations involving the ventilation of methane," the suspected cause of the April 5, 2010 accident. The article quoted MHSA administrator Stricklin as saying that "it appeared the mine was not operating safely.   'An explosion wouldn't have happened if it was operating safely.'"

57.     Numerous media outlets then reported that the Upper Big Branch mine had more than 3,000 regulatory violations over the past 15 years, including 600 in the year preceding the accident, leading to more than $900,000 in fines.   At least 50 of those citations charged the Company with an "unwarrantable failure" to comply with safety standards.   According to

MHSA, the rate of serious violations at the mine was 19 times the national rate.   "'I've never

see that many for one mine in a year,'" the editor of *Mine Safety & Health News* was quoted as

saying in one media report.   "'If you look at other mines that are the same size or bigger, they

do not have the sheer number of 'unwarrantable' citations that this mine has.'"   The same article

quoted Stricklin as saying that he was concerned about the more serious violations.   "***It means***

***the operator was aware of some of these conditions***," he said.

58.     On April 15, 2010, President Obama delivered a stinging rebuke to the Company,

stating in a Rose Garden speech that the accident was triggered by "a failure first and foremost of

management."   The same day, reports of additional safety violations surfaced when federal

inspectors turned up more than 60 serious safety violations at Massey's operations after visiting

30 underground mines operated by the Company in West Virginia, Virginia and Kentucky in the

days following the explosion at Upper Big Branch mine.   These revelations caused additional

injury to investors as a result of further declines in the value of Massey securities, including a

$1.41 per share (3.1%) decline on April 15, 2010 and an additional $1.63 per share (3.7%)

decline on heightened volume of 12.3 million shares on April 16, 2010.

59.     On April 21, 2010, after the market closed, Massey issued a press release

discussing its results for the first quarter of 2010, the period ending March 31, 2010, which was

published by *PR Newswire* and disseminated to the market by various media and analyst reports.

The release stated, in relevant part:

> Massey Energy Company today reported net income of $33.6 million or $0.39 per
> diluted share and EBITDA of $131.3 million for the first quarter of 2010.
> Produced coal revenue for the first quarter 2010 was $571.8 million. By
> comparison, Massey generated net income of $43.4 million or $0.51 per diluted
> share and EBITDA of $145.4 million on produced coal revenue of $681.0 million
> in the first quarter of 2009.

                                                    ***

Excluding the second quarter integration of the Cumberland operations, Massey expects full year 2010 produced coal shipments to be in the range of 35.0 to 37.0 million tons, with average produced coal realization now between $70.50 and $72.00 per ton. Because the Company is uncertain as to the impact of the force majeure levels that will be triggered by the UBB tragedy and the potential for related impacts on other sales due to quality switching and contract buyouts, etc., these estimates may need to be revised as more details become known.

Average cash cost per ton for the full year 2010 is expected to be in the range of $54.00 to $57.00, excluding charges related to the Upper Big Branch mine tragedy. Other income is expected to be between $70.0 and $120.0 million. Capital expenditures for 2010 are expected to be approximately $300 million.

Financial results for the second quarter 2010 will include a charge related to the tragic accident at the Upper Big Branch mine. While Massey anticipates further analysis will be required, the Company estimates the range of loss to be $80 million to $150 million for charges related to the benefits being provided to the families of the fallen miners, costs associated with the rescue and recovery efforts, insurance deductibles, possible legal and other contingencies. In addition, the full book value of equipment, mine and longwall panel development and mineral rights at the mine potentially impacted by the disaster is approximately $62 million. Massey will assess these assets for possible impairment once full access to the mine is restored but it does expect to recover much of the equipment.

60.     The following morning, April 22, 2010, *The Wall Street Journal* published an article entitled "Massey's CEO Defends Its Safety Practices," recounting the tidal wave of criticism facing the Company.   The article, which was available online the evening of April 21, 2010, stated in part:

Regulators and politicians have barraged Massey Energy Co. and its chief executive, Don Blankenship, with criticism in the wake of the nation's deadliest coal-mine accident in 40 years, but the outspoken Mr. Blankenship appears unlikely to back away from any conflict over the company's safety practices, which he said are the best in the business.

Days after the April 5 blast that killed 29 workers at Massey's Upper Big Branch mine in West Virginia, ***Sen. John D. Rockefeller IV, a West Virginia Democrat, called the nation's fourth-largest coal company by revenue and one of his state's biggest private employers, a "rogue" operator that likes to "drag safety violations through the courts year after year***."

Last week, President Barack Obama called the accident "a failure, first and foremost, of management."

Mr. Blankenship strongly disagrees, defending his longtime leadership of the company. "I'm extremely confident that I've done what I could to run the company properly in every regard," he said in an interview. "I've been here for 28 years, and we know we have the best of safety programs and the best of safety procedures."

*The fatal blast is expected to take a financial toll on the company*. On Wednesday, Massey warned it could face a second-quarter charge of between $80 million and $150 million for costs associated with damage to the mine and benefit payments to families of the dead workers. The disclosure came as the company reported that its first-quarter net income dropped 23% from a year earlier to $33.6 million, as coal sales declined. First-quarter revenue fell 16% to $571.8 million.

Also on Wednesday, the West Virginia Board of Coal Mine Safety and Health said it would issue proposed new regulations intended to make the state's mines safer. The board said it would propose measures aimed at improving maps, evacuations and drills related to mine fires, beefing up requirements for mine rescue teams and requiring each mine office to have a barometer to monitor air-pressure changes, which can contribute to potentially explosive concentrations of methane inside mines.

Joel Watts, health and safety administrator for the board, declined to say if the new rules were a direct result of the Upper Big Branch disaster or any preliminary findings about the blast by state investigators. "I cannot say one way or the other because the investigation is still ongoing," he said.

Federal mine regulators said separately Wednesday that they began an "inspection blitz" over the weekend focusing on 57 underground coal mines with a history of problems involving ventilation and methane accumulation, among other things. The Mine Safety and Health Administration said results of the inspections would be made public as they became available.

*The Upper Big Branch mine has had more safety violations, on average, than other mines in recent years*. Many of those violations involved ventilation, which is crucial to clear away methane and coal dust. MSHA officials have said the explosion was probably caused by high levels of methane amplified by coal dust.

MSHA officials have also focused on how often inspectors told workers to evacuate the mine. In 2009 and 2010, MSHA issued 61 withdrawal orders for what the agency said were repeated "significant and substantial" violations the company knew or should have known constituted a hazard. *That rate was 19 times the national average*.

Mr. Blankenship, the CEO, said withdrawal orders are "very complicated," and that the company would address the issue in detail as soon as next week. He said that prior to the April 5 blast, "I wasn't aware that we had so many withdrawal orders."

Davitt McAteer, a former federal mine regulator picked by West Virginia Gov. Joe Manchin to head an independent inquiry into the blast, said Massey's safety culture has been "problematic" under Mr. Blankenship. "He is a very hands-on manager," Mr. McAteer said. "If your [production] report is down, you're going to hear from him."

Mr. McAteer cited a memo Mr. Blankenship wrote in October 2005 to the company's mine superintendents, three months before two miners were killed at Massey's Aracoma mine. "*If any of you have been asked by your group presidents, your supervisors, engineers or anyone else to do anything other than run coal (i.e. build overcasts, do construction jobs, or whatever) you need to ignore them and run coal*," Mr. Blankenship wrote in the memo, which was made public during the investigation into the accident in 2006. "This memo is necessary only because we seem not to understand that the coal pays the bills."

61.     Amid this news of the financial impact of the Upper Big Branch mine disaster and mounting criticism of the Company's safety practices, Massey's common stock fell to as low as $41.30 per share on April 22, 2010, before closing at $42.93 per share, a one-day drop of nearly 2% that caused additional injury to plaintiff and other members of the Class.   The drop was all the more significant because it came despite an announcement that the Company's first quarter earnings had beat Wall Street estimates by $0.11 per share, and that it was raising its full year guidance for the remainder of the year, thereby further demonstrating the significance and materiality of the withheld information about the Company's safety practices.

## COUNT I
### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against Defendants Massey,
### Blankenship, Phillips and Tolbert

62.     Plaintiff incorporates ¶¶1-63 by reference.

63.     During the Class Period, the defendants named in this Count disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Massey securities during the Class Period.

65.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Massey securities and suffered damages when that inflation was eliminated by disclosure of information that revealed the facts and conditions hidden by defendants' fraudulent statements and omissions, or the economic impact of those facts and conditions.  Plaintiff and the Class would not have purchased Massey securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

66.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Massey securities during the Class Period.

**COUNT I**
**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

67.     Plaintiff incorporates ¶¶1-68 by reference.

68.     The Individual Defendants acted as controlling persons of Massey within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of

Massey and their ownership of Massey stock, the Individual Defendants had the power and authority to cause Massey to engage in the wrongful conduct complained of herein.  Massey controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Massey are each liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:          April 29, 2010.

/s/ John F. Dascoli (SBID #6303)
JOHN F. DASCOLI, PLLC
2442 Kanawha Boulevard, East
Charleston, WV   25311
Telephone: 304/720-8684
304/342-3651 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA   92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELER RUDMAN & DOWD LLP
DENNIS J. HERMAN
100 Pine Street, Suite 2600
San Francisco, CA   94111
Telephone: 415/288-4545
415/288-4534 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI   48201
Telephone: 313/578-1200
313/578-1201 (fax)

*Counsel for Plaintiff*