

99-010

-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
NOTICE: In lieu of a star print, errata are printed to indicate corrections to the original report.
-------------------------------------------------------------------------------

Calendar No. 128

**104TH CONGRESS**

*Report*

***SENATE***

1st Session

104-98

**--ERRATA**

--PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

June 19, 1995- Ordered to be printed

*Mr. D'AMATO, from the Committee on Banking, Housing, and Urban Affairs, submitted the following*

REPORT

*together with*

*ADDITIONAL VIEWS*

[To accompany S. 240]

# CORRECTION

On page III (Table of Contents), add under Additional Views the following lines:



| | |
|---|---|
| Additional views of Senators Sarbanes, Bryan, and Boxer | 36 |
| Additional views of Senator Dodd | 51 |



EXHIBIT
A

U.S. Congress,

Congressional Budget Office,

Washington, DC, June 19, 1995.

Hon. ALFONSE M. D'AMATO,
Chairman, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Washington, DC.

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 240, the Private Securities Litigation Reform Act of 1995, as ordered reported by the Senate Committee on Banking, Housing, and Urban Affairs on May 25, 1995. CBO estimates that enacting S. 240 would cost the federal government between $125 million and $250 million over the next five years, assuming appropriation of the necessary amounts. Because enacting S. 240 would affect receipts, pay-as-you-go procedures would apply to the bill. Enacting S. 240 would not affect the budgets of state or local governments.

*Bill purpose*

Title I of S. 240 would require a court, when hearing class action litigation brought under the Securities Exchange Act of 1934, to appoint a lead plaintiff for the class under certain circumstances. The bill would require the full disclosure of the terms of settlement for any such class action lawsuit and would prohibit the payment of attorneys' fees from certain funds. In addition, the bill would establish various procedures and restrictions to discourage litigation, restrict the liability of those persons who make forward-looking statements regarding securities or markets, and require the Securities and Exchange Commission (SEC) to promulgate rules establishing such limited liability. The bill would amend the Racketeer Influenced and Corrupt Organizations statute to exclude from its purview an action involving fraud in the sale of securities. Title II of S. 240 would limit the amount of damages that could be awarded in certain securities litigation cases, and would limit the application of joint and several liability in those cases. Title III would include certain procedures to be followed during a required audit of a securities issuer, and would provide civil penalties for violations of those procedures.

*Federal budgetary impact*

CBO estimates that promulgating the rules required by the bill would result in increased costs to the federal government of approximately $300,000 in 1996, primarily for personnel costs, assuming appropriation of the necessary amounts.

By discouraging private litigation under the Securities Exchange Act of 1934, enacting S. 240 would result in an increase in the number of enforcement actions brought by the SEC. In 1994, there were about 50 enforcement actions due to financial fraud, resulting in administrative costs to the federal government of approximately $24 million. Although the impact on the SEC's workload from enacting S. 240 is highly uncertain, CBO expects that financial fraud enforcement actions would number at least 100, and possibly up to 150. Therefore, CBO estimates that enactment of S. 240 would increase costs to the SEC for enforcement actions by $25 million to $50 million annually, or $125 million to $250 million over the next five years, assuming appropriation of the necessary amounts.

*Pay-as-you-go impact*

S. 240 would require civil penalties for violations of certain of its provisions. These civil penalties would count as governmental receipts, and thus would be subject to pay-as-

you-go provisions. CBO estimates, however, that no significant additional amount of receipts would be collected.

*Previous CBO estimate*

On February 23, 1995, CBO provided an estimate for Title II of H.R. 10, the Securities Litigation Reform Act, as ordered reported by the House Committee on the Judiciary, to that committee. S. 240 differs from that bill primarily in that S. 240 would require civil penalties for violations of the provisions of Title III, and it would require additional rulemakings by the SEC. In other respects the bills are substantially similar, and CBO's estimate of the SEC's enforcement costs under S. 240 is unchanged from our estimate for Title II of H.R. 10.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are John Webb and Melissa Sampson.

Sincerely,

*JUNE E. O'NEILL, DIRECTOR.*

## ADDITIONAL VIEWS OF SENATORS GRAMM, MACK, FAIRCLOTH, BENNETT, GRAMS, AND FRIST

The Hippocratic Oath begins with the admonition to do no harm. The bill reported by the Committee follows that mandate. Unlike much of the legislation of past Congresses, this bill is not 'two-steps-forward, one-step-back' legislation. The improvements that the bill makes over current law are not eroded by new legislative injuries.

While the bill provides significant incremental relief from abusive securities lawsuits, the costs of these lawsuits are so high that stronger reform is needed. Information presented to the Subcommittee on Securities indicates that approximately 300 securities litigation cases are filed each year. Few of these cases are brought to trial. Instead, the high costs of litigation normally induce settlements of the cases, at an average amounting to $8.6 million per case, for a combined total of nearly $2.5 billion per year. Even with settlements, the legal costs for defendants average an additional $700,000 per case.

Perhaps the most destructive aspect of securities strike suits is the disruption that they cause to company operations. For example, defendant companies devote an average of 1,000 management and employee hours to each case. This amounts to 37,500 workdays each year consumed by securities lawsuits.

Moreover, there seems to be a pattern of targeting high technology companies. A survey conducted by the American Electronics Association of their forty largest firms found that twenty-four had been sued for securities fraud, including nine out of the top ten. Either the securities litigation system is broken, or there is an enormous disrespect for the law in Silicon Valley. We believe that the problem lies with the system of litigation.

We therefore recommend that the bill's provisions be strengthened. Among such changes, particular attention should be given to (1) strengthening the proportionate liability provisions of section 202, (2) strengthening the sanctions for abusive litigation provision of section 103, (3) strengthening the safe harbor for forward-looking statements in section 105, and (4) delineate more clearly the standard of liability provisions of section 104.

## PROPORTIONATE LIABILITY (SECTION 202)

No reform was more strongly supported by witnesses and members during subcommittee hearings than the concept of introducing proportionate liability for securities lawsuits. Currently, defendants have joint and several liability, which means that any person found to have any liability at all, regardless of how insignificant, can be liable for all of the damages awarded in these securities cases. The effect of this has been to add to the lawsuit `deep-pocket' plaintiffs who have at most a marginal involvement in the alleged wrongdoing, such as accounting firms, securities houses, banks, investment partners and others. Faced with (1) the risk of being jointly and severally liable for the entire settlement amount and (2) the high cost of litigation, such peripherally involved defendants frequently decide to settle the case rather than proceed to trial.

The concept of proportionate liability is that no one should be required to compensate for injuries for which they are not responsible. Unfortunately, the bill's proportionate liability provisions contain exceptions that leave deep-pocket parties still within reach of the strike-suit attorneys. Under the bill's provisions, if a clearly guilty defendant's share of a court's judgment is not collectible, every other peripherally involved defendant is jointly and severally liable for the uncollectible share if the financial net worth of the plaintiff is $200,000 or less, that is, most individual investors.

This exception to proportionate liability is open-ended, with no limitations on liability for defendants with minor fault, and no practical means of verifying the net worth or losses of those claiming to be such small investors. This is an exception with the potential for swallowing the rule and should be corrected.

## ATTORNEY SANCTIONS FOR ABUSIVE LAWSUITS (SECTION 103)

The bill contains a very modest provision to penalize attorneys who promote abusive securities suits. Currently, strike suit attorneys face little cost or risk in filing lawsuits on flimsy pretexts. Rule 11 of the Federal Rules of Civil Procedure purportedly applies penalties against attorneys for abusive litigation. But investigation by the Congressional Research Service could find only three cases in history in which Rule 11 attorneys sanctions were ever actually applied in securities Rule 10b-5 cases. We advocated and support the directive in the bill that requires judges to review Rule 11 issues in every case and provide a written statement regarding compliance with Rule 11, with mandatory sanctions in the case of a violation. However, we fear that this provision by itself will not be enough to end the 'winner pays' reality of securities suits and alter the imbalance in the economics of securities litigation. This is particularly true, since the provision still relies upon the action of judges who have so far demonstrated little interest in imposing such sanctions. Innocent defendants will continue to be left in most cases to carry the expensive burden of proving their innocence.

## SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS (SECTION 105)

The safe-harbor provision of the bill must be strengthened. Currently, there is impaired communication between investors and management regarding the forward-looking views and plans of corporations. Under the fear of costly abusive lawsuits filed when predictions of the future do not materialize, corporate representatives prefer to guard their silence or hide behind meaningless generic statements about the future. A statement from a recent securities filing by a financial services corporation is typical: 'The amount of future provisions will continue to be a function of regular quarterly review of the reserve for credit losses, based upon management's assessment of risk at that time, and, as such, there can be no assurance as to the level of future provisions.' Investors and analysts are left wondering.

While the provisions of the bill may allow for some degree of freer communication between corporate management and investors, we believe that the provisions have been so narrowly constrained and burdened with vague terms and standards that they are unlikely to provide in many cases adequate protection against abusive lawsuits. We are concerned that innocent corporations may still be subject to expensive and time-consuming litigation and detailed fact-finding over the terms and restrictions of the safe harbor provisions and the extent of their application. In order to be effective, a safe harbor must have a bright line that is unmistakable to all parties. Otherwise, the utility of a safe harbor for obtaining early dismissal of abusive securities suits, or discouraging them entirely, may be elusive.

## STANDARD OF LIABILITY (SECTION 104)

Curiously, under current law, it is often not clear just what constitutes a violation of Rule 10b-5. The current ambiguity is one of the contributing factors allowing for the filing of abusive, meritless, strike suits. Without a clear line as to what is and what is not a violation, the issue is left to the trial process. That is to say, meritless claims are given too long of a ride, all the while imposing costs on innocent defendants. Moreover, different courts in different judicial circuits have applied different interpretations of the standard of liability. A clear standard of liability would give greater protection to the innocent while allowing courts to focus on genuine cases of securities fraud.

The legislation reported by the Committee would establish a single standard of liability. Unfortunately, it is still a vague standard that will require further judicial interpretation. Congress should provide clearer guidance to the courts than that provided in this bill. Otherwise, we will continue to provide too much legal confusion and too much room for the pursuit of meritless lawsuits. All of that imposes an unnecessary cost on the innocent and on our economy.

## ROOM FOR IMPROVEMENT

While we support reporting this bill, we hope that in the remaining steps in the legislative process its provisions will be improved. At the same time, the legislation should remain free from provisions that take us backwards in the effort to eliminate abusive securities lawsuits.

Phil Gramm.
Connie Mack.
Lauch Faircloth.
Robert F. Bennett.
Rod Grams.
Bill Frist.

**ADDITIONAL VIEWS OF SENATORS SARBANES, BRYAN, AND BOXER**

## INTRODUCTION

We support the goal of deterring frivolous lawsuits and sanctioning appropriate parties when such lawsuits are filed. A number of the provisions in this bill are designed to achieve that goal. We support these provisions, and those that will improve class action procedures.

This legislation, however, will affect far more than frivolous suits:

The safe harbor provision will, for the first time, provide immunity under the Federal securities laws for fraudulent statements.

The proportionate liability provision will, for the first time, transfer responsibility from participants in a fraud to innocent victims of that fraud. These will make it more difficult for investors to bring fraud actions, and will reduce recoveries in such actions.

The bill also fails to include provisions necessary to ensure that victims of securities fraud have adequate remedies:

The bill does not extend the statute of limitations for securities fraud actions imposed by the Supreme Court in 1991, which the SEC and the State securities regulators believe is too short.

Ignoring the recommendation of the securities regulators, the bill does not restore the ability of investors to sue individuals who aid and abet violations of the securities laws.

This legislation threatens the capital formation process by undermining the confidence on which our markets depend. We are not alone in this conclusion. In a June 8, 1995 letter, the Government Finance Officers Association ('GFOA') strongly agreed with this assessment. Consisting of more than 13,000 state and local government financial officials, the GFOA's members both issue securities and invest billions of dollars of public pension and taxpayer funds. In its letter, the GFOA opposed S. 240 as reported:

We support efforts to deter frivolous securities lawsuits, but we believe that any legislation to accomplish this must also maintain an appropriate balance that ensures the rights of investors to seek recovery against those who engage in fraud in the securities markets. We believe that S. 240 does not achieve this balance, but rather erodes the ability of investors to seek recovery in cases of fraud.

Securities regulators, bar associations, consumer groups, and state and local government officials share this opinion, as discussed below. We reach the same conclusion, and accordingly voted against the legislation.

## STRENGTH OF U.S. CAPITAL MARKETS

By every measure, the United States capital markets are the largest and strongest in the world. In size, the U.S. markets remain preeminent: for 1993, U.S. equity market capitalization stood at $5.2 trillion, over one-third of the world total.1

[Footnote] The U.S. markets continue to grow: the combined total of equity and debt filings for 1994, over $810 billion, was exceeded only by the record level set in 1993.2

[Footnote] So attractive are the U.S. capital markets that more than 600 foreign companies from 41 different countries have tapped them, a level matched only in London, and more continue to come.3

[Footnote]

[Footnote] 1 *U.S. Securities and Exchange Commission 1994 Annual Report*, at 28.

[Footnote] 2 *Id.* at 53.

[Footnote] 3 *Id.*

The growth of trading on our exchanges is a sign of the strength of our markets. Average daily trading volume on the New York Stock Exchange increased from 44.9 million shares in 1980, to 156.8 million shares in 1990, to 291.4 million shares in 1994.4

[Footnote] The NASDAQ and American Stock Exchanges have experienced similar gains in trading volume.5

[Footnote]

[Footnote] 4 *Securities Industry TRENDS*, Vol. XXI, No. 3, April 5, 1995.

[Footnote] 5 *Id.*

Another sign of the strength of our markets is the rise of the mutual fund industry, one of the fastest-growing segments of the financial services industry. From 1980 to 1993, mutual fund assets increased by more than 10 times, to $1.9 trillion.6

[Footnote] Approximately 38 million Americans, representing 27 percent of American households, own mutual funds.

[Footnote] 6 See Testimony of Arthur Levitt before the Senate Securities Subcommittee, November 10, 1993.

*Role of the Federal Securities Laws*

Our securities markets have been operating under the Federal securities laws since those laws were enacted over 60 years ago. As discussed above, our markets today are the largest and most vibrant in the world. This is so not in spite of the Federal securities laws, but in part because of the Federal securities laws. The Federal securities laws generally provide for sensible regulation, and self-regulation, of exchanges, brokers, dealers and issuers.

Even more important to ensuring the success of our markets is investor confidence. That confidence is maintained because investors know they have effective remedies against persons who would defraud them. Both Republican and Democratic Chairmen of the Securities and Exchange Commission have stressed the integral role of the private right of action in maintaining investor confidence. In 1991, then-Chairman Richard Breeden testified before the Banking Committee:

Private actions under Sections 10(b) and 14(a) of the Exchange Act have long been recognized as a `necessary supplement' to actions brought by the Commission and as an `essential tool' in the enforcement of the federal securities laws. Because the Commission does not have adequate resources to detect and prosecute all violations of the federal securities laws, private actions perform a critical role in preserving the integrity of our securities markets.

Current Chairman Arthur Levitt reiterated that point in testimony before the House Subcommittee on Telecommunications and Finance on February 10, 1995:

Besides serving as the primary vehicle for compensating defrauded investors, private actions also provide a `necessary supplement' to the Commission's own enforcement activities by serving to deter securities law violations. Private actions are crucial to the integrity of our disclosure system because they provide a direct incentive for issuers and other market participants to meet their obligations under the securities laws.

The importance of the private right of action is likely to increase, given the budgetary constraints on SEC resources. Testifying in 1993, the Director of the SEC's Division of Enforcement noted,

Given the continued growth in the size and complexity of our securities markets, and the absolute certainty that persons seeking to perpetrate financial fraud will always be among us, private actions will continue to be essential to the maintenance of investor protection.

*State of the Securities Litigation System*

The Securities Subcommittee has held hearings over the past two years reviewing the health of the Federal securities litigation system. The Subcommittee received testimony from plaintiffs' lawyers, from corporate defendants, from accountants, academics, securities regulators and investors. There was sharp disagreement among the witnesses over how well the securities litigation system is functioning, and over what policy responses are appropriate.

Some argue that American business, particularly younger companies in the high-tech area, face a rising tide of frivolous securities litigation. A number of corporate executives told the Securities Subcommittee of their experiences. The American Electronics Association decried what it described as the `current practice of filing off-the-shelf legal complaints when a company announces a downturn in performance [that] amounts to an uncontrolled `tax on innovation.'

Clearly some frivolous securities cases are filed, as indeed some frivolous cases of every sort are filed. However, frivolous securities litigation does not appear to be at the crisis levels which some assert. Presenting statistics obtained from the Administrative Office of the U.S. Courts, the Director of the SEC's Division of Enforcement testified in June 1993 that:

the approximate aggregate number of securities cases (including Commission cases) filed in Federal district courts does not appear to have increased over the past two decades. Similarly, while the approximate number of securities class actions filed during the past three years is significantly higher than during the 1980's, the numbers do not reveal the type of increase that ordinarily would be characterized as an `explosion.'

Professor Joel Seligman of the University of Michigan Law School, one of the leading experts on the Federal securities laws, testified at the same hearing, `there is little objective data at this time that suggests there is a need for significant reform of the federal securities laws, either to benefit plaintiffs or defendants.'

The Committee Report states that it is easy to craft complaints alleging violations of the Federal securities laws. However, the Committee received evidence that it is difficult to bring even a meritorious securities action under the current system. Rule 9 of Federal Rules of Civil Procedure requires fraud to be pled with specificity. Joan Gallo, City Attorney for the City of San Jose, testified on March 22, 1995 about the successful securities fraud suit that San Jose brought against a number of brokers in the 1980's. She said, `[u]nder current law, despite the fact that the City had very experienced legal counsel, it was not until February 1986 that our third amended complaint was finally found sufficient by the Federal Court.'

Some argue that securities fraud class actions are inhibiting the capital formation process. Marc Lackritz, President of the Securities Industry Association, testified on March 2, 1995 that `new or innovative ventures are foregone because of the litigation risks involved in capital formation.' James F. Morgan testified on behalf of the National Venture Capital Association that the big accounting firms are `winnowing out' growth companies because of their riskiness.

In fact, initial public offerings have been setting records in recent years: the record $39 billion in initial public offerings in 1992 was in turn exceeded by a record $57 billion in IPO's in 1993.7

[Footnote] The $34 billion in IPO's in 1994 was exceeded only by the records set in 1992 and 1993.8

[Footnote] Less than one month ago, on May 22, 1995, the New York Times reported:

[Footnote] 7`Securities Industry TRENDS,' Vol. XXI, No. 3, April 5, 1995 (Source: Securities Data Company).

[Footnote] 8Id.

One of the great booms in initial public offerings is now under way, providing hundreds of millions in new capital for high-tech companies, windfalls for those with good enough connections to get in on the offerings and millions in profit for the Wall Street firms underwriting the deals.

The Securities Industry Association's own publications describe the boom in initial public offerings:

`After years of weakness in the late 1980s, investment in new securities and IPOs accelerated dramatically from 1990-1993. During that time, the securities industry raised a record $130 billion for small business through IPOs. Again, this was more than was raised in America's first two centuries!'9

[Footnote]

[Footnote] 9*The Securities Industry Briefing Book, A Partnership with America* (1994), at 11.

# PROVISIONS OF S.240

To be sure, frivolous litigation should be deterred and sanctioned. Some of the provisions in S.240 as reported appear to be directed toward this goal. The requirement that

courts include specific findings in securities class actions regarding compliance by all parties and attorneys with Rule 11(b) of the Federal Rules of Civil Procedure should act as a powerful deterrent to frivolous cases. Should a court find a violation of Rule 11, the court is required to impose sanctions.

The bill also prohibits payments to lead plaintiffs in class actions of additional compensation, other than `reasonable costs and expenses.' This will help ensure that class actions are brought by real parties in interest, rather than `professional plaintiffs.' To the same end, the bill requires that the plaintiff file a sworn statement that he or she authorized the filing of the complaint and did not purchase the securities at the direction of counsel or to participate in a lawsuit. The bill also prohibits attorneys from paying brokers for referring clients.

The bill also seeks to improve the procedures governing class action lawsuits. The new procedures contained in the bill for selecting a lead plaintiff in class actions are designed to encourage participation by institutional investors. We are pleased that this provision contains safeguards intended to ensure that a lead plaintiff must continue to represent the class fairly and adequately, as required under the Federal Rules of Civil Procedure.

The bill also seeks to improve the quality of information provided to investors when a securities fraud action is settled. The bill requires that a notice of a proposed settlement provided to investors must include clear information to allow investors to make an informed decision on the settlement. The statement must include the reason for the proposed settlement, the average damages recoverable per share if the settling parties can agree, and the attorneys' fees and costs.

*Provisions of S.240 will hurt investors*

Other provisions in S.240, however, are not tailored to deterring or sanctioning frivolous litigation. Instead, they will make it more difficult to bring all securities fraud suits, including meritorious cases, and reduce recoveries across the board.

*Safe harbor provision will undermine market confidence by protecting fraudulent statements*

Contrary to the advice of the SEC, the North American Securities Administrators Association, the Government Finance Officers Association and others, S.240 as reported creates a statutory exemption from liability for certain `forward looking statements.' Not only will this provision immunize reckless statements, but Chairman Levitt has warned that as drafted it will immunize fraudulent statements as well. By undermining confidence in our markets, such a return to the pre-Federal securities laws days of `buyer beware' would not benefit investors or issuers.

`Forward looking statements' are broadly defined in the bill, to include projections of financial items such as revenues, income and dividends as well as statements of future economic performance required in documents filed with the SEC. As with any attempt to foresee the future, such statements always have an element of risk to them, and prudent investors must be careful in relying on them. In fact, until 1979 the SEC prohibited disclosure of forward looking information. The SEC believed that forward looking information was inherently unreliable, and that investors would place too much emphasis on such information in making investment decisions.

After reviewing the matter extensively in the 1970's, the SEC adopted a `safe harbor' regulation for forward looking statements.10

[Footnote] The regulation (known as `Rule 175') generally offers protection for specified forward looking statements when made in documents filed with the SEC. To sustain a fraud suit, the investor must show that the forward looking information lacked a reasonable basis and was not made in good faith.

[Footnote] 10See Securities Act Release No. 6084 (June 25, 1979); 17 CFR 230.175 (1994), 17 CFR 240.3b-6 (1994).

There is a wide body of opinion that the current regulatory safe harbor does not provide sufficient protection for good faith corporate projections. In a May 19, 1995 letter to the members of the Senate Banking Committee, Chairman Levitt acknowledged `a need for a stronger safe harbor than currently exists.' Indeed, the SEC has been conducting a comprehensive review of its safe harbor regulation.11

[Footnote] Testifying before the Securities Subcommittee in April, Chairman Levitt said:

[Footnote] 11See Securities Act Release No. 33-7101 (October 13, 1994).

The Commission recently published a `concept' release soliciting comments on current practices relating to disclosure of forward-looking information, with a view to developing a new safe harbor for projections that provides issuers with meaningful protection but continues to protect investors. The Commission has received approximately 150 comment letters in response to the release, and public hearings on the issue were conducted in Washington, DC and San Francisco during February.

As originally introduced by Senators Domenici and Dodd, S.240 would have allowed the SEC to continue this regulatory effort. The bill as introduced required that the SEC consider adopting rules or making legislative recommendations identifying criteria for exempting `forward-looking statements concerning * * * future economic performance' from antifraud liability under the Federal securities laws. S.240 provided that if the SEC adopted such a rule, a defendant could request a stay of discovery while the court considered a motion for summary judgment on the grounds that the forward looking statement was within the coverage of the rule.

Chairman Levitt endorsed this approach in his April 1995 testimony before the Securities Subcommittee:

From the Commission's perspective, an appropriate legislative approach is contained in the Domenici/Dodd bill. This provision would allow the Commission to complete its rulemaking proceeding and take appropriate action after its evaluation of the extensive comments and testimony already received. Based on the Commission's experience with this issue to date, we believe that there is considerable value in proceeding with rulemaking, which can more efficiently be administered, interpreted and, if needed, modified, than can legislation.

In a May 23, 1995 letter, the North American Securities Administrators Association, the Government Finance Officers Association, the National League of Cities and nine other groups expressed the same view (`we believe the more appropriate response is SEC rulemaking in this area').

However, the Committee Print substitute to S.240, unlike the bill as introduced, abandoned this approach in favor of enacting a statutory safe harbor. Like the bill passed by the House, S.240 as reported will for the first time shield fraudulent statements from liability under the Federal securities laws. This provision constitutes an ill-advised break with 60 years experience under the Federal securities laws.

Under the original Committee Print, forward looking statements were immunized from antifraud liability under the Federal securities laws unless they were `knowingly made with the expectation, purpose, and actual intent of misleading investors,' and unless an investor could prove that he or she `had actual knowledge of and actually relied on' the statement.12

[Footnote]

[Footnote] 12In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court rejected this requirement of `actual knowledge of and actual reliance on' fraudulent statements in most circumstances. Instead, the Supreme Court recognized a doctrine called `fraud on the market' that had previously been adopted by a majority of Federal circuit courts. The Court held that:

---

[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in

the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a[n antifraud] action.

485 U.S. at 247.

In a May 19, 1995 letter to the members of the Senate Banking Committee, SEC Chairman Levitt expressed his `personal views about a legislative approach to a safe harbor.' He suggested that:

[a] carefully crafted safe harbor protection from meritless private lawsuits should encourage public companies to make additional forward-looking disclosure that would benefit investors. At the same time, it should not compromise the integrity of such information which is vital to both investor protection and the efficiency of the capital markets--the two goals of the federal securities laws.

He stated, `[a] safe harbor must be thoughtful--so that it protects considered projections, but never fraudulent ones.' He indicated he would support a safe harbor containing `a scienter standard other than recklessness.'

As explained above, the safe harbor provision in the original Committee Print did not adhere to Chairman Levitt's suggestions: the safe harbor in the original Committee Print would have protected fraudulent projections if an investor could not prove `actual knowledge' of and `actual reliance' on the projection. The substitute Committee Print offered at the Committee's May 25, 1995 mark up deleted the requirement that an investor prove he or she `had actual knowledge of and actually relied on' a fraudulent statement.

As amended, however, the substitute Committee Print continued to exclude from the safe harbor protection only statements `knowingly made with the expectation, purpose, and actual intent of misleading investors.' The Committee Report states that `expectation,' `purpose,' and `actual intent' are separate elements, each of which must be proven by the investor. This language so troubled Chairman Levitt that he wrote to Committee members again, on May 25, 1995, the morning of the markup. He stressed that even the substitute Committee Print failed to adhere to his belief that a safe harbor should never protect fraudulent statements:

I continue to have serious concerns about the safe harbor fraud exclusion as it relates to the stringent standard of proof that must be satisfied before a private plaintiff can prevail. As Chairman of the Securities and Exchange Commission, I cannot embrace proposals which allow willful fraud to receive the benefit of safe harbor protection. The scienter standard in the amendment may be so high as to preclude all but the most obvious frauds.

He warned that the bill's standard of `knowingly made with the expectation, purpose and actual intent of misleading investors' is a more stringent standard than currently used by the SEC and the courts. Given the broad definition of `forward looking statement' discussed above, it is crucial that the legislation not shield such statements from antifraud liability.

The Committee Report states that the safe harbor provision in the bill is based on current Rule 175, and a legal doctrine known as `bespeaks caution.' Neither the SEC rule nor the court decisions cited, however, provide protection to fraudulent statements as the bill does.

As discussed above, the SEC's Rule 175 does not immunize fraudulent statements. It requires forward looking statements to be reasonable and made in good faith.

The courts have imposed a similar requirement on forward looking statements. The Third Circuit case cited by the majority, *In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357 (3rd Cir. 1991), states:

We have squarely held that opinions, predictions and other forward-looking statements are not per se inactionable under the securities laws. Rather, such statements *** may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them.13

[Footnote]

[Footnote] 137 F.3d at 368.

*Rubenstein v. Collins,* 20 F.3d 160 (5th Cir. 1994), also cited in the Committee Report, reaches the same conclusion. The Fifth Circuit held that a forward looking statement

contains at least three factual assertions that may be actionable: (1) The speaker genuinely believes the statement is accurate; (2) there is a reasonable basis for that belief; and (3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement.14

[Footnote]

[Footnote] 1420 F.3d at 166.

The Third Circuit stated that to be immunized from liability the forward looking statements must be accompanied by cautionary statements `substantive and tailored to the specific future projections estimates or opinions ***15

[Footnote] The bill omits this requirement. Instead, it allows forward looking statements to be accompanied by general words of caution that will likely be boilerplate language, of little use to investors.

[Footnote] 157 F.3d at 371-72.

The Committee Report states that the safe harbor provision is intended to encourage disclosure of information by issuers. Encouraging companies to make fraudulent projections would hurt investors trying to make intelligent investment decisions and penalize companies trying to communicate honestly with their shareholders. We hope the majority of the Committee did not intend to achieve such a result. A safe harbor for fraudulent statements runs counter to the entire philosophy of the Federal securities laws, that fraud must be deterred and punished when it occurs. As described above, this philosophy has helped build the most vibrant securities markets in the world. While the majority of the Committee did not accept an amendment to this provision at the markup, we hope that the flaw in this provision identified by Chairman Levitt will be corrected.

*Proportionate liability proviston transfers losses from fraud perpetrators to fraud victims*

Predating the Federal securities laws, courts have traditionally held parties who commit fraud to be `jointly and severally' liable. Under joint and several liability, each person who participates in a fraud is liable for the entire amount of the victim's damages. Mark Griffin, Securities Commissioner for the State of Utah, testified before the Securities Subcommittee on March 22, 1995 on behalf of the 50 State securities commissioners. He explained why the law currently holds all parties who participate in a securities fraud jointly and severally liable:

Under current law, each defendant who conspires to commit a violation of the securities law is jointly and severally liable for *all* the damages resulting from the violation. The underlying rationale of this concept is that a fraud will fail if one of the participants reveals its existence and, as a result, all wrongdoers are held equally culpable if the fraud achieves its aims. (emphasis in original)

In *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185 (1976), the Supreme Court held that a defendant is liable under the Federal securities antifraud provision only if he or she

possesses a state of mind known in the law as `scienter.' Conduct intended to deceive or mislead investors satisfies the scienter requirement.

While the Supreme Court did not decide the question in *Hochfelder*, courts in every Federal circuit have held that reckless conduct also satisfies the scienter requirement. These courts have followed the guidance of hundreds of years of court decisions in fraud cases. As the *Restatement of Torts*, states, `The common law has long recognized recklessness as a form of scienter for purposes of proving fraud.'16

[Footnote]

[Footnote] 16See *Restatement (Second) of Torts*, Sec. 526(b), comment e; Prosser and Keeton, *Law of Torts*, Sec. 107.

The most commonly accepted definition of reckless conduct that constitutes securities fraud was enunciated by the Seventh Circuit in *Sundstrand Corp.* v. *Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977), cert. denied, 434 U.S. 875. This demanding standard defines reckless conduct as:

Highly unreasonable [conduct], involving not merely simple, or even gross negligence, but an extreme departure from the standards of ordinary care, and which present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Under current law, then, individuals who participate in a fraud through their reckless conduct are fully liable to the victims. Recklessness liability is generally applied to an issuer's professional advisers, such as accountants, attorneys and underwriters.

The bill limits joint and several liability under the Federal securities laws to persons who committed `knowing securities fraud.' All other violators will generally be liable only for their proportionate share of the fraud victim's losses. `Knowing securities fraud' is defined in the legislation specifically to exclude reckless conduct. S. 240 thus reduces the liability for reckless violators from joint and several liability to proportionate liability.

When investors' damages can be paid by a violator who is jointly and severally liable, this change will not affect the recovery available to investors. In cases where the architect of the fraud is bankrupt, has fled, or otherwise cannot pay the investors' damages, though, this change will harm investors. In those cases, innocent victims of fraud will be denied full recovery of their damages. Testifying before the Securities Subcommittee on April 6, 1995, Chairman Levitt said:

Proportionate liability would inevitably have the greatest effect on investors in the most serious cases (e.g., where an issuer becomes bankrupt after a fraud is exposed). It is for this reason that the Commission has recommended that Congress focus on measures directly targeted at meritless litigation before considering any changes to the liability rules.

Perhaps recognizing this unfairness to investors, S. 240 would require violators who are proportionately liable to pay more than their proportionate share in two circumstances. Neither provision, however, goes very far toward making fraud victims whole. First, if part of the judgment is uncollectible, defendants who are proportionately liable would be jointly and severally liable to investors whose net worths are each under $200,000 and who each lost more than 10 percent of that net worth in the fraud. In our view, this will protect only a tiny number of investors. In many parts of the country, few investors who own their own homes will have net worths under $200,000. Further, very few such investors will invest 10 percent of their net worth in a single stock or bond issue. Second, if part of the judgment is uncollectible, defendants who are proportionately liable would also be liable for an additional amount, not to exceed 50 percent of their proportionate share. For example, a defendant found to be 10 percent responsible for the commission of a fraud would be liable for up to 15 percent of the investors' losses. This provision therefore will likely increase the recovery of defrauded victims only marginally, leaving the balance of losses uncollectible.

In a February 23, 1995 letter to House Commerce Committee Chairman Thomas J. Bliley, Jr., Chairman Levitt wrote, `[t]he Commission has consistently opposed proportionate liability.' The Association of the Bar of the City of New York agreed `it is critical that all defendants remain jointly and severally liable to the plaintiff when a wrongdoer is unable to pay his or her share of any judgment.' In their June 8, 1995 letter, the Government Finance Officers Association also identified the restriction of joint and several liability as a reason for their opposition to the bill.

Accountants are the class of defendants most likely to be affected by a change to proportionate liability. Dr. Abraham J. Briloff, CPA, the Emanuel Saxe Distinguished Professor Emeritus of Baruch College, City University of New York and a respected authority on accounting, testified before the Banking Committee. He stressed the crucial role accountants play in preventing fraudulent financial statements from reaching the investing public. He stated that the accountant

is presumed to stand as the `sentinel at the gates'; it is he who holds the passkey required for the history of the enterprise's management and accountability, its financial statements, to become acceptable for the purposes of the securities laws.

If * * * he has permitted the passkey to be used irresponsibly, then he should be held fully liable for any resultant harm to those who relied on his professional undertaking.

To the extent he may identify those who overtly created the underlying quagmire, well, then, the auditor should have the right of subrogation. But again, as in negotiable instruments law, if you cannot find the `maker', you proceed against the `last endorser'--in the circumstances before us that `last endorser' is presumed to be the certified public accountant who has undertaken the independent audit function.

The bill would undermine the independent auditor's role as the last line of defense against fraud.

The legislation reported provides that defendants who meet the *Sundstrand* definition of recklessness, that is, who know of a fraud but in an extreme departure from the standards of ordinary care do nothing about it, will no longer be responsible for the result of their conduct. Instead, innocent investors--individuals, pension funds, county governments--will have to make up the loss. This legislation would, for the first time in our legal history, transfer responsibility for bearing the results of a fraud from participants in the fraud to innocent victims of the fraud. Such a change would be neither fair to investors nor beneficial to our markets, and is opposed by a host of consumer groups, labor unions, and government officials.17

[Footnote]

[Footnote] 17See May 23, 1995 letter to Committee Members from American Council on Education, California Labor Federation--AFL-CIO, Congress of California Seniors--LA County, Consumer Federation of America, Consumers for Civil Justice, International Brotherhood of Teamsters, Government Finance Officers Association, Gray Panthers, National League of Cities, New York State Council of Senior Citizens, North American Securities Administrators Association, and U.S. Public Interest Research Group (`primary concerns with respect to the provisions of S. 240 * * * include * * * Limits on joint and several liability. * * *'); May 24, 1995 letter to Committee Members from Citizen Action, Consumer Federation of America, Consumers Union, Public Citizen, U.S. Public Interest Research Group, Violence Policy Center (`Abrogation of joint and several liability * * * would effectively immunize professional wrongdoers.')

## S. 240 DOES NOT CONTAIN PROVISIONS NEEDED TO PROTECT INVESTORS

We are concerned about the provisions of S.240 described above, which in our view will harm investors bringing meritorious suits. We also are disappointed that S.240 as reported does not contain provisions that would aid investors bringing meritorious suits.

*Failure to extend the statute of limitations*

Chairman Levitt's May 25, 1995 letter to the members of the Banking Committee stated, `[i]n addition to my concerns about the safe harbor, there is not complete resolution of two important issues for the Commission. First, there is no extension of the statute of limitations for private fraud actions from three to five years.'

For over 40 years, courts held that the statute of limitations for private rights of action under Section 10(b) of the Securities Exchange Act of 1934, the principal antifraud provision of the Federal securities laws, was the statute of limitations determined by applicable State law. While these statutes varied, they generally afforded securities fraud victims sufficient time to discover and bring suit. Indeed, 13 States recognize the concept of equitable tolling, under which the statute of limitations does not begin to run until the fraud is discovered, for private securities fraud cases.18

[Footnote]

[Footnote] 18See June 14, 1995 Letter from the North American Securities Administrators Association.

In *Lampf v. Gilbertson*, 501 U.S. 350 (1991), the Supreme Court significantly shortened the period of time in which investors may bring such securities fraud actions. By a five to four vote, the Court held that the applicable statute of limitations is one year after the plaintiff knew of the violation and in no event more than three years after the violation occurred. This is shorter than the statute of limitations for private securities actions under the law of 31 of the 50 States.19

[Footnote]

[Footnote] 19Id.

*Lampf's* shorter period does not allow individual investors adequate time to discover and pursue violations of securities laws. Testifying before the Banking Committee in 1991, SEC Chairman Richard Breeden stated `the timeframes set forth in the [Supreme] Court's decision is unrealistically short and will do undue damage to the ability of private litigants to sue.' Chairman Breeden pointed out that in many cases,

Events only come to light much after the original distribution of securities and the *Lampf* cases could well mean that by the time investors discover they have a case, they are already barred from the courthouse.

   The FDIC and the State securities regulators joined the SEC in favor of overturning the *Lampf* decision.

On this basis, the Banking Committee in 1991 without opposition adopted an amendment to the bill later enacted as the FDIC Improvement Act (`FDICIA'). The amendment lengthened the statute of limitations for all Section 10(b) rights of action to two years after the plaintiff knew of the securities law violation, but in no event more than five years after the violation occurred. In a letter to Senator Bryan, Chairman Breeden stated that `[a]doption of these measures would give private litigants a more realistic time frame in which to discover that they have been defrauded, while also accommodating legitimate interests in providing finality to business transactions and avoiding stale claims.'

When FDICIA reached the Senate floor in November 1991, some Senators indicated they would seek to attach additional provisions relating to securities litigation. They argued that the statute of limitations should not be lengthened without additional reform of the litigation system. No arguments were raised specifically against the extension of the statute of limitations. In order to expedite consideration of FDICIA, the extension of the statute of limitations was dropped. Senators Domenici and Dodd included the extended statute of limitations in their comprehensive securities litigation reform bill, introduced as S. 1976 in the 103rd Congress and as S. 240 in this Congress.

Now that the Congress is acting on comprehensive changes to the securities litigation system, it should include the longer statute of limitations in keeping with the 1991 agreement. Chairman Levitt testified before the Securities Subcommittee in April 1995, `[e]xtending the statute of limitations is warranted because many securities frauds are inherently complex, and the law should not reward the perpetrator of a fraud who successfully conceals its existence for more than three years.'

We are deeply disappointed that the Committee did not include the extension of the statute of limitations in S. 240 as reported, and consider it imperative that the full Senate restore some balance to the legislation by voting to adopt the extension.

*Failure to restore aiding and abetting liability*

Chairman Levitt's May 25, 1995 letter to Banking Committee Members stated that, in addition to his concerns about the safe harbor, the Committee Print substitute did not resolve two important issues for the Commission. The first of these, discussed above, was the statute of limitations; the second was aiding and abetting liability. Chairman Levitt expressed his disappointment that `the draft bill does not fully restore the aiding and abetting liability eliminated in the Supreme Court's *Central Bank of Denver* opinion.'

Prior to 1994, courts in every circuit in the country had recognized the ability of investors to sue aiders and abettors of securities frauds. The courts derived aiding and abetting liability from traditional principles of common law and criminal law. The notion attaches liability to those who provide assistance to the unlawful acts of others. To be held liable, most courts required that an investor show that a securities fraud was committed, that the aider and abettor gave substantial assistance to the fraud, and that the aider and abettor had some degree of scienter (intent to deceive or recklessness toward the fraud). 20

[Footnote]

*[Footnote 20:* See, e.g., *IIT v. Cornfeld*, 619 F.2d 909, 992 (2nd Cir. 1980).]

In *Central Bank of Denver v. First Interstate Bank of Denver*, 114 S. Ct. 1439 (1994), the Supreme Court eliminated the right of investors to sue aiders and abettors of securities fraud. Writing for four dissenters, Justice Stevens criticized the five member majority for `reach[ing] out to overturn a most considerable body of precedent.' While the issue was not directly before the Court, Justice Stevens warned that the decision would also eliminate the SEC's ability to pursue aiders and abettors of securities fraud.

As Senator Dodd stated at a May 12, 1994 Securities Subcommittee hearing, `aiding and abetting liability has been critically important in deterring individuals from assisting possible fraudulent acts by others.' Testifying at that hearing, Chairman Levitt stressed the importance of restoring aiding and abetting liability for private investors:

Persons who knowingly or recklessly assist the perpetration of a fraud may be insulated from liability to private parties if they act behind the scenes and do not themselves make statements, directly or indirectly, that are relied upon by investors. Because this is conduct that should be deterred, Congress should enact legislation to restore aiding and abetting liability in private actions.

   The North American Securities Administrators Association and the Association of the Bar of the City of New York also endorsed restoration of aiding and abetting liability in private actions.

The bill reported by the Committee restores, in part, the SEC's ability to sue parties who aid and abet violations of the securities laws. The provision in the bill is limited to violations of Section 10(b) of the Securities Exchange Act, and to individuals who act `knowingly.' It ignores the recommendation made by the SEC, the State securities regulators and the bar association that aiding and abetting liability be fully restored for the SEC and private litigants as well. While the provision in the bill is of some help, the deterrent effect of the securities laws would be strengthened if aiding and abetting liability were restored in private actions as well.

# CONCLUSION

Our capital markets depend on investor confidence. Individuals and institutions are motivated to place their funds in our markets, in part because they believe in the efficiency and fairness of those markets. Their confidence depends also on the existence of effective remedies against persons who commit securities fraud.

While we support the goal of deterring and sanctioning frivolous securities litigation, provisions in this bill will deter meritorious fraud actions as well. By protecting fraudulent forward looking statements, and by restricting the application of joint and several liability, this bill may undermine investor confidence. These changes are likely to fall hardest on the elderly, who often are targeted as fraud victims. 21

[Footnote] Further, it fails to include provisions that are needed to ensure that investors have adequate time and means to pursue securities fraud actions.

[Footnote 21: See 'If the Hair is Gray, Con Artists See Green,' The New York Times, May 21, 1995.]

The securities markets are crucial to our economic performance as a nation; we should evaluate efforts to tamper with them very carefully. Because this legislation may reduce investor confidence in the capital formation process it seeks to promote, we oppose it and hope it will be improved by the full Senate.
Paul Sarbanes.
Barbara Boxer.
Richard Bryan.

## ADDITIONAL VIEWS OF SENATOR DODD

I share the view of the Committee majority that this bill carefully addresses the flaws in the current securities litigation system, without limiting the rights of investors to bring actions to recover damages. Striking the balance between protecting the rights of victims of securities fraud and the rights of public companies to avoid costly and meritless lawsuits was difficult, but on balance, I believe the Committee has succeeded.

The measure adopted by the Committee is based on a bill that Senator Domenici and I introduced in the past two Congresses. The bill, as reported, contains several substantial improvements to S. 240 as introduced this year in the Senate. However, there are several provisions of the original bill that I wish had also been included, although I understand the need to produce a consensus document.

Specifically, I have pressed for an extension of the current statute of limitations for private actions under the Securities Exchange Act of 1934. The Committee rejected an amendment to do that, and I expect this issue will be raised again when this bill is considered by the entire Senate.

Another issue of concern to me involves liability in private actions under 10b-5 for aiders and abettors of primary securities law violators. As chairman of the Subcommittee on Securities, I held a hearing on this issue in May 1994, after the Supreme Court ruled that private parties could not bring suit against alleged aiders and abettors. I am pleased that the Committee bill grants the Securities and Exchange Commission explicit authority to bring actions against those who knowingly aid and abet primary violators. However, I remain concerned about liability in private actions and will continue work with other Committee members on this issue as we move to floor consideration.

A final provision, which would have created a self-disciplinary organization for auditors, is also not part of the bill.

I favor all three of these provisions because of my belief that as we properly make it more difficult to bring meritless lawsuits, we must do all that we can to ensure that legitimate victims can continue to sue and can recover damages quickly. It is appropriate to 'raise the bar,' but we must provide the careful balance that is needed to protect the rights of fraud victims.

*CHRIS DODD.*

**Stay Connected with the Library** All ways to connect »

**Find us on**

**Subscribe & Comment**

- RSS & E-Mail
- Blogs

**Download & Play**

- Podcasts
- Webcasts
- iTunes U

About | Press | Site Map | Contact | Accessibility | Legal | External Link Disclaimer | USA.govSpeech Enabled