UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

| | | |
|---|---|---|
| In re MASSEY ENERGY CO.<br>SECURITIES LITIGATION | ) | Civil Action No. 5:10-cv-00689 |
| | ) | |
| | ) | <u>CLASS ACTION</u> |
| | ) | |
| This Document Relates To: | ) | The Honorable Irene C. Berger |
| | ) | |
| ALL ACTIONS | ) | Jury Trial Demanded |
| | ) | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## <u>TABLE OF CONTENTS</u>

GLOSSARY ....................................................................................................................... v

I.      NATURE AND SUMMARY OF THE ACTION ........................................... 13

        A.      Fallout from the 2006 Fire at Massey's Alma No. 1 Mine ....................... 14

        B.      Massey Created a New Corporate Image to Lure Investors by
                Purporting to Implement Safety Improvement Initiatives.......................... 17

        C.      Notwithstanding its Purported Safety Improvement Initiatives,
                Massey Prioritized Production Over Safety During the Class Period,
                Culminating in the Disaster at Upper Big Branch...................................... 18

        D.      After the Explosion, Criminal and Civil Investigations Revealed
                Deceptive Tactics Used by Massey to Cover Up its Safety-Last
                Approach to Coal Mining During the Class Period ................................... 20

        E.      Massey Restates its Critical NFDL Safety Metric and Blankenship
                Resigns ...................................................................................................... 23

II.     JURISDICTION AND VENUE ..................................................................... 25

III.    PARTIES ....................................................................................................... 25

        A.      Plaintiffs .................................................................................................. 25

        B.      Massey....................................................................................................... 26

        C.      The Officer Defendants ............................................................................ 26

        D.      The Director Defendants ........................................................................... 28

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ....... 32

        A.      Massey and its Subsidiaries...................................................................... 32

        B.      Blankenship's Rise to Power and Reign at Massey .................................. 35

        C.      Before the Class Period, Massey Was Embroiled in Criminal and
                Civil Litigation Arising from Unlawful Safety Practices in 2006............. 37

        D.      Massey Embarks on "Safety Improvement Initiatives" to Enhance its
                Corporate Image Following the Alma Fire ............................................... 40

        E.      Blankenship's Fixation on Production was Spurred by Surging Global
                Demand for Metallurgical Coal During the Class Period ......................... 43

i

F.   MSHA's Regulation of Massey ...................................................................... 49

  1.   Section 104(b) of the Mine Act ...................................................... 52

  2.   Section 104(d) of the Mine Act ...................................................... 52

  3.   Section 107(a) of the Mine Act ...................................................... 52

  4.   MSHA's Definition of Injuries—NFDL Rates .............................. 53

G.   Massey's Safety Record During the Class Period Was Worse Than the Industry as a Whole and Establishes a Widespread Culture of Non-Compliance ........................................................................................ 53

  1.   Massey's Fatality Rate Was the Worst in the Nation During the Class Period ................................................................................... 55

  2.   Massey's S&S Citation Rate Was Worse Than the National Industry Average During the Class Period ..................................... 55

    (a)   Large Underground Mines ................................................... 55

    (b)   Large Surface Mines ........................................................... 57

  3.   Massey's Elevated Enforcement Action Rate Was Worse Than the National Industry Average During the Class Period ................... 58

    (a)   Large Underground Mines ................................................... 58

    (b)   Large Surface Mines ........................................................... 60

H.   Massey Used Improper Tactics to Manipulate NFDL Rates .................... 64

I.   Massey Used an Unlawful Early Notification System to Deceive MSHA Safety Inspectors and to Hide the Dangerous State of its Mines ........................................................................................................ 70

J.   Red Flags Raised but Recklessly Disregarded by Massey ....................... 74

K.   The Explosion ........................................................................................... 81

V.   MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ............................................................................................. 87

A.   February 2008 Statements ........................................................................ 87

B.   April 2008 Statements .............................................................................. 92

C.   May 2008 Statements ............................................................................... 95

D.    August 2008 Statements ........................................................... 96

E.    November 2008 Statements ..................................................... 101

F.    December 2008 Statements ...................................................... 102

G.    February 2009 Statements ....................................................... 103

H.    March 2009 Statements ........................................................... 104

I.    April 2009 Statements ............................................................. 106

J.    May 2009 Statements .............................................................. 107

K.    July 2009 Statements .............................................................. 110

L.    September 2009 Statements ..................................................... 111

M.    October 2009 Statements ......................................................... 113

N.    December 2009 Statements ...................................................... 115

O.    February 2010 Statements ....................................................... 116

P.    March 2010 Statements ........................................................... 118

Q.    Massey's Annual Reports to Shareholders .............................. 124

R.    Massey's 2009 Corporate Social Responsibility Report ........ 131

VI.    ADDITIONAL FACTS SUPPORTING THE INDIVIDUAL
DEFENDANTS' SCIENTER ............................................................. 134

A.    Massey Has Destroyed Evidence Relevant to the Government's
Criminal and Civil Investigations of the Explosion ................ 134

B.    Other Clearly Wrongful Conduct Raises a Strong Inference of
Scienter ..................................................................................... 135

C.    The Individual Defendants Closely Monitored Massey's Core Safety
Practices and Regulatory Compliance and Violations ............ 137

D.    Blankenship's and Adkins' Incentive Bonus Award Compensation
Was Driven in Part by False NFDL Rates .............................. 140

VII.    INVESTORS SUFFERED DAMAGES WHEN MASSEY'S STOCK
PRICE DROPPED AS INFORMATION CONCEALED BY
DEFENDANTS WAS REVEALED TO THE MARKET DURING THE
CLASS PERIOD ................................................................................ 141

VIII.   POST-CLASS PERIOD DISCLOSURES.................................................................... 155

IX.   CLASS ACTION ALLEGATIONS .............................................................................. 156

X.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE
FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER
THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE
ALTERNATIVE, UNDER THE FRAUD-ON-THE-MARKET
DOCTRINE ............................................................................................................... 159

XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................... 161

XII.   CAUSES OF ACTION ................................................................................................ 161

COUNT I  VIOLATIONS OF SECTION 10(b) OF THE SECURITIES
EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 (Asserted Against All
Defendants).......................................................................................................................161

COUNT II  VIOLATIONS OF SECTION 20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934 (Asserted Against the Officer Defendants)..................................163

XIII.   PRAYER FOR RELIEF .............................................................................................. 164

Jury Trial Demanded.......................................................................................................... 165

# GLOSSARY

Headgate 22 ...................................................................................................47
The three-entry headgate development section at Upper Big Branch north of the active Longwall Panel.

Tailgate 22 ....................................................................................................76
The three-entry tailgate development section at Upper Big Branch north of the active Longwall Panel.

Air Split (a/k/a Split Air) ...............................................................................47
The division of a current of air into two or more parts.

Bandytown Fan ...............................................................................................76
The main exhaust fan at Upper Big Branch, west of the active longwall area to which all return air was being exhausted.

Bituminous Coal ............................................................................................32
The most common type of coal, with moisture content less than 20% by weight and heating value of 10,500-14,000 British thermal unit (or "Btu") per pound.

Belt Buster ....................................................................................................45
A job title for a miner who tears down or assembles conveyor belts.

Black Lung......................................................................................................73
A deposition of coal dust within the lungs from inhalation of sooty air.

British thermal unit ("Btu") ...............................................................Glossary
A measure of the thermal energy required to raise the temperature of one pound of pure liquid water one degree Fahrenheit at the temperature at which water has its greatest density (39 degrees Fahrenheit).

Buggy..............................................................................................................47
A four-wheeled steel car used for hauling coal to and from mine chutes.

Chamberlin, Elizabeth.....................................................................................41
Massey's Vice President of Safety during the Class Period

CSRR ...............................................................................................................16
Corporate Social Responsibility Report

Coal dust ........................................................................................................19
Particles of coal that can pass through a No. 20 sieve.

Coal seam.............................................................................................Glossary
Coal deposits occur in layers.  Each layer is called a "seam."

Coke ........................................................................................................................32
    A hard, dry carbon substance produced by heating coal to a very high temperature in
    the absence of air that is used to manufacture iron and steel.

Conveyor belt ........................................................................................................38
    The apparatus, belt, chain, or shaker, which, in conveyor mining, moves coal from the
    rooms and entries of a mine to a discharge point or to the surface.

Crosscuts ...............................................................................................................84
    A small passageway driven at right angles to a main mine entry to connect it with a
    parallel entry or air course or a tunnel driven at an angle to the dip of the strata to
    connect different seams or workings.

Cutting bits ...........................................................................................................81
    Conical, carbide-tipped bits used on a longwall shearer drum, or a continuous mining
    machine drum, to cut coal from the coal face.

Director Defendants ...............................................................................................28
    Dan R. Moore, E. Gordon Gee, Richard M. Gabrys, James B. Crawford, Robert H.
    Foglesong, Stanley C. Suboleski, and Lady Barbara Thomas Judge

Drum (of a Shearer) ...............................................................................................47
    A cylindrical or polygonal rim type of wheel around which cable, chain, belt, or other
    linkage may be wrapped.

Elevated Enforcement Action ................................................................................51
    A MSHA citation or order under Sections 104(b), 104(d), and 107(a) of the Mine Act,
    that causes production to stop and a mine to be shut down.

Ellis Mains ............................................................................................................81
    The northern most set of main entries on the eastern side of Upper Big Branch.

Face .......................................................................................................................19
    The surface of an unbroken coal bed at the advancing end of the working place.

Fire boss ...............................................................................................................19
    A State-certified supervisory mine official who examines a mine for combustible
    gases and other dangers before a shift comes into it and who usually makes a second
    examination during the shift; in some States, it is used loosely to designate assistant
    or section foreman.

Float Coal Dust .....................................................................................................81
    The coal dust consisting of particles of coal that can pass through a No. 200 sieve.

Hazard Elimination Committee .............................................................................17
    A committee at Massey that reported to SEPPC and the Board created to reinforce
    employees' ability to recognize and remedy potential violations of mine safety laws,
    educate employees of recent changes to mining laws, and improve compliance.

Inertized ...................................................................................................................................84
    The combination of coal dust, rock dust, and other dust in a mine entry is legally
    "inertized" when the incombustible content of the combined dust is 80% or higher in
    return entries, or 65% or higher in intake entries.

Headgate ..................................................................................................................................47
    The set of entries on the side of a longwall panel that gives primary access for
    personnel and supplies, provides intake air used to ventilate a longwall face, and
    houses the conveyor belt, electric and hydraulic power equipment, and other
    equipment necessary for longwall mining operations.

Highwall Mining........................................................................................................................33
    Highwall mining is used in connection with surface mining.  A highwall mining
    system consists of a remotely controlled continuous miner, which extracts coal and
    conveys it through augers or belt conveyors to the portal.

Headgate Entry..........................................................................................................................81
    The entry of the headgate section nearest the longwall face as mining is conducted.

Intake Air ..................................................................................................................................76
    The primary fresh, uncontaminated air coursed through a mine and provided to a
    working coal face; or, air that has not yet ventilated the last working place on any
    split of any working section, or any worked-out area, whether pillared or non-pillared.

Intake Duct................................................................................................................................49
    When an auxiliary fan is used, a duct that carries intake air to a prescribed location,
    e.g., to a coal face, a machine-mounted scrubber, or a return entry.

Large Surface Mines..................................................................................................................57
    Surface mines with at least one hundred employees.

Large Underground Mines..........................................................................................................55
    Underground mines with at least one hundred employees.

Longwall mining........................................................................................................................33
    Longwall mining is a type of underground mining in which a shearer (sometimes
    called a cutting head) moves back and forth across a panel of coal (typically about
    1,000 feet in width) cutting slices approximately 3.5 feet deep.  The cut coal then falls
    onto a flexible conveyor for removal.  Longwall mining is performed under hydraulic
    roof supports (called shields) that are advanced as a seam is cut.

Longwall Panel ..........................................................................................................................76
    A panel or section set up through development mining that arranges a long wall of
    coal, or face, often in excess of 1000 feet, to be mined using a longwall shearer and
    other equipment running parallel to the face.

Longwall Shearer ................................................................................................81
The extraction machine on a longwall face, equipped with two ranging drums, one on the headgate side and one on the tailgate side, so that coal can be cut in either direction.

Mantrip..............................................................................................................47
A transportation device that carries mine personnel, by rail or rubber tire, to and from a work area in a mine.

Metallurgical Coal .............................................................................................17
The various grades of coal suitable for carbonization to make coke for steel manufacturing.  Also known as "met" coal, metallurgical coal possesses four important qualities: volatility, which affects coke yield; the level of impurities, which affects coke quality; composition, which affects coke strength; and basic characteristics, which affect coke oven safety.  Metallurgical coal has a particularly high Btu heat content, but low ash content.

Methane...............................................................................................................19
Carbureted hydrogen or marsh gas or combustible gases; formed by the decomposition of organic matter.  Methane, the most common gas found in coal mines, is usually tasteless, colorless, and odorless; but it can have a peculiar smell when there is impurity in a mine.

Mine Act ............................................................................................................49
Legislation requiring MSHA to inspect surface mines and underground mines; investigate mine accidents, complaints, and violations; develop safety and health standards; assess and collect monetary penalties for violation of these standards; expand educational programs related to mine safety; and approve mining, education, and training plans.

MINER ACT.......................................................................................................50
2006 amendment to the Mine Act to improve safety and health in mines by means of improved accident preparedness.

MSHA ................................................................................................................13
U.S. Mine Safety and Health Administration

Neutral Air ........................................................................................................76
Low airflow entries in a mine, most often the belt entry or common entries with the belt entry, where air is coursed outby, away from the working places.

NFDL .................................................................................................................23
Non-Fatal Days Lost incidents are occupational injuries that result in loss of one or more days from the employee's scheduled work, or days of limited or restricted activity while at work.

Non-S&S..................................................................................................................50
    MSHA category for "non significant and substantial" citations and orders issued to a
    mine operator.

Non-S&S Violation.................................................................................................50
    A violation "not reasonably likely to cause reasonably serious injury" that is corrected
    promptly.

Officer Defendants.................................................................................................26
    Don L. Blankenship, Baxter F. Phillips, Jr., Eric B. Tolbert, J. Christopher Adkins

OMHST.................................................................................................................82
    West Virginia's Office of Miners' Health Safety & Training

Outby...................................................................................................................87
    Toward a mine entrance or shaft; away from the working face of a mine.

Overcast ..............................................................................................................14
    A safety device.  An enclosed airway that permits an air current to pass over another
    one without interruption.

Pillar..................................................................................................................33
    An area of coal left to support the overlying strata in an underground mine,
    sometimes left permanently to support surface structures.

Resource Group ...................................................................................................32
    An organizational unit at Massey, generally located within a specific geographic
    locale, that contains one or more of the following operations related to the mining,
    processing, or shipping of coal: underground mine, surface mine, preparation plant, or
    load-out facility.

Return Air ...........................................................................................................76
    Air that has circulated the workings and is flowing towards the main mine fan;
    vitiated or foul air.

Ribs ...................................................................................................................84
    The side of a pillar or the wall of an entry.  The solid coal on the side of any
    underground passages.

Rock Dusting ......................................................................................................73
    The dusting of underground areas with powdered limestone to dilute the coal dust in
    the mine atmosphere and on the mine surfaces, thereby reducing explosion hazards.

Roof...................................................................................................................73
    The stratum of rock or other mineral above a coal seam; the overhead surface of a
    coal working place.

Sandstone ........................................................................................................................81
A medium-grained clastic sedimentary rock composed of fragments of sand size set in a fine-grained matrix (silt or clay) and more or less firmly united by a cementing material (commonly silica, iron oxide, or calcium carbonate); the consolidated equivalent of sand.  The sand particles usually consist of quartz, and the term sandstone, when used without qualification, indicates a rock containing about 85% to 90% quartz.

S&S ................................................................................................................................20
MSHA category for "significant and substantial" citations and orders issued to a mine operator.

S&S Violation ................................................................................................................50
A violation "reasonably likely to result in serious injury or illness under the unique circumstance contributed to by the violations."

SEPPC ...........................................................................................................................16
The Safety, Environmental and Public Policy Committee of Massey's Board of Directors.

Shearer ..........................................................................................................................47
In bituminous coal mining, one who operates a type of coal-cutting machine that shears (cuts) out a channel down the sides of the working face of coal (as distinguished from undercutting) prior to blasting the coal down.

Shearer Drum ................................................................................................................83
A large, rotating, heavy-duty cylinder equipped with cutting bits for the purpose of cutting coal on a longwall face, which extends from the shearer body using a ranging arm.

Shield ............................................................................................................................20
A safety device; specifically, in longwall mining, a series of steel canopies used along the face to protect the miners who work beneath them. Shields are sequentially moved forward as mining progresses.

Steam Coal ....................................................................................................................32
Also known as utility coal, steam coal used by power plants and industrial steam boilers to produce electricity or process steam.  It is generally lower in Btu heat content and higher in volatile matter than metallurgical coal.

Stopping ........................................................................................................................47
A safety device constructed of hollow-core or solid blocks, used to separate one entry (tunnel) or a set of entries from another entry or set of entries in a mine.  Stoppings are particularly important when isolating air containing harmful gases or dust from fresh air.

Stopping Line.............................................................................................................16
A safety measure.  A line of walls, called stoppings, constructed of hollow core or solid concrete blocks, or other approved material, to separate one airway or a set of airways from another airway or set of airways.  The line of walls are 'plastered' to control air leakage into adjacent isolated airways.

Surface Mining...........................................................................................................44
Surface mining is used to extract coal deposits found close to the surface. This method involves removal of overburden (earth and rock covering coal) with heavy earth moving equipment, including large shovels and draglines, and explosives, followed by extraction of coal from coal seams.  After extraction of coal, disturbed parcels of land are reclaimed by replacing overburden and reestablishing vegetation and plant life.

Sweep Air...................................................................................................................47
Air that is used to ventilate several faces on a single split of air.

Underground Mine......................................................................................................55
Also known as a "deep" mine, an underground mine is usually located several hundred feet below the earth's surface, in which coal is removed mechanically and transferred by shuttle car or conveyor to the surface.

Underground Room and Pillar Mining .......................................................................33
In the underground room and pillar method of mining, continuous miners cut three to nine entries into the coal bed and connect them by driving crosscuts, leaving a series of rectangular pillars, or columns of coal, to help support the mine roof and control the flow of air.  Generally, openings are driven 20 feet wide and the pillars are 40-100 feet wide.  As mining advances, a grid-like pattern of entries and pillars is formed. When mining advances to the end of a panel, retreat mining may begin.  In retreat mining, as much coal as is feasible is mined from the pillars that were created in advancing the panel, allowing the roof to fall upon retreat.  When retreat mining is completed to the mouth of the panel, the mined panel is abandoned.

UMWA .......................................................................................................................65
United Mine Workers of America

Ventilation..................................................................................................................19
The provision of a directed flow of fresh and return air along all underground roadways, traveling roads, workings, and service parts.

Ventilation Curtains ..................................................................................................72
A safety device.  Ventilation curtains are hung to direct currents of fresh air to miners and to sweep methane out of a mine.

Ventilation Plan ........................................................................................................82
A safety measure.  A plan or drawing, required by law, that shows the ventilation air currents in a mine and the means of controlling those currents.

Water Spray ...........................................................................................................................82
    A safety mechanism.  A water pipe system extends throughout a mine's working
    areas; and sprays are employed at all loading and other dusty points.

Wetting...................................................................................................................................72
    A safety process in which mine roadways are sprayed with water or other wetting
    agent in order to: (1) increase the difficulty of raising the dust deposit into air to take
    part in an explosion; and (2) reduce the flammability of dust raised in an explosion.

1.      Court-appointed Lead Plaintiff Commonwealth of Massachusetts Pension Reserves Investment Trust ("Massachusetts PRIT") and Plaintiff David Wagner (together, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned counsel, for their Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") asserting claims against Massey Energy Company ("Massey" or the "Company") and the other Defendants named herein, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I.      NATURE AND SUMMARY OF THE ACTION

2.      Plaintiffs bring this federal securities class action on behalf of themselves and all similarly situated persons and entities that, between February 1, 2008 and July 27, 2010, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock of Massey and were damaged thereby (the "Class").

3.      Massey is the fourth-largest coal producer in the United States and the largest coal producer in the Central Appalachian region—*i.e.*, regions of West Virginia, Kentucky, and Virginia.  For nearly twenty years, Massey has been virtually synonymous with Defendant Don

---

[1] Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things: (i) review and analysis of documents filed publicly by Massey with the Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases issued by or concerning Massey and the other Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning Massey's securities; (iv) review and analysis of news articles and media reports concerning Massey's operations; (v) review and analysis of testimony concerning Massey before the U.S. Senate Committee on Health, Education, Labor and Pensions (the "Senate HELP Committee"), the U.S. Senate Committee on Appropriations (the "Senate Appropriations Committee"), and the U.S. House of Representatives Committee on Education and Labor (the "House Labor Committee") after April 5, 2010; (vi) information and data published by the U.S. Mine Safety and Health Administration ("MSHA"); (vii) an investigation conducted by and through Plaintiffs' counsel, which included interviews of former Massey employees and others; and (viii) review and analysis of pleadings, including a criminal indictment, filed in other pending civil and criminal actions that name Massey, other Defendants named herein, or certain other Massey employees as defendants or nominal defendants.

L. Blankenship ("Blankenship").  Since 1992, and throughout the Class Period, Blankenship was

Massey's (or its predecessor's) self-described "hands on" Chairman of the Board, Chief

Executive Officer ("CEO"), President, and Executive Committee Chair, as well as Chairman,

CEO, and President of A.T. Massey Coal Company, Inc. ("A.T. Massey Coal"), the Company's

principal operating subsidiary.[2]  During Blankenship's tenure, Massey's Board of Directors (the

"Board") granted him tremendous leeway to run the Company as he saw fit.

### A.      Fallout from the 2006 Fire at Massey's Alma No. 1 Mine

4.      On January 19, 2006, before the Class Period, a fire broke out at Massey's Alma

No. 1 mine in West Virginia ("Alma").  Two miners died.  Testimony and documents uncovered

in investigations conducted by MSHA and the Federal Bureau of Investigation (the "FBI")

showed that the fire and fatalities were preventable and that Massey and Blankenship were to

blame.  Massey pleaded guilty to ten criminal charges and entered into a $4.2 million

settlement—the largest such settlement in the history of the coal industry.

5.      More specifically, the MSHA and FBI investigations of the Alma fire revealed an

October 19, 2005 internal memorandum by Blankenship instructing his miners to stop

implementing safety measures and construction in favor of extracting coal.  Blankenship wrote to

all of Massey's Deep Mine Superintendents: "If any of you have been asked by your group

presidents, your supervisors, engineers or anyone else to do anything other than run coal (*i.e.*

build overcasts,[3] do construction jobs, or whatever) ***you need to ignore them and run coal.***  This

---

[2]  On November 13, 2008, Defendant Baxter F. Phillips ("Phillips") became President of Massey.
Blankenship retained his other titles at Massey throughout the Class Period until his resignation effective
December 31, 2010.  *See also infra* at III.C.

[3]  An "overcast" is a safety mechanism that refers to a constructed air flow device that permits one
air current to pass over (or under) another air current without interruption.

memo is necessary only because we seem not to understand that the coal pays the bills."[4]  Ex. A.
Blankenship's message was clear: Production trumps Safety.

6.     Blankenship's memo contradicted the Company's public statements about mine

safety.  Recognizing that public release of the memo could create a public relations nightmare, a

week later, on October 26, 2005, Blankenship sent a follow-up memo containing a half-hearted

retraction.  While stating that safety was the Company's "first responsibility," Blankenship went

on to state: "If you have construction jobs at your mine that need to be done to keep it safe or

productive, make every effort to do those jobs without taking members and equipment from the

coal producing sections that pay the bills."  Ex. B.  How safety construction projects were

supposed to be performed without diverting workers from mining coal was not explained.

7.     Despite Blankenship's attempt to create a phony "paper record" supporting safety

over production, Blankenship continued to run Massey in such a way that safety took a second

seat to coal production.  This was well known to Massey's Board of Directors (the "Board").  In

fact, given the catastrophic consequences of Blankenship's dangerous policies, two members of

the Board, Daniel S. Loeb and Todd Q. Swanson, attempted to get the Company to focus on

safety after the fire at Alma.  When their attempts were unsuccessful they resigned in protest on

June 13, 2007, explaining: "As you know, we have repeatedly expressed concerns about a

number of the Company's business practices, and the Board's unwillingness to confront them . . .

.  These and other correctible [safety] deficiencies combine to maintain a 'Blankenship Discount'

in the market price for Massey's shares . . . .  We cannot stand by while the Board fails to

address these concerns."  Ex. C.

---

[4]  Throughout this Complaint, all emphases are added unless otherwise stated.

8.      Massey's shareholders also called for accountability following the Alma tragedy by filing a derivative lawsuit in the Circuit Court of Kanawha County, West Virginia.[5]  In settlement of that lawsuit, Massey agreed to implement significant corporate governance reforms relating to safety.  These included the issuance of an annual Corporate Social Responsibility Report regarding "safety compliance" and the establishment of an enhanced Safety, Environmental and Public Policy Committee (the "SEPPC") as a standing committee of the Board.  *See* Ex. D.

9.      During the Class Period, the SEPPC was charged with, among other responsibilities, providing detailed mine safety reports to the full Board that were supposed to include the number and type of all safety incidents at Massey mines, and an analysis of any causal or contributing factors.  Defendants Phillips, Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski, and Judge (defined below) all served on the SEPPC from its formation and during the Class Period.

10.     In light of the high financial costs and substantial reforms associated with the Company's wrongdoing at Alma and Loeb's and Swanson's dramatic resignations, Blankenship set out to convince investors that he had recognized the error of his production-at-all-costs approach to mining coal, and that his new outlook was that "a safe mine is a productive mine." Massey 2007 Annual Report, at 8.  Indeed, Blankenship acknowledged that "no coal company can succeed over the long term without a total commitment to safety."  Massey 2009 Corporate Social Responsibility Report (the "2009 CSRR"), at 6.  He even took responsibility for the Alma

---

[5]  *See Manville Personal Injury Trust v. Blankenship*, Case No. 07-C-1333 (W. Va. Cir. Ct. Kanawha Cty.) (the "Manville Action").

fire, acknowledging publicly that "there had been a wall, a stopping line,[6] that should have been

up but wasn't.  And, of course, we're the first line of responsibility there."  *See* "Massey CEO on

Aracoma Settlement," *MetroNews Talkline*, Nov. 19, 2008.

**B.      Massey Created a New Corporate Image to Lure Investors**
**by Purporting to Implement Safety Improvement Initiatives**

11.      Massey also embarked on "safety improvement initiatives" to bolster public

perception and present a new corporate image.  Massey revamped a program that Blankenship

coined "S-1, P-2, M-3," which meant "***safety first, production second,*** and measurement third."

Massey and Blankenship reinforced their new image through an organized campaign which

emphasized that "safety first" was "not just a slogan" but "an integral part of [Massey's] daily

routine."  Massey continued to repeatedly reassure the Class that the Company had put its sordid

past behind it and "pull[ed] together to create a culture of safety."  Massey Press Release, Apr.

14, 2008.

12.      Massey underscored that its new safety program was "one of the best in the

industry, setting standards that far exceed federal and state requirements."  2007 Annual Report,

at 8.  Massey even claimed that safety had become the cornerstone of its success in terms of

shareholder value, using the following tagline: "Our Formula for Success [is] S-1 + P-2 + M-3 =

Shareholder Value."  *Id.* at 5.

13.      On August 1, 2009, as a continuation of Massey's purported new-found

commitment to miner safety, the Company claimed to take safety to a "new level" by adding a

"Hazard Elimination Committee" as yet another layer of safety governance.  The Hazard

---

[6]  A "stopping line" is a safety measure that refers to a line of walls constructed of hollow core, solid
concrete blocks, or other approved material, to separate one airway or a set of airways from another
airway or set of airways.

Elimination Committee was "intended to reinforce Massey's members'[7] ability to recognize and remedy potential violations of state and federal mining laws, educate members on recent changes to those laws, and enhance compliance throughout [Massey's] operations."  Massey July 29, 2009 Form 8-K, at 3.  Indeed, Massey's effort to re-brand itself as a safety-conscious company was critical to its ability to position itself to benefit from unprecedented global demand for metallurgical coal (which is used to make steel) during the Class Period.

14.     As alleged herein, however, Massey had two faces during the Class Period: a public face, shown by what Defendants told investors about the Company's safety practices and improvement initiatives; and a private face, reflected in what they and others at Massey actually did and did not do with regard to safety.  Privately, Massey continued to be run by Defendants as a Company that disregarded mine safety in favor of a production-at-all-costs approach to running coal.  Defendants knew, or were reckless in not knowing, that dangerous undisclosed conditions persisted across Massey's core mining operations, particularly with respect to its "large mines" (defined *infra*), and that safety was not a priority at all.

### C.     Notwithstanding its Purported Safety Improvement Initiatives, Massey Prioritized Production Over Safety During the Class Period, Culminating in the Disaster at Upper Big Branch

15.     Massey's disregard for the safety of its employees culminated in more death and disaster.  On April 5, 2010, twenty-nine miners died in an explosion and fire that turned corners and killed along a two-mile path at Massey's Upper Big Branch mine at Montcoal in Raleigh County, West Virginia (the "Explosion").  The Explosion was the deadliest U.S. coal mining accident in forty years.  News of the Explosion and subsequent disclosures concerning the investigations into its causes revealed to the public that Massey had not become an "industry

---

[7] During the Class Period, Massey referred to its miners and other rank-and-file employees as "members."

leader in safety" at all.  In fact, the enhanced safety protocols Massey purportedly instituted following the Alma fire were nothing more than words on pieces of paper—lies used by Defendants to cover up the fact that Blankenship had not changed his method of running the Company and that Massey miners remained at serious risk of injury or loss of life.  Such lies lured the members of the Class, who invested in Massey in reliance on public representations that the Company had turned over a new leaf with regard to mine safety.

16.     As detailed herein, throughout the Class Period and unbeknownst to the public, Massey made production a priority over mine safety.  Stanley "Goose" Stewart, a Massey miner at Upper Big Branch for fifteen years—and one of the few on-site who survived the Explosion—testified before the House Labor Committee on July 13, 2010:

> In 2009, we were made by Chris Blanchard, the President of Performance Coal, to *cut coal going into our air supply.*  We mined this way for 2,000 feet . . . .
>
> A young man I personally know was working at a Massey mine as a Fireboss[8] and was told by upper management to fix the books to proper air readings when the section had virtually *no air.*  He was so angry he quit Massey.
>
> When moving the long wall to a new face we were made to load coal *before* all the *shields*[9] *and ventilation were in place* so someone could call Mr. Blankenship to say we were "in the coal."

17.     When Blanchard instructed Mr. Stewart and other miners to "cut coal going into [their] air supply," it meant there would be insufficient air to breathe and insufficient air to dilute

---

[8]  A "Fireboss" (or "fire boss") is a State-certified supervisory mine official who examines the mine for combustible gases and other dangers before a shift comes into it and who usually makes a second examination during the shift.  In some states, "fire boss" is used loosely to designate assistant or section foreman.

[9]  A "shield" is a safety device; specifically, in longwall mining, a shield is a series of steel canopies used along the face to protect the miners who work beneath them. Shields are sequentially moved forward as mining progresses.

methane and coal dust to below explosive levels.[10]  Mr. Stewart's account also describes an occasion in which upper management explicitly told a fire boss to falsify a report to cover up inadequate mine ventilation.  Mr. Stewart's testimony, set forth in greater detail herein and corroborated by numerous other accounts described in this Complaint, vividly shows that Massey cared more about increasing production than mine worker safety during the Class Period.

18.  Consistent with Mr. Stewart's testimony and other confidential accounts described below, a collection of MSHA data now shows that Massey, during the Class Period, was the worst coal operator in the United States as measured by the most material safety metrics—including fatalities, significant and substantial ("S&S") citations, and "elevated enforcement" actions (both defined *infra*).  Such data—available to Massey's SEPPC and Board through the detailed mine safety reports they received—raised red flags during the Class Period that were known to Defendants but ignored in favor of a short-sighted production and profits-based strategy.

### D. After the Explosion, Criminal and Civil Investigations Revealed Deceptive Tactics Used by Massey to Cover Up its Safety-Last Approach to Coal Mining During the Class Period

19.  After the Explosion, Congressional testimony and numerous witness accounts described an "early notification system" used to deceive MSHA safety inspectors and to hide dangerous conditions at Massey mines.  As described further below, it was a regular practice at Massey mines to use a secret radio channel and code words to alert miners to the presence of MSHA inspectors at mine entrances in order to allow miners to fix non-compliant conditions before inspectors could get underground.

---

[10]  Coal dust is a fine powdered form of coal created by the crushing, grinding, or pulverizing of coal. Coal dust suspended in air is highly explosive, like gunpowder.

20.     Gary Quarles, a former Massey employee, testified in this regard on May 24, 2010 before the House Labor Committee: "[T]he code words go out 'we've got a man on the property.' . . .  When the word goes out, all effort is made to correct any deficiencies."  Mr. Stewart similarly testified before the same Committee on July 13, 2010:  "A section boss underground would be called from outside and be told, 'it's cloudy outside' or 'there's a man on the property' meaning there is an inspector outside, get things right to pass inspection."

21.     On February 28, 2010, a criminal indictment filed against Hughie Elbert Stover ("Stover"), Blankenship's personal driver and Chief of Security at Massey's Performance Coal subsidiary, which operated Upper Big Branch, was unsealed: *United States v. Hughie Elbert Stover*, No. 5:11-CR-00038 (S.D. W. Va. Feb. 25, 2011) (the "Stover Indictment"), annexed hereto as Ex. E.

22.     The Stover Indictment alleges that on January 11, 2011, on Stover's order, thousands of pages of Massey security documents stored at Upper Big Branch that evidenced Massey's unlawful early warning notification system were partially destroyed.  These documents were later recovered after the Department of Justice (the "DOJ") inquired about their existence in the course of its investigation into allegations of advance notices of safety inspections.

23.     The Stover Indictment further details the extent to which Massey used the unlawful early notification system to deceive MSHA safety inspectors and to cover up non-compliant conditions at Massey mines during the Class Period.  Stover and his team allegedly used a clandestine radio channel called the "Montcoal channel" to warn miners of MSHA inspectors' arrivals so that they could improvise safer conditions and cure violations.

24.     Stover, who was "very, very close to Blankenship" during the Class Period,[11] ordered and supervised a calculating process whereby thousands of pages of inculpatory documents were disposed of in a trash compactor while certain strategic documents were preserved (*e.g.*, property transfer and equipment removal documents).

25.     Notwithstanding Massey's efforts to hide safety regulation violations from MSHA's inspectors during the Class Period, Massey's mines still managed to receive a shocking number of the most severe safety violations.  Indeed, after the Explosion, MSHA released data showing that there had been a litany of red flags with respect to mine safety raised at Upper Big Branch that Defendants ignored prior to the Explosion.  The data shows that the number and severity of violations at Upper Big Branch increased dramatically in 2009 and 2010, putting Massey on notice that the mine was in what Tony Oppegard, a former MSHA regulator, called a "a crisis situation."[12]

26.     During the course of investigations into the causes of the Explosion, at least eighteen Massey executives, including Blankenship and Defendant J. Christopher Adkins ("Adkins"), Massey's Senior Vice President and Chief Operating Officer ("COO") since 2003, have invoked their Fifth Amendment rights.  Although MSHA's investigation into the Explosion is ongoing, it has yielded preliminary results showing Massey's disregard for mine safety.

27.     On April 27, May 24, and July 13, 2010, the Senate HELP Committee, the Senate Appropriations Committee, and the House Labor Committee held hearing sessions on, *inter alia*, the stark contradictions between Massey's public statements about safety and Massey's actual safety practices, as revealed by the Explosion.

---

[11]  Jerry Markon, "Massey Official Charged with Lying to FBI in Mine Investigation," WASH. POST, Mar. 1, 2011.

[12]  Steven Mufson, Kimberly Kindy, and Ed O'Keefe, "W.Va. Mine: Years of Violations, Say Feds," WASH. POST, Apr. 9, 2010.

28.     The FBI has since launched a criminal investigation into whether Massey executives attempted to bribe MSHA inspectors to overlook mine safety violations.  The FBI is also investigating possible tampering with safety monitors at Massey mines.  Another aspect of the FBI's investigation involves a May 13, 2010 disclosure by MSHA that a page was removed from a "Fireboss Book" at Upper Big Branch in which Massey supervisors were required to record daily ventilation fan measurements.  According to MSHA, the missing page may have noted when mine personnel checked ventilation fans and could have provided evidence of criminal misconduct.  The removal of such a page is itself a misdemeanor.  *See* W. Va. Code, §§ 22A-1-21(d).

29.     Prosecutors from the U.S. Attorney's Office for the Southern District of West Virginia have confirmed that, in addition to the Stover Indictment, the DOJ continues to investigate possible willful criminal activity by Massey in connection with inadequate safety practices.

**E.      Massey Restates its Critical NFDL Safety Metric and Blankenship Resigns**

30.     On September 30, 2010, Massey admitted in a "Letter to Stakeholders" that the sole safety metric it reported to investors during the Class Period, Company-wide Non-Fatal Days Lost ("NFDL") incident rates, were materially understated for the years 2007, 2008, and 2009 because of lapses in reporting procedures as determined by an independent consultant. Massey's 2007 NFDL rate was increased from 2.05 to 2.63, or 28%; its 2008 NFDL rate was increased from 1.93 to 2.52, or 30%;[13] and its 2009 NFDL rate was increased from 1.67 to 2.33, or 40%.

---

[13] Throughout the Class Period, Massey stated that its NFDL rate for 2008 was 1.93.  However, in its September 30, 2010 "Letter to Stakeholders," Massey stated that it had previously reported an NFDL rate of 1.94 for 2008.

31.     Despite the fact that MSHA regulations require the filing of reports whenever there is an injury, 30 C.F.R. § 50.1 *et seq.*, Massey used scare tactics, intimidation, and a light-duty work policy to deter miners from filling out lost-time incident reports, which made it impossible to measure an accurate NFDL rate during the Class Period and diminished its importance altogether.  For example, former Massey miner Jeffrey Harris, who worked at Massey's Keppler mine (among other Massey mines) and provided testimony to the Senate HELP Committee on April 27, 2010, explained that "If you got hurt [at Massey], you were told not to fill out the lost time accident paperwork.  The Company would just pay guys to sit in the bathhouse or to stay home if they got hurt—anything but fill out the paperwork."  Mr. Harris further explained that "[if] you complained, you'd be singled out and fired."  Mr. Stewart, who survived the Explosion, similarly testified before the House Labor Committee on July 13, 2010: "Massey sends a safety director to the hospital to pressure miners hurt on the job to return and sit in the office so their accident doesn't get listed as a 'lost time accident.'"  Regardless of whether a miner is able to do restricted work while injured, however, MSHA requires that Massey fill out an NFDL incident report in any event—but Massey did not do so during the Class Period.[14]

32.     After the Explosion, investors began to learn the truth about Massey's duplicitous and deceptive scheme.  By July 27, 2010, the end of the Class Period, Massey shares had hit a new low—representing a staggering decline that reduced Massey's market capitalization by more than $3 billion and caused massive losses to the Class.

33.     Finally, on December 3, 2010, after nearly twenty years running the Company, public outcry over Massey's disregard for mine safety prompted Blankenship to resign.

---

[14]  *See infra* at IV.F, discussing the "Mining Industry Accident, Injuries, Employment, and Production Data Source and Scope of Current Data and Definitions of Terms," and the reporting requirements of 30 C.F.R. § 50.1 *et seq.*, regarding the reporting of mine worker injuries.

Blankenship's departure, however, came too late to save the Company. Faced with increased regulatory scrutiny, decreased production due to mine shutdowns, enormous litigation expenses, and seemingly endless headline risk, Massey agreed to sell itself to Alpha Natural Resources, Inc. ("Alpha") on January 29, 2011.

## II.       JURISDICTION AND VENUE

34.       The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

35.       This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

36.       Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District.

37.       In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, mail, interstate telephone communications, and the facilities of a national securities market.

## III.      PARTIES

### A.       Plaintiffs

38.       Lead Plaintiff Commonwealth of Massachusetts Pension Reserves Investment Trust ("Massachusetts PRIT") is a pooled investment fund established by the Massachusetts Legislature in 1983 with a mandate to reduce Massachusetts' unfunded pension liability and to assist participants in meeting their future pension obligations. Massachusetts PRIT has more than $41 billion in total assets under management and includes assets managed for the benefit of the Massachusetts State Teachers' and Employees' Retirement Systems, and participating

county, authority, district, and municipal retirement systems.  Massachusetts PRIT purchased

Massey common stock on the open market during the Class Period at artificially inflated prices,

and suffered damages as a result of the federal securities law violations alleged herein.

39.     Plaintiff David Wagner ("Wagner") purchased Massey common stock on the open

market during the Class Period at artificially inflated prices, and suffered damages as a result of

the federal securities law violations alleged herein.

**B.     Massey**

40.     Defendant Massey Energy Company ("Massey" or the "Company") is a

corporation organized and existing under the laws of the State of Delaware, with its corporate

headquarters in Richmond, Virginia and its operational headquarters in Julian, West Virginia.

During the Class Period, Massey's shares of common stock traded on the New York Stock

Exchange ("NYSE") under the ticker symbol "MEE."  On January 29, 2011, Massey announced

its acquisition by Alpha, which is expected to be completed by mid-2011.

**C.     The Officer Defendants**

41.     Defendant Don L. Blankenship ("Blankenship") served as the Company's CEO

from November 2000 until December 2010, and as President from November 2000 until

November 2008.  Blankenship was also a member of Massey's Board from 1996 until December

2010, and served as Chairman of the Board from November 30, 2000 until December 2010.

Blankenship was also Chairman and CEO of A.T. Massey Coal, the wholly-owned and sole

direct operating subsidiary of Massey, from 1992 until 2010, and served as A.T. Massey's

President from 1992 until November 2008.  Blankenship was also the Chair of Massey's

Executive Committee during the Class Period.  On December 3, 2010, under public pressure

from shareholders as referenced above, Blankenship announced his resignation effective

December 31, 2010.  Defendant Blankenship signed Massey's Forms 10-K dated February 29,

2008, March 2, 2009, and March 1, 2010; Forms 10-Q dated May 9, 2008, August 4, 2008, November 7, 2008, May 8, 2009, August 10, 2009, October 28, 2009, and April 30, 2010; and Form S-3ASR dated August 5, 2008, and otherwise participated in the making and issuance of the false and misleading statements alleged herein.

42.     Defendant Baxter F. Phillips, Jr. ("Phillips") became the CEO of Massey effective December 3, 2010, was elected President of the Company effective November 10, 2008, and has been a Massey director since May 22, 2007.  Phillips previously served as Executive Vice President and Chief Administrative Officer of the Company from November 20, 2004 to November 2008.  He served as Massey's Senior Vice President and Chief Financial Officer ("CFO") from September 1, 2003 to November 2004, and as Vice President and Treasurer from 2000 to August 2003.  Phillips was also a member of the SEPPC and Finance Committee during the Class Period.  Defendant Phillips signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008, and otherwise participated in the making and issuance of the false and misleading statements alleged herein.

43.     Defendant Eric B. Tolbert ("Tolbert") has been the CFO and Vice President of Massey since November 2004.  Tolbert previously served as Corporate Comptroller from 1999 until 2004.  Defendant Tolbert signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; Forms 10-Q dated May 9, 2008, August 4, 2008, November 7, 2008, May 8, 2009, August 10, 2009, October 28, 2009, and April 30, 2010; and Form S-3ASR dated August 5, 2008, and otherwise participated in the making and issuance of the false and misleading statements alleged herein.

44.     Defendant J. Christopher Adkins ("Adkins") has been Massey's Senior Vice President and COO since June 23, 2003.  During the Class Period, Adkins oversaw all mining

and processing operations and reported directly to Blankenship.  Adkins participated in the making and issuance of the false and misleading statements alleged herein.

45.    Defendants Blankenship, Phillips, Tolbert, and Adkins are referred to herein collectively as the "Officer Defendants."

D.    **The Director Defendants**

46.    Defendant Dan R. Moore ("Moore") has been a Massey director since 2002. During the Class Period, Moore served on all of the Board's Committees—the SEPPC, the Compensation Committee, the Governance and the Nominating Committee, the Executive Committee, and the Finance Committee.  He also served as Chair of the Audit Committee during the Class Period.  Defendant Moore signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

47.    Defendant E. Gordon Gee ("Gee") was a Massey director from 2000 until July 1, 2009.  At all relevant times herein until July 1, 2009, Gee served as a member of the SEPPC, the Executive Committee, the Audit Committee, and the Governance and Nominating Committee. Gee signed Massey's Forms 10-K dated February 29, 2008 and March 2, 2009; and Form S-3ASR dated August 5, 2008.

48.    Defendant Richard M. Gabrys ("Gabrys") has been a Massey director since May 22, 2007, serving as a member of both the SEPPC and the Governance and Nominating Committee during the Class Period.  Defendant Gabrys signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

49.    Defendant James B. Crawford ("Crawford") has been a Massey director since 2005, and served on the Board and SEPPC during the Class Period.  From July 2009 through the end of the Class Period, Crawford was the Chair of the SEPPC and a member of the Executive Committee, the Audit Committee, the Compensation Committee, and the Governance and

Nominating Committee.  Defendant Crawford signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

50.    Defendant Robert H. Foglesong ("Foglesong") has been a Massey director since February 21, 2006.  During the Class Period, Foglesong was a member of the SEPPC, Executive Committee, the Audit Committee, and the Governance and Nominating Committee, and was also the Chair of the Compensation Committee.  Defendant Foglesong signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

51.    Defendant Stanley C. Suboleski ("Suboleski") has been a Massey director since May 2008.  From August 2006 through the end of the Class Period, Suboleski provided mining engineering consulting services to Massey.  During the Class Period, Suboleski served as a member of the SEPPC, the Finance Committee, and the Governance and Nominating Committee.  Defendant Suboleski signed Massey's Forms 10-K dated March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

52.    Defendant Lady Barbara Thomas Judge ("Judge") served as a director of Massey from February 19, 2008 until she resigned on April 19, 2010.  During that time, Judge was Chair of the Governance and Nominating Committee and a member of the SEPPC.  Defendant Judge signed Massey's Forms 10-K dated February 29, 2008, March 2, 2009, and March 1, 2010; and Form S-3ASR dated August 5, 2008.

53.    Defendants Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski, and Judge are referred to herein collectively as the "Director Defendants."

54.    The Officer Defendants and Director Defendants are referred to herein collectively as the "Individual Defendants."

55.     A chart depicting the reporting structure of the Individual Defendants during the Class Period is illustrated below.



**Note:** *A.T. Massey Coal is not a named defendant.*

56.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Massey, were privy to confidential and proprietary information concerning Massey, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Massey, as discussed in detail below.  Because of their positions with Massey, the Individual Defendants had access to non-public information about the Company's safety record, business, finances, and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such

30

information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

57.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Officer Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section  20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Officer Defendants were able to and did, directly or indirectly, control the conduct of Massey's business.

58.     The Individual Defendants, because of their positions with the Company, controlled and possessed the authority to control the contents of Massey's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

59.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock is registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Massey's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Massey's securities would be based upon truthful and accurate information.  The Individual Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Massey and its Subsidiaries

60.    Massey's roots date back to 1920 when A.T. Massey incorporated a coal brokering business in Richmond, Virginia under his name.  In the late 1940s, A.T. Massey expanded his business to include coal mining and processing.  A.T.'s son, Evan Massey, became President of the coal brokering, mining, and processing company shortly thereafter.  During the course of the next fifty years, A.T. Massey's business underwent several corporate mergers, takeovers, and spin-offs.

61.    On December 1, 2000, Massey Energy Company emerged as a distinct public entity trading on the NYSE under the ticker symbol "MEE."  From its humble beginnings as a family-run company, Massey has evolved into the fourth-largest coal producer in the United States, and the largest coal producer in Central Appalachia, controlling one-third of the region's bituminous coal reserves.  Central Appalachia is the country's principal source of low-sulfur bituminous coal, which is used for power generation, metallurgical coke production, and industrial boilers.  Significantly, Central Appalachian coal accounted for 20% and 19% of coal production in the United States in 2008 and 2009, respectively, according to the Energy Information Administration.  *See* Massey Form 10-K dated March 2, 2009 (the "2008 10-K"), at 4; Massey Form 10-K dated March 1, 2010 (the "2009 10-K"), at 4.

62.    Massey produces, processes, and sells bituminous coal of various steam and metallurgical grades.  At January 31, 2010, Massey operated 56 mines—42 underground and 14

surface mines—and 23 processing and shipping centers (which Massey calls "Resource Groups") that received coal from Massey's mines.  *See* 2009 10-K at 1.[15]

63.     Massey produces coal using four distinct mining methods: (1) underground room and pillar; (2) underground longwall; (3) surface; and (4) highwall mining.  *See id.* at 3.

64.     Massey, however, has no independent assets or operations of its own.  *See id.* at 60.  Instead, as illustrated in the chart below, Massey operates through a vast web of controlled and consolidated wholly or majority-owned subsidiaries, including Performance Coal, which operated Upper Big Branch.  (Massey and its subsidiaries are collectively referred to herein as "Massey.")

---

[15]  The number of mines that Massey operates varied during the Class Period.  For example, as of January 31, 2009, Massey operated 66 mines, including 46 underground and 20 surface mines.  *See* 2008 10-K, at 1.  As of January 31, 2008, Massey operated 47 mines, including 35 underground and 12 surface mines.  *See* Massey Form 10-K dated Feb. 29, 2008 (the "2007 10-K"), at 1.



**NOTE:** *Many of Massey's subsidiaries operated under other names; for instance, Alex Energy, Inc. does business as ("d/b/a") Edwight Mining Company, Intrepid Mining Company, North Surface Mine, and Superior Surface Mine. The d/b/a's have been omitted from this chart with the exception of Performance Coal Co. d/b/a Upper Big Branch Mining Co.*

65.     As shown above, Massey has one direct operating subsidiary, A.T. Massey Coal, to which the rest of the Company's indirect subsidiaries report.  A.T. Massey Coal and Massey's other subsidiaries account for "substantially all of [the Company's] assets and . . . revenues." *Id.*[16]  Massey represented in its SEC filings that the Company had "established disclosure controls and procedures to ensure that information relating" to its "subsidiaries required to be disclosed . . . under the Exchange Act, is accumulated and communicated to management, including the principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure."  2009 10-K, at 60.

66.     As described further below, despite the Company's complex corporate configuration, Blankenship clearly controlled everything that happened at Massey during the Class Period.

**B.     Blankenship's Rise to Power and Reign at Massey**

67.     Blankenship started to work at Massey in 1982 at a subsidiary called Rawl Sales & Processing ("Rawl").  In 1984, Blankenship was named president of Rawl.  In 1992, Blankenship was appointed Chairman, CEO, and President of the entire Company.  Within a year, Blankenship had amassed enough influence and power at Massey that he was free to run the Company as he saw fit and exercised complete control over all core mining operations.

68.     Blankenship has admitted in sworn deposition testimony that he is a "hands-on" CEO and knows of every "significant issue" at Massey's mines:

---

[16] For the year ended December 31, 2009, Massey reported "produced coal revenue" of $2.3 billion. Export shipment revenue derived from operations within Massey's Resource Groups totaled approximately $472.1 million, representing approximately 20% of 2009 produced coal revenue.  *See* 2009 10-K, at 14.  For the year ended December 31, 2008, Massey reported "produced coal revenue" of $2.6 billion.  Export shipment revenue derived from operations within Massey's Resource Groups totaled approximately $756.3 million, representing approximately 30% of 2008 produced coal revenue.  *See* 2008 10-K, at 14.

> Q. . . . ***Mr. Blankenship, and your daily job, understanding that no day is the same, it seems to me that you're kind of a hands-on kind of guy***.  Would you say that's a fair description of the way you operate?
>
> A. ***As CEO, yes.***
>
> *        *        *
>
> Q. Okay.  And if something happens at a particular mine or resource group that's unusual . . . you're immediately made aware of that, aren't you?
>
> A. Supposed to be.
>
> Q. Okay.  And it works that way usually I would take it, doesn't it?
>
> A. Well, typically on an environmental violation, you know, a nonsignificant environmental violation, I would get a report the following day or the next day that shows that it happened.  ***If we had a significant issue, I would know about it.***
>
> Q. Okay.  Like if the [U.S. Department of Labor] ***was about to shut a mine down, you would be told that immediately or as soon as possible, wouldn't you?***
>
> A. ***Yes.***

Ex. F, at 59.

69. In fact, according to Confidential Witness ("CW") 1,[17] a former Human Resource manager at Massey's Black Castle mine between May 2006 and May 2007, Blankenship "micromanaged" every mine and signed off on every hire, even the janitors.  CW 1 explained that if he wanted to hire personnel at Black Castle, he would have to send a memorandum to Blankenship with the applicant's qualifications and salary requirements.  CW 1 would then

---

[17] In an effort to protect the identity of knowledgeable witnesses who have come forward on a confidential basis, Plaintiffs have not pleaded all available information concerning job titles, locations, and starting and ending dates of employment, because providing such information would likely be tantamount to revealing the witnesses' identities.  Plaintiffs will provide such information to the Court *in camera* if the Court so requests.

receive a faxed authorization with Blankenship's signature on it if the proposed hire was approved.

70.     A feature called "The Truth About Don Blankenship," published by *Vanity Fair* on April 15, 2010, described Blankenship as such a micromanager that even "[p]urchase orders for the smallest items had to be cleared with [him]."  One manager noted his "amazement in learning, soon after arriving at Massey, that [Blankenship] had to sign off on a tankful of gas for the manager's Massey truck."

71.     Blankenship's domination and control of Massey during the Class Period was reinforced by the Board's unyielding loyalty to him.  The Board's loyalty and deference to Blankenship is evidenced by Loeb's and Swanton's June 13, 2007 letter of resignation.  Therein, Loeb and Swanson stated in relevant part: "The Board['s] . . . misguided insistence on keeping [Blankenship] in place as CEO outweighed strategic considerations. . . ."  Ex. C.

72.     The Board's loyalty and deference to Blankenship is further evidenced by the latitude afforded to him by the Compensation Committee (on which Blankenship does not sit).  As described by Jeffrey Gillenwater, Massey's Vice President for Human Resources, in deposition testimony: "I would say that the [C]hairman, Mr. Blankenship set—set the wage rates through his leeway that the Compensation Committee affords [sic] him."  Ex. F, at 61.

### C.     Before the Class Period, Massey Was Embroiled in Criminal and Civil Litigation Arising from Unlawful Safety Practices in 2006

73.     On January 19, 2006, a fire broke out at the Alma mine.  At the time, Alma was operated by a Massey subsidiary called Aracoma Coal Company ("Aracoma").  Two Massey miners died of carbon monoxide poisoning because monitors were improperly installed and a permanent ventilation control was removed from an emergency escape passage.

74.     Investigations by the FBI and MSHA into the causes of the Alma fire found that, among other things, a conveyor belt malfunction—a malfunction that had caused at least two prior fires at the same mine, neither of which had been reported, as required, to authorities— triggered the ignition of coal dust.  As admitted by Blankenship, "there had been a wall, a stopping line, that should have been up but wasn't."  *See* "Massey CEO on Aracoma Settlement," *MetroNews Talkline*, Nov. 19, 2008.

75.     Massey's disregard for mine safety leading to the fire and deaths at Alma tarnished the Company's name and reputation.  Blankenship, in particular, was maligned after a memorandum he wrote on October 19, 2005 was made public, directing miners "to ignore" safety concerns (*e.g.*, "build[ing] overcasts") in order to "run coal" because "coal pays the bills." Ex. A.  As referenced above, Blankenship's memorandum so plainly demonstrated Massey's production-first culture that Blankenship was compelled to issue a clarification one week later. On October 26, 2005, Blankenship sent a half-hearted "retraction":

> Last week I sent each of you a memo on running coal.  Some of you may have interpreted that memo to imply that safety and S-1 are secondary.  I would question the membership of anyone who thought that I consider safety to be a secondary responsibility.
>
> The point is that each of you is responsible for coal producing sections, and our goal is to keep them running coal.  If you have construction jobs at your mine that need to be done to keep it safe or productive, ***make every effort to do those jobs without taking members and equipment from the coal producing sections that pay the bills.***

Ex. B.

76.     While Blankenship's "clarifying" memorandum made generalized statements as to the importance of safety, it failed to mention the specific safety procedure referenced in Blankenship's first memo—*i.e.*, "building overcasts"—and again made clear that when there is a choice as to the allocation of resources between "running coal" (which "pays the bills") and

"construction jobs" (which, like building overcasts, can be for safety purposes), "every effort" should be undertaken not to take any resources away from the former, notwithstanding that such a decision would likely affect the quality of work on the latter.  The memorandum provided nothing more than public relations "cosmetics" in terms of pretending to negate Blankenship's October 19 message, and simply reiterated Massey's production-centric approach to running coal.

77.     Subsequently, a shareholder derivative lawsuit was filed in the Circuit Court of Kanawha County, the Manville Action, alleging, *inter alia*, breaches of fiduciary duty in connection with the conduct at Massey that led to the two deaths at Alma.  Massey entered into a Stipulation of Settlement in the Manville Action on May 20, 2008 (the "Manville Settlement"). Ex. D.  Pursuant to the Manville Settlement, Massey agreed to reform its policies and procedures regarding mine worker safety.  In particular, Massey agreed to establish an enhanced SEPPC. Ex. D, at 11-12 and Exhibit 2.

78.     During the Class Period, the SEPPC was responsible for "develop[ing] goals for implementing enhancements to the Company-wide process utilized to monitor, count and report mine safety incidents and complaints . . . and near misses with high potential for injury."  The SEPPC was also charged with providing detailed mine safety reports to Massey's Board—*i.e.*, the Director Defendants.  These reports were supposed to include the "number of mine safety incidents overall and by type; . . . findings by third-party auditors; and . . . an analysis of any causal factors contributing to safety incidents."  Exhibit 2 to Ex. D, at 4-5.  Massey also agreed to provide its shareholders with an annual Corporate Social Responsibility Report ("CSRR") regarding "worker safety compliance" and to create a position for a "Vice President for Best

Safety Practices" who would report to the SEPPC, as well as various "Safety Compliance Managerial Positions."

79.     The SEPPC was further tasked with "adopt[ing] quantitative goals . . . for reducing . . . mine safety incidents and near misses with a high potential for injury in connection with its operations," and with creating a system for employees to report "information concerning possible illegal or unethical conduct regarding the Company's compliance with safety . . . issues" without "fear or reprisal."  *Id.*  Moreover, the SEPPC was supposed to receive reports from Compliance Managers every quarter about compliance with mine (and mine worker) safety laws, rules, and regulations.  *Id.*

80.     On December 23, 2008, Massey's Aracoma subsidiary and the government agreed to the largest settlement in coal industry history.  Massey paid $4.2 million ($2.5 million in criminal penalties; $1.7 million in civil penalties), and pleaded guilty to ten criminal charges.

### D.     Massey Embarks on "Safety Improvement Initiatives" to Enhance its Corporate Image Following the Alma Fire

81.     Prior to resolving the criminal and derivative shareholder litigations resulting from the tragedy at Alma, Massey embarked on a media blitz to reinvent its public image.  In so doing, Massey sought to build goodwill with regulators and the investing public by promising a new and improved approach to safety.

82.     The cornerstone of Massey's re-branding effort was a "rigorous and innovative safety program" implemented under the auspices of the Company's Raymond Bradbury Safety Program, discussed *infra*.  Pursuant to this new and improved safety program, Massey repeatedly promised to put "new procedures and training requirements in place" that prioritized "Safety [as] Job One."  Massey Annual Shareholders Meeting, May 22, 2007.  Massey's new safety program

was given a tagline often repeated by Blankenship, "S-1, P-2, M-3," and explained by the

Company as follows:

> Our Formula for Success
>
> S-1 + P-2 + M-3 = Shareholder Value
>
> At Massey, we have built the most successful and enduring coal mining company in Central Appalachia by adhering to three key operating standards: S-1, P-2 and M-3:
>
> S-1: SAFETY IS JOB ONE.
>
> As our members safely arrive on the job each morning, our first priority is to ensure that they go safely home each night.  Our continuous safety innovations are evidence of our commitment to operating safe coal mines.
>
> P-2: PRODUCTION STANDARDS LEAD THE INDUSTRY.
>
> Massey promotes the application and implementation of best production practices.  Extensive training and communication programs ensure that technological advancements are implemented in each of our resource groups.
>
> M-3: MEASUREMENT DATA TO INFORM COMPANY DECISIONS.
>
> Massey's M-3 standard requires that managers receive timely, accurate measurement data related to the company's daily operations, enabling them to make the best decisions based on the best information.
>
> This proven formula . . . is a hallmark of our company and will continue to be our formula for generating long-term shareholder value.

2007 Annual Report, at 5.

83.     Another phase of the Company's purported safety improvement initiatives was

announced with the introduction of a new executive position: a Vice President of Safety and

Training.  The position was filled by Elizabeth Chamberlin ("Chamberlin"), Chairperson of the

National Mining Association's Safety Committee who practiced as a lawyer before the Federal

Mine Health and Safety Review Commission, and who had been a certified mine foreperson in Pennsylvania, where she held various underground production positions.

84. Thereafter, Blankenship went to investor conferences touting Chamberlin and her credentials, the relative safety of Massey as compared to the industry, and highlighting Massey's "safety awards."

85. For example, on September 6, 2007, at the Lehman Brothers CEO Energy Conference, Blankenship stated:

> The main thing about Massey is, *we have a better safety performance than the industry, whether you're looking at underground, surface, or total.  And we have S1 and safety programs in place that far exceed the law* . . . .
>
> We think this performance speaks very well for the management's focus on safety and our S1 program.  A lot of safety awards. . . . [W]hat you often don't see in the press is number one, how safe the industry is; number two, how safe Massey is in comparison; or number three, how many safety awards are won by our Company.

86. Blankenship repeatedly emphasized to shareholders that, after the fire at Alma, "S-1" was "not just a slogan" but an "integral part of [Massey's] daily routine," resulting in "a culture of safety."  To further fortify the new Massey message, in the Company's Annual Report for the year 2007, Blankenship wrote in the Letter to Shareholders:

> When Elizabeth Chamberlin joined Massey, she took over an already very successful safety program.  However, *in just over a year,* she has asserted her experience, leadership and enthusiasm to *re-emphasize the "culture of safety"* throughout the Company. That culture is epitomized within the Raymond Bradbury Safety Program.  This program engages all Massey members in our safety initiatives . . . .  The results are clear.

87. Massey continued to tout the Company's safety improvement initiatives throughout the Class Period, as discussed in detail *infra* at V.  Indeed, on February 1, 2008, the first day of the Class Period, Defendant Phillips stated on a shareholder conference call: "I would

be remiss if I didn't acknowledge the positive results of our safety improvement initiatives.  As you know, safety is job one everyday at Massey."

88.    Seventeen months later, on July 29, 2009, the Company announced the development of a Hazard Elimination Committee.  The Hazard Elimination Committee was purportedly "intended to reinforce Massey's members' ability to recognize and remedy potential violations of state and federal mining laws, educate members on recent changes to those laws, and enhance compliance throughout [Massey's] operations."  Massey July 29, 2009 Form 8-K, at 3.  Defendant Adkins emphasized that Massey was "very excited about this new [Hazard Elimination Committee] safety program," adding: "We are confident that it will be very effective and enable us to take our safety performance to a new level."  Massey July 29, 2009 Form 8-K, at 3.

**E.    Blankenship's Fixation on Production was Spurred by Surging Global Demand for Metallurgical Coal During the Class Period**

89.    Blankenship has long believed "that capitalism, from a business standpoint, is survival of the ***most productive***."[18]  E. Morgan Massey, grandson of the Company's founder, has said that Blankenship "could always tell you exactly what the [production] numbers were. . . . The [production] numbers drive every decision he makes."  Jeff Goodell, The Dark Lord of Coal Country," *Rolling Stone*, Nov. 29, 2010.

90.    In fact, Blankenship's appetite for production translated into overly aggressive production targets at Massey.[19]  Notwithstanding the lip service paid to mine worker safety, Blankenship's obsession with production came at the expense of safety, and he directed Massey

---

[18]  *Mine War on Blackberry Creek*, 1986.

[19]  *See* Ed O'Keefe & Steven Mufson, "Mine Owner's Push for Output Compromised Safety, Critics Charge," *Wash. Post*, Apr. 8. 2010.

employees to do whatever was necessary to meet his aggressive production targets—including violating safety laws and regulations.

91.     Indeed, during the Class Period, Blankenship's production-at-all-costs approach to running coal was adopted by his inner circle, including the Individual Defendants, and was made well-known to those who worked at Massey mines.  For example, as reported by *Vanity Fair*, a "red phone" was installed in "one of the managers' offices" at Upper Big Branch with a "direct line" to Blankenship.  Confidential sources who worked at Massey described how "[p]roduction figures were relayed to Mr. B every day; [and] if the line stopped for even an hour, the on-site managers had to explain why."

92.     Former Massey employees corroborate and detail Blankenship's production-driven approach.  According to CW 3, a former miner at Upper Big Branch who worked at Massey between approximately 2002 and April 2010, Blankenship received production reports from Upper Big Branch approximately every two hours.  CW 3 knows that Blankenship reviewed such production reports because he talked to Blankenship about them on more than one occasion.

93.     According to CW 1, who left Massey in May 2007 after the Company had purportedly implemented its new safety initiatives, "production was number one" at Massey and production reports were generated every four hours at the Black Castle mine, which went directly to Mike Snelling, Vice President of Surface Mining, who reported directly to Defendant Blankenship.

94.     According to CW 9, who worked as a highwall miner at Massey's Black Castle mine between October 2008 and mid-2010, "production was the priority" at Massey at safety's expense.  For example, CW 9 recounted an occasion on which he was operating a "988F loader,"

which was used to lift and transport "coal cars."  According to CW 9, the brakes on the 988F loader did not work properly and he could not get the machine to stop.  CW 9 considered the machine too dangerous to operate and refused to continue using it.  CW 9's superintendent refused to correct the issue and instead grew angry with CW 9 for raising the issue.  According to CW 9, the 988F loader was not fixed, his superintendent just got somebody else to run it.

95.     According to CW 5, a former surface mining equipment operator at Massey's Twilight surface mine who operated a "Komatsu WA-900 loader" to "peel rock off coal," even after the fire at Alma S-1/P-2 was not an accurate description of the way things worked at Massey, because production always came first.

96.     CW 2, a former "Rock Truck" driver at Massey's West Cazy surface mine between October 2007 and April 2009, explained that even though Massey was always preaching "safety first," production was in fact most important.  Indeed, according to CW 4, a former "Belt Buster" at Upper Big Branch between 1994 and 2006, Defendant Adkins was not concerned about anything other than receiving faxes about the mine's production.  According to CW 4, production—not safety—was the most important thing to Massey management.

97.     According to CW 6, a former electrician at Upper Big Branch between 2001 and 2006, and CW 7, a former mine supervisor at Massey's Black Castle mine from January 2006 through November 2007 (after Massey had purported to implement new safety improvement initiatives), production was prioritized over safety at Massey.  According to CW 7, in terms of production Massey management were "great coal miners," but in terms of safety it had "low ethics."

98.     According to CW 8, who worked as a member of the "Belt Move Crew" at Upper Big Branch (third shift) from 1994 through September 2006, even after the Alma fire S-1/P-2

was not an accurate description of the Company's policies because production was the first priority at Massey.  CW 8 explained that each Massey miner had to "watch out for 'number one'" *i.e.*, personal safety, because if the miners did not do so for themselves Massey would not.

99.     Further, according to CW 10, a former Maintenance Planner at Massey's Edwight mine between June 2005 and May 2006 (*i.e.*, after the Alma fire), S-1/P-2 was a "joke" and it should have been called "P-1," because production was more important than safety at Massey.

100.    Not only was production the clear priority at Massey mines, but it frequently took priority at the expense of mine worker safety.  For example, as coal production increased at Upper Big Branch, so too did safety violations.  The following chart published in *Business Week* on April 15, 2010 illustrates the inverse correlation between safety and production at Massey:



101.    During the Class Period, global demand for metallurgical coal "surge[d],"[20] whetting Massey's and Blankenship's appetite for production even further.  On April 4, 2008, Massey announced that it would spend $90 million more (a total of $310 million) to expand coal mining operations through an aggressive growth plan.  Subsequently, on February 3, 2010,

_____

[20]  Jeffries & Company, Inc. report, Mar. 18, 2010.

during an earnings call about the fourth quarter of 2009, Blankenship reported that Massey's metallurgical coal sale projection for 2010 increased from 10 million tons to 12 million tons.

102.    As Massey was striving to keep up with increasing demand for metallurgical coal during the Class Period, production at Upper Big Branch and other Massey mines that produced metallurgical coal was kicked into overdrive.[21]  Upper Big Branch produced 1.2 million tons of coal in 2009—a three-fold increase from the 363,923 tons produced at Upper Big Branch in 2008.  In the fourth quarter of 2009, coal production at Upper Big Branch nearly doubled from the previous three months—surging from 263,319 tons mined in the third quarter of 2009 to 525,207 tons in the fourth quarter.  For these reasons, according to CW 11, a miner of thirty years' experience who serves as a Miner's Representative in connection with MSHA's investigation of the Explosion, Upper Big Branch was referred to as the Company's "mother mine."

103.    As illustrated in ¶ 100 above, in pushing the Company to meet his aggressive production goals, Blankenship sacrificed the safety of Massey's mines and mine workers and created a culture of non-compliance with MSHA regulations.  National Public Radio ("NPR") interviewed ten supervisors and miners at Upper Big Branch who made similar statements such as: "They wouldn't fix the ventilation problems"; "I told them I needed more air [and] they threatened to fire me if I didn't run enough coal"; and "there was constant confusion" in the management of the airflow system.

104.    "Goose" Stewart's July 13, 2010 testimony before the House Labor Committee is even more shocking:

---

[21]  Massey's metallurgical coal was valued at approximately $95.93 per ton at year-end 2009, while Massey's thermal coal, which is used by power plants that generate electricity, was valued only at approximately $53.69 per ton at year-end 2009.  The more profitable metallurgical coal constituted approximately 25% of Massey's output.

On July 26, 2009, *our crew on the second shift was told by upper management to change from sweep to split air in* Headgate 21, where the longwall is now.  *We knocked stoppings*[22] *while crews were still working, which can short circuit their air supply.  This violated MSHA requirements* to evacuate miners when changing the ventilation system, but upper management made it clear we had to do this job . . . .  [I]t scared me and when I got home I wrote it down.

On Head-gate 22, the tracks were never laid within ½ mile from the mantrip [23] to our section.  We had a buggy[24] for emergency transport that we used to travel from the mantrip to our section but it got a flat tire.  It was not fixed until the inspectors wrote them up for it.  After that we weren't allowed to ride it from the mantrip to the section so it wouldn't breakdown again.

*      *      *

In the months before the [E]xplosion on Headgate 22, *my section foreman got consistently low air readings and complained to upper management.  He would be berated and told to go back to work or he would lose his job, and the air was never fixed.*  He was afraid something would happen so he quit.

The long wall worried me because of the constant ventilation problems and with so much methane being liberated and no air moving I felt that area was *a ticking time bomb.*

There were at least two fireballs on the drum of the shearer on the long wall according to separate reports of miners working those shifts.  That meant methane was building in that area proving ventilation problems.

*      *      *

In my years of working for Massey I feel they have taken coal mining back to the early 1900s using three principles: fear, intimidation and propaganda.

---

[22]  A "stopping" is a safety device constructed of hollow-core or solid blocks, used to separate one entry (or tunnel) or a set of entries from another entry or set of entries in a mine.  Stoppings are particularly important when isolating air containing harmful gases or dust from fresh air.

[23]  A "mantrip" carries mine personnel by rail or rubber tire to and from a work area in a mine.

[24]  A "buggy" is a four-wheeled steel car used for hauling coal to and from mine chutes.

105.    The *Washington Post* further reported that Massey's "senior managers [at Upper Big Branch] showed 'reckless disregard' for worker safety in favor of production by telling a foreman to ignore a citation the mine had received for faulty ventilation, according to the [MSHA] inspectors' handwritten notes."  Specifically, notes from MSHA inspections at Upper Big Branch in January 2010 reveal that the President of Massey's Performance Coal subsidiary, Christopher Blanchard ("Blanchard"), told a foreman "not to worry about it" when he raised a cited ventilation problem.

106.    A second unidentified Upper Big Branch employee told this MSHA inspector about another serious ventilation problem—air flowing the wrong direction in an intake duct— which had not been fixed because Blanchard and Performance Coal Vice President Jamie Ferguson instructed a foreman, Terry Moore, to disregard the issue.  The MSHA inspector described their actions as "reckless disregard of care to the miners," adding "the operator has shown high negligence due to the fact of management knowing where the problem is."

107.    These detailed Company-wide accounts tell a consistent story about Massey:  it was a Company that, contrary to its public statements, placed production and profits well above safety.

### F.    MSHA's Regulation of Massey

108.    The first line of the Federal Mine Safety and Health Act of 1977 (the "Mine Act") states that "the first priority and concern of all in the coal or other mining industry must be the health and safety of *its most precious resource—the miner*[.]"  30 U.S.C. § 801(a). Accordingly, the Mine Act requires MSHA inspectors to issue a citation or order for each violation of a health or safety standard they encounter at a coal mine.  Each issuance results in the assessment of a civil penalty.

109.     As described by Defendant Suboleski, under the system of regulations imposed on Massey by MSHA "there are many types of violations . . . , so the types of violations cited and the circumstances involved are important."  *See* Massey Letter to Stakeholders dated Sept. 30, 2010.  Suboleski has further explained that context is critical when discussing MSHA citations and orders because some violations are more serious than others—*i.e.*, "citations can range from leaving tools in the wrong place to methane buildups."  In this regard, MSHA categorizes citations and violations into two general categories: "non significant and substantial" ("non-S&S") and "significant and substantial" ("S&S").

110.     MSHA Fact Sheet 95-4 states that a non-S&S violation is one that is "not reasonably likely to cause reasonably serious injury that is corrected promptly. . . ."  Non-S&S violations are assessed a $60 penalty.[25]

111.     MSHA Fact Sheet 95-4 further states that an S&S violation is one that is "reasonably likely to result in a reasonably serious injury or illness under the unique circumstance contributed to by the violations."  *Id.*  In writing each citation, an MSHA inspector determines whether a violation is S&S or not.  *Id.*  S&S violations are assessed according to a formula that considers six factors.[26]  The maximum penalty for S&S violations under the Mine Act, as amended by the Mine Improvement and New Emergency Response Act of 2006 (the "MINER Act"), is $60,000.  However, when there is a "flagrant violation" (*see infra*) there is a penalty of $220,000.

---

[25]  *See* MSHA Fact Sheet 95-4, *available at* http://www.msha.gov/mshainfo/factsheets/mshafct4.htm.

[26]  The six factors include: (1) history of previous violations; (2) size of the operator's business; (3) any negligence by the operator; (4) gravity of the violation; (5) the operator's good faith in trying to correct the violation promptly; and (6) effect of the penalty on the operator's ability to stay in business. These factors are determined from an MSHA inspector's findings, MSHA records, and information supplied by the operator.  *Id.*

112.     S&S violations can create a domino effect.  Specifically, if an MSHA inspector finds an S&S violation resulting from an "unwarrantable failure" of an operator to comply with a standard, the inspector incorporates that finding into the S&S citation.  If a second violation due to unwarrantable failure is found within ninety days, MSHA issues a "withdrawal order"—*i.e.* an order issued on the spot and without a hearing that results in the immediate closure of an area alleged to be in violation of the standards[27]—until it is corrected.  Thereafter, any violation similar to the one that led to the withdrawal order triggers another withdrawal order.  This applies until an inspection of a mine discloses no similar violations.  *See* MSHA Office of Assessments, Citations & Order Explanations, Section XIV.

113.     If MSHA determines that a mine has a "pattern" of S&S violations, the Mine Act and regulations provide that the agency shall notify the mine operator, which is then given an opportunity to improve compliance.  Thereafter, if a mine is notified that it has a pattern of violations, any S&S violation found within ninety days automatically triggers a withdrawal order.  Each additional S&S violation means another withdrawal order until a mine has a "clean" inspection with no S&S violations.  *See* MSHA Office of Assessments, Citations & Order Explanations, Section XIV.

114.     Violations of Sections 104(b), 104(d), and 107(a) of the Mine Act result in "elevated enforcement" ("Elevated Enforcement Actions").  When MSHA issues an Elevated Enforcement Action under these statutory provisions, sections of a mine are shut down entirely and production is stopped.  Accordingly, Elevated Enforcement Actions are the most serious and consequential of all S&S violations.

---

[27] *See* Nat'l Mining Ass'n, Critical Enforcement Auth. of the Fed. Mine Safety & Health Admin., *available at* http://www.nma.org/pdf/safety/042310_enforcement.pdf.

### 1.      Section 104(b) of the Mine Act

115.    There are specific criteria pursuant to which MSHA may issue a citation or order under Section 104(b).  In determining whether to issue a Section 104(b) citation, an MSHA inspector must determine whether there is a reasonable basis for extending a previously issued abatement date.  If an extension of time is not justified and the cited condition is not abated, the inspector must issue a Section 104(b) order of withdrawal.  Upon abatement of the condition or practice cited in the original citation, the withdrawal order is terminated.  *See* MSHA Office of Assessments, Citations & Order Explanations, Section XII.

### 2.      Section 104(d) of the Mine Act

116.    There are also specific criteria pursuant to which MSHA may issue a citation or order under Section 104(d).  A 104(d) citation shall be issued if "(1) there is a violation of a mandatory health or safety standard; (2) the violation significantly and substantially contributes to the cause and effect of a mine safety or health hazard; and (3) there is an unwarrantable failure of the mine operator or contractor to comply with the standard."  Further, MSHA provides that a 104(d) violation is caused by an unwarrantable failure "if it is determined that the mine operator or contractor has engaged in aggravated conduct constituting more than ordinary negligence." *See* MSHA Office of Assessments, Citations & Order Explanations, Section XIII.

### 3.      Section 107(a) of the Mine Act

117.    The purpose of Section 107(a) orders is to immediately remove miners from exposure to serious hazards and prevent miners from entering hazardous areas.  MSHA provides that an inspector cannot issue a Section 107(a) order in the absence of an "imminent danger." "Imminent danger" is defined in the Mine Act as "the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated."  According to MSHA, imminent danger exists

"only when the hazardous condition has a reasonable potential to cause death or serious injury within a short period of time."[28]  An imminent danger order cannot be issued for an accident that has already occurred unless the imminence still exists.  *See* MSHA Office of Assessments, Citations & Order Explanations, Section XVI.

**4.**     **MSHA's Definition of Injuries—NFDL Rates**

118.    According to the "Mining Industry Accident, Injuries, Employment, and Production Data Source and Scope of Current Data and Definitions of Terms," MSHA divides "injuries" into three categories with the following definitions:

> FATAL (work-related injuries resulting in death to employees on active mine property);
>
> ***NONFATAL, DAYS LOST (NFDL) cases (occupational injuries that result in loss of one or more days from the employee's scheduled work, or days of limited or restricted activity while at work);***
>
> NO DAYS LOST (NDL) cases (occurrences requiring only medical treatment - beyond first aid).  "Incidence rates" are the number of injuries in a category times 200,000 divided by the number of employee-hours worked.

119.    Since January 1, 1978, mine operators subject to the Mine Act, such as Massey, have been required under 30 C.F.R. Part 50 to submit reports of injuries, occupational illnesses, and related data.  Massey purported to comply with these requirements during the Class Period.

**G.     Massey's Safety Record During the Class Period**
    **Was Worse Than the Industry as a Whole and**
    **Establishes a Widespread Culture of Non-Compliance**

120.    Despite Massey's claim that its safety record was better than average and that the Company was an industry leader in safety, no U.S. coal company had a worse fatality record

---

[28]  *Available at* http://www.msha.gov/programs/assess/citationsandorders.asp.

than Massey during the last ten years, and Massey's "Large"[29] mines performed worse than the national industry averages as measured by both S&S citations and Elevated Enforcement Actions during the Class Period.

121.    The safety statistics detailed below, compiled from thousands of data entries in MSHA's Open Government Data Sets, establish that when it came to the most serious types of regulations and violations, Massey epitomized a culture of non-compliance, not a culture of safety.  Specifically, MSHA makes eight raw data sets available in text delimited files through its website: (1) Accident Injuries Data Set; (2) Employment/Production Data Set—Yearly; (3) Employment/Production Data Set—Quarterly; (4) Inspections Data Set; (5) Mine Addresses of Record Data Set; (6) Mines Data Set; (7) Violations Data Set; and (8) Section 107(a) Orders Issued Data Set.  *See* http://www.msha.gov/OpenGovernmentData/OGIMSHA.asp.  Six of these raw data sets may be used to analyze accident and citation information.  Specifically, accident analyses use the "Accident Injuries Data Set" and the "Employment/Production Data Set." Citation analyses use the "Inspections Data Set" and the "Violations Data Set."  In order to undertake either accident analyses or citation analyses, one must first use the "Mines Data Set" and "Mine Addresses of Record Data Set" to identify mine operators associated with mine names and MSHA mine identifiers.  Overall safety performance analyses use normalized measures of accident categories and citation categories, and require combining various data sets.  Accuracy is verified by cross-checking data entries in different categories according to mine-size and mine-type.  Accordingly, the raw data does not lend itself to easy interpretation or analysis to provide

---

[29]  The term "Large" mines is used herein to refer to mines at which there are at least 100 employees. This definition matches the classification used by MSHA to compare the safety performance of Massey mines with similar national mines.

the statistical comparisons alleged herein.  Multiple data sets must be worked on to extract the necessary, fragmented  information, which then must be pieced together in a complex process.

### 1. Massey's Fatality Rate Was the Worst in the Nation During the Class Period

122.    Since 2000, 54 workers have been killed at Massey mines, dozens more than at any other company.[30]  This total includes the 23 fatalities before the Upper Big Branch Explosion, 29 fatalities in the Explosion, and 2 fatalities since.  *See* Giovanni Russonello, "Massey had worst mine fatality record even before April disaster." INVESTIGATIVE REPORTING WORKSHOP, Nov. 23, 2010.

### 2. Massey's S&S Citation Rate Was Worse Than the National Industry Average During the Class Period

123.    During the Class Period, Massey performed significantly worse than the national average at its Large underground and Large surface mines as measured by MSHA-issued S&S citations.

### (a) Large Underground Mines

124.    According to MSHA data sets, in 2008, the national average of percent S&S citations at Large underground mines was 32%.  Massey's Company-wide rate, however, was higher at 35.2%.  In 2009, the national average of percent S&S citations at Large underground mines was 31.4%.  Massey's Company-wide rate, however, was higher at 35%.  The chart below, compiled using data from MSHA's Open Government Data Sets, illustrates these comparisons:

---

[30] Both Massey and CONSOL Energy Inc. ("CONSOL") had 23 fatalities between 2000 and 2009, but CONSOL produced more coal than Massey, giving Massey a much poorer ratio of deaths-to-production.



125.    According to a compilation of MSHA data sets, in terms of S&S violations in 2009, half of Massey's ten Large underground coal mines performed either the same as or worse than the 31.4% industry average for 2009.  Alma had a rate of 39.2%; Massey's Roundbottom mine had a rate of 32%; Massey's Allegiance mine had a rate of 35.8%; Massey's Four Mile Deep mine had a rate of 37.6%; and Upper Big Branch had a rate of 39.3%.  The chart below, compiled using data from MSHA's Open Government Data Sets, illustrates these comparisons:





**(b)     Large Surface Mines**

126.    Massey's Large surface mines as compared to the national average of Large

surface mines also performed worse than the national industry average during the Class Period.

In 2008, the national average of percent S&S citations at Large surface mines was 29%.

Massey's Company-wide rate was higher at 31.5%.  In 2009, the national average of percent

S&S citations at Large surface mines was still 29%.  Massey's Company-wide rate, however,

was significantly higher at 41.8%.  The chart below, compiled using thousands of data entries

from MSHA's Open Government Data Sets, illustrates these comparisons:



**3.** **Massey's Elevated Enforcement Action Rate Was Worse Than the National Industry Average During the Class Period**

127.    In terms of Elevated Enforcement Actions, Massey also performed significantly worse than the national average at Large underground and surface mines during the Class Period.

**(a)**    **Large Underground Mines**

128.    In 2008, the national average of Elevated Enforcement Actions per 1,000 inspection hours ("IH") at Large underground mines was 3.4.  Massey's Company-wide rate, however, was 4.84, or 42% higher than the national industry average.  In 2009, the national average of Elevated Enforcement Actions per 1,000 IH at Large underground mines was 2.95.  Massey's Company-wide rate was 7.03, or 138% higher than the national industry average.  The

chart below, compiled using thousands of data entries from MSHA's Open Government Data Sets, illustrates these comparisons:



129.    A Large underground mine-by-mine breakdown of Elevated Enforcement Action data for 2009, reveals that ***all*** of Massey's Large underground mines performed worse than the industry average.  In 2009, the national average of Elevated Enforcement Actions per 1,000 IH at Large underground mines was 2.95.  However, as depicted below, Massey's Freedom Energy Mine had a rate of 3.6; Massey's Alma mine had a rate of 5.27; Massey's Roundbottom mine had a rate of 6.1; Massey's Allegiance mine had a rate of 11.1; Massey's Four Mile Deep mine had a rate of 25.25; and Upper Big Branch had a rate of 28.6—a nearly ten-fold increase

compared to the national industry average.  The chart below, compiled using thousands of data entries from MSHA's Open Government Data Sets, illustrates these comparisons:



**2009 Elevated Enforcment Actions**
**[104(d), 107(a), 104(b)]**
**Large Underground Mines**
*Massey v. National Industry Average*

(b)    **Large Surface Mines**

130.    In 2008, the national average of Elevated Enforcement Actions per 1,000 IH at Large surface mines was 3.67.  Massey's Company-wide rate was significantly higher at 5.78.  In 2009, the national average of Elevated Enforcement Actions per 1,000 IH at Large surface mines was 2.16.  Massey's Company-wide rate was worse at 3.19.  The chart below, compiled using thousands of data entries from MSHA's Open Government Data Sets, illustrates these comparisons:



131.    The statistics cited in ¶¶ 124-130 were material to Massey investors during the Class Period, including Plaintiffs and the Class.  A coal mining company's ability to maintain production is based in large part upon maintaining mine safety in order to avoid being closed down by regulators.  Mine safety is also material to investors who are concerned about the adverse economic effects upon a company that can result from deaths, injuries, and mine shutdowns.

132.    Despite the materiality of these various safety metrics, Massey never disclosed any of them and, indeed, affirmatively hid its poor safety record from the investing public during the Class Period.  Massey simply did not mention S&S citations, Elevated Enforcement Actions, or any other relevant safety compliance measurements in its public statements about safety compliance.  As discussed further below, the Individual Defendants knew of Massey's abysmal safety record by means of the reporting obligations of the SEPPC.  *See supra* at IV.C.

133.    Throughout the Class Period, Massey disclosed only one safety-related metric to the public: NFDL incident rates on a Company-wide basis.  Massey has stated that NFDL rates are "calculated as the number of employee work-related accidents times 200,000 hours, divided by the total employee hours worked."  After the Explosion, however, Massey admitted that the NFDL rates it reported to the public during the Class Period (and statements made in 2008 about 2007 NFDL rates) were materially false, and required restatement.

134.    On September 30, 2010, while Massey understood it was being subjected to a substantial amount of scrutiny arising from the Explosion, Massey acknowledged and detailed the Company's false NFDL rates in its Letter to Stakeholders as follows:

> In the aftermath of the [Explosion], Massey began a meticulous review of the Company's accident reporting at all of its facilities. ***The results from this review have revealed errors in previously reported non-fatal injury rates (NFDL rates) for Massey operations from 2007 thru [sic] 2009.  Massey's review resulted in the following adjustments:***
>
> ***Massey's NFDL rate for 2007 increased from 2.05 to 2.63; Massey's NFDL rate for 2008 increased from 1.94 to 2.52; and Massey's NFDL rate for 2009 increased from 1.67 to 2.33.***
>
> . . . While the Company is disappointed in the lapses in its reporting procedures …. The Company is working to ensure that similar reporting errors are avoided in the future and Massey remains committed to putting the safety and health of our miners first.

135.    The Company's restated NFDL rates are materially higher than originally reported—Massey's 2007 restated NFDL rate increased by 28%; Massey's 2008 restated NFDL rate increased by 30%; and Massey's 2009 restated NFDL rate increased by 40%.  Indeed, as disclosed by Massey, with each year during the Class Period, Massey increased the extent to which it falsely inflated NFDL rates.

136.    On December 28, 2010, Massey released its 2010 Corporate Social Responsibility Report (the "2010 CSRR").  The 2010 CSRR also reported the Company's restated NFDL rates for 2007, 2008, and 2009.

137.    These claims of material "lapses in reporting procedures," resulting in materially deflated NFDL rates with which Massey made broad claims as to its safety record, are particularly peculiar and lack credibility given that CW 12, a former senior executive who worked at Massey for more than eight years and reported directly to Defendant Tolbert during the Class Period until February 2009, has stated that Blankenship and other executives in senior management tracked and reviewed reports on lost time due to accidents regularly, possibly even daily.

138.    Further, NFDL incident rates are not a safety compliance metric as Defendants wanted investors to believe.  NFDL rates measure days lost from injuries, ***not compliance*** with mine safety laws and regulations.  NFDL rates are simply a statistical value used to measure worker injuries that by definition do not reflect fatalities, near misses, patterns of violations, S&S citations, Elevated Enforcement Actions, or any other type of mine safety compliance measure, much less the Company's compliance with all mine safety laws and regulations.

139.    As illustrated by the following chart, a comparison of Massey's NFDL rates to the total number of MSHA citations and orders issued to the Company between 2007 and 2009 reveals that reported NFDL and regulatory safety compliance are not at all correlated:



140.    Therefore, Defendants' disclosure of NFDL rates during the Class Period was a materially insufficient means to inform investors of the overall safety of Massey's operations.

**H.    Massey Used Improper Tactics to Manipulate NFDL Rates**

141.    During the Class Period, Massey had an undisclosed policy that reduced NFDL rates by encouraging injured miners to report for work despite their injuries and despite the fact that they were, as a result of injuries, physically unable to maintain their regular duties.  When Massey employees were put on light duty (or restricted work activities), despite a legal requirement otherwise, Massey did not require that injury reports be filled out.  This policy violated MSHA's regulations, decreased the reliability of NFDL rates as an indicator of mine safety and improving conditions over time, and deceived the investing public during the Class Period.

142.     Pursuant to this surreptitious policy, management either allowed or encouraged—even coaxed and shamed in some cases—injured miners to continue working to avoid a "days-lost incident" that would affect the Company's NFDL rate.  Recent Congressional testimony by three former Massey miners describe the Company's manipulation of NFDL rates in this regard.

143.     According to the July 13, 2010 testimony of "Goose" Stewart before the House Labor Committee: "Massey sends a safety director to the hospital to pressure miners hurt on the job to return and sit in the office so their accident doesn't get listed as a 'lost time accident.'"  On April 27, 2010, another former Massey miner, Jeffrey Harris, testified before the Senate HELP Committee about the Company's safety record as measured by NFDL rates:

> Reports about Massey's lost time accidents are also misleading . . . .  If you got hurt, you were told not to fill out the lost time accident paperwork.  The Company would just pay guys to sit in the bathhouse or to stay home if they got hurt – anything but fill out the paperwork.

144.     Former Massey miner, Chuck Nelson, similarly testified before the Senate HELP Committee on April 27, 2010:

> I've hauled people out of the mines on a stretcher, at Massey mines . . . .  And the very next day you'll see 'em walking up the hill, coming back to the mine office on crutches and [in] neck braces – just to keep from having a lost-time accident, to keep 'em from filling out an accident report.

145.     On this point, Cecil Roberts ("Mr. Roberts"), the President of the United Mine Workers of America ("UMWA"), testified on May 20, 2010 before the Senate Appropriations Committee:

> [The UMWA] ha[s] witnesses and people who work at Massey who tell us that when you get injured at Massey, well, when you get to the emergency room, someone from human resources meets you there.
>
> And we've got one young man who had his finger cut off.  And the person from human resources said to this young man who happens

– incidentally, worked at Upper Big Branch – "You don't have to take time off here. You can come back to work, and we'll give you light duty *and that way we don't report this."*

We also have evidence that they have at least one individual that we know of that has three broken bones in his back, and he's working at Massey. So that's not a lost time accident at Massey. *So I think the statistics are borderline fraudulent here.*

When you're paying people who are hurt and would be off any other coal mine in this nation and taking time off from work and getting worker's comp[ensation] or S&A benefits, and you're paying those people to come to work and say, "Look what I've done."

And I think there's another important thing here that is troublesome to us – is in *Mr. Blankenship's package that he has with the company, he gets a bonus for reducing lost time accidents.* So we take company money, and we pay someone who's injured to come to work, and then [Blankenship] gets a bonus because he reduced lost time accidents.

146. In testimony *immediately following Mr. Roberts* at the same May 20, 2010 hearing, Blankenship did not dispute Mr. Roberts' testimony, but instead confirmed the Company's policy of making light duty work available to injured miners, though he studiously avoided making reference to the requirement to fill out the requisite NFDL incident paperwork in such circumstances, thereby failing to refute Mr. Roberts' testimony on that issue:

A guy that's going to get 60 percent of his pay to stay home, who has [the] tip of his finger cut off, may choose that he wants to work as a dispatcher or something that he can productively do rather than stay home. We don't require that. We can't require that. The law prohibits requiring that. But, in fact, we make that opportunity available to people who would want to choose to do that . . . . I don't think it's a bad practice, so long as the guy can fully perform the job that's available for him.

147. Blankenship's own explanation indicates that he knew of the incentives that Massey was providing injured workers and, together with his failure to refute the testimony as to Massey's foregoing unlawful policy and practice regarding the non-reporting of injuries, also

shows that he knew that those incentives reduced the reliability of the Company's reported NFDL rates.

148.    The testimony of Stewart, Harris, and Roberts quoted above is corroborated by numerous former Massey employees who prefer to remain anonymous for fear or reprisals. For example, according to CW 4, Massey mine bosses tried to convince workers that they were not hurt as badly as originally thought so that they would not fill out lost-time incident reports. Further, according to CW 4, workers were assigned to light duty jobs in lieu of taking time off due to injuries in order to avoid paperwork (which should have been filled out in any event). For example, according to CW 4, injured workers were assigned to clean the "bath house" or to be dispatchers instead of taking time off from work altogether, and workers were even paid to stay home at full pay in order not to fill out lost-time incident reports. CW 4 noted that Massey miners were looked down upon if they filled out an injury-related report, and that "contract employees" were fired for insisting on filling out lost-time incident reports.

149.    CW 2, a former "Rock Truck" driver at Massey's West Cazy surface mine between October 2007 and April 2009, explained that there was a "big board" on site at the West Cazy mine which tallied days lost to injuries. CW 2 explained that there was pressure not to report injuries in order to keep the days lost number on the "big board" low. CW 2 recalled one specific incident in which an "old" dozer operator was "thrown through the windshield" of his bulldozer, but that this colleague's injury did not give rise to filling out an injury report at Massey.

150.    According to one former Massey miner with 15 years of experience, as alleged in the Manville Action, Company management was exceptionally focused on keeping the Company's NFDL rate down and regularly encouraged miners to work while injured. *See* Ex. F

at 25.  As described by this former Massey employee, at an annual 8-hour retraining in March 2010, management reiterated the importance of keeping the NFDL rate low by returning to work after an injury.  At the meeting, management singled out a particular miner as an exemplary employee for returning to work the day after suffering an injury that may have caused others to stay home and incur a lost-time incident.  *Id.*

151.    According to CW 13, who worked as a "Roof Bolter" between approximately March 2006 and October 2006 at Massey's Keppler, Road Fork #51, and Upper Big Branch mines, when a friend of his broke his arm and was slated to be out longer than four days, he was told by a Massey manager to go back to his doctor to get a "release" so he could return to work in some limited capacity and not fill out a lost-time incident report.   CW 13 stated that once a worker came back with a "release" from his doctor, the NFDL report would be "tore up." Further, according to CW 13, his friend complied with this request because workers who insisted on staying out when injured put their jobs in "jeopardy."

152.    Indeed, Massey used scare tactics and intimidation to foster an environment in which workers were discouraged from raising safety concerns and reporting injuries.  For instance, Mr. Harris testified before the Senate HELP Committee on April 27, 2010, "[y]ou might wonder why we would work if we thought it was dangerous.  The answer is simple: either you worked or you quit [and if] you complained, you'd be singled out and get fired."

153.    Former Massey coal miner Chuck Nelson similarly told *The Washington Independent* on April 27, 2010 that "I knew that if I said something [about safety], I wouldn't have a job tomorrow."

154.    Mr. Stewart similarly testified in front of the House Labor Committee on May 24 and July 13, 2010 about Massey miners' fears if they spoke up about existing dangerous conditions.  According to "Goose" Stewart:

> The morale around the mine for the most part was bad.  No one felt they could go to management and express their fears or the lack of air on our sections.  We knew that we'd be marked men and the management would look for ways to fire us.  Maybe not that day, or that week, but somewhere down the line, we'd disappear.  We'd seen it happen and I told my wife, I felt like I was working for the Gestapo at times.

> *    *    *

> They want you to load coal at all costs **and I feel that mentality is handed down from top management.**

> *    *    *

> I've worked the long wall in dust so thick I couldn't see my hand in front of my face and I couldn't breathe because of improper ventilation.  I once went to the assistant coordinator and asked why we didn't have proper air on the long wall face.  I was told "it's funny you're the only one to say anything about it."  My response was "that's because they are too afraid of to lose their jobs to say anything."

155.    Other Massey miners who worked at Upper Big Branch who came forward to identify safety hazards were frequently threatened and intimidated.  For example, in testimony provided on May 24, 2010 before the House Labor Committee, Steve Morgan, a miner for twenty-nine years, testified that his son Adam, a miner at Upper Big Branch, had communicated his concerns about ventilation, methane, dust, and working as a trainee under unsafe conditions. In response to these concerns, Adam Morgan was told by his boss "if you're going to be that scared of your job there you need to rethink your career."

156.    According to CW 14, a former Massey employee who worked at Massey's Diamond Energy mine in 2007 and in Massey's Guyandotte Energy Slope #2 mine in 2009, one

of the biggest problems at Massey was that workers were afraid to question or point out safety issues for fear of being fired.

157.    Massey miner Rickey Lee Campbell ("Campbell") said that he was fired from Massey after complaining of unsafe working conditions at two of the Company's mines, including Upper Big Branch.  The *Pittsburgh Post-Gazette* reported Campbell as saying that "[Upper Big Branch] was one of the worst I've ever been in."  The U.S. Department of Labor's preliminary investigation has thus far concluded that Campbell's complaint "is not frivolous" and that "there is reasonable cause to believe that Mr. Campbell's dismissal was motivated by the exercise of protected activities."

158.    Given the forgoing widespread practice at Massey used to discourage miners from filling out lost-time incident reports, the Company's NFDL rates, even as restated, were false and misleading during the Class Period.

## I.    Massey Used an Unlawful Early Notification System to Deceive MSHA Safety Inspectors and to Hide the Dangerous State of its Mines

159.    Massey maintained an illegal "early notification system" to deceive MSHA inspectors and to hide inadequate safety compliance at Company mines.  In connection with this early notification system, Massey used a secret secondary radio channel and specific code words to warn miners that MSHA inspectors had arrived.

160.    As alleged in the Stover Indictment, Stover, the Chief of Security at Upper Big Branch who was very close to Blankenship and served as his personal driver during the Class Period, employed a secondary radio channel called the "Montcoal channel" to give early notification of an MSHA inspector's arrival to miners so that they could cover up safety violations prior to inspection.

161.    The Stover Indictment alleges that Stover ordered the disposal of thousands of pages of documents stored in the Barracks at Upper Big Branch that evidence this scheme.  The documents, which were disposed of by one of Stover's subordinates on or about January 11, 2011, are said to specify the precise times and dates of MSHA inspectors' arrivals.

162.    The undertaking described in the Stover Indictment was strategic:

> On approximately January 11, 2011, [Stover's subordinate] carried out defendant Hughie Elbert Stover's instruction by sorting through the documents in the Barracks garage, preserving at the direction of defendant Hughie Elbert Stover, a limited number of documents related to property transfer and equipment removal, and disposing of thousands of pages of security-related documents in the trash compactor.

> At the time he ordered [his subordinate] to dispose of the documents, [Stover] knew that the FBI and MSHA were conducting an investigation into allegations of criminal conduct involving [Upper Big Branch], including allegations that advance notices of inspections had been given at [Upper Big Branch], in violation of the Mine Act.

163.    In addition to the allegations in the Stover Indictment regarding the use of the clandestine Montcoal channel, numerous former Massey employees explain that it was a regular practice to use code words and phrases to alert miners to the presence of MSHA investigators at a mine's guard gate in order to allow them to fix non-compliant conditions before the MSHA investigators could get to the miners' respective sections.

164.    On July 13, 2010, for example, Stewart testified before the House Labor Committee: "management regularly violated the law concerning advance warning on inspector arrivals."  Stewart explained that "[a] section boss underground would be called from outside and be told, *'it's cloudy outside'* or *'there's a man on the property'* meaning there is an inspector outside, get things right to pass inspection."

165.    Gary Quarles, a former Massey employee, similarly testified to Massey's tactics in this regard on May 24, 2010 before the House Labor Committee:

> When an MSHA inspector comes onto a Massey mine property, the code words go out ***"we've got a man on the property."*** Those words are radioed from the guard gates and relayed to all working operations in the mine.  The mine superintendent and foreman communicate regularly by phone, and there are signals that require the foreman who is underground to answer the phone.  That is one way that the message is conveyed that an inspector is on the property.  When the word goes out, all effort is made to correct deficiencies or direct the inspector's attention away from any deficiencies.

166.    Clay Mullins, a former Massey employee who worked at Upper Big Branch, also testified before the House Labor Committee on May 24, 2010 about the signals that Massey guards would send to mine management: "[W]hen an inspector came by the guard shack they would . . . call the sections and tell them we have an inspector on the property and make sure everything was right and if it wasn't to fix it."

167.    According to CW 4, a "Belt Buster" at Upper Big Branch who worked at Massey for 12 years until 2006, when an MSHA inspector arrived at the "guardhouse," a call would be placed to the mine office, and from there word went down to the miners that an inspector was on site so that any items that could be cited in a safety inspection could be rectified *ad hoc—e.g.*, ventilation curtains[31] not in place or excessive amounts of coal dust.

168.    According to CW 15, a former "Dozer Operator" at Massey's Black Castle mine between July 2006 and April 2008, whenever an inspector arrived at Black Castle a communication would be made from the guard house to the mine so that safety violations could be rectified by the time the MSHA inspector arrived at a particular mine section.

---

[31] "Ventilation curtains" are a safety feature hung to direct currents of fresh air to miners and sweep methane out of the mine.

169. CW 8 further corroborated that a call would go from to the "guard gate" to the mine office and word would get down to the miners to put things in order and to "get the [ventilation] curtains up."

170. According to CW 6, a former electrician at Upper Big Branch from approximately 2001 through 2006, when an MSHA safety inspector showed up for a surprise inspection, a call would go out from the "guard shack" to the mine office that a ***"load of cinder blocks"*** had arrived. According to CW 6, production would stop with that cue so that miners could make sure safety procedures were back in place—*e.g.*, hang ventilation curtains.

171. CW 16, a former "Bolt Top Operator" at Massey's Seng Creek mine between February and May 2010, stated that there was a system in place wherein when an inspector was on site, communications would be made from the guard shack to the mine office to the mine so that safety procedures could be put back in place. CW 16's account is consistent with the accounts of Stewart, Quarles, Mullins and certain of the confidential witness accounts described above.

172. These accounts further dovetail with statements made by Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, on May 20, 2010 before the Senate Appropriations Committee. Secretary Main explained that MSHA had recently changed inspection tactics at Massey mines: "MSHA made unexpected inspections in the evening and in two cases captured the mine phones preventing calls underground to warn of the inspection. . . ." According to Secretary Main's statement, inspectors found a number of illegal mining practices, including "mining of coal several feet beyond legal limits; mining without air movement to prevent mine explosions and exposure to dust levels that can cause black lung; inadequate rock dusting, which is a critical protective measure to prevent coal dust explosions; blocking of miner

escapeways by accumulated water; inadequate mine examinations by the mine operator; and

mine roof conditions exposing miners to roof fall hazards."  As a result of these inspections,

"MSHA issued several closure orders requiring the withdrawal of miners."  These raids came in

response to anonymous tips about conditions at Massey mines by miners "so fed up with the

conditions that they were working in, that they called MSHA."  Main ended his testimony by

noting that "the conduct that [MSHA] found could not be considered any more outlawish."

### J.      <u>Red Flags Raised but Recklessly Disregarded by Massey</u>

173.     Massey's above-average fatality rate, S&S citation rate, and Elevated

Enforcement Actions rate, and false and misleading NFDL rates were red flags that the Company

ignored when measuring and reporting its safety performance to investors during the Class

Period.

174.     Further, there were a litany of serious, particularized red flags at Upper Big

Branch prior to the Explosion that Massey plainly ignored, thus jeopardizing mine workers'

safety.  MSHA has made available to the public the citations issued at Upper Big Branch,

including information on S&S citations and Elevated Enforcement Actions during the Class

Period.  The records released by MSHA show that the number and severity of violations at

Upper Big Branch increased dramatically in 2009 and 2010, putting Massey on notice that the

mine was like a "ticking time bomb."  Statement of Mr. Stanley Stewart before House Labor

Committee, May 24, 2010.

175.     In 2009, MSHA citations at Upper Big Branch more than doubled from 2008 to

more than 500, and proposed fines more than tripled to $897,325.  Moreover, in 2009 MSHA

issued 202 S&S citations to Upper Big Branch, almost equaling the 204 S&S citations issued to

Upper Big Branch during the 24 months prior to December 2007, when the mine was placed on

pattern of violations status.  Indeed, Secretary Main confirmed on April 27, 2010 before the

Senate HELP Committee: "Were it not for a computer error in the screening process, [Upper Big Branch] could have been placed into potential pattern of violations status in October of 2009, when the last pattern of violations review for this mine took place."

176.    Further, in the first three months of 2010, Upper Big Branch was the subject of 124 citations and 53 assessed penalties totaling $188,769.  MSHA records also show that MSHA had issued 61 withdrawal orders to Upper Big Branch in 2009, shutting down parts of the mine 54 times in 2009.  MSHA also issued numerous withdrawal orders in the first 3 months of 2010, shutting Upper Big Branch down 7 times.  As reported in the *Charleston Gazette* on April 8, 2010, Tony Oppegard, a former MSHA regulator, described the 61 withdrawal orders as "way off the charts."

177.    Of the 54 withdrawal orders issued at Upper Big Branch during 2009, 48 of them occurred following express findings that Performance Coal exhibited an "unwarrantable failure" to comply with federal safety standards, and four involved "failure to abate" problems identified in previous citations.  Of the seven withdrawal orders issued in 2010, six involved "unwarrantable failures," and one resulted from a "failure to abate" the subject of previous complaints.

178.    As further reported in *Washington Post*, Oppegard also stated that, with regard to the number of withdrawal orders issued at Upper Big Branch in 2009 and 2010, "You're past the point of a red flag and you're really in a crisis situation."  In comments to the *Associated Press* reported on April 6, 2010, Ellen Smith, editor of *Mine Safety & Health News*, expressed similar sentiments: "I've never seen that many [withdrawal orders] for one mine in a year.  If you look at other mines that are the same size or bigger, they do not have the sheer number of 'unwarrantable' citations that this mine ha[d]."

179.    Notably, in 2009, Upper Big Branch was cited hundreds of times for "mine ventilation" violations, and received 37 complaints of "accumulations of combustible materials." As reported on April 7, 2010 in *The New York Times*, two miners, interviewed on condition of anonymity for fear of losing their jobs, recounted how the mine had been evacuated for dangerously high methane levels in the two months prior to the Explosion.

180.    Robert Ferrier, a 27-year veteran of MSHA who is now with the Mine Safety Program of the Colorado School of Mines, called the ventilation problems at Upper Big Branch "highly unusual" in comments to *Bloomberg News*.  He noted: "They were not getting air into places where they said they would."  Characterizing the nature of the violations in an article appearing in the *Charleston Gazette* on April 8, 2010, West Virginia University law professor and coal industry expert Pat McGinley commented, "We are not talking about parking tickets here.  When a mine's ventilation system isn't working properly or there is an unacceptable accumulation of coal dust even for an hour, miners [sic] lives are put at risk."

181.    A graphic reflecting the ventilation-related citations and orders received at Upper Big Branch in 2009 and 2010 is depicted below.  The red arrows indicate the path of "return air." The black arrows represent the path of "intake air" and "neutral air."  The combination of arrows and lines indicates the flow of intake air streaming into the longwall panel and to the Headgate 22 and Tailgate 22[32] working sections all the way to the working mine faces (*i.e.*, where coal was cut).  The arrows then show the path of the return air all the way to the Bandytown fan.[33]  The citations are arranged on the illustration with respect to where on the air pathway violations were generally found, demonstrating multiple violations throughout the pathway.

---

[32]   In a longwall mine such as Upper Big Branch, "gate roads" are constructed along the longwall's path before mining begins.  The gate road along one side of the block is called a "maingate" or "headgate."  The gate road on the other side of the longwall is called a "tailgate."

[33]   The "Bandytown fan" was the main exhaust fan at Upper Big Branch.



Ventilation Citations at Upper Big Branch in 2009 and 2010

182.     In an interview with *The New York Times* published on April 7, 2010, Davitt McAteer, head of MSHA during the Clinton Administration, also called recent substandard-ventilation violations and other reported problems at Upper Big Branch "cardinal sins." Characterizing Upper Big Branch's S&S and Elevated Enforcement Actions in March 2010 alone—including almost daily citations related to improper ventilation or the dangerous accumulation of coal dust—McAteer told *ABC News* on April 6, 2010: "That's a red flag.  That's saying, 'wait a minute, something's gone wrong here.'"  McAteer also spoke with the *Associated Press* about safety compliance on April 6, 2010:  "There are mines in the country who have operated safely for twenty years.  There are mines who take precautions ahead of time.  There are mines who spend the money and manpower to do it.  Those mines don't blow up."

183.     Kevin Stricklin, an MSHA administrator, expressed similar sentiments in comments to *The New York Times* reported on April 7, 2010:  "The magnitude of the explosion showed that something went very wrong here . . . .  All explosions are preventable.  It's just making sure you have things in place to keep one from occurring."

184.     To show the extent to which Upper Big Branch deviated from the national average performance, MSHA has released the following graphs.  The first graphic reproduced below illustrates the number of citations issued to Upper Big Branch relative to its district—District 4—and the nation as a whole.[34]

---

[34]  The U.S. Department of Labor provides a "Coal Mine Safety and Health District" for each mine in the nation.  Upper Big Branch is located in District 4.  All mine plans required to be filed with MSHA are filed with the District Manager.  The District Manager of District 4 during the Class Period was Robert G. Hardman.



| | 2008 | 2009 |
|---|---|---|
| UBB | 198 | 515 |
| District 4 | 102 | 282 |
| Nation | 124 | 292 |

**This graph compares mines with similar employment and production characteristics.**

185.    MSHA has also released the following graph to illustrate the percent of S&S

citations issued to Upper Big Branch relative to District 4 and the nation as a whole:



| | 2008 | 2009 |
|---|---|---|
| ■ UBB | 0.421 | 0.397 |
| ☐ District 4 | 0.361 | 0.387 |
| ■ Nation | 0.319 | 0.336 |

**This graph compares mines with similar employment and production characteristics.**

186.   MSHA has also released the following graph to illustrate the number of Elevated

Enforcement Actions per 1,000 IH issued at Upper Big Branch relative to District 4 and the

nation as a whole:



This graph compares mines with similar employment and production characteristics.

|  | 2008 | 2009 |
|---|---|---|
| UBB | 4.63 | 29.67 |
| District 4 | 3.28 | 4.21 |
| Nation | 2.3 | 3.31 |

187.    The myriad red flags raised at Upper Big Branch that were knowingly or recklessly ignored by Massey culminated in the Explosion.

**K.    The Explosion**

188.    At approximately 3:30 p.m. on April 5, 2010, the longwall shearer at Upper Big Branch was cutting coal and sandstone in the mine's roof.  As the shearer was cutting, one or more sparks were generated by contact between the shearer's cutting bits and the sandstone.  The spark(s) combined with methane and/or natural gas, causing the explosive gas to ignite.  The gas explosion ignited significant amounts of float coal dust on the longwall.  The float coal dust explosion then propagated down the entire length of Upper Big Branch's longwall panel, turned

the corner at the mine's headgate, and continued to kill along its path to Ellis Mains.[35]  Twenty-nine miners died.

189.    After the Explosion, MSHA began an investigation at Upper Big Branch and increased inspection and enforcement activities at numerous other Massey mines.  MSHA's investigation is being conducted in coordination with and with cooperation from the West Virginia Office of Miners' Health, Safety & Training Team ("OMHST") and the West Virginia Governor's Independent Investigation Team.

190.    No fewer than *18* Massey executives have invoked their Fifth Amendment rights not to incriminate themselves during the MSHA interview process—including Defendants Blankenship and Adkins.

191.    After on-site investigations underground at Upper Big Branch by 10 MSHA Mine Dust Survey Teams, 7 MSHA Mapping Teams, 3 MSHA Electrical Teams, and an MSHA Ventilation Team, Geology Team, Flames and Forces Team, and Evidence Collection Team, preliminary findings have been made public.  According to MSHA, the cause of the Explosion largely involved basic mine safety practices that were not adhered to:  inadequate water sprays, dull cutting bits, and extraordinary levels of float coal dust due to inadequate rock dusting.

192.    These contributory factors—the meat and potatoes of mine safety practices—were all controllable by conforming to straightforward safety procedures and regulations.  In fact, adequate water sprays and good rock dusting are among the most elementary safety practices that "make[] every explosion preventable."  Kevin Stricklin, Massey Family Meeting Transcript, Jan. 19, 2010.

---

[35]  "Ellis Mains" is the northern most set of main entries on the eastern side of Upper Big Branch.

193.     Water sprays are a critical safety component in any underground mine.  Water sprays wet (and therefore inertize) and isolate coal dust away from mine workers.  Water sprays are supposed to direct fine water droplets toward the area where a shearer's cutting bits contact a mine's roof.  These water sprays create a sort of "water curtain" to keep floating and respirable dust isolated and away from miners.  Water sprays also cool the metal portion of a shearer's cutting bits[36] and quell any sparks generated from the shearer's cutting action to quench frictional ignition.  If fine coal dust particles are not wetted well, they are much more likely to be involved in a coal dust explosion.  If water sprays are not maintained in accordance with a ventilation plan, and particularly if they are not spraying fine water droplets, the area of contact between a shearer's cutting bits and a mine's roof will not be sufficiently wetted and cooled.  This leads to dry float coal dust suspended in the air which under the right circumstances, as here, explodes.  Notably, legally-compliant water sprays are easy to monitor because they are readily visible when regularly examined at the headgate according to standard practice.

194.     In a presentation made by MSHA on January 19, 2011 to the families of deceased miners (the "Family Meeting Presentation"), MSHA explained that the condition of the water sprays at Upper Big Branch was shocking prior to the Explosion.  The flow of water from the sprays on the shearer drum was non-compliant—four sprays were visibly missing and streams of water were flowing, as opposed to the requisite cloud of fine water mist or droplets.  MSHA explained this at the Family Meeting as follows: "It almost looks as if a garden hose has water coming out of it while the other sprays do not have water coming out of them.  And again, our opinion is that this was in place at the time of the [E]xplosion."

---

[36] Cutting bits are conical, carbide-tipped bits used  to cut coal from the coal face on a longwall shearer drum or continuous mining machine drum.

195.    In the same Family Meeting Presentation, MSHA explained that prior to the Explosion, Massey miners were also using dull cutting bits, *i.e.*, bits which had lost their tungsten carbide tip.  Cutting bits need to be changed when the steel is worn, or if the carbide tips fall out, and they get worn very quickly.  Worn bits also generate more fine float coal dust than sharp bits, and thus it is a best safety practice to check and change worn bits with every full shearer pass.  Dull bits generate sparks upon contact with sandstone, and sparks caused by dull bits can be hot enough to ignite methane and coal dust—especially coal dust that has not been well wetted by adequate water sprays.  Industry experts state that even one dull bit is sufficient to generate sparks hot enough to ignite methane and non-compliant float coal dust.  Significantly, cutting bits are both easy to fit and relatively inexpensive.  Massey, however, did not use standard operating procedure to check and change worn bits as needed during the Class Period.

196.    have a standard operating procedure in place to check and change worn bits as needed during the Class Period.

197.    Further, MSHA reported in the Family Meeting Presentation that there were extraordinary levels of float coal dust at Upper Big Branch prior to the Explosion.[37] Approximately *80%* of all dust samples taken showed that they were out of compliance with the regulation associated with rock dusting—Section 75.403 of the Mine Act.  This shocking condition permitted the propagation of the Explosion through the mine.   Indeed, rock dusting is the primary means of defense against coal dust explosions in underground coal mines, and is a basic safety practice that simply involves spraying a white powder (usually pulverized limestone) onto exposed mine surfaces.

---

[37] Float coal dust is required to be inertized by the application of rock dust (usually pulverized limestone).

198.     As illustrated on the diagram below, float coal dust was, as described by MSHA, the "fuel" for the Explosion, with each black dot indicating a location where there was non-compliant coal dust.  Such non-compliant coal dust was present virtually throughout the mine:



○ Location of Compliant Dust Sample

● Location of Non-Compliant Dust Sample

● Location Too Wet for Dust Sampling

● Location Inaccessible for Dust Sampling

199.     Consistent with MSHA's findings and the graphic above, CW 11, who serves on a team designated under the Mine Act as a Miner's Representative for purposes of the recovery of the miners and investigation into the causes of the Explosion, and who has personally worked alongside MSHA inspectors underground at Upper Big Branch, confirms that Massey miners did not properly rock dust the "outby" areas surrounding the longwall and elsewhere throughout the mine, noting that the mine was the "blackest" he had ever seen.  When asked why miners would not rock dust if rock dusting is a critically important safety measure, CW 11 explained that rock dusting "takes time away from production.  Simple as that."

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

200.     Prior to and during the Class Period, Defendants made materially false and misleading statements and omissions regarding Massey's regulatory compliance, the safety of its operations, its costs of production, and its ability to maintain or increase the rate of metallurgical coal production at the Company.

201.     Defendants' false statements and omissions created or maintained inflation in Massey's stock price during the Class Period, including by preventing price declines that would have resulted from complete, accurate, and truthful disclosure of information about the safety and regulatory compliance of Massey mines and other concealed conditions at the Company's operations as alleged herein.

### A.     February 2008 Statements

202.     On February 1, 2008, the first day of the Class Period, Massey issued a press release that was filed with the SEC on a Form 8-K titled "Massey Energy Reports Fourth Quarter 2007 Results, Caps With Record EBITDA."  The press release stated that fourth quarter financial results were positive and that the "2007 injury incident rate (NFDL) per 200,000 man hours

declined to a record low 2.05."  Additionally, Defendant Blankenship was quoted in the press

release:

> "We were pleased to conclude 2007 having set a company record for EBITDA, having increased our cash by $126 million, and having ***set a company safety record for the lowest injury incident rate in our history***," said Don Blankenship, Massey's Chairman and Chief Executive Officer.  "***In all we do, safety is our first priority every day,*** so this record is something we are very proud of.  ***Running safe mines is the best way to ensure shareholder value***."

203.    The same day, Massey held a conference call with analysts to discuss its 2007

fourth quarter results.  Defendant Phillips stated that "we had the most successful year ever,

specifically in terms of EBITDA, increased cash balance and improving the safety of our

miners."  Further, Defendant Phillips said:

> I would be remiss if I didn't acknowledge the positive results of our safety improvement initiatives.  As you know, safety is job one everyday at Massey.  For 2007, we are very pleased to have reduced ***our NFDL incident rate to 2.05***, which was a Company record and significant [sic] below the industry average of 3.31.  ***We have several mines which incurred zero loss time injuries for 2007*** . . . .

204.    The statements in ¶¶ 202-03 were materially false and misleading when made.  As

set forth in greater detail above, statements professing that safety was the "first priority every

day" were false and misleading when made because production, not safety, was the first priority

at Massey during the Class Period.  This is demonstrated by unsafe working conditions at

Massey mines, particularly the Company's Large underground and surface mines, which had the

worst fatality rate in the nation, and had a worse than national industry average performance as

measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G,

*supra*.  Further, Massey failed to disclose that the Company used a widespread early notification

system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in

order to avoid even more MSHA citations and orders—and mine shutdowns.  *See* Section IV.G *supra*.  The statements above relating to Massey's NFDL rates were also not accurate.  The Company's reported NFDL rate of 2.05 for the year 2007 required a subsequent restatement to 2.63 due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, *see* Section IV.G, *supra*, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered statements like "we have several mines which incurred zero loss time injuries for 2007" materially misleading.  In addition, the Company's statement that it believed that "[r]unning safe mines is the best way to ensure shareholder value" was plainly inconsistent with Massey's production-driven approach to running coal.

205.    The market reacted positively to the news of positive fourth quarter results, and Massey's improved safety record ostensibly demonstrated by a better than industry average and all-time low NFDL rate and increased production promises.   Analysts raised earnings estimates and price targets for the Company's stock.[38]  On this news, the Company's stock price increased 5.08% from the prior day to close at $38.92 per share on February 1, 2008.

---

[38]  *See, e.g.*, Caris & Co., Raising PT to $48 from $36; Reaffirm 2*/AA Rating, Feb. 5, 2008; Bear Stearns, A Solid Year – Momentum Building – Raising 2009 Estimate and YE 2008 Price Target Reaffirm Outperform Rating, Feb. 4, 2008.

206.    Had investors known that Massey was concealing widespread regulatory and safety violations at its operations, the price of Massey securities would not have risen as much, if at all, on this news, as investors would have realized that: (i) the Company's per-ton costs of production would need to increase significantly above historic levels to meet mine safety standards and other regulatory requirements, thereby limiting the opportunities for growth by expanding production at existing mines; and (ii) the Company's existing operations gave rise to heightened risk of regulatory fines, work stoppages, legal claims and mine disasters that would further jeopardize Massey's financial condition and prospects for success.

207.    On February 29, 2008, Massey issued its Form 10-K Annual Report with financial results for fiscal year 2007, ending December 31, 2007 (the "2007 10-K").  The 2007 10-K was filed with the SEC and signed by Defendants Blankenship, Tolbert, Crawford, Foglesong, Gabrys, Gee, Judge, Moore, and Phillips.  In a section of the 2007 10-K entitled "Environmental, Safety and Health Laws and Regulations," the Company stated:

> *We endeavor to conduct our mining operations in compliance with all applicable federal, state and local laws and regulations.* However, even with our substantial efforts to comply with extensive and comprehensive regulatory requirements, violations during mining operations occur from time to time.

208.    The 2007 10-K also included a section entitled "Item 1A. Risk Factors."  The section stated that if Massey failed to comply with safety laws, regulations, or enforcement policies, MSHA or other agencies could temporarily or permanently shut down Massey's mines:

> *Federal and state government regulations applicable to operations increase costs and may make our coal less competitive than other coal producers.*
>
> We incur substantial costs and liabilities under increasingly strict federal, state and local environmental, health and safety and endangered species laws, regulations and enforcement policies. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the

90

imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations. We may also incur costs and liabilities resulting from claims for damages to property or injury to persons arising from our operations.  See Item 1. Business, under the heading "Environmental, Safety and Health Laws and Regulations" for further discussion of this risk.

*          *          *

*MSHA or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed, which could adversely affect our ability to meet our customers' demands.*

MSHA or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed.  Our customers may challenge our issuance of force majeure notices in connection with such closures.  If these challenges are successful, we may have to purchase coal from third party sources to satisfy those challenges, negotiate settlements with customers, which may include price reductions, the reduction of commitments or the extension of the time for delivery, terminate customers' contracts or face claims initiated by our customers against us.  The resolution of these challenges could have an adverse impact on our cash flows, results of operations or financial condition.

(Emphases in original.)

209.    The statements in ¶ 207 were materially false and misleading when made because, as set forth in greater detail above, Massey violated federal law and regulations deliberately and regularly, and not from "time to time."  During the Class Period, Massey's Large underground and surface mines were consistently in violation of the Mine Act and MSHA regulations, plagued by ever-increasing S&S citation and Elevated Enforcement Actions that Defendants ignored and covered up during the Class Period.  *See* Sections IV.G, *supra*.  As such, Massey's mines were operated in an unsafe manner during the Class Period, jeopardizing the lives and safety of its employees and in violation of regulatory requirements, which, if discovered would

91

result in the shutting down of mines and stopping of production.  Additionally, the statements

relating to risk factors in ¶ 208 were materially misleading when made.  As set forth above,

*supra*, statements that a "[f]ailure to comply with [safety] laws and regulations may result in . . .

the issuance of injunctions to limit or cease operations" or that "MSHA or other federal or state

regulatory agencies may order certain of [Massey] mines to be temporarily or permanently

closed" were materially misleading when made because Massey had already failed to comply

with the Mine Act and MSHA regulations on numerous occasions, resulting in the assessment of

civil penalties on a frequent and regular basis, and risking far greater regulatory costs if, as in

fact happened, Massey's failure to comply with mandatory safety regulations resulted in a

devastating accident involving deaths and injuries, as well decreased production capabilities and

revenue opportunities.  Further, Massey had endeavored to, and succeeded in, hiding even more

legal safety violations from MSHA during the Class Period, the consequences of which

Defendants knew would, if discovered, lead to closure and production stoppage.

### B.      April 2008 Statements

210.    On April 4, 2008, Massey issued a press release that was filed with the SEC on

Form 8-K entitled "Massey Energy Accelerates Expansion, Updates Guidance:  Management to

Present at Howard Weil Energy Conference."  The press release noted that Massey's Board

approved $90 million more in funds allowing for a total of $310 million to accelerate Massey's

expansion in 2008 and that the Company had reactivated several mines to expand production.

The release stated:

> "Our expansion projects are continuing on our original schedule,"
> stated Don L. Blankenship, Massey's Chairman and Chief
> Executive Officer.  "In this strong coal market, we are doing all we
> can to optimize shareholder value in both the near and longer term.
> By making these additional investments and accelerating the
> expansion, we expect to realize very favorable returns."

211.    The statements referenced above in ¶ 210 as to the Company being on track with respect to an accelerated production schedule were materially misleading when made.  As set forth in great detail above, Massey failed to disclose that in order to meet accelerated production targets for metallurgical coal, Massey mines were prioritizing and intended to continue to prioritize production over safety and operate in an unsafe manner, jeopardizing the lives and safety of its employees in violation of regulatory requirements, which, if discovered, would result in the shutdown of mines and stoppage of production altogether.  Massey's announcement caused analysts to raise their earnings estimates and price targets for the Company.  For instance, on April 4, 2008, Credit Suisse noted that "Massey Energy raised its expectations for average realized prices for 2008-2010, as well as accelerated expansion plans with higher 2008 capex and increased production targets for 2009 and 2010.  As a result, we are increasing our 12 month price objective from $44 to $50, which is based on a 2010 EV/EBITDA multiple of 5.2x.  We reiterate our Neutral rating on the shares."  On this news, Massey's stock price soared 18.23% to close at $47.15 per share on April 4, 2008.

212.    On April 7, 2008, Defendant Blankenship presented at the Howard Weil Energy Conference in New Orleans, Louisiana, on behalf of Massey.  One of his presentation slides provided 2007 highlights and noted: "Set Company safety record for lowest injury incident rate (NFDL of 2.05)."  Another slide Blankenship presented compared Massey's false NFDL rates to the industry's historical NFDL rates from 1985 to 2007.  *See* Ex. G, at 5,6.

213.    The statements in ¶ 212 relating to Massey's NFDL rates were materially false and misleading when made.  The Company's reported NFDL rate of 2.05 for the year 2007 required a subsequent restatement to 2.63 due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater

detail above, Massey failed to disclose that NFDL rates do not measure compliance with any federal safety regulations, s*ee* Section IV.H, *supra*, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.

214.    On April 15, 2008, Massey filed its annual proxy statement with the SEC on a Form DEF 14A (the "2008 Proxy").  The 2008 Proxy touted Massey's false NFDL rates in connection with justification of Defendants Blankenship's and Adkins's compensation:

> The actual results achieved for Mr. Blankenship's business performance criteria were: . . . (ix) 2.05 for non-fatal days lost . . . . The business performance criteria for non-fatal days lost was between the target and maximum amounts . . . .

> *        *        *

> The actual results achieved for Mr. Adkins' specific performance measurements were (i) 2.05 for non-fatal days lost . . . .  The specific performance measure for non-fatal days lost was between the between the target and maximum amounts . . . .

215.    The statements in ¶ 214 relating to Massey's NFDL rates were materially false and misleading when made.  The Company's reported NFDL rate of 2.05 for the year 2007 required a subsequent restatement to 2.63 due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations.  *See* Section i*d.*, *supra*.  Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless even as a measure of its mine workers' injury incidents because Massey

used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work." *See* Section IV.H, *supra*.

      **C.**    **May 2008 Statements**

216.    On May 9, 2008, Massey filed its Form 10-Q Quarterly Report with the SEC with results for the quarter ending March 31, 2008 (the "1Q08 Form 10-Q").  Defendants Blankenship and Tolbert signed the 1Q08 Form 10-Q.  The 1Q08 Form 10-Q set forth the same risk factors that were included in the 2007 10-K.  The 1Q08 Form 10-Q further stated that "we do not believe there have been any material changes to the risk factors previously disclosed in [Massey's] Annual Report on Form 10-K for the year ended December 31, 2007."

217.    The statements referenced above in ¶ 216 were materially misleading when made for the same reasons as the statements of these risk factors in the 2007 10-K.  *See* ¶ 209, *supra*.

218.    The market reacted positively to Massey's 1Q08 Form 10-Q.  On this news, the Company's stock price rose 1.34% to close at $58.96 per share on May 9, 2008.

219.    On May 13, 2008, Massey held its annual shareholders meeting.  At the meeting, Defendant Blankenship falsely represented Massey's safety record and NFDL rate:

> More importantly, you can see on this slide *our continuing progress on improving safety over the past several years.  Our S1, or Safety is Job One Program, allowed us to achieve an NFDL rate of 2.05.*  This was not only an all-time best for Massey.  But it was also far better than the industry average, just as it has been for 15 of the past 16 years.

220.    Further, Defendant Blankenship presented a slide that compared Massey's false NFDL rates to the industry's historical NFDL rates from 1985 to 2007.  *See* Ex. H.

221.     The statements in ¶¶ 219-20 relating to Massey's NFDL rates were materially

false and misleading when made.  The Company's reported NFDL rate of 2.05 for the year 2007

required a subsequent restatement to 2.63 due to material lapses in reporting, which Massey

admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater

detail above, Massey failed to disclose material information regarding the import of NFDL rates

insofar as such rates do not measure compliance with any federal safety regulations, and that its

NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents

because Massey used a light duty work policy to discourage miners from filling out the

paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to

MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity

while at work."  *See* Section IV.H, *supra*.

222.     The market reacted positively to disclosures made at the May 2008 Annual

Shareholders meeting, including Massey's improved NFDL rate.  On this news, the Company's

stock price increased 2.67% to close at $59.95 per share on May 13, 2008.

**D.     August 2008 Statements**

223.     On August 4, 2008, Massey filed its Form 10-Q Quarterly Report with the SEC

with results for the quarter ending June 30, 2008 (the "2Q08 Form 10-Q").  Defendants

Blankenship and Tolbert signed the 2Q08 Form 10-Q.  The 2Q08 Form 10-Q set forth the same

risk factors that were included in the 2007 10-K.  The 2Q08 Form 10-Q further stated that "we

do not believe there have been any material changes to the risk factors previously disclosed in

[Massey's] Annual Report on Form 10-K for the year ended December 31, 2007."

224.     The statements referenced above in ¶ 223 were materially misleading when made

for the same reasons as were the statement of these risk factors in the 2007 10-K.  *See* ¶ 209,

*supra*.

225.     On August 6, 2008, Massey filed a preliminary prospectus supplement with the

SEC on a Form 424B5, which provided for the registration and offering of 3.8 million shares of

Massey common stock pursuant to the Form S-3ASR automatic shelf registration dated August

5, 2008 (the "2008 ASR"), signed by Defendants Phillips, Blankenship, Tolbert, Crawford,

Foglesong, Gabrys, Gee, Judge, Moore, and Suboleski (the "Preliminary Prospectus

Supplement").

226.     The Preliminary Prospectus Supplement described Massey's strategy in terms of

safety as follows:

> **Strategy**
>
> Our primary objectives are to capitalize on current market
> conditions and to continue to build upon our competitive strengths
> to enhance our position as one of the premier coal producers in the
> United States by: . . .
>
> ***Enhancing profitability through continued safety improvements,
> productivity gains and cost measurement.  We continue to seek to
> reduce operating costs and increase profitability at our mines
> through our safety, productivity and cost measurement
> initiatives.  We continue to implement safety measures designed
> to improve our profitability.***

227.     Also on August 6, 2008, Massey filed a second preliminary prospectus

supplement on a Form 424B5, which provided for the registration and offering of $600 million

of Massey debt securities in the form 3.25% convertible senior notes due 2015 (the "3.25%

Notes") pursuant to the 2008 ASR signed by Defendants Phillips, Blankenship, Tolbert,

Crawford, Foglesong, Gabrys, Gee, Judge, Moore, and Suboleski.  The Preliminary Prospectus

Supplement for the 3.25% Notes repeated the disclosures in the Preliminary Prospectus

Supplement.

228.    Similarly, on August 7, 2008, the final Prospectus Supplements on a Form 424B5 for secondary stock and 3.25% Notes offerings contained the same disclosures as the Preliminary Prospectus Supplement.

229.    The statements in ¶¶ 226-28 were materially false and misleading when made.  As set forth in greater detail above, statements about "[e]nhancing profitability through continued safety improvements" were false and misleading because Massey focused on production, not safety, to drive profitability during the Class Period.  This measurable fact is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shutdowns.  *See* Section IV.I, *supra*.

230.    On August 20, 2008, Massey announced the release of its inaugural Corporate Social Responsibility Report (the "2008 CSRR"), which was one of the corporate governance reforms agreed to by Massey in the Manville Settlement.  The 2008 CSRR included a Letter to Stakeholders from Defendants Blankenship and Phillips, which represented that Massey was an industry leader in safety—"***We are a recognized industry leader in safety and the development of innovative new technologies to ensure the protection of our miners.***"

231.    A portion of 2008 CSRR, titled "Protecting Our People," touted 2007 as "the safest year in Massey history" and discussed the importance of safety to the Company:

> All mining operations adhere to stringent safety standards intended
> to prevent accidents.  We work hard to instill ***a zero-tolerance***

*policy and commitment from all members, whether they work at corporate headquarters or in the mines, to make safety the number one priority – every day.*

232.    Under the same "Protecting Our People" section, the Company continued to

promote its mantra that safety comes first:

> **Safety is Job One**
>
> **. . . Our strategy for continued safety improvement starts with our S-1 (Safety First) program.  S-1 instills a culture of safety through a well-developed process of training, mentoring, monitoring, reduction of risk through safety innovation, and recognition of safety excellence.  This focus on safety also gives Massey a competitive advantage; because a safely operated mine is a productive mine.**
>
> **Comprehensive and Regular Assessment of Safety Practices**
>
> **Every Massey member – from executive to miner – takes direct responsibility for safety.  Massey's process for safety evaluations provides each Massey member with an active voice in developing, improving and maintaining our safety programs.**
>
> \*        \*        \*
>
> A stable workforce is a safe workforce.
>
> Massey offers many benefits to our miners leading to workforce stability and improved safety.  With better trained, longer tenured members operating Massey facilities, we can limit future accidents through experience.  Increasing the number of tenured Massey members also improves our ability to mentor new members and provide better training on safe practices.

233.    Massey additionally stated in the 2008 CSRR that it was a "good year for safety"

because of its NFDL rates:

> **A Good Year for Safety**
>
> - Massey's non-fatal days lost (NFDL) safety record was 62 percent better than the bituminous coal industry average.
>
> - We achieved a 2.05 Work Days Lost Incident Rate per 200,000 hours worked compared to 3.31 estimated average

99

rate for the bituminous coal industry through the third
quarter of 2007.

- The company's safety performance in 2007 improved 26
percent over the prior year making 2007 the safest in
Massey history.

- The trend continues to be strong: through May 2008,
Massey's estimated NFDL is 1.87 and we hope to make
2008 another record-breaking year for safety.

234.     The statements in ¶¶ 230-33 were materially false and misleading when made.  As

set forth in greater detail above, statements professing that safety was the "number one priority []

every day" were false and misleading because production, not safety, was the first priority at

Massey during the Class Period.  This is demonstrated by unsafe working conditions at Massey

mines, particularly the Company's Large underground and surface mines, which had the worst

fatality rate in the nation, and had a worse than national industry average performance as

measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G,

*supra*.  Further, Massey failed to disclose that the Company used a widespread early notification

system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in

order to avoid even more MSHA citations and orders—and mine shutdowns.  *See* Section IV.I,

*supra*.  The statements above relating to Massey's NFDL rates were also not accurate.  The

Company's reported NFDL rate of 2.05 for the year 2007 required a subsequent restatement to

2.63 due to material lapses in reporting, which Massey admitted after the Class Period.  *See*

Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose

material information regarding the import of NFDL rates insofar as such rates do not measure

compliance with any federal safety regulations, and that its NFDL rates were rendered

meaningless even as a measure of mine workers' injury incidents because Massey used a light

duty work policy to discourage miners from filling out the paperwork necessary to process an

NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered statements like "Massey's process for safety evaluations provides each Massey member with an active voice in developing, improving and maintaining our safety programs" deceptively misleading, particularly given testimony to the House Labor Committee that "[n]o one felt they could go to management and express their fears or the lack of air in our sections.  We knew that we'd be marked men and the management would look for ways to fire us."  *See* Section IV.H, *supra*.  Additionally, statements such as "a safely operated mine is a productive mine" were materially misleading because, despite professing this purported belief, Massey's conduct clearly established that its philosophy was that productivity should be maximized at the expense of safety.

235.    The market reacted positively to Massey's 2008 CSRR.  The Company's stock price rose 1.39% to close at $64.86 per share on August 20, 2008.

### E.    November 2008 Statements

236.    On November 7, 2008, Massey filed its Form 10-Q Quarterly Report with the SEC with results for the quarter ending September 30, 2008 (the "3Q08 Form 10-Q").  Defendants Blankenship and Tolbert signed the 3Q08 Form 10-Q.  The 3Q08 Form 10-Q set forth the same risk factors that were included in the 2007 10-K.  The 3Q08 Form 10-Q further stated that "we do not believe there have been any material changes to the risk factors previously disclosed in [Massey's] Annual Report on Form 10-K for the year ended December 31, 2007."

237.    The statements referenced above in ¶ 236 were materially misleading when made for the same reasons as were the statement of these risk factors in the 2007 10-K.  *See* ¶ 209, *supra*.

238.    The market reacted positively to the release of Massey's 3Q08 Form 10-Q.  The

Company's stock price rose 5.84% to close at $19.20 per share on November 7, 2008.

**F.    December 2008 Statements**

239.    On December 4, 2008, Defendant Phillips participated in the Raymond James

Coal Investors Conference, an annual conference attended by coal industry executives held by

Raymond James & Associates Equity Capital Markets to provide investment information to its

clients.  At the conference, Defendant Phillips boasted of Massey's safety program and

purportedly better than industry average NFDL rates:

> Safety.  We have prided ourselves on our leadership in safety over
> the years.  Currently for this year our NFDL rates through early or
> through the end of November actually, was below 2.0 and of
> course the ultimate would be to be zero, but meeting the goal of
> below 2.0 is certainly a significant accomplishment and we
> continue to work hard in that regards.
>
> *            *            *
>
> We're particularly proud of the programs that we have
> implemented in safety, production and management.  Effectively
> our — we have written a book on each of these, S1 being our
> safety program.  And we have documented the procedures that we
> use for safety and we expect them to be used throughout our
> organization and we enforce the use of those procedures.  I guess
> to accomplish, if you will, our lower NFDL rates, we have taken
> the position that posters don't get the job done, that you literally
> have to change the work environment, make if you will, physical
> changes to the environment to preclude accidents from taking
> place.

240.    The statements in ¶ 239 relating to Massey's NFDL rates were materially false

and misleading when made.  The Company's reported NFDL rate of 2.05 for the year 2007

required a subsequent restatement to 2.63 due to material lapses in reporting, which Massey

admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater

detail above, Massey failed to disclose material information regarding the import of NFDL rates

insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work." *See* Section IV.H, *supra*.

###### G.  February 2009 Statements

241.    On the morning of February 4, 2009, Massey hosted a conference call with Defendants Blankenship, Philips, and Tolbert to discuss 2008 fourth quarter earnings.  During the call, Defendant Blankenship emphasized that Massey was "working hard to comply with a large number of new environmental and safety regulations. . . ."

242.    The statements in ¶ 241 were materially false and misleading when made.  As set forth in greater detail above, statements about "working hard to comply with a large number of . . . safety regulations" were false and misleading because production, not safety, was Massey's first priority during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate  in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions. *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs. *See* Section IV.I, *supra*.

H.   **March 2009 Statements**

243.   On March 2, 2009, Massey filed its Form 10-K Annual Report with the SEC for

fiscal year 2008, ending December 31, 2008 ("2008 10-K").  Defendants Blankenship, Tolbert,

Crawford, Foglesong, Gabrys, Gee, Judge, Moore, Phillips, and Suboleski signed the 2008 10-K.

In a section of the 2008 10-K entitled "Environmental, Safety and Health Laws and Regulations"

the Company stated:

> *We endeavor to conduct our mining operations in compliance
> with all applicable federal, state and local laws and regulations.*
> However, even with our substantial efforts to comply with
> extensive and comprehensive regulatory requirements, violations
> during mining operations occur from time to time.

244.   Further, the 2008 10-K included a section entitled "Item 1A. Risk Factors."  The

section stated that if Massey failed to comply with safety laws, regulations, or enforcement

policies, MSHA or other agencies could temporarily or permanently shut down Massey's mines:

> *Federal and state government regulations applicable to operations
> increase costs and may make our coal less competitive than other
> coal producers.*
>
> We incur substantial costs and liabilities under increasingly strict
> federal, state and local environmental, health and safety and
> endangered species laws, regulations and enforcement policies.
> Failure to comply with these laws and regulations may result in the
> assessment of administrative, civil and criminal penalties, the
> imposition of cleanup and site restoration costs and liens, the
> issuance of injunctions to limit or cease operations, the suspension
> or revocation of permits and other enforcement measures that
> could have the effect of limiting production from our operations.
> We may also incur costs and liabilities resulting from claims for
> damages to property or injury to persons arising from our
> operations.  See Item 1. Business, under the heading
> "Environmental, Safety and Health Laws and Regulations" for
> further discussion of this risk.
>
> *            *            *
>
> *MSHA or other federal or state regulatory agencies may order
> certain of our mines to be temporarily or permanently closed,*

> *which could adversely affect our ability to meet our customers'*
> *demands.*
>
> MSHA or other federal or state regulatory agencies may order
> certain of our mines to be temporarily or permanently closed.  Our
> customers may challenge our issuance of force majeure notices in
> connection with such closures.  If these challenges are successful,
> we may have to purchase coal from third party sources to satisfy
> those challenges, negotiate settlements with customers, which may
> include price reductions, the reduction of commitments or the
> extension of the time for delivery, terminate customers' contracts
> or face claims initiated by our customers against us.  The
> resolution of these challenges could have an adverse impact on our
> cash flows, results of operations or financial condition.

245.    In addition, under the section titled "Mine Safety and Health," the 2008 10-K

stated:  "We believe that a superior safety and health regime is inherently tied to achieving

productivity and financial goals, with overarching benefits for our shareholders, the community

and the environment."  *Id.* at 15.

246.    The statements in ¶ 243 were materially false and/or misleading when made

because, as set forth in greater detail above, Massey violated federal law and regulations

deliberately and regularly, and not from "time to time."  During the Class Period, Massey's

Large underground mines and surface mines were consistently in violation of the Mine Act and

MSHA regulations, plagued by ever-increasing S&S citation and Elevated Enforcement Actions

that the Defendants ignored and covered up during the Class Period.  *See* Section IV.G *supra*.

As such, Massey's mines were operated in an unsafe manner during the Class Period,

jeopardizing the lives and safety of its employees and in violation of regulatory requirements,

which, if discovered, would result in the shut down of mines and stoppage of production.

Further, the statements related to risk factors in ¶ 244 were materially misleading.  As set forth

above, *supra*, statements that a "[f]ailure to comply with [safety] laws and regulations may result

in . . . the issuance of injunctions to limit or cease operations" or that "MSHA or other federal or

state regulatory agencies may order certain of [Massey] mines to be temporarily or permanently closed" were misleading because Massey had *already* failed to comply with statutes and regulations of MSHA or other governmental or regulatory agencies on numerous occasions resulting in the assessment of civil penalties on a frequent basis and risking far greater regulatory costs if, as in fact happened here, Massey's failure to comply with mandatory safety regulations resulted in a devastating accident involving deaths and injuries as well decreased production capabilities and revenue opportunities.  Further, Massey had endeavored to, and succeeded in, hiding even more legal safety violations from such agencies the consequences of which Defendants knew would lead to closure and production stoppage if discovered.  Massey's statement that it believed "a superior safety and health regime is inherently tied to achieving productivity and financial goals" was misleading for all of these reasons.

## I.    April 2009 Statements

247.    On May 5, 2009, Massey publicized zero NFDL rates at its Hernshaw mine and Logan's Fork mine in a press release entitled "Massey Subsidiaries Honored with Prestigious Safety Awards."  Defendant Blankenship stated:

> "Massey Energy has a strong tradition of safety excellence because we make it a priority every day.  All our members work hard at being safe in the workplace and these awards are well deserved recognition of our success."

248.    The statements in ¶ 247 were materially false and misleading when made.  As set forth in greater detail above, statements professing that safety was "a priority every day" were false and misleading because production, not safety, was the first priority at Massey during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst in the nation fatality rate, and had a worse than national industry average performance as measured by MSHA-issued

S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were also not accurate.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered misleading its statements about the Hernshaw mine and Logan's Fork mine having a NFDL rate of "zero."

   **J.**   **May 2009 Statements**

   249.   On May 8, 2009, Massey issued its Form 10-Q Quarterly Report with the SEC for the quarter ending March 31, 2009 (the "1Q09 Form 10-Q").  Defendants Blankenship and Tolbert signed the 1Q09 Form 10-Q.  The 1Q09 Form 10-Q set forth the same risk factors that were included in the 2008 10-K.  The 1Q09 Form 10-Q further stated that "we do not believe there have been any material changes to the risk factors previously disclosed in [Massey's] Annual Report on Form 10-K for the year ended December 31, 2008."

250.     The statements referenced above in ¶ 249 were materially misleading when made for the same reasons as were the statement of these risk factors in the 2008 10-K.  *See* ¶ 209, *supra*.

251.     The market reacted positively to Massey's release of its 1Q09 Form 10-Q.  The Company's stock price increased 1.93% to close at $21.60 per share on May 8, 2009.

252.     Massey's Annual Meeting of Stockholders was held on May 19, 2009.  During the meeting, Defendant Blankenship commented on the Company's "record low accident rate of 1.93" and how Massey purportedly put safety first:

> Adjusted earnings before interest, taxes, depreciation and amortization improved to $640 million, a greater than 50% increase over 2007, reflecting and perhaps confirming Raymond Bradbury's view that a safe mine is a productive mine.  We set all of these financial records while improving upon our safety performance.
>
> In 2008 we achieved a new record low accident rate of 1.93, which was an improvement over our previous record in 2007 and significantly better than the industry average.  In fact 2008 was the fourth year in the last five years in which we have set a new record for safety performance.
>
> As a company and as an industry, we have been successful in improving our safety performance because of our members' commitment, our investments and our continuous development and implementation of safety related innovations.
>
> *              *              *
>
> Their story and safety is our first concern and the responsibility of returning over 6000 people home from work each day trumps all other challenges in importance.  We believe that our investments in safety improvements and our development of a culture of safety at Massey have made us a leader in the industry.  Safety is a clear element of our long term success and our S1 or Safety is Job One Program is second to none.

253.     A presentation used in connection with the Annual Meeting of Stockholders further provided a chart entitled "Safety History – NFDL Massey vs. Industry" which purported

to show Massey's NFDL rates from 1988 until 2008 compared to those of the industry.  *See* Ex. I.

254.    Further, the presentation included a section titled "Our Members," which referred to the Company's employees.  This section stated that Massey's: "***First priority is safety***."

255.    The statements in ¶¶ 252-54 were materially false and misleading when made.  As set forth in greater detail above, statements that "[f]irst priority is safety" were false and misleading because production, not safety, was Massey's first priority during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were also not accurate.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is

required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered misleading its statements like "we achieved a new record low accident rate of 1.93."

256.    The market reacted positively to the news disseminated at Massey's Annual Meeting of Stockholders.  The Company's stock price rose 0.73% to close at $20.65 per share on May 19, 2009.

**K.**    **July 2009 Statements**

257.    On July 29, 2009 Massey issued a press release that was filed with the SEC on a Form 8-K titled "No Injuries in Fire at Massey Energy Preparation Plant," which purported to summarize the Company's safety record and NFDL rate:

> *Safety*
>
> Massey is on track for another record year in terms of safety. ***Through the first six months of 2009, Massey reported a non-fatal days lost (NFDL) incident rate of 1.72.***  The Company's previous best rate for a full year was 1.93, achieved in 2008.  By comparison, the bituminous coal industry average NFDL rate was 2.95 in 2008 . . . .  Massey remains committed to working with regulators to identify and develop the most effective safety programs possible.
>
> Massey has long been an innovator in mining safety initiatives. Consistent with this history, Massey has recently developed a comprehensive Hazard Elimination Program which will be implemented in conjunction with Federal and State mine safety agencies.  This program is intended to reinforce Massey's members' ability to recognize and remedy potential violations of state and federal mining laws, educate members on recent changes to those laws, and enhance compliance throughout its operations. The new program will be implemented August 1, 2009 as a continuation of Massey's long-standing commitment to the health and safety of its members.
>
> "We are very excited about this new safety program," said Chris Adkins, Massey's Senior Vice President and Chief Operating Officer.  "We are confident that it will be very effective and enable us to take our safety performance to a new level."

258.    The statements above relating to Massey's NFDL rates were not accurate during the Class Period due to material lapses in reporting.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.

259.    The market reacted positively to Massey's assurances about its safety program. The Company's stock price jumped 6.82% to close at $24.29 per share on July 29, 2009.

**L.    September 2009 Statements**

260.    On September 10, 2009, Blankenship, as Massey's representative, made a presentation at the Barclays Capital 2009 CEO Energy Conference.  Blankenship touted Massey's "best practices program for safety measurement and productivity" as follows:  "***And we've developed a best practices program in the area of safety measurement and productivity that we think are the best documented and the best utilized programs in the industry.***"

261.    The statements in ¶ 260 were materially false and misleading when made.  As set forth in greater detail above, statements that Massey's best practices program on "safety measurement and productivity" were the best in the industry were false and misleading when made because production, not safety, was Massey's first priority during the Class Period.  This is

demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst in the nation fatality rate, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were also not accurate.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period. *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.

262.    The market reacted positively to Blankenship's statements at the Barclays Capital 2009 CEO Energy Conference.  Massey's stock price increased 2.36% to close at $29.98 per share on September 10, 2009.

M.      **October 2009 Statements**

263.    On October 28, 2009, Massey issued a press release that was filed with the SEC

on a Form 8-K, titled "Massey Energy Reports Third Quarter 2009 Operating Results," which

again discussed the Company's safety record in terms of false and misleading NFDL rates:

> Massey remains on track for another record year in terms of safety.
> Through the first nine months of 2009, Massey reported a non-fatal
> days lost (NFDL) incident rate of 1.72.  The Company's previous
> best rate for a full year was 1.93, achieved in 2008.  By
> comparison, the bituminous coal industry average NFDL rate was
> 2.95 in 2008.

264.    The statements in ¶ 263 relating to Massey's NFDL rates, and using them to boast

a "record year in terms of safety," were materially false and misleading when made.  The

Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required

subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which

Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in

greater detail above, Massey failed to disclose material information regarding the import of

NFDL rates insofar as such rates do not measure compliance with any federal safety regulations,

and that its NFDL rates were rendered meaningless even as a measure of mine workers' injury

incidents because Massey used a light duty work policy to discourage miners from filling out the

paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant to

MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity

while at work."  *See* Section IV.H, *supra*.

265.    The same day, Massey filed its Form 10-Q Quarterly Report with the SEC for the

quarter ending September 30, 2009 (the "3Q09 Form 10-Q").  Blankenship and Tolbert signed

the 3Q09 Form 10-Q, which set forth the same risk factors that were included in the 2008 10-K.

The 3Q09 Form 10-Q further stated that "we do not believe there have been any material

changes to the risk factors previously disclosed in [Massey's] Annual Report on Form 10-K for

the year ended December 31, 2008."

266.    The statements referenced above in ¶ 265 were materially misleading when made

for the same reasons as were the statement of these risk factors in the 2008 10-K.  *See* ¶ 209,

*supra*.

267.    On October 28, 2009, Massey issued a press release titled "Massey Energy

Becomes First Mining Company to Win Three Sentinels of Safety Awards in a Single Year":

> "No coal company can succeed over the long term without a total
> commitment to safety.  More importantly, Massey is a family.  We
> care about protecting our fellow members, ***which is why we strive
> to remain an industry leader in safety,"*** added Mr. Blankenship.
>
> ***2008 marked the safest year in Massey history, and fifth straight
> year in which Massey's safety performance was stronger than the
> industry average.  In fact, Massey's safety performance has been
> stronger than the industry average for 16 of the past 18 years.***

268.    Further, during the afternoon of October 28, 2009, Massey hosted a conference

call to discuss third quarter 2009 earnings on which Defendant Phillips reiterated that Massey

mines were among the safest in the industry, and Blankenship commented on the Company's

progress in terms of production in connection with the Company's expansion plan:  "Following

our expansion last year, we have the capacity to produce over 12 million tons of met[allurgical]

coal per year.  We also have several immediate opportunities to expand met[allurgical] coal

production . . . ."

269.    The statements in ¶¶ 267-68 were materially false and misleading when made.  As

set forth in greater detail above, statements that Massey "strive[s] to remain an industry leader in

safety" were false and misleading because production, not safety, was Massey's first priority

during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines,

particularly the Company's Large underground and surface mines, which had the worst in the

nation fatality rate, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*. Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders, and mine shutdowns.  *See* Section IV.I, *supra*.  The statements above relating to Massey's production were also misleading.  As set forth in great detail above, Massey failed to disclose that in order to meet accelerated production targets for metallurgical coal, Massey mines were prioritizing production and would continue to prioritize production over safety and operate in an unsafe manner, jeopardizing the lives and safety of its employees in violation of regulatory requirements, which, if discovered, would result in the shutting down of mines and stopping of production altogether.

### N.   December 2009 Statements

270.   On the afternoon of December 8, 2009, Massey participated in the Bank of America Securities Merrill Lynch Industrials Conference, where Defendant Tolbert discussed safety at Massey:

> Now while our focus in the Company is growth of the Company for shareholder value, our daily responsibility is safety of our miners.  Massey has been an innovator and implementer of many safety enhancements over the years.  One of the best-known safety enhancements is the Massey reflective stripes. . . .

> This slide here, and I don't know if the green line is very well seen, but it basically is a slide of Massey's NFDL, or nonfatal days lost, safety rate over the past number of years.  We have had a very good run or result of our safety programs over the years that we have consistently been lower than the industry average.  In 2008, we had a record NFDL rate of 1.93.  In 2009, we have actually bettered that so far year-to-date.  In 2008, three of our operations were awarded the Sentinels of Safety Award by the National Mining Association, MSHA.  Massey being awarded three out of the six coal awards in that category.

271.    A presentation used in connection with the Bank of America Securities Merrill Lynch Industrials Conference provided a chart titled "Safety History – NFDL Massey vs. Industry," which purported to show Massey's NFDL rates from 1988 until 2008 compared to those of the industry.  *See* Ex. J, at 6.

272.    The statements in ¶ 271 relating to Massey's NFDL rates were materially false and misleading when made.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations, and that its NFDL rates were rendered meaningless as a measure of even its mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident— even though NFDL paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Further, Massey's statement regarding its "daily responsibility" being the "safety of [its] miners" was misleading because Massey regularly ignored the safety concerns raised by its employees and created an environment in which miners were discourage from raising safety concerns.

O.    **February 2010 Statements**

273.    On February 3, 2010, Massey issued a press release titled "Massey Energy Reports Fourth Quarter Results, Increases Metallurgical Coal Outlook For 2010," which was filed with the SEC on Form 8-K.  Therein, the Company and Defendant Phillips heralded 2009 as being the safest year in the Massey's history based upon an NFDL rate of 1.93:

**Safety**

Massey completed the safest year in Company history by
achieving a non-fatal days lost (NFDL) incident rate of 1.67 in the
full year 2009.  The Company's previous best rate for a full year
was 1.93, achieved in 2008.  By comparison, the bituminous coal
industry average NFDL rate was 2.95 in 2008. . . .

\*          \*          \*

"Safety has long been our top priority.  Many of our operations
worked the entire year without a single lost time incident.  We
continue to make significant investments of time, personnel and
capital to ensure that our mines are as safe as they can be and
achieving this record low rate is a reflection of that commitment. "
2009 was the sixth consecutive year and the seventeenth year in
the past nineteen years in which Massey's NFDL incident rate was
better than the bituminous coal industry average.

274.    The same day, Defendants Blankenship, Phillips, and Tolbert participated in a

conference call with analysts that was hosted by Massey to discuss the Company's 2009 fourth

quarter results.  At the start of the conference call, Defendant Phillips boasted of Massey's safest

year due to a 1.93 NFDL rates and mines without any lost time accidents:

Turning your attention to safety, we are extremely proud of our
accomplishments in improving the safety of our members in our
operations during 2009.  We completed the safest year in Company
history by achieving a nonfatal days lost, NFDL incident rate of
1.67 for the full year 2009.  Our Company's previous best rate for
a full year was 1.93 achieved in 2008.  Many of our operations
worked the entire year without a single lost time accident.  We
continue to make significant investments of time, personnel and
capital to ensure that our mines are as safe as they can be and
achieving this record low rate is a reflection of that commitment.  I
know many of our operation managers and safety development
group members will be listening to this call and I congratulate
them on our safety record in 2009 and challenge them to continue
this trend in 2010.

275.    The statements in ¶¶ 273-74 relating to Massey's NFDL rates were materially

false and misleading when made.  The Company's reported NFDL rates of 2.05 for the year

2007, 1.94 for the year 2008, and 1.67 for year 2009 required subsequent restatements to 2.63,

2.52, and 2.33, respectively, due to material lapses in reporting, as admitted by Massey after the

Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations.  Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Further, Massey's statement that "[s]afety has long been [its] top priority" was misleading because, as discussed in detail above, the Company's approach to running coal had long been focused on production as top priority, not safety, because, as Blankenship stated back in 2005, "coal pays the bills."  *See* Section IV.E, *supra*.

276.    The market reacted positively to Massey's announcement regarding fourth quarter financials and record safety results.  The Company's stock price increased 1.19% to close at $42.60 per share on February 3, 2010.

**P.    March 2010 Statements**

277.    On March 1, 2010, Massey filed its Form 10-K Annual Report with the SEC for fiscal year 2009, ending December 31, 2009 (the "2009 10-K").  Defendants Blankenship, Tolbert, Crawford, Foglesong, Gabrys, Judge, Moore, Phillips, and Suboleski signed the 2009 10-K.  In the section of the 2009 10-K entitled "Environmental, Safety and Health Laws and Regulations" the Company stated that, "We endeavor to conduct our mining operations in compliance with all applicable federal, state and local laws and regulations. However, even with our substantial efforts to comply with extensive and comprehensive regulatory requirements, violations during mining operations occur from time to time. "

278.   Under the section titled "Mine Safety and Health," the Company stated:  "We believe that a superior safety and health regime is inherently tied to achieving productivity and financial goals, with overarching benefits for our shareholders, the community and the environment."

279.   The 2009 10-K also included a section entitled "Item 1A. Risk Factors."  The section stated that if Massey failed to comply with safety laws, regulations, or enforcement policies, MSHA or other agencies could temporarily or permanently shut down Massey's mines:

> *Federal and state government regulations applicable to operations increase costs and may make our coal less competitive than other coal producers.*
>
> We incur substantial costs and liabilities under increasingly strict federal, state and local environmental, health and safety and endangered species laws, regulations and enforcement policies. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of cleanup and site restoration costs and liens, the issuance of injunctions to limit or cease operations, the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from our operations. We may also incur costs and liabilities resulting from claims for damages to property or injury to persons arising from our operations.  See Item 1. Business, under the heading "Environmental, Safety and Health Laws and Regulations" for further discussion of this risk.
>
> *       *       *
>
> *MSHA or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed, which could adversely affect our ability to meet our customers' demands.*
>
> MSHA or other federal or state regulatory agencies may order certain of our mines to be temporarily or permanently closed.  Our customers may challenge our issuance of force majeure notices in connection with such closures.  If these challenges are successful, we may have to purchase coal from third party sources to satisfy those challenges, negotiate settlements with customers, which may include price reductions, the reduction of commitments or the

> extension of the time for delivery, terminate customers' contracts
> or face claims initiated by our customers against us.  The
> resolution of these challenges could have an adverse impact on our
> cash flows, results of operations or financial condition.

280.    The statements in ¶ 277 were materially false and misleading when made because, as set forth in greater detail above, Massey violated federal law and regulations deliberately and regularly, and not from "time to time."  During the Class Period, Massey's Large underground mines and surface mines were consistently in violation of the Mine Act and MSHA regulations, plagued by ever-increasing S&S citation and Elevated Enforcement Actions that the Defendants ignored and covered up during the Class Period.  *See* Section IV.G, *supra*.  As such, Massey's mines were operated in an unsafe manner during the Class Period, jeopardizing the lives and safety of its employees and in violation of regulatory requirements, which, if discovered, would result in the shutting down of mines and stopping of production.  Additionally, the statements related to risk factors in ¶ 279 were materially misleading.  As set forth above, statements that a "[f]ailure to comply with [safety] laws and regulations may result in . . . the issuance of injunctions to limit or cease operations" or that "MSHA or other federal or state regulatory agencies may order certain of [Massey] mines to be temporarily or permanently closed" were materially misleading when made because Massey had already failed to comply with statutes and regulations of MSHA or other governmental or regulatory agencies on numerous occasions resulting in the assessment of civil penalties on a frequent basis and risking far greater regulatory costs if, as in fact happened, Massey's failure to comply with mandatory safety regulations resulted in a devastating accident involving deaths and injuries as well decreased production capabilities and revenue opportunities.  Further, Massey had endeavored to, and succeeded in, hiding even more legal safety violations from such agencies, the consequences of which Defendants knew would lead to closure and production stoppage if discovered.

281.    The market reacted positively to Massey's year-end 2009 report.  The Company's

stock price increased $3.41 to close at $44.54 per share on March 1, 2010.

282.    On March 9, 2010, Massey participated in the Raymond James Institutional

Investors Conference in Orlando, Florida.  During the conference, Massey's Vice President of

Planning, Mike Bauersachs, highlighted the Company's purported "record" year in safety:

> One thing I would like to highlight, we just completed another year
> in essence of continued to outpace the industry in what is a fairly
> difficult basin to operate in.  I think our NFDL rate was 1.63,
> which I think is a new Massey record.  So in the next day or two
> we'll be kind of completing our Raymond Bradbury Safety
> Awards in Charleston and it's one of those things that we celebrate
> every year, because it is the most important thing that we do every
> day to make sure we send people home safely.  It's a focus.  It's
> the first thing we talk about at every meeting and a safe mine is
> also a productive mine, so it continues to be something that I love
> to highlight when I get the opportunity to speak to people.

283.    Massey created a presentation to complement Bauersachs's statements that

included a chart titled "Safety History - NFDL Massey vs. Industry."  This chart purported to

compare Massey's NFDL rates from 1988 until 2009 with the industry average.  *See* Ex. K, at 42.

284.    The statements in ¶¶ 282-83 relating to Massey's NFDL rates were materially

false and misleading when made.  The Company's reported NFDL rates of 2.05 for the year

2007, 1.94 for the year 2008, and 1.67 for year 2009 required subsequent restatements to 2.63,

2.52, and 2.33 respectively, due to material lapses in reporting, which Massey admitted after the

Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey

failed to disclose material information regarding the import of NFDL rates insofar as such rates

do not measure compliance with any federal safety regulations.  Moreover, Massey failed to

disclose the material fact that its NFDL rates were rendered meaningless even as a measure of

mine workers' injury incidents because Massey used a light duty work policy to discourage

miners from filling out the paperwork necessary to process an NFDL incident—even though

NFDL paperwork, pursuant MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.

285.    On March 22, 2010, Massey filed a Preliminary Prospectus Supplement with the SEC on Form 424B5, which provided for the registration and offering of up to 9.7 million shares of Massey common stock pursuant to the automatic shelf registration on August 5, 2008 on a Form S-3ASR, signed by Defendants Phillips, Blankenship, Tolbert, Crawford, Foglesong, Gabrys, Gee Judge, Moore, and Suboleski.

286.    The March 22, 2010 Preliminary Prospectus Supplement describe Massey's strategy in terms of safety as follows:

> Strategy
>
> Our primary objectives are to capitalize on current market conditions and to continue to build upon our competitive strengths to enhance our position as one of the premier coal producers in the U.S. by:
>
> Maintaining focus on high safety standards.  We believe a safe mine is a profitable mine.  We strive to maintain safe operations and continue to develop and implement new safety improvement initiatives that exceed regulatory requirements.  For the year ended December 31, 2009, we recorded an all-time Company best Nonfatal Days Lost ("NFDL") rate of 1.67.  The bituminous coal mining industry average NFDL rate was 2.95 in 2008.  We continually review and update our safety procedures and equipment, and we believe our focus on high safety standards has resulted in fewer injuries and accidents and cost savings related thereto.

287.    Similarly, on March 24, 2010, the final Prospectus Supplements that Massey filed with the SEC on Forms 424B5 contained the same disclosures as the March 22, 2010 Preliminary Prospectus Supplements.

288.    The statements in ¶¶ 286-87 were materially false and misleading when made.  As set forth in greater detail above, statements such as "[w]e believe a safe mine is a profitable

mine" were false and misleading when made because production, not safety, was what Massey focused on to drive profitability during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were misleading during the Class Period due to material lapses in reporting.  The Company's reported NFDL rates of 2.05 for the year 2007, 1.94 for the year 2008, and 1.67 for year 2009 required subsequent restatements to 2.63, 2.52, and 2.33 respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations.  Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless as a measure of even its mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered misleading statements like "We believe a safe mine is a profitable mine."

**Q.**    **Massey's Annual Reports to Shareholders**

289.    Massey's 2007 Annual Report included a Letter to Shareholders from Blankenship that touted Massey as being the "industry leader in safety" because of its "work days lost" and a corporate culture that puts safety first by means of its "Safety is Job One" program:

> We continued to be an industry leader in safety during 2007. Our safety record in terms of work days lost was 37% better than the national industry average. Our Raymond Bradbury Safety Program and our S-1 campaign – "Safety is Job One" – make safety an integral part of our Company culture. Our mine rescue teams are recognized as among the best in the mining industry . . . .

290.    Also, throughout the 2007 Annual Report Massey stressed the importance of its formula for success, which includes safety as a key component—"S-1 + P-2 + M-3 = Shareholder Value."

291.    According to Massey, "S-1" or safety first is "not just a slogan. It's an integral part of [the Company's] daily routine. Our S-1 safety program is recognized as one of the best in the industry, setting standards that far exceed federal and state requirements." Moreover, in discussing "safety first," the Company stated that:

> The program, designed for sustained safety improvement, uses a well-developed process of training, mentoring, monitoring and reduction of risk through innovation and recognition of safety excellence. The result is a culture of safety.
>
> RECORD-SETTING YEAR
>
> In 2007, our non-fatal days lost (NFDL) accident incident rate was 37% better than the bituminous coal industry incident rate. Massey achieved a 2.05 NFDL incident rate per 200,000 hours worked compared to a 3.24 NFDL incident rate estimated for the bituminous coal industry overall. Our safety performance in 2007 improved 26% over our performance in 2006 making 2007 the safest year in Massey Energy history.
>
> RECOGNIZING EXCELLENCE

> . . . Internally, Massey Energy encourages and recognizes
> exemplary safety efforts of teams and individuals with our
> nationally acclaimed Raymond Safety Awards Program.  The
> companywide program and its highest award, the Bradbury Award,
> were named in honor of retired executive Raymond Bradbury who
> was known for his slogan, "a safe mine is a productive mine."
> This program will mark its 16th anniversary in 2008, and the
> Bradbury award is as coveted as ever.

292.    The 2007 Annual Report also discussed the impact of Chamberlin, Vice President

of Safety and Training, on the Company's safety record:

> When Elizabeth Chamberlin joined Massey, she took over an
> already very successful safety program.  However, in just over a
> year, she has asserted her experience, leadership and enthusiasm to
> re-emphasize the "culture of safety" throughout the Company.
> That culture is epitomized within the Raymond Bradbury Safety
> Program.  This program engages all Massey members in our safety
> initiatives through competition and by providing team and
> individual rewards for safety excellence.  The results are clear.  In
> the 15 years since the Bradbury Program was introduced, Massey
> has reduced its non-fatal days lost (NFDL) incident rate by 64%.

293.    The statements in ¶¶ 289-92 were materially false and misleading when made.  As

set forth in greater detail above, statements about Massey's safety program placing "safety first"

were false and misleading because production, not safety, was Massey's first priority during the

Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly

the Company's Large underground and surface mines, which had the worst in the nation fatality

rate, and had a worse than national industry average performance as measured by MSHA-issued

S&S citations and Elevated Enforcement Actions, *see* Section IV.G, *supra*—demonstrating that

Massey's safety standards did not "far exceed federal and state requirements."  Further, Massey

failed to disclose that the Company used a widespread early notification system to deceive

MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even

more MSHA citations and orders, and mine shutdowns.  *See* Section IV.I, *supra*.  The statements

above relating to Massey's NFDL rates were not accurate during the Class Period due to material

lapses in reporting.  The Company's reported NFDL rate of 2.05 for the year 2007 required a

subsequent restatement to 2.63 due to material lapses in reporting, which Massey admitted after

the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above,

Massey failed to disclose that NFDL rates do not measure compliance with any federal safety

regulations, and that its NFDL rates were rendered meaningless even as a measure of mine

workers' injury incidents because Massey used a light duty work policy to discourage miners

from filling out the paperwork necessary to process an NFDL incident—even though NFDL

paperwork, pursuant to MSHA's definition of NFDL, is required to be filled out in connection

with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this

regard rendered statements about a "culture of safety" false.

294.    The following year, Massey released its 2008 Annual Report, which included a

Letter to Shareholders from Blankenship emphasizing the Company's safety record.

Blankenship represented that:

> We improved upon our record safety performance of 2007 by
> setting a new record low accident rate (NFDL) of 1.93,
> significantly better than the industry average.
>
> *             *             *
>
> It is always our intent to structure and conduct our business in
> compliance with all laws and regulations, and this will continue.
>
> *             *             *
>
> Our members are another stakeholder group that merits our highest
> priority and focus.  Their safety is our first and foremost concern
> and the responsibility of returning 6,700 people home from work
> each day trumps all other challenges in importance.
>
> ***Shareholders, regulators and our members can be assured that
> the Massey management team understands its responsibility to
> provide a safe workplace.  Our record of success in improving the
> safety of our members is clearly shown in the chart on page 14.*** .
> . . .  We will continue to invest in the development and

126

implementation of safety innovations. . . .  We will continue to
offer innovative programs to motivate and reward our members for
safe work habits and accident-free operations.  We believe that our
investments in safety improvements and our development of a
culture of safety at Massey have made us a leader in the industry
and are clear elements of our long-term success.

295.     Blankenship concluded the Letter to Shareholders by stating:

Underlying all of our positions is the foundation that honesty and
responsibility supersede political correctness or political reality.
Our core values cannot be satisfied nor our core responsibilities be
fulfilled if we are not honest with ourselves and others.  Let me say
to all of our pledge to you that whether the
news is good or bad, whether our opinion is favored or disfavored,
and whether we are ultimately proven right or wrong, you will
receive from us honest and transparent communications.

296.     Additionally, in a portion of the 2008 Annual Report entitled "Essential: Safety &

Environment," the Company again stressed its "all-time best NFDL . . . rate of 1.93," which

exceeded the industry average and commented on the industry awards the Company received:

Safety and environmental stewardship are as essential to Massey as
are coal and the members who mine it.  Our S-1 or "safety first"
program is far more than a slogan.  It is our top priority every day.
We believe our safety programs are some of the most effective and
successful in the industry and our record speaks for itself.  In 2008,
Massey recorded an all-time best NFDL (a measure of lost-time
accidents) rate of 1.93.  This is an improvement over last year's
rate of 2.05, our previous best result, and significantly better than
the total bituminous coal mining industry rate of 2.95.  2008 marks
the 5th consecutive year in which Massey's safety record was
better than the industry.

We are particularly pleased that in 2008 we had four of our 23
resource groups and 51 separate mining sites that completed the
year without a single lost-time accident.

297.     The statements in ¶¶ 294-95 were materially false and misleading when made.  As

set forth in greater detail above, statements about safety being "top priority every day" were false

and misleading when made because production, not safety, was Massey's first priority during the

Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly

the Company's Large underground and surface mines, which had the worst in the nation fatality rate, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Massey's poor safety performance, together with the accounts of myriad employees who were explicitly directed to run coal at the expense of their own safety, establishes that it was not "always [Massey's] intent to structure and conduct [its] business in compliance with all laws and regulations."  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were not accurate during the Class Period.  The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52, respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  *See* Section IV.G, *supra*.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations.  Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered statements like "the Massey management team understands its responsibility to provide a safe workplace" deceptively misleading.

298.    Similar to its 2007 and 2008 Annual Reports, Massey's 2009 Annual Report

emphasized Massey's commitment to safety and falsely stated a record NFDL rate of 1.67:

> It takes **an unwavering focus and commitment to safety** to operate coal mines successfully.  At Massey, we believe that our investments in safety improvements and our development of a culture of safety are cornerstones of our long-term success.
>
> We are proud to have achieved another record year in terms of safety in 2009, showcasing our members' core commitment to safety stewardship.  Our 2009 NFDL incident rate (a measure of lost time accidents) of 1.67 is an improvement over last year's rate of 1.93, our previous best result, and significantly better than the total industry rate of 2.81.  We are particularly pleased that we had 56 separate mining sites that completed the year without a single lost time accident.
>
> While **our safety performance outpaces the industry**, our focus and effort to improve will continue.  As safety is significantly a matter of individual behavior and engineering, Massey Energy analyzes failures and commits engineering resources and behavioral training toward prevention of reoccurrences.

299.    The 2009 Annual Report also included a Letter to Shareholders from

Blankenship, one which emphasized Massey's safety record:

> Massey is especially proud of our continued success in improving the safety of our nearly 6,000 members.  Last year was the safest ever at Massey – as was the year before that and the year before that.  Our success in protecting our miners has been recognized at both the federal and state level.  Massey has been honored with numerous awards for our outstanding safety record, including recognition by state regulators and the Federal Mine Safety and Health Administration.  The recognition that these awards represent are welcomed by everyone at Massey.
>
> While we are proud of our safety record, Massey will not rest on its laurels.  We continue to endorse and implement a culture of safety by developing innovative programs and technologies, encouraging worker training and devoting engineering resources to anticipate and eliminate potential safety problems.  We are continually developing safety systems, procedures and equipment that will protect our members.  Our latest effort includes the development of an innovative new miners' helmet that exceeds industry requirements and is likely to become the standard in the

mining industry.  These types of investment and innovation more clearly define our commitment to safety than does our compliance with state and federal regulatory requirements.

300.   The statements in ¶¶ 298-99 were materially false and misleading when made.  As set forth in greater detail above, statements that "our development of a culture of safety are cornerstones of our long-term success" were false and misleading because production, not a culture of safety, was Massey's first priority during the Class Period.  This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst in the nation fatality rate, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions.  *See* Section IV.G, *supra*.  Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs.  *See* Section IV.I, *supra*.  The statements above relating to Massey's NFDL rates were not accurate during the Class Period.  The Company's reported NFDL rates of 2.05 for the year 2007, 1.94 for the year 2008, and 1.67 for year 2009 required subsequent restatements to 2.63, 2.52, and 2.33 respectively, due to material lapses in reporting, which Massey admitted after the Class Period.  In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations.  Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless as a measure of even its mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork necessary to process an NFDL incident—even though NFDL paperwork, pursuant MSHA's definition of NFDL, is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice

in this regard rendered misleading statements like "[w]e are particularly pleased that we had 56 separate mining sites that completed the year without a single lost time accident."

### R.    **Massey's 2009 Corporate Social Responsibility Report**

301.    No earlier than November 20, 2009, Massey released its second Corporate Social Responsibility Report  (the "2009 CSRR").  The 2009 CSRR touted Massey's S1 program as putting safety first:

> At Massey, we are committed to doing our best and doing the right thing – then learning and working to do even better.  Our S1, P2 and M3 programs are formalized policies and processes through which we pursue continuous improvements.  S-1 means Safety First. Massey's safety innovations, developed and implemented over the years, demonstrate our continuing commitment to operating safe coal mines.  P-2 promotes the application of the best production practices in the coal industry.  M-3 requires that our managers receive the accurate and timely information needed to make the best business decisions.  Though it may not be the easiest way or the least costly way, this is the right approach for our company and our future.

302.    Moreover, the 2009 CSRR highlights 2008 as being Massey's safest year ever because of its NFDL rate:

> *2008: Our Safest Year Ever*
>
> - Recorded an all-time best rate for non-fatal days lost, making 2008 our safest year in history.
> - Accomplished an NFDL safety record that was 35 percent better than the overall bituminous coal industry, besting the industry average for the fifth consecutive year.
> - Achieved a 1.93 Work Days Lost Incident Rate per 200,000 hours worked, compared to a 2.95 estimated average rate for the bituminous coal industry overall.

303.    Additionally, the 2009 CSRR reiterated that safety comes first to protect its employees and noted that employees were encouraged to communicate safety issues:

**Protecting Our People**

131

Massey Energy's members are the best-trained, most productive, and safest miners in the world.  We embrace our commitment to safety at all levels – from executive to miner.  At Massey, we understand that no coal company can succeed over the long term without a total commitment to safety.  Our members are the primary reason we are an industry leader in productivity and safety. . . .

**Safety First**

Safety is everyone's concern.  Massey Energy is committed to instilling a culture of safety through our S-1 (Safety First) program.  S-1 combines comprehensive training, mentoring, monitoring, audits, safety innovation, risk reduction and recognition of safety excellence.  This focus on safety also gives Massey a competitive advantage because a safely operated mine is a productive mine.

**Listening to Our Members About Safety Practices**

Massey encourages active involvement and empowers all Massey members at all levels to be a part of developing and improving our safety programs.  Our extensive training efforts and frequent operations and management meetings create opportunities for the exchange of information and new ideas.  Through these meetings Massey managers share best practices for safety, ensuring that all Massey operations are equipped with the best and most current safety tools and programs.

304.   Also included was a chart titled "History: Massey Energy vs. Industry Non-Fatal Days Lost in 2008," which set forth NFDL rates for Massey from 1990 until 2008 compared to the national industry average.

305.   And, the 2009 CSRR promoted Massey's proprietary Bradbury Award:

The Bradbury Award

The Edwight Surface Mine of Massey's Edwight Mining Company, located in Raleigh County, West Virginia, won the company's prestigious 2008 Bradbury Award for its miners working over 523,000 hours without a single lost-time accident and achieving a non-fatal days lost rate of 0.00.  NFDL rates are the benchmark the coal industry uses to measure safety.  The safety performance of the miners at the Edwight Surface Mine greatly

contributed to the record safety results that Massey achieved in 2008. Last year, Edwight produced nearly 1.8 million tons of coal.

Since winning the 15th Annual Bradbury Award, Edwight Mining Co. has continued its stellar safety performance. Its miners have logged another 330,000 hours worked without a lost-time injury.

306.    The statements in ¶¶ 303-05 were materially false and misleading when made. As set forth in greater detail above, statements about Massey's safety first program and that the Company "understand[s] that no coal company can succeed over the long term without a total commitment to safety" were false and misleading because production, not safety, was Massey's first priority during the Class Period. This is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions. *See* Section IV.G, *supra*. Further, Massey failed to disclose that the Company used a widespread early notification system to deceive MSHA safety inspectors and to hide the dangerous conditions of its mines in order to avoid even more MSHA citations and orders—and mine shut downs. *See* Section IV.I, *supra*. The statements above relating to Massey's NFDL rates were not accurate during the Class Period. The Company's reported NFDL rates of 2.05 for the year 2007 and 1.94 for the year 2008 required subsequent restatements to 2.63 and 2.52 respectively, due to material lapses in reporting, which Massey admitted after the Class Period. *See* Section IV.G, *supra*. In addition, as set forth in greater detail above, Massey failed to disclose material information regarding the import of NFDL rates insofar as such rates do not measure compliance with any federal safety regulations. Moreover, Massey failed to disclose the material fact that its NFDL rates were rendered meaningless even as a measure of mine workers' injury incidents because Massey used a light duty work policy to discourage miners from filling out the paperwork

necessary to process an NFDL incident—even though NFDL paperwork, pursuant MSHA's definition of NFDL is required to be filled out in connection with "restricted activity while at work."  *See* Section IV.H, *supra*.  Massey's practice in this regard rendered misleading statements like the "Edwight Mining Company . . . working over 523,000 hours without a single lost-time accident."  Further, statements such as "Massey encourages active involvement and empowers all Massey members at all levels to be a part of developing and improving our safety programs" were misleading, especially given testimony to the House Labor Committee that "[n]o one felt they could go to management and express their fears or the lack of air in our sections. We knew that we'd be marked men and the management would look for ways to fire us."

## VI.   ADDITIONAL FACTS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

307.    At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements during the Class Period.  Each of the Individual Defendants had actual knowledge that the statements made by him or her were false and misleading, or acted with deliberately reckless disregard for the truth or falsity of those statements.  Each of the Individual Defendants' intent to deceive, or deliberately reckless disregard for the truth, is demonstrated by substantial direct and circumstantial facts and evidence supporting a strong inference of scienter.

### A.   Massey Has Destroyed Evidence Relevant to the Government's Criminal and Civil Investigations of the Explosion

308.    As a result of the respective investigations that MSHA, the FBI, and the DOJ commenced into the civil and criminal misconduct at Massey giving rise to the Explosion, it was discovered that Massey had destroyed relevant evidence.  The alleged destruction of

documentary evidence is an egregious attempt to cover up the fraud alleged herein and raises a strong inference of scienter.

309.    As alleged in the Stover Indictment by the U.S. Attorney for the Southern District of West Virginia, R. Booth Goodwin II, based on the careful review of evidence and testimony that the U.S. attorney was able to obtain by criminal subpoena, on or around January 11, 2011, security documents stored in the Barracks at Upper Big Branch, which would have evidenced Massey's unlawful early warning notification system, described *supra* at IV.I, were disposed of in a trash compactor.  Stover, who served as Blankenship's personal driver and bodyguard, ordered the methodical disposal of said documents, in his capacity as Performance Coal's Security Chief and as an agent of Blankenship, the "hands-on" CEO of the Company.  When he did so, he knew that MSHA, the FBI, and the DOJ were investigating the unlawful early warning notification system described herein.  There was simply no reason for the disposal of this evidence except for an intent to hide the truth concerning Massey's failure to comply with mine safety laws and regulations during the Class Period.

310.    Further, MSHA has disclosed that a page was removed from an Upper Big Branch "Fireboss Book" in which Massey supervisors were required to record daily ventilation fan measurements.  The removal of such a page is itself a misdemeanor.  *See* West Virginia Code, Chapter 22A-1-21(d).

311.    Massey's brazen destruction of evidence is a telling attempt to hide information from the public and further raises a strong inference of scienter here.

**B.    Other Clearly Wrongful Conduct Raises a Strong Inference of Scienter**

312.    The pervasiveness of Massey's deliberate and well-planned misconduct in connection with steps taken to cover up safety violations from MSHA regulators further buttresses the strong inference of scienter.  As alleged in the Stover Indictment, the secret

135

Montcoal radio channel was systematically used to give early notification of an MSHA inspector's arrival.  Numerous former Massey employees have stated that it was also regular practice to use code words to alert miners to the presence of MSHA investigators at a mine's guard gate in order to allow them to fix non-compliant conditions before the MSHA investigators could get to those places where the conditions existed.  As set forth in greater detail above, "Goose" Stewart, who survived the Explosion, testified that "management regularly violated the law concerning advance warning on inspector arrivals;" that "[a] section boss underground would be called from outside and be told, 'it's cloudy outside' or 'there's a man on the property' meaning there is an inspector outside, get things right to pass inspection."  Gary Quarles, a former Massey employee, similarly testified on May 24, 2010 before the House Labor Committee: "When an MSHA inspector comes onto a Massey mine property, the code words go out "we've got a man on the property."  Those words are radioed from the guard gates and relayed to all working operations in the mine . . . .  When the word goes out, all effort is made to correct deficiencies."  Clay Mullins, a former Massey employee who worked at Upper Big Branch, similarly testified  before the House Labor Committee on May 24, 2010: "[W]hen an inspector came by the guard shack they would . . . [t]hey would call the sections and tell them we had an inspector on the property and make sure everything was right and if it wasn't to fix it."  CW 4, CW 15, CW 8, CW 6, and CW 16 further corroborate these accounts, as did the testimony offered by Secretary Main.  *See supra* at IV.I.

313.    Moreover, as set forth in greater detail above, when Massey employees were put on light duty (or restricted work activities), despite a legal requirement otherwise, Massey did not require NFDL incident reports to be filled out.  This policy violated MSHA's regulations, and falsely decreased Massey's reported NFDL rates and deceived the investing public during

the Class Period.  As set forth in greater detail above, Stewart testified that "Massey sends a safety director to the hospital to pressure miners hurt on the job to return and sit in the office so their accident doesn't get listed as a 'lost time accident.'"  Jeffrey Harris similarly testified:  ". . . If you got hurt, you were told not to fill out the lost time accident paperwork.  The Company would just pay guys to sit in the bathhouse or to stay home if they got hurt – anything but fill out the paperwork."  CW 4 further corroborated these accounts.  *See supra* at IV.H.  Chuck Nelson further corroborated: "I've hauled people out of the mines on a stretcher, at Massey mines . . . . And the very next day you'll see 'em walking up the hill, coming back to the mine office on crutches and [in] neck braces – just to keep from having a lost-time accident, to keep 'em from filling out an accident report."

### C.    The Individual Defendants Closely Monitored Massey's Core Safety Practices and Regulatory Compliance and Violations

314.    During the Class Period, coal mining was Massey's core business.  Adherence to mine safety laws and regulations are, in turn, a core part of Massey's coal mining business.  As Blankenship has freely acknowledged, "no coal company can succeed over the long term without a total commitment to safety."  Indeed, the Mine Act clearly states that "the first priority and concern of all in the coal . . . industry must be the health and safety of . . . the miner."  30 U.S.C. § 801(a).  This is because of the potentially disastrous consequences of a coal mining company's failure to abide by safety regulations—*i.e.*, injury and loss of life.  In addition to ethical considerations, safety is a core component of Massey's business because the consequences of regulatory safety violations have significant economic affects on the Company's production and bottom line.  Massey knows that "MSHA or other federal or state regulatory agencies may order . . . mines to be temporarily or permanently closed" which "adversely affect[s] [the] ability to meet . . . customers' demands."  When Massey is faced with temporary (or permanent) mine

closures, production output is lost, and the Company may be forced to negotiate settlements with customers—which can include price and commitment reductions. This inevitably has an adverse impact on the Company's cash flows, results of operations, and financial condition. Furthermore, safety is a core component of Massey's coal mining business for obvious public relations and reputational reasons. Specifically, Massey is, as demonstrated below, vulnerable to headline risk—*i.e.*, the likelihood that news of heightened risk of serious injuries or death at one or more of Massey's mines will spread to media outlets and cause a significant negative change in the value of its securities. There are investors who simply do not wish to support and be associated with companies linked to a substantial risk of        death and disaster. For all of these reasons, Massey knew that it was critical to assure shareholders after the fire at Alma that "safety first" was "not just a slogan" but "an integral part of [Massey's] daily routine." During the Class Period, the Company touted its "Safety is Job One Program" to these ends.

315.    As described in detail above, the Individual Defendants were "hands-on," detail-oriented, and deeply involved in the daily management of all aspects of Massey's core operations, including the Company's policies, procedures, and standards for safety practices at underground and surface mines. The Individual Defendants were Massey's executive officers, SEPPC members, and Board members directly responsible for these core operations, including Massey's safety practices and compliance with safety laws and regulations.

316.    Overall, Massey's day-to-day management and safety initiatives were overseen by Officer Defendants Blankenship, Adkins, and Tolbert, as well as the SEPPC, whose members included Defendants Phillips, Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski, and Judge during the Class Period.

317.    The SEPPC received reports from Compliance Managers on a quarterly basis on compliance with worker and mine safety laws, rules, and regulations.  The receipt of S&S citations and Elevated Enforcement Actions—demonstrating that Massey was not complying with safety laws and regulations—would necessarily have been included in these reports.  The SEPPC was mandated under its charter to provide detailed mine safety reports to Massey's Board.  These reports included the "number of mine safety incidents overall and by type; [ ] findings by third-party auditors; and . . . an analysis of any causal factors contributing to safety incidents."  Exhibit 2 to Ex. D, at 4-5.

318.    As of August 2009, Massey's management also maintained a Hazard Elimination Committee, which added another layer of safety governance.  The Hazard Elimination Committee monitored Massey's violations of state and federal mining laws, and reported those violations to the SEPPC, which in turn reported them to the Board.

319.    By reason of these standing Committees and regular and ongoing activities, the Individual Defendants were made aware of developing issues involving the Company's mine safety compliance (or lack thereof) and compliance assessment policies during the Class Period.

320.    Accordingly, Massey's CEO, CFO, and COO and Board members were not just generally aware of federal safety regulation violations or that the Company's mines were operated in dangerous conditions; rather, they were regularly provided with detailed safety and production statistics.

321.    Moreover, the safety-related data that Massey's SEPPC was provided systematically tracked exactly the business practices at issue here—*i.e.*, the number and type of mine safety incidents, an analysis of any contributing factors, and regulatory violations cited by MSHA.  Indeed, according to CW 12, who reported directly to Defendant Tolbert during the

Class Period until February 2009, Blankenship and other executives regularly reviewed reports containing NFDL rates—possibly even on a daily basis.  Notwithstanding the extent to which these reports were monitored, they were false and misleading during the Class Period and ultimately required restatement.  *See supra* at IV.G.

322.     Taken together, the importance of core safety issues fundamental to Massey's future success, the Individual Defendants' job positions, duties, and access to detailed corporate safety and regulatory compliance reports give rise to a strong inference of scienter.  The safety violations at Massey mines were so fundamental to Massey's financial well-being, and on such a broad scale, that that the only logical inference that can be drawn is that those Defendants at the top levels of Massey management knew of the true state of affairs or were reckless in not being aware of them.

323.     Notwithstanding the forgoing, the Individual Defendants repeatedly signed the Company's filings with the SEC, that made false and misleading representations as to the extent to which Massey was in compliance with safety regulations governing the Company's core mining operations, and otherwise acted in a manner emphasizing maximum protection to the health and safety of its miners.

### D.     Blankenship's and Adkins' Incentive Bonus Award Compensation Was Driven in Part by False NFDL Rates

324.     During the Class Period, Defendants Blankenship and Adkins personally benefited from the fraud alleged herein by means of the incentive bonus award compensation structure implemented at Massey by Blankenship.

325.     Specifically, 75% of Blankenship's incentive bonus award was based upon:

> . . . nine business performance criteria. . . : (i) EBIT, (ii) produced tons, (iii) produced coal cash cost per ton reduction compared to 2006, (iv) productivity of continuous miners in terms of feet per shift, (v) productivity of longwall operations in terms of feet of

retreat per longwall per day, (vi) surface mining productivity in terms of tons per manhour compared to 2006, (vii) earnings per share, (viii) net coal sales, and (ix) *non-fatal days lost (calculated as the number of employee work-related accidents times 200,000 hours, divided by the total employee hours worked).*

326.   Further, approximately 25% of Adkins' incentive bonus award was based upon:

. . . four specific performance measures . . . : (i) *non-fatal days lost (calculated as the number of employee work-related accidents times 200,000 hours, divided by the total employee hours worked),* (ii) produced coal cash cost per ton reduction compared to 2006, (iii) productivity of continuous miners in terms of feet per shift, and (iv) productivity of longwall operations in terms of feet of retreat per longwall per day.

2008 Proxy at 26, 28; 2009 Proxy at 31, 33.

327.   These incentive-related facts bolster inferences that even raw data used to calculate Company-wide NFDL rates were falsified.  That is, notwithstanding the regular (and possibly daily) review of NFDL reports, Blankenship and Adkins earned incentive bonus award compensation based in part upon false NFDL rates, which have subsequently been restated, *see supra* at IV.G, and as to which the Company further rendered meaningless by systemically providing workers with financial and job security incentives to report to work and, in violation of relevant regulations, not fill out NFDL forms.

## VII.   INVESTORS SUFFERED DAMAGES WHEN MASSEY'S STOCK PRICE DROPPED AS INFORMATION CONCEALED BY DEFENDANTS WAS REVEALED TO THE MARKET DURING THE CLASS PERIOD

328.   Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance, *infra* at X.  The market price of Massey common stock traded on the NYSE was artificially inflated by the false and misleading statements and material omissions complained of herein, including Massey's misleading statements and omissions about the safety of and risks to its mining operations, its compliance with regulatory requirements, its costs of production, its ability to safely and legally increase coal production at the Company's mines, and

the other matters complained of herein.  Defendants' false statements and omissions inflated the price of Massey common stock and maintained that price at a higher level than would have resulted from disclosure of the true condition of Massey's operations.

329.    The Class Period inflation in Massey's stock price was removed when the conditions and risks concealed by Defendants' scheme, or the financial, regulatory, and operational impacts thereof, were revealed to the market.  The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Massey's regulatory and safety violations, Defendants' deliberate disregard of regulatory and safety requirements, and the increased costs and reduced production that would result from attaining the level of regulatory and safety compliance that Defendants falsely claimed Massey had been maintaining during the Class Period.  These disclosures, more particularly described below, reduced the price of Massey's common stock, causing economic injury to Plaintiffs and other members of the Class.

330.    The corrective impact of the individual disclosures alleged herein was, however, tempered by Defendants' continued false and misleading statements about the regulatory compliance and safety of Massey's operations, including their false denials of statements by MSHA regulators and in the media following the Explosion.  These continued misrepresentations maintained the price of Massey common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Massey even after the Explosion, and leading to further price declines that caused additional injury to the Class upon the disclosure of additional information about the true condition of Massey's operations.[39]

---

[39]   The inflationary and corrective events identified and described herein are based upon Plaintiffs' preliminary analysis, and investigation to date.  Upon further investigation, discovery, and analysis, Plaintiffs may alter or amend their theory of damages, including by identifying additional inflationary or corrective events that caused or contributed to the damages claimed in this action.

331.   The risks and conditions concealed from investors by Defendants' scheme to defraud the public reached the market through a series of partial disclosures.  Each of these disclosures revealed some of the risks and conditions concealed by Defendants' fraudulent scheme, or the financial, legal, and operational consequences thereof, causing the price of Massey securities to decline, and reducing the extent to which the price of those securities was inflated by Defendants' misrepresentations, thereby causing economic injury to plaintiffs and other Class members.

332.   None of the disclosures was sufficient on its own to fully remove the inflation from Massey's stock price, because each only partially revealed the risks and conditions that had been concealed from investors.  In addition, the individual corrective impact of these disclosures was reduced by Defendants' contemporaneous false assertions about the causes of the incidents reported, and their false contentions that the incidents leading to the corrective declines did not indicate there were broader safety and regulatory problems affecting Massey's operations.

333.   The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below and summarized on the following chart, which identifies each corrective event, the price decline in Massey common stock resulting from the event, and, for purposes of comparison, the percentage change in both the Dow Jones U.S. Coal Index ("DJUSCL") and the S&P 500 Index during the same time period.[40]

---

[40]  Because Massey represents a significant part of the DJUSCL, the impacts on Massey's stock price caused by Defendants' fraud also impacted the DJUSCL, causing the overall index to decline on days that Massey's stock declined.  The DJUSCL was also affected by negative news impacting other coal companies whose operations were subjected to heightened regulatory scrutiny following the Explosion.  The percentage drops in the DJUSCL alleged herein reflect the decline in the total index, and have not been adjusted to back out the impact of Massey or to adjust for company-specific news regarding other coal companies which also affected the DJUSCL.  As a result, the economic impact of the fraud as compared with the DJUSCL is even greater than reflected in the chart of corrective events.

| Date | Corrective Event | MEE $ | MEE % | DJUSCL % | S&P 500 % |
|---|---|---|---|---|---|
| 04/06/10-04/07/10 | Explosion Reveals Widespread Safety Violations at Massey | ($9.47) | (17.3%) | (8.0%) | (0.4%) |
| 04/13/10-04/16/10 | Investigations Reveal Pattern of Safety Violations at Massey | ($4.45) | (9.5%) | (3.6%) | (0.2%) |
| 04/22/10 | Q1'10 Earnings Report Reveals Immediate Costs of Massey's Willful Disregard of Safety Standards | ($0.86) | (2.0%) | 0.0% | 0.2% |
| 04/30/10 | NPR Reports FBI Probe Into Massey's Willful Criminal Misconduct | ($4.53) | (11.0%) | (2.3%) | (1.7%) |
| 05/17/10 | U.S. Attorney Confirms Criminal Probe Into Massey | ($3.71) | (10.0%) | (3.1%) | 0.1% |
| 07/27/10 | 2Q10 Earnings Reveal Lowered Production and Increased Costs Resulting from Regulatory Problems | ($2.08) | (6.6%) | (3.3%) | (0.1%) |

334.    Almost immediately following the Explosion, Wall Street raised concerns about the financial consequences of it, including the impact that increased regulatory scrutiny would have on Massey's bottom line.  For instance, *Reuters* reported on April 6, 2010, in an article entitled "S&P May Cut Massey Energy Rating After Mine Disaster," that Standard & Poor's ("S&P") warned that it would cut ratings on Massey's securities because the Explosion was likely to bring increased regulatory scrutiny that would reduce production and present headline risk.

335.    The day after the Explosion, Credit Suisse told investors in a research report called "A Tragic Reminder" to expect reduced Massey profits, "meaningfully higher regulatory costs," and an overhang on Massey shares as a result of liability and litigation expenses and "permitting/regulatory challenges" arising from the Explosion.  "Public and government scrutiny will intensify for the industry in general, and Massey Energy in particular," Jefferies & Co. wrote in a report called "Tragic Explosion at Upper Big Branch Underground Mine" issued the same day.  Investors' concerns continued to grow as regulators and the media began digging into Massey's safety records, uncovering additional evidence of the extent of Massey's regulatory and safety deficiencies.[41]

336.    As a result of the foregoing risks and conditions revealed by reason of, and in the aftermath of, the Explosion, the price of Massey common stock declined $9.47 over the two days

---

[41]    *See also*, *e.g.*, Tim Huber, "W.Va. mine owner accused of putting safety second," ASSOCIATED PRESS, Apr. 6, 2010 (recounting Massey's history of regulatory violations at UBB, including 600 in the last year alone); "Mine owner ran up serious violations," ASSOCIATED PRESS, Apr. 6, 2010 (same); "Mines Fight Strict Laws by Filing More Appeals," N.Y. TIMES, Apr. 6, 2010; "Mine Cited on Safety Issues; Regulator Lists 35 Significant Violations This Year, Including Methane Controls," WALL ST. J., Apr. 7, 2010 (recounting Massey's repeated challenges to regulatory citations intended to prevent MSHA from finding a "pattern of violations" that would make it easier for regulators to shut down the mine when serious violations were found).

following the Explosion, reducing its value more than 17% and resulting in an immediate loss of $900 million in market capitalization that injured Plaintiffs and the Class.

337.    More specifically, on April 6, 2010, the first trading day following the Explosion, the price of Massey common stock fell by $6.24, closing at $48.45 on extraordinary volume of 39.6 million shares, a one-day drop of 11.4% in value from its $54.69 closing price on the prior trading day.  On April 7, 2010, amid further revelations of the unsafe conditions at Massey's operations, Massey's stock price declined by another $3.23, closing at $45.22 on continued extraordinary trading volume of 37.1 million shares, a further one-day drop of 6.67% in market value.

338.    Summarizing the stock market's reaction, an April 8, 2010 *Associated Press* piece carried in *Business Week* (and numerous other media outlets) noted that the Explosion could jeopardize the Company's aggressive expansion program that was intended to increase production in order to take advantage of strong and growing demand for metallurgical coal: "[T]he deadly explosion . . . could hamper its expansion plans, be a drag on earnings and bring additional scrutiny for a coal miner already accused of putting profit ahead of workers' lives."[42] "Besides the shutdown of [Upper Big Branch], the [E]xplosion will draw additional scrutiny from inspectors and that could hinder production at other Massey operations where there are already complaints about unsafe conditions."  *Id.*

339.    Despite such concerns, the corrective impact of the Explosion was blunted, in part, by Defendants' repeated assertions that Massey's mines were safe, including in articles

---

[42]  *See, e.g.*, Mark Williams, "Mine explosion dampens Massey's growth plans," ASSOCIATED PRESS, Apr. 8, 2010.

recounting production increases and safety violations that had occurred in the months leading up to the Explosion.[43]

340.    On April 8, 2010, Massey posted the following statement on its website, firing the first salvo in what would be a continuing effort by Defendants to mold public opinion by challenging and denying assertions about the Company's safety record, thereby delaying and muting the stock price impact of the negative information that continued to be reported in the aftermath of the Explosion, and maintaining Massey's share price at an artificially inflated level:

> Safety Statement
>
> The safety of our members has been and will continue to be our top priority every day.  Media reports suggesting that the UBB tragedy was the result of a willful disregard for safety regulations are completely unfounded.  Our lost-time incident rate has been better than the industry average for 17 of the past 19 years, improving significantly in recent years.  These improvements have been achieved through concerted effort and significant investment.
>
> At Massey, safety is everyone's concern.  We are committed to instilling a culture of safety through our S-1 (Safety First) program.  S-1 combines training, mentoring, monitoring, safety innovation, and risk reduction.  We continue to invest in the development of safety innovations that exceed industry and regulatory standards.  Our past innovations have become industry standards such as the Massey reflective stripes on miners' clothing and flapper pads on roof bolting equipment.  More recently, we have developed proximity devices that automatically shut down equipment if a person gets too close.  We are also working on a revolutionary new miner helmet that will provide improved safety as well as convenience.  Our safety efforts and accomplishments are well known and acknowledged by our industry.
>
> Since the passage of the Miner Act in 2006, we have worked hard to implement the requirements of the Miner Act, including the usage of tracking devices and shelters.

---

[43] *See, e.g.*, Kris Mahr, "Production at Massey Mine Jumped in Fourth Quarter," WALL ST. J., Apr. 9, 2010; Stephen Power & Sara Murray, "Massey Mine Cited for Some Violations More Often Than Average," WALL ST. J., Apr. 9, 2010.

> Media coverage on the UBB incident has referred to safety
> violations issued to UBB by MSHA without placing the numbers
> in context.  Since January 2009, UBB has had less than one
> violation per day of inspection by MSHA, a rate consistent with
> national averages.  We do not condone any violation of MSHA
> regulations, and we strive to be in compliance with all regulations
> at all times.  Most of the citations issued by MSHA to UBB in the
> last year were resolved on the same day they were issued.

341.    The extent of the post-Explosion stock drop was further limited by Defendants'

assertions that they expected the Company to rebound from the Explosion without any loss of

coal production.  A statement posted on Massey's website on April 8, 2010 asserted that the

Company had plans in place to replace much of the lost production from Upper Big Branch by

redeploying workers to, and increasing production at, other mines.  *See* Form 8-K, Ex. 99.5, Apr.

9, 2010.[44]

342.    Unbeknownst to investors, Massey's ability to increase production was dependent

upon its continued operation of other mines in an unsafe condition and in violation of regulatory

requirements.  Market analysts, unaware of the conditions at Massey mines where production

would supposedly be increased, reacted favorably to news of the Company's plans to increase

production, further helping to stem market losses following the Explosion.[45]

343.    Despite the Defendants' efforts to manage public opinion, the intense focus on

Massey's operations by government regulators and the worldwide media in the weeks and

months following the Explosion further revealed the extent and seriousness of the safety and

regulatory violations affecting the Company's operations, causing additional losses in market

---

[44]  *See also*, *e.g.*, Tim Huber, ASSOCIATED PRESS, Apr. 9, 2010, "Massey plans to replace lost W.Va. coal production."

[45]  *See, e.g.*, Jefferies & Co., "Mitigation Plan for Production Loss at UBB Mine," Apr. 9, 2010 (stating that mitigation plan "will help support Massey shares" by limiting EBITDA impact from lost coal production to $30-$50 million and financial loss from business interruption to $10-$15 million, and recommending that investors buy additional shares because the market impact to the Explosion "appears excessive").

value that injured investors as the market learned that the Company's repeated boasts about its safety programs were false, and that the risks to its operations were much greater than the Company had previously revealed.

344.    On April 13, 2010, NPR reported that ten Massey underground mines with above-average injury rates—including four whose rates were more than twice the national industry average—had received 2,400 safety citations in 2009 alone, a rate of 4.6 serious violations per week.  *See* Howard Berkes and Robert Benincasa, "Other Massey Mines Showed a Pattern of Violations," NPR, Apr. 13, 2010.

345.    NPR's April 13, 2010 report, which was widely carried by other media outlets, caused Massey common stock to drop $0.90 per share, a one-day decline of 2.0%.

346.    On April 15, 2010, President Barack Obama delivered a stinging rebuke to the Company, stating in a Rose Garden speech that the Explosion was triggered by "a failure first and foremost of management."  The same day, reports of additional safety violations surfaced when federal inspectors turned up more than sixty serious safety violations at Massey's operations after surprise inspections of Massey mines in West Virginia, Virginia, and Kentucky.[46]  These revelations caused further declines in the value of Massey securities, including a $1.41 per share (3.1%) decline on April 15, 2010 and an additional $1.63 per share (3.7%) decline on heightened volume of 12.3 million shares on April 16, 2010.

347.    On April 21, 2010, after the market closed, Massey issued a press release disclosing its 1Q10 financial results.  The release, for the first time, disclosed the Company's estimate of costs associated with the Explosion, and told investors to expect expenses of $80

---

[46] *See, e.g.*, Marcus Barum, "Safety Violations at Massey Mines Skyrocket: 130 In Week Since Accident," HUFFINGTON POST, Apr. 15, 2010; Tim Huber, "Serious problems turn up at other Massey mines," ASSOCIATED PRESS, Apr. 16, 2010.

million to $150 million "for charges related to the benefits being provided to the families of the fallen miners, costs associated with the rescue and recovery efforts, insurance deductibles, possible legal and other contingencies."  In addition, Massey told investors that it expected to take an impairment charge of $62 million for damage to equipment and resources at Upper Big Branch as a result of the Explosion.  The same day, MSHA announced that it begun an "inspection blitz" over the weekend focusing on, *inter alia*, eight Massey mines.

348.    In connection with its 1Q10 earnings release, Massey forecast coal production costs of $54-$57 per ton for the remainder of the year.  Although this reflected an increase from the Company's prior coal production cost guidance of $49-$52 per ton, Defendant Blankenship told investors during the Company's quarterly conference call that the increase reflected labor and other costs associated with increased production, and did not reflect expectations for increased safety or regulatory expenses following the Explosion.  Wall Street analysts reacted favorably to this news, advising investors to purchase Massey shares in light of the apparent visibility into the financial impact of the Explosion, the Company's purported ability to replace lost production from Upper Big Branch, and the lack of any significant increase in regulatory or safety expenses.[47]  As a result of the foregoing, Massey's shares continued to trade at a price that was inflated by fraud after the issuance of the Company's 1Q10 earnings.

349.    The following morning, on April 22, 2010, *The Wall Street Journal* published an article entitled "Massey's CEO Defends Its Safety Practices; Blankenship Dismisses Criticism of His Leadership, Expresses Confidence He Has Run Miner Properly 'in Every Regard,'"

---

[47] *See, e.g.*, Jefferies & Co., MEE: More Clarity on UBB Costs – Met Mix Driving Margins – Reaffirm Buy Rating, Apr. 22, 2010; Macquarie (USA) Equities Research, "We See Solid Upside to 2011 Price and Volume Guidance; Reiterate OP," Apr. 22, 2010.

recounting the tidal wave of criticism facing Massey after the Explosion as a result of the widespread violations of safety and regulatory requirements.

350.    Also on April 22, 2010, the Circuit Court of Kanawha County, West Virginia issued an order to show cause why Massey should not be held in contempt for violating the Manville Settlement.  Amid this news of the financial impact of the Explosion and mounting criticism of the Company's safety practices, Massey's common stock fell to as low as $41.30 per share on April 22, before closing at $42.93 per share on heightened volume of more than 10 million shares, a one-day drop of nearly 2% that caused additional injury to Plaintiffs and other members of the Class.

351.    Defendants again stemmed the stock price decline from the foregoing events by issuing additional false and misleading statements about Massey's safety and compliance record. As a result, Massey's stock continued to trade at prices that were artificially inflated by the fraud alleged herein.  For example, following President Obama's Rose Garden speech, Massey issued a press release calling his statements "regrettable," claiming he had been "misinformed about [Massey's safety] record."  *See* "Massey Energy Responds to White House Statements," *PR Newswire*, Apr. 15, 2010.

352.    In addition, in Massey's press release announcing 1Q10 earnings and again during the conference call with analysts to discuss those results, Defendants condemned media reports regarding the safety and regulatory problems at its mines, and reiterated their false assertions regarding the safety of the Company's mines.

353.    Further, following a critical article in *The New York Times* on April 22, 2010, Massey immediately issued a press release criticizing the newspaper and denying its assertions

about the (lack of) training of its workers and commitment to safety.  *See* "Massey Energy

Responds to the New York Times Article," PR NEWSWIRE, Apr. 23, 2010.

354.    On April 26, 2010, Massey orchestrated a press conference at which Blankenship

and a hired mining consultant all made statements purporting to demonstrate the safety of

Massey's mines and the Company's adherence to regulatory requirements.  Following the press

conference, Jefferies & Co. issued a report stating "We thought Massey provided a clear, calm

defense of its company policies regarding safety and compliance. . . .  The Board clearly resents

accusations surrounding Massey's commitment to safety. . . .  We recognize the continued

headline and regulatory risk, but believe the market has overly discounted potential issues in

current valuation."  Jefferies & Co., "Board Hosts a Press Conference Supporting Its Recent

Letter to Stakeholders," Apr. 27, 2010.

355.    Then, after MSHA issued a press release on April 27, 2010 announcing citations

issued as a result of surprise inspections at three Massey-owned mines following anonymous

complaints reflecting a serious disregard for safety at those facilities, the Company issued a press

releases denying key aspects of the MSHA announcement, reiterating its purported commitment

to regulatory compliance, and again asserting that Massey's safety standards exceed industry

requirements.  *See* "Massey Responds to MSHA Press Release Regarding Surprise Inspections,"

PR NEWSWIRE, Apr. 27, 2010.  The same day, Massey issued two additional press releases

contradicting testimony made during Congressional hearings into the Explosion.  *See* "Massey

Responds to Statements Made by UMWA Members at Senate Hearings Today," PR NEWSWIRE,

Apr. 27, 2010.

356.    Defendants' efforts to prop up Massey's stock price provided only temporary

relief, as additional information continued to come to light that further revealed the extent of

Massey's safety and regulatory violations and the willful nature of its actions, leading to additional stock price declines that caused further injury to the Class.

357.    Specifically, on April 30, 2010, NPR reported that the FBI was investigating Massey for bribery of state and federal mine inspectors, and was exploring criminal negligence on the part of the Company.  *See* "FBI Probing U.S. Officials and Massey, Owner of W. Va. Mine Where 29 Died," NPR, Apr. 30, 2010.  NPR's report was picked up and carried by major national media outlets.[48]

358.    On this news, Massey shares dropped $4.53 per share, a 1-day loss of 11% in value on accelerated volume of 24 million shares, more than 4 times its historic average.

359.    Once again, Massey sought to, and did, limit the extent of the stock drop by immediately issuing a press release seeking to discount and undercut the report.  *See* "Massey Energy Statement on Unsubstantiated Rumors Relating to Criminal Investigation," PR NEWSWIRE, Apr. 30, 2010; *see also* Jefferies & Co., "More Headlines Emerge," May 3, 2010 (reporting that Blankenship publicly stated in a May 2, 2010 television interview that he did not believe there was anything to the investigation and stressed the safety and ethics culture at Massey; and noting "We recognize the continued headline and regulatory risk, but believe the market has overly discounted potential issues in current valuation").

360.    On Saturday, May 15, 2010, NPR's report of the FBI's criminal probe was confirmed in an article published in *The Wall Street Journal* which quoted a letter from U.S. Attorney Chuck Miller confirming that his office was investigating Massey for engaging in

---

[48]  *See, e.g.*, Massey faces criminal probe for mine blast: sources, REUTERS, Apr. 30, 2010; "FBI Investigating Fed Officials and Massey Energy Over Possibl[e] Bribery," ASSOCIATED PRESS/ HUFFINGTON POST, Apr. 30, 2010.

"'willful criminal activity.'"  *See* Kris Maher, "U.S. Confirms Probe in Coal Mine Blast," WALL

ST. J., May 15, 2010.

361.    The following Monday, May 17, 2010, Massey's shares plunged $3.71 per share,

a 10% loss in value on heightened volume of 12.6 million shares, causing additional economic

injury to the Class.  *See, e.g.*, "Massey Energy stock plunges 10%," CNNMoney.com, May 17,

2010 (attributing Monday stock drop to weekend *Wall Street Journal* report).

362.    On July 27, 2010, Massey reported its 2Q10 earnings which significantly missed

Wall Street's expectations because of decreased coal production of 9.8 million tons—1 million

tons below the Company's estimate—at an increased cost of $59.51 per ton, nearly $4 higher

than the midpoint of the cost guidance that had been provided the prior quarter.

363.    Contrary to the Company's prior contentions, Massey's 2Q10 earnings release

admitted that coal production costs had, in fact, risen due to "increased regulatory enforcement

actions and related temporary shutdowns, increased labor turnover rates, unplanned transfers of

crews and equipment," and other factors.  The release further acknowledged that the decreased

production was primarily related to "[l]ower productivity and temporary shutdowns" associated

with increased MSHA enforcement of safety and regulatory violations at Massey mines.  *See*

"Massey Energy Reports Second Quarter Operating Results," PR NEWSWIRE, July 27, 2010.

364.    In its 2Q10 earnings release, Massey increased its cost guidance to $56-$60 per

ton, and decreased its production estimate to 39–40.5 million tons, down from its prior estimate

of 41-43 million tons for the year, alerting investors to the continued impact that previously

concealed safety and regulatory violations would have on Massey's operations.  In addition, the

2Q10 earnings release disclosed $128.9 million in incurred costs, asset impairments and accrued

reserves associated with the Explosion.  Analysts responded negatively to this news, lowering

their price targets and estimated earnings for 2010.  *See, e.g.,* Macquarie (USA) Equities

Research, "Lowering Estimates as Costs Escalate," July 28, 2010 (lowering EPS estimates from

$2.10 to $1.30; "Massey is clearly going to feel the most impact given its link to the UBB

tragedy, it appears very likely MEE is going to see above-average cost inflation as guidance

implies."); Credit Suisse, "In Value Territory, BUT. . . ," July 28, 2010 (lowering EPS estimates

from $1.81 to $0.55 due to further incremental cost pressures including regulatory costs).

365.     The information in the 2Q10 earnings release sent Massey's stock price tumbling,

dropping the price of its common shares by $2.08 on July 27, 2010, a 1-day loss of 6.6% in value

on heightened trading volume of 8.4 million shares that caused further injury to the Class.

366.     Each of the factors leading to the increased costs and reduced production

disclosed in the 2Q10 earnings release was the direct and proximate result of regulatory actions

and other measures taken to investigate, correct, or otherwise address the unsafe and illegal

conditions that, unbeknownst to investors, had existed throughout Massey's mining operations

during the Class Period.  As such, the increased expenses and lowered production reported in the

2Q10 earnings release reflected the manifestation of risks and conditions that had been concealed

from investors throughout the Class Period.

## VIII.   POST-CLASS PERIOD DISCLOSURES

367.     On August 11, 2010, *Bloomberg News* and other media outlets reported that

Massey's top executives would be subpoenaed in connection with MSHA's investigation into the

Explosion, which the agency said was a "***preventable occurrence.***"

368.     On August 27, 2010, after the *Associated Press* reported that a handheld methane

detector had documented the presence of explosive levels of methane at the time of the

Explosion.

369.     Thereafter, the conditions concealed from investors during the Class Period continued to negatively impact Massey's operations, further demonstrating the extent to which the Company's reputation as the leading producer of coal had been built on a pattern and practice of ignoring safety and regulatory requirements to artificially increase the rates of, and reduce the costs of, coal production.

370.     For example, on September 16, 2010, Massey revised its guidance, issuing a press release after the market closed disclosing that coal production had decreased yet again as a result of the heightened regulatory scrutiny of its operations following the Explosion:

> The Company expects 2010 operating results to be at the low end of its previously announced guidance range.
>
> "Our operations have continued to struggle since April," said Don Blankenship, Massey's Chairman and CEO.  "As we have noted earlier, increasingly stringent enforcement actions by MSHA across our operations and throughout the Central Appalachian region have resulted in lost shifts and loss of productivity.  In addition, our Revolution longwall mine was idled in June for a planned longwall move but has remained down pending approval of its ventilation plan.  As a result of these and other factors, we now expect our third quarter shipments to approximate 10 million tons and we expect to report an operating loss for the quarter."
>
> For the full year 2010, the Company now expects to ship approximately 39 million tons of coal at an average price of approximately $71.00 per ton.  The average cash cost(1) of tons shipped is expected to approximate $60.00 per ton.

371.     The information disclosed in the September 16, 2010 press release caused Massey shares to drop $2.42 on September 17, a one-day decline of 7.5% in value.

## IX.     CLASS ACTION ALLEGATIONS

372.     Plaintiffs brings this case as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as all persons and entities that purchased or otherwise acquired shares of Massey Energy Company common stock between

February 1, 2008 and July 27, 2010, inclusive, and were damaged thereby.  Excluded from the

Class are Defendants, the officers and directors of Massey and all of its subsidiaries during all

relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which Defendants have or had a controlling interest.

373.    The members of the Class are so numerous that joinder of all members is

impracticable.  As of March 16, 2010, during the Class Period, more than 102 million shares of

Massey common stock were issued and outstanding and actively traded on the NYSE.  While the

exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained

through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed

Class.  Record owners and other members of the Class may be identified from records

maintained by Massey or its transfer agent, and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class actions.

374.    Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class were similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

375.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained Co-Lead Counsel, who are competent and experienced in class and

securities litigation.

376.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as

alleged herein;

(b)      whether statements and omissions made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Massey;

(c)      whether Defendants made those statements despite knowing of their falsehood, or knowingly omitted to state facts so that other statements made by Defendants would not be misleading;

(d)      whether Plaintiffs and the Class are entitled to the fraud-on-the-market presumption to establish reliance;

(e)      whether Plaintiffs and the Class are entitled to a presumption of reliance under the *Affiliated Ute* doctrine to establish reliance;

(f)      the extent to which the price of Massey common stock was artificially inflated during the Class Period; and

(g)      the extent to which the members of the Class have sustained damages when the truth was disclosed and the appropriate measure of such damages.

377.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this case as a class action.

**X.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF
       RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL
       FACTS UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE
       ALTERNATIVE, UNDER THE FRAUD-ON-THE-MARKET DOCTRINE**

378.    At all relevant times, the market for Massey's common stock was an efficient

market for the following reasons, among others:

(a)    Massey's stock met the requirements for listing, and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b)    There was a significant market for Massey's common shares, which had

an average daily trading volumes of 5,444,400 shares during the period 2008 and 2010;

(c)    As a regulated issuer, Massey filed periodic public reports with the SEC

and NYSE;

(d)    Massey regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases

by major newswire services, publications on its website and other Internet sites, media coverage

of its operations, and other widely-disseminated public disclosures, including conference calls,

communications with the financial press, and other reporting services;

(e)    During the Class Period, Massey was followed by securities analysts

employed by major brokerage firms, including Bank of America, Merrill Lynch, Barclays,

BB&T Capital Markets, BMO Capital Markets, Citigroup, Crédit Agricole Securities (USA)

Inc., Credit Suisse – North America, Dahlman Rose & Co., LLC, Davenport & Co., LLC, FBR

Capital Markets, Goldman, Sachs & Co., HSBC Global Research, Jefferies & Co., Inc., Johnson

Rice & Company, JP Morgan, Macquarie (US) Equities Research, Raymond James, Simmons

Co. International, Stifel Nicolaus & Co., UBS and others.  Analysts employed by each of these

firms regularly wrote reports based upon the publicly available information disseminated by

defendants about Massey.  These reports were distributed to the sales force and certain customers of their respective brokerage firms, and from time to time reported in the press;

(f)      Massey had substantial institutional ownership during the Class Period, including shares owned by Fidelity Management & Research, BlackRock Financial Management, State Street Global Advisors (US), Vanguard Group, Inc., Van Eck Associates Corporation, Westfield Capital Management Company, Lazard Asset Management, Norges Bank Investment Management, Soros Fund Management, Wellington Management Company, Northern Trust Investments, J.P. Morgan Securities Inc. and Bass Brothers.  Each of the institutions owning Massey shares regularly analyzed and reported on the publicly-available information about Massey and its operations; and

(g)      Through the foregoing mechanisms, the information publicly disseminated about Massey and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of their transactions in Massey stock, the information disseminated by defendants, including the false and misleading statements described herein, became incorporated into and were reflected by the market price of Massey's publicly-traded securities.

379.    As a result of their purchase of Massey's common stock at the public prices prevailing in the market during the Class Period, all members of the Class: (i) are presumed to have relied upon the false and misleading information and material omissions particularized herein; and (ii) suffered similar injury when the price of Massey's common stock declined upon the public disclosure of facts, conditions and circumstances concealed by defendants' fraud or the economic, operational and regulatory consequences thereof.

## XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

380.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be false and misleading all relate to historical facts or existing conditions and were not identified as forward-looking statements.  To the extent any of the false statements alleged herein may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements.  Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or the statement was authorized or approved by an executive officer of Massey who knew that those statements were false.

## XII.   CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5 (Asserted Against All Defendants)

381.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.

382.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC by Plaintiffs and the Class against Defendant Massey, Blankenship, Phillips, Tolbert, Adkins, Foglesong, Gee, Gabrys, Crawford, Judge, Moore, and Suboleski.

383.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Massey's stock; and (iii) cause Plaintiffs and other members of the Class to purchase Massey's stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, each of them, took the actions set forth herein.

384.     Defendants, individually and in concert, directly and indirectly by the use of means and instrumentalities of interstate commerce, the mails, the facilities of national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially inflated market prices for Massey's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Officer Defendants are also sued as controlling persons of Massey, as alleged below.

385.     The Individual Defendants' primary liability, and Officer Defendants' controlling person liability, also arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, forecasts and/or reports; (iii) Defendants enjoyed significant personal

contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendants were aware of the Company's dissemination of information to the investing public that they knew was materially false and misleading.

386.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

387.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (Asserted Against the Officer Defendants)

388.     Plaintiffs incorporate by reference and reallege each and every allegation contained above as if fully set forth herein.

389.     This Count is asserted against Defendants Blankenship, Phillips, Tolbert and Adkins.  Throughout the Class Period, the Officer Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were controlling persons of Massey within the meaning of Section 20(a) of the Exchange Act.

390.     The Officer Defendants had the power to, and did, directly and indirectly, exercise control over Massey, including the content and dissemination of statements that Plaintiffs allege are false and misleading.  The Officer Defendants were each provided with and/or had access to reports, filings, press releases and other statements alleged to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance or correct

the statements.  The Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and engaged in the acts constituting violations of the federal securities laws, as set forth in Count One above.

391.    The Officer Defendants culpably participated in the matters alleged herein because, among other things, they knew that the statements set forth above were materially false and misleading, or omitted material information.  Facts giving rise to the Officer Defendants' culpable participation are set forth in detail above.

392.    The Officer Defendants acted as controlling persons of Massey within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

## XIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying it as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### Jury Trial Demanded

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  March 11, 2011

/s/ Joel H. Bernstein
JOEL H. BERNSTEIN

**LABATON SUCHAROW LLP**
JOEL H. BERNSTEIN
CHRISTOPHER J. KELLER
IRA A. SCHOCHET
STEFANIE J. SUNDEL
FELICIA Y. MANN
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Counsel for Lead Plaintiff Commonwealth
of Massachusetts Pension Reserves Investment
Trust and Co-Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
PAUL J. GELLER
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida  33432
Telephone:  (561) 750-3000
Facsimile:  (561) 750-3364

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
DENNIS J. HERMAN
CHRISTOPHER M. WOOD
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California  94104
Telephone:  (415) 288-4545
Facsimile:  (415) 288-4534

*Attorneys for Plaintiff David Wagner
and Co-Lead Counsel for the Class*

**JAMES F. HUMPHREYS
 & ASSOCIATES L.C.**
SAMUEL D. ELSWICK
JAMES A. McKOWEN
United Center, Suite 800
500 Virginia Street, East
Charleston, West Virginia  25301
Telephone:  (304) 347-5050
Facsimile:  (304) 347-5055

*Liaison Counsel for Lead Plaintiff
Massachusetts PRIT*

**JOHN F. DASCOLI, PLLC**
JOHN F. DASCOLI (SBID #6303)
2442 Kanawha Boulevard, East
Charleston, West Virginia  25311
Telephone:  (304) 720-8684
Facsimile:  (304) 342-3651

*Local Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2011, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following CM/ECF participants:

- **Jonathan L. Anderson**
  jlanderson@jacksonkelly.com

- **Stephen L. Brodsky**
  sbrodsky@zsz.com

- **John F. Dascoli**
  johnfdascoli@hotmail.com, Pamdc519@aol.com

- **Samuel D. Elswick**
  selswick@jfhumphreys.com, rbell@jfhumphreys.com

- **A. L. Emch**
  aemch@jacksonkelly.com, sra@jacksonkelly.com, jcrawford@jacksonkelly.com

- **Thomas V. Flaherty**
  tflaherty@fsblaw.com, cmontague@fsblaw.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **Stuart W. Gold**
  sgold@cravath.com

- **Tammy R. Harvey**
  tharvey@fsblaw.com, cmontague@fsblaw.com

- **Dennis J. Herman**
  DennisH@rgrdlaw.com

- **Laurie L. Largent**
  LLargent@rgrdlaw.com, triciam@rgrdlaw.com

- **J. Burton LeBlanc**
  bleblanc@baronbudd.com

- **James A. McKowen**
  Jmckowen@jfhumphreys.com, Dhoffman@jfhumphreys.com,
  Dmilhoan@jfhumphreys.com

- **Julie A. North**
  jnorth@cravath.com

- **Bradley J. Pyles**
  brad.pyles@cphtlogan.com, bjpyles@suddenlink.net

- **Julie A. North**
  jnorth@cravath.com

- **Jack Reise**
  jreise@rgrdlaw.com, pgeller@rgrdlaw.com

- **Darren J. Robbins**
  e_file_d@csgrr.com

- **Ronald S. Rolfe**
  rrolfe@cravath.com, managing_attorneys_office@cravath.com, sthompson@cravath.com

- **Mazin Sbaiti**
  msbaiti@baronbudd.com

- **Robert S. Schachter**
  rschachter@zsz.com

- **David C. Walton**
  davew@rgrdlaw.com

- **Christopher M. Wood**
  CWood@rgrdlaw.com

I hereby certify that I have mailed the document by United States Postal Service to the

following non-CM/ECF participants:

      **Michael J. Vanoverbeke**
      **Thomas C. Michaud**
      VANOVERBEKE MICHAUD & TIMMONY
      79 Alfred Street
      Detroit, MI 48201

DATED:  March 11, 2011           _/s/ Joel H. Bernstein_____
                            JOEL H. BERNSTEIN
                            **LABATON SUCHAROW LLP**
                            140 Broadway
                            New York, New York  10005
                            Telephone: (212) 907-0700
                            Facsimile: (212) 818-0477
                            jbernstein@labaton.com