# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

IN RE MASSEY ENERGY CO.
SECURITIES LITIGATION[1]

CIVIL ACTION NO.  5:10-cv-00689

### MEMORANDUM OPINION AND ORDER

Lead Plaintiff, Commonwealth of Massachusetts Pension Reserves Investment Trust ("Massachusetts PRIT") and Plaintiff David Wagner, on behalf of the putative class, allege that the price of Massey Energy Company ("Massey") stock was artificially inflated, between February 1, 2008, and July 27, 2010, because Massey and several of its senior executives and directors misled the market about its safety and compliance record and its disregard for safety regulatory compliance. The Defendants move for dismissal of Plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("CAC").  (*Don L. Blankenship, Baxter F. Phillips, Jr., Eric B. Tolbert and Christopher Adkins' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint* ("Officer Defs.'s Mot. to Dismiss") (Document 94); *Joint Motion of Massey Energy Company and the Outside Director Defendants to Dismiss the Consolidated Amended Class Action Complaint* ("Joint Mot. to Dismiss") (Document 96)).   The Joint Motion to Dismiss is

---

[1]   On June 22, 2011, the Court was advised that Massey Energy Company changed its name to Alpha Appalachia Holdings, Inc. (Notice of Name Change (Document 113)); *see also* Memorandum of Law of Certain Massey Defendants in Opposition to Plaintiffs' Motion to Strike Exhibits B-H to the Declaration of Julie A. North in Support of Defendants' Motion to Dismiss ("Defs.' Opp'n to Mot. to Strike") (Document 116) at 1, n.1 ("As of June 1, 2011, following the consummation of the merger of Massey Energy Company and Alpha Natural Resources, Inc., Massey became a wholly owned subsidiary of Alpha and renamed Alpha Appalachia Holdings, Inc.")).  For consistency with the parties written submissions, the Court will continue to refer to Massey Energy Company as "Massey" or "the Company."

supported by the Declaration of Julie A. North and various exhibits regarding "screenshots" of web-pages from the United States Mine Safety and Health Administration's ("MSHA") website. Plaintiffs move to strike these exhibits. (*Plaintiffs' Motion to Strike Exhibits B-H to the Declaration of Julie A. North in Support of Defendants' Motions to Dismiss* ("Mot. to Strike") (Document 100)).

After careful review of the motions and appropriate submissions relative thereto and for the reasons that follow, the Court grants the Plaintiffs' motion to strike and denies the Defendants' motions to dismiss.

### I.

This civil action, filed on April 29, 2010, arises out of the alleged securities fraud committed by Massey and several of its officers and directors. Massey, a Delaware Corporation with its headquarters in Richmond, Virginia, is the fourth largest coal producer in the United States and the largest coal producer in the regions of West Virginia, Kentucky and Virginia. Massey produces, processes and sells bituminous coal. On January 31, 2010, through its operating subsidiary A.T. Massey, Massey operated fifty-six (56) mines (forty-two (42) underground mines and fourteen (14) surface mines) and twenty-three (23) processing and shipping centers. The company is a publicly owned corporation traded on the New York Stock Exchange. The following officers and directors were named as Defendants: Don Blankenship, Former Chairman of the Board, Chief Executive Officer ("CEO"), President, Executive Committee Chair, who also held executive leadership roles in A. T. Massey Coal;[2] Baxter F. Phillips, Jr., CEO of Massey, member of the Safety, Environmental

---

[2]   On November 13, 2008, during the relevant class period, Defendant Blankenship ceased serving as President of Massey. He retained the balance of his roles until December 31, 2010, when his resignation became effective. Defendant Baxter F. Phillips was elected President of Massey on November 10, 2008, and became CEO of Massey effective December 3, 2010. He has been a Massey director since May 22, 2007. At times during the class period, Defendant Phillips served as Executive Vice President and Chief Administrative Officer of the

and Public Policy Committee ("SEPPC") of Massey's Board of Directors; Eric B. Tolbert, Chief Financial Officer and Vice President of Massey;  J. Christopher Adkins, Senior Vice President and Chief Operating Officer, overseeing all mining and processing operations reporting directly to Defendant Blankenship; Dan R. Moore, Massey Director since 2002, Chairman of the Audit Committee, and member of all of the Board of Directors' committees, including the SEPPC; E. Gordon Gee, Massey Director from 2000 until July 1, 2009, member of the SEPPC and various Board of Directors' committees; Richard M. Gabrys, Massey Director since May 22, 2007, member of the SEPPC and the Governance and Nominating Committee during the Class Period; James B. Crawford, Massey Director since 2005, member of various Board of Directors' committees, including the SEPPC, served as Chairman of the SEPPC from July 2009 through the end of the Class Period; Robert H. Foglesong, Massey Director since February 21, 2006, member of the SEPPC and various Board of Directors' committees; Stanley C. Suboleski, Massey Director since May, 2008, member of the SEPPC and various Board of Directors' committees, provided mining engineering consultative services to Massey from August 2006 through the end of the class period; Lady Barbara Thomas Judge, Massey director between February 19, 2008, until she resigned on April 19, 2010, member of the SEPPC and the Governance and Nominating Committee.[3]  Lead Plaintiff, Massachusetts PRIT, a pooled investment fund with more than $41 billion in total assets under management, including assets managed for the benefit of the Massachusetts State Teachers' and Employees' Retirement Systems and participating county, authority, district and municipal

Company.

---

[3]  In the CAC, Defendants Blankenship, Phillips, Tolbert and Adkins are referred to as the "Officer Defendants," while Defendants Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski and Judge are identified as the "Director Defendants."  Collectively, Plaintiffs refer to all of these defendants as the "Individual Defendants."  For consistency, the Court will do the same.

retirement systems, and David Wagner purchased Massey common stock on the open market between February 1, 2008, and July 27, 2010.  Plaintiffs filed this suit as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3), to represent a class of those who purchased common stock from Massey during the class period and who were damaged as a result.[4]   The Court has reviewed the entirety of the one hundred seventy (170) page CAC, but will only briefly detail the facts giving rise to this litigation, viewing them as true, as the Court must in its consideration of the pending Rule 12(b)(6) motions to dismiss.

On January 19, 2006, a fire claimed the lives of two miners at Alma No.1 mine in West Virginia.  At the time, Alma No.1 mine was operated by Massey subsidiary Aracoma Coal Company.  As a result, investigations were conducted by MSHA and the FBI.[5]  Plaintiffs aver that

---

[4]   On April 29, 2010, this action was initiated by Macomb County Employees' Retirement System as a securities class action on behalf of purchasers of Massey stock during the period of October 28, 2009, to April 21, 2010, against Massey and Defendants Blankenship, Phillips, Tolbert, Gabrys, Judge, Moore, Crawford, Foglesong, and Suboleski.  (Complaint for Violation of the Federal Securities Laws (Document 1, ¶1, 9-19.)  On May 28, 2010, Firefighters' Retirement System of Louisiana initiated a securities fraud class action on behalf of purchasers of Massey stock between February 1, 2008, and May 16, 2010, against Massey and Defendants Blankenship, Phillips, Tolbert, Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski Judge and Adkins.  *Firefighters' Retirement System of Louisiana v. Massey*, Civil No. 5:10-cv-776  (Complaint for Violation of the Federal Laws (Document 1, ¶ 1, 14-26)).  On January 10, 2011, this Court consolidated the actions, designated the instant case as the lead case, appointed the Massachusetts PRIT as Lead Plaintiff, and listed David Wagner as a named plaintiff in the Consolidated Action. (Document 55).  Plaintiffs filed the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws on March 11, 2011 (Document 83).

[5]   The investigations revealed two internal memoranda written on October 19, 2005, and October 26, 2005, by Defendant Blankenship instructing, in the first instance, all Deep Mine Superintendents to "run coal" and "ignore" any requests by anyone "to do anything other than run coal (*i.e.* – build overcasts, do construction jobs, or whatever)." (CAC, Ex. A.) In the second memorandum, he stated that "safety and S-1 is our first responsibility, Productivity and P-2 are second," referred to his October 19, 2005 memo and some people's "interpret[ation]" that he considered safety to be a secondary responsibility ("I would question the membership of anyone who thought that I consider safety to be a secondary responsibility"), and instructed that if there was a necessary construction job at the mine, "keep it safe or productive, make every effort to do these jobs without taking members and equipment from the coal producing sections that pay the bills."  (CAC, Ex. B.)  According to the CAC in this case, Defendant Blankenship's message was clear that "Production trumps Safety" and that he ran the company, with the Board of Director's knowledge, in such a way that safety was second to production.  In 2007, two members of the  Board of Directors resigned amid concerns about the management of the company, rejection of a business opportunity and "the Company's confrontational handling of environment and regulatory matters . . . [which they termed as ] counterproductive."  (CAC, Ex.C.)

the miners died of "carbon monoxide poisoning because monitors were improperly installed and a permanent ventilation control was removed from an emergency escape passage." (CAC, ¶ 73.) Following criminal and civil litigation, which included a derivative shareholder action, Massey pled guilty to ten criminal charges and entered into a $4.2 million settlement ($2.5 million in criminal penalties and $1.7 million in civil penalties). The settlement required, among other things, "changes to the corporat[ion's] governance policies and procedures relating to director oversight and conduct regarding environmental compliance and mine worker safety"; the SEPPC's development of "goals for implementing enhancements to the Company-wide process utilized to monitor, count and report mine safety incidents and complaints (a "mine safety incident" is a lost-time injury suffered in connection with the Company's mining activities) and near misses with high potential for injury"; reports by the SEPPC to the Board of Directors "regarding the Company's compliance with all applicable mine safety laws and regulations[,]" including "(a) the number of mine safety incidents overall and by type (b) findings by third-party auditors, and (c) an analysis of any causal factors contributing to safety incidents"; enhancements to the safety and environmental procedures and reporting, including shareholder reporting; and annual shareholder reporting from the Board in its Corporate Social Responsibility reporting "environmental and worker safety compliance." (CAC, ¶¶ 9, 18, 78-79, 317, 321; *see also* CAC, Ex.D.)

Following the 2006 miner deaths and the litigation that followed, Defendant Blankenship and Massey sought to restore the Company's reputation and image by announcing that it had a strong company commitment to the safety of its miners and that it had begun "safety improvement initiatives." Massey began to focus on building investor confidence and goodwill with regulators by stating its commitment to safety and affirming that its organization put the safety of its miners

before its production, in its SEC quarterly and annual filings, press releases, and investor presentations.  For instance, in its 2007 Annual Report, Massey declared that "a safe mine is a productive mine" and explained  its "formula for success [as] $S-1 + P-2 + M-3 =$ shareholder value." The Annual Report detailed the meaning of the equation as "safety first, production second and measurement third." (*See* CAC, ¶ 82) (highlighting the 2007 Annual Report description of "S-1" as "Safety is Job One").  Additionally, on September 6, 2007, at the Lehman Brothers CEO Energy Conference, Defendant Blankenship stated that:

> The main thing about Massey is, *we have a better safety performance than the industry, whether you're looking at underground, surface or total.  And we have S1 and safety programs in place that far exceed the law* . . .
>
> We think this performance speaks very well for the management's focus on safety and our S1 program. A lot of safety awards . . . [W]hat you often don't see in the press is number one, how safe the industry is; number two, how safe Massey is in comparison; or number three, how many safety awards are won by our Company.

(CAC, ¶ 85) (emphasis added).  In a 2008 press release, Massey emphasized that "safety first" was "not just a slogan" in its organization and, in its 2009 Corporate Social Responsibility Report, stated that "no coal company can succeed over the long term without a total commitment to safety." Throughout the class period, Massey affirmed and restated its commitment to safety and reported to investors that a key safety measurement rate, the NFDL rate, was decreasing year after  year for the company.[6]  (*See* CAC, ¶¶ 30, 118, 134, 203, 212, 257, 270, 273-274) (Massey reported that the

---

[6]   Plaintiffs allege that "MSHA divides 'injuries' into three major categories with the following definition:

- FATAL (work-related injuries resulting in death to an employee on active mine property);
- NONFATAL, DAYS LOST (NFDL) cases (occupational injuries that result in loss of one or more days from the employee's scheduled work, or days of limited or restricted activity while at work);

NFDL rates for 2007, 2008, and 2009 were 2.05, 1.93, and 1.67, respectively).   In 2007 through 2010, Massey and its Directors signed SEC filings and made statements in various press releases and presentations to investors that indicated that it had a commitment to safety, that safety of its miners and the successfulness of its company were linked and that it was leading the industry in safety performance.   Plaintiffs allege that Massey, in its frequent communications about its "enhanced safety protocols . . . lured the members of the Class, who invested in Massey in reliance on public representations that the Company had turned a new leaf with regard to mine safety." (CAC, ¶ 15.)

However, on April 5, 2010, twenty-nine (29) miners died in an explosion and fire at Massey's Upper Big Branch Mine ("UBBM") at Montcoal in Raleigh County, West Virginia.   The explosion, one of the deadliest United States coal mining accidents in forty years, led to various news reports regarding Massey's safety violations and investigations.   Plaintiffs aver that according to MSHA, the cause of the explosion largely involved basic mine safety practices that were not adhered to; namely, inadequate water sprays, dull cutting bits, and extraordinary levels of float coal dust due to inadequate rock dusting. (CAC, ¶ 191.)   Plaintiffs further aver that the investigations into the explosion and Massey revealed that despite Massey's public statements that it was an "industry leader in safety" and that production was secondary to safety, Massey and Defendant Blankenship, with the acquiescence of the Board of Directors, had continued to make production a priority over safety.

MSHA began to release data that showed the number and severity of violations at the UBBM

---

- NO DAYS LOST (NDL) cases (occurrences requiring only medical treatment-beyond first aid).   "Incidence rates" are the number of injuries in a category times 200,000 divided by the number of employee-hours worked.

(CAC, ¶ 118.)

increased drastically in 2009 and 2010 as production increased.[7] Of note, in the year before the explosion, MSHA citations at the UBBM "more than doubled from 2008 to more than 500, and proposed fines more than tripled to $897,325." (CAC, ¶ 175.) Additionally, in 2009, MSHA issued 202 S&S citations to UBBM, which almost equaled the number of citations the mine had received during the prior 24 months when it was "placed on pattern of violations status."[8] (*Id.*) MSHA records revealed that in 2009, MSHA had issued to UBBM sixty-one (61) withdrawal orders and shut down parts of the mine fifty-four (54) times. In the first quarter of 2010, UBBM was the subject of one hundred twenty-four (124) citations, fifty-three (53) assessed penalties totaling $188,769, numerous withdrawal orders and had been shut down seven (7) times. (CAC, ¶176.) The UBBM was cited "hundreds of times for 'mine ventilation' violations and received 37 complaints of 'accumulations of combustible materials.'" (CAC, ¶179.) Contrary to Massey's asserted claims of safety, during the class period, Massey: (1) had the worst fatality rate in the nation (fifty-four (54) deaths, which includes twenty-three fatalities before the UBBM explosion, and two since); (2) performed worse than the national average when defined by MSHA issued S&S citations, at its large

---

[7]   (*See* CAC, ¶102 ("[UBBM] produced 1.2 million tons of coal in 2009 – a three-fold increase from the 363,923 tons produced at [UBBM] in 2008.")

[8]   MSHA is charged with issuing a citation or order for each violation of health and safety standards that they encounter. There are many types of violations that range in importance and the assessment of civil penalties. (*See* CAC, ¶¶ 109-117.) There are two general categories of citations and violations, non significant and substantial ("non-S&S") and significant and substantial ("S&S"). (CAC, ¶¶ 109-111.) "[A] non-S&S violation is one that is 'not reasonably likely to cause reasonably serious injury that is corrected promptly[.]" (CAC, ¶110) (citing MSHA Fact Sheet 95-4). A S&S violation is defined in the CAC as "[a] violation 'reasonably likely to result in serious injury or illness under the unique circumstance contributed to by the violations[,]'" and is determined upon consideration of six factors. (CAC, ¶111, n.26.) If MSHA determines that the S&S violations demonstrate a "pattern" at a given mine, the mine operator is notified and given an opportunity to bring the mine into compliance. Further S&S violation found on that mine within ninety days will automatically trigger a withdrawal order. (CAC, ¶113.) The Federal Mine Safety and Health Act of 1977 ("the Mine Act") authorizes MSHA to issue citations pursuant to Sections 104(b) and (d) and 107(a). (CAC, ¶¶114-117.) These citations result in "elevated enforcement actions" which has the potential to halt coal production and shut down sections of a mine entirely. (CAC, ¶114.)

mines, with at least 100 employees[9] and (3) performed worse than the national average in terms of elevated enforcement actions.[10]  Plaintiffs allege that these violations at UBBM and other Massey mines were "red flags" to the Company about their safety compliance.  However, they were ignored when measuring and reporting Massey's safety performance to investors during the class period.

After the tragic UBBM explosion on April 5, 2010, investors began to learn the truth about "Massey's duplicitous and deceptive schemes." (CAC, ¶ 32.)  Several current and former Massey miners began to offer insight regarding the Company's commitment to production over safety. (*See* CAC, ¶ 103-105) (miners interviewed on the National Public Radio ("NPR") and testifying before the House Labor Committee revealing ventilation problems at UBBM that were reported, but not fixed.)  For example, a miner on site at the UBBM explosion testified before the House Labor Committee on July 13, 2010, regarding directives he and others received that made them work in conditions that were unsafe, and also testified about another miner who was told to falsify a report to cover up inadequate mine ventilation.  (CAC, ¶16) (miners told to "cut coal going into our air supply . . . [w]e mined this way for 2,000 feet"; "we were made to load coal before all the shields and ventilation were in place so someone could call Mr. Blankenship to say we were 'in the coal;'" and another miner was told "by upper management to fix the books to proper air readings when the section had virtually no air.")

---

[9]   Plaintiffs, using MSHA's Open Government Data Sets--raw data available on MSHA's website in eight separate files--calculate a Massey Company-wide rate of 35.2% of S&S citations at large underground mines, while the national average in 2008 was 32%; in 2009, Massey's company-wide S&S violations were 35%, which was greater than the national average of 31.4%.  (CAC, ¶ 124.)  Moreover, in 2009, half of Massey's large underground mines performed either the same or worse than the industry average.  (CAC, ¶ 125.) Respecting large surface mines, Massey also performed worse than the national industry average during the class period.  For instance, in 2009, the national average of S&S citations was 29% compared to Massey's company-wide rate of 41.8%.  (CAC, ¶ 126.)

[10]   The national average of elevated enforcement actions per 1,000 inspection hours at large underground mines, in 2008, was 3.4. However, at Massey ,the company-wide rate was 4.84.  In 2009, 2.95 national average compared to 7.03 Massey company-wide. (CAC, ¶ 128.)

Additionally, miners testified before the House Labor Committee on May 24, 2010, about an early notification system at UBBM where Massey guards would send signals to mine management that an MSHA inspector was on the property.  (CAC, ¶ 166.) (Former Massey employee testified that "[W]hen an inspector came by the guard shack they would . . . call the sections and tell them we have an inspector on the property and make sure everything was right and if it wasn't to fix it.")  In their CAC, Plaintiffs allege that various confidential witnesses "have come forward" to corroborate this miner's testimony.  Confidential witness No. 4, a "Belt Buster" at UBBM until 2006, stated that when an MSHA inspector arrived at the "guardhouse" a call would be placed to the mine office so that any items that could be a safety violation could be fixed. (CAC, ¶167; *see also id*.  ¶¶169-70 (confidential witnesses 8 and 6  making the same assertion about UBBM), ¶ 168(confidential witness 15, a former "Dozer Operator" between July 2006 and April 2008, detailing early notification system at Massey's Black Castle mine), ¶ 171 (same statement from confidential witness 16, a former "Bolt Top Operator" at Massey's Seng Creek mine between February and May 2010).

A criminal investigation at UBBM revealed that Hughie Elbert Stover, Chief of Security at UBBM, who "was very close to Blankenship and served as his personal driver during the class period, employed a secondary radio channel, called the 'Montcoal channel,' to give early notification to miners of the arrival of MSHA inspectors so that they could cover up safety violations prior to inspection, and ordered the disposal of thousands of pages of documents stored in the Barracks at [UBBM]" when he knew that the FBI and MSHA officials were conducting an investigation into the criminal conduct involving the UBBM explosion. (CAC, ¶160.)

Miners also testified before the Senate HELP Committee on April 27, 2010, regarding a

"light duty policy" at Massey that was used to prevent injured miners from completing the regulatory-required NFDL paperwork.  According to a former Massey Keppler miner, "If you got hurt [at Massey], you were told not to fill out the lost time accident paperwork.  The company would just pay guys to sit in the bathhouse or stay home if they got hurt–anything but fill out the paperwork." (CAC, ¶ 31.)  The miner stated that if you requested the paperwork, you would be singled out and fired.  (*See* CAC, ¶ 31) (another miner, who survived the UBBM explosion, offered similar testimony to the House Labor Committee on July 13, 2010); *id*. ¶ 144 (another miner offering similar testimony before the Senate HELP Committee on April 27, 2010).  On May 20, 2010, at the Senate Appropriations Committee, Cecil Roberts, President of the United Mine Workers of America, testified that his organization had witnesses and Massey employees who had informed them that when a person was injured at Massey, a human resources employee would meet the worker at the hospital and advise the employee that he or she did not have to take time off from work. (CAC, ¶ 145.)  The human resources employee would offer the employee an opportunity to come back to work for light duty assignments so that the injury would not have to be reported. (*Id*.)  Mr. Roberts further testified that Defendant Blankenship's compensation included a bonus for reducing lost time accidents. (*Id*.)

Plaintiffs aver that Defendant Blankenship testified after Mr. Roberts at the May 20, 2010 hearing and did not dispute the testimony.  Defendant Blankenship acknowledged that injured miners were given the opportunity to perform light duty assignments, if they were available, rather than receive only 60% of their pay while at home. (CAC, ¶ 146.)  However, Defendant Blankenship did not reference the completion, or non-completion, of the requisite NFDL incident paperwork.  Plaintiffs further aver that both Defendants Blankenship and Adkins received compensation

packages that were calculated, in part, on the company's NFDL rate.  In response to the varied investigations that followed the explosion, eighteen (18) of Massey's Directors and Senior executives, including Defendants Blankenship and Adkins, invoked their Fifth Amendment rights. Based on the foregoing, Plaintiffs allege the Defendants knew or should have known about the nature of the safety compliance record at Massey, but failed to disclose any of these relevant statistics and policies to investors or the market.

In their CAC, Plaintiffs assert claims for securities fraud based on the "fraud on the market" theory of reliance.  Plaintiffs contend that the price of Massey common stock was inflated by their false and misleading statements and omissions about the safety of, and risks to, its mining operations. On the day following the explosion, Massey's common stock fell from $54.69 to $48.45, a one-day drop of 11.4% in the value of the stock, and on April 7, 2010, the stock dropped another $3.23, to $45.22, as revelations of the unsafe conditions at Massey became known.  In the days and weeks that followed the April 5, 2010 explosion, as the news of the explosion became nationally publicized and MSHA released information about Massey's safety and compliance record, the stock price continued to fall.  However, Massey continued to post statements on its website "firing" back at news publications asserting that its aggressive pursuit of production sacrificed miner safety. Particularly, on April 8, 2010, Massey released a statement which indicated, in part, that the safety of its miners had been and would continue to be a top priority every day, that "[m]edia reports suggesting that the UBB tragedy was the result of a willful disregard for safety regulations are completely unfounded."  They further indicated, "our lost-time incident rate has been better than the industry average for 17 of the past 19 years, improving significantly in recent years",  and that "[a]t Massey, safety is everyone's concern." (CAC, ¶340.)  Plaintiffs allege that the "extent of the post-

Explosion stock drop" was limited by the Defendants' assertion that the Company would rebound after the explosion without any loss of productivity because workers were being redeployed to other mines to increase production. Massey released its 2010 first quarter financial results on April 21, 2010, wherein they disclosed, for the first time, the estimates of costs associated with the explosion, telling investors to expect $80 to $150 million in expenses for charges related to the explosion, support of family for the fallen miners, costs of recovery efforts, insurance deductibles and possible legal and other contingencies. Massey also forecasted coal production costs which were higher than previous estimates, but explained that the increase was not due to increased safety and regulatory expenses following the explosion, but rather labor and other costs with increased production. Plaintiffs cite several investment analysts who received the first quarter results favorably, and assert that, as a result of Massey's statements to investors, the stock price continued to be inflated by the fraud perpetrated by Massey. (CAC, ¶354.)[11]  As more negative news reports surfaced regarding safety violations at the UBBM and other Massey mines, Defendants "condemned media reports" by reasserting "false and misleading statements about Massey's safety and compliance record." After a May 15, 2010 NPR report that the FBI's investigation into "willful criminal activity" was confirmed, Massey's stock plunged $3.71 in one day on heightened volume of 12.6 million shares. On July 27, 2010, Massey reported its second quarter earning results which indicated that it significantly missed its production estimates and showed a higher cost of coal per ton than its previous cost guidance had provided. The financial report acknowledged that the difference in production estimates was due to lower productivity and temporary shutdowns associated with

---

[11]  Jefferies & Co., reported in response to the April 26, 2010 Massey press conference, "We thought Massey provided a clear, calm defense of its company policies regarding safety and compliance. . . . The Board clearly resents accusations surrounding Massey's commitment to safety. . . . We recognize the continued headline and regulatory risk, but believe the market has overly discounted potential issues in current violations."

increased MSHA enforcement of safety and regulatory violations at Massey mines.  (CAC, ¶ 363.)
Analysts responded negatively to this news, lowered their price targets and estimated earnings for
the company in 2010. (CAC, ¶ 364.)  Massey's stock tumbled on July 27, 2010, by $2.08, a one-day
loss of 6.6% in value.

On September 30, 2010, Massey admitted, in a letter to shareholders, that the sole safety
metric, which it had reported to investors during the class period regarding NFDL incident rates, was
materially understated for 2007, 2008, 2009 due to lapses in reporting procedures determined by an
independent consultant. (CAC, ¶30) ("Massey's 2007 NFDL rate was increased from 2.05 to 2.63,
or 28%; its 2008 NFDL rate was increased from 1.93 to 2.52, or 30%; and its 2009 NFDL rate was
increased from 1.67 to 2.33, or 40%.")  Finally, on December 3, 2010, after running the company
for twenty years, Defendant Blankenship resigned after public outcry for Massey's disregard for
mine safety.  On January 29, 2011, Alpha National Resources, Inc., agreed to purchase Massey.

Plaintiffs allege that Massey and its Directors provided false and misleading information to
its investors by reporting only one safety metric, the NFDL rate, which was later disclosed as false
and manipulated by Massey's policy of requiring injured workers to perform light duty assignments
in lieu of NFDL reporting, frequently told investors that it had a commitment to safety, but failed
to disclose its policy of an early notification system which announced the presence of MSHA
inspectors and failed to reveal its true safety record by the measurement of its compliance with
regulations.  Plaintiffs further allege that Massey and its Directors were positioned to receive reports
and other information about its compliance record and MSHA violations, but either ignored the
reports or recklessly disregarded the reports in their pursuit to increase coal production.  In light of
the foregoing, Plaintiffs allege that Massey's stock price was artificially inflated by Massey's fraud

and they suffered economic loss as a result.

Defendants' separate motions to dismiss the CAC are fully briefed and ripe for this Court's consideration.[12]

*II.*

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "[T]he legal sufficiency of a complaint is measured by whether it meets the standard stated in Rule 8 [of the Federal Rules of Civil Procedure] (providing general rules of pleading) . . . and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.)" *Id.* Federal Rule of Civil Procedure 8(a)(2) requires that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This pleading standard requires that a complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007). In *Ashcroft v. Iqbal*, the United States Supreme Court stated that to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when [a party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The plausibility standard "asks for more than a sheer possibility that a [party] has acted unlawfully."

---

[12]   The Officer Defendants, Defendants Blankenship, Tolbert, Adkins and Phillips, have filed their own motion to dismiss, but they adopt the various arguments asserted in Massey and the Director Defendants' motion to dismiss.

15

*Id*.  Rather, "[i]t requires [a party] to articulate facts, when accepted as true, that 'show' that [the party] has stated a claim entitling [them] to relief[.]"  *Francis*, 588 F.3d at 193 (quoting *Twombly*, 550 U.S. at 557).  Such "factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S.Ct. at 1950.  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]"– "that the pleader is entitled to relief."  *Id*. (quoting Fed.R.Civ.P. 8(a)(2)).

Prior to the Private Securities Litigation Reform Act (PSLRA) of 1995, courts considered the sufficiency of a securities fraud complaint under the standard set forth by Rule 9 of the Federal Rules of Civil Procedure.  Rule 9 requires a party to "state with particularity the circumstances constituting fraud or mistake[,]".  However, the party was permitted to allege generally any "[m]alice, intent, knowledge, and other conditions of a person's mind."  Fed.R.Civ.P. 9(b).  The PSLRA superseded Rule 9(b) to the extent that it imposed a heightened pleading requirement in actions brought pursuant to Section 10(b) and Rule 10B-5.  (*Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011); 15 U.S.C. § 78u-4(b)(1),(2)).  "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity *facts* giving rise

to a strong inference that the defendant acted with the required state of mind.'"[13]  *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citing 15 U.S.C. § 78u-4(b)(1),(2)) (emphasis added). While courts considering Rule 12(b)(6) motions, generally, "take into account any set of facts that could be proved consistent with the allegations of a complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission." (*Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(1)).

Thus, when considering a defendant's Rule 12(b)(6) motion, the Court will (1) accept all factual allegations in the complaint as true and (2) consider the entire complaint and other sources courts ordinarily examine for such motions, particularly documents incorporated into the complaint by reference, and matters which are the proper subject of judicial notice. (*Katyle*, 637 F.3d at 466) (citing *Tellabs*, 551 U.S. at 322)).[14]

---

[13]  In its 2011 decision in *Katyle*, the Fourth Circuit instructed that loss causation must be pled with "'sufficient specificity,' a standard largely consonant with [Federal Rule of Civil Procedure] 9(b)'s requirement that averments of fraud be pled with particularity."  *Katyle*, 637 F.3d at 471.  The Circuit Court admitted that there is some uncertainty about the appropriate standard to use, in light of the Supreme Court's 2005 decision in *Dura Pharm. Inc., v. Broudo*, 544 U.S. 336, 346-47 (2005).  The Fourth Circuit considered that "[t]he PSLRA . . . does not address the pleading standards applicable to the remaining elements of a § 10(b) claim," and that the Supreme Court in *Dura* cast some doubt on whether the Rule 9(b) standard is proper for loss causation when it applied Rule 8's "short and plain statement" standard.  (*Id.* at 471 n.5.)  However, the Fourth Circuit noted that the Supreme Court, in Dura, did not find that the Rule 9(b) standard was inapplicable, but only "assume[d], at least for argument's sake, that neither the Rules nor the [PLSRA] imposed any special further requirement [beyond Rule 8] in respect to the pleading of proximate causation or economic loss."

[14]  To that end, the Court has reviewed the record in this case and observes that Plaintiffs on at least three occasions requested the Court to (1) take judicial notice of various statements and exhibits including the deposition transcript of Defendants Blankenship, Phillips and Inman of testimony proffered in the *In re: Massey Energy Co. Derivative and Class Action Litigation* currently before the Delaware Court of Chancery and (2) consider various "proffers" of additional allegations supporting its pleading, opposition to the motion to dismiss and Plaintiffs' request for leave to amend its pleading pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.  First, the

*III.*

Before the Court turns its attention to the pending motions to dismiss, the Court will consider Plaintiffs' motion to strike as it concerns the scope of the Court's review.  In support of their motion to dismiss, Massey and Certain Director Defendants rely on the Declaration of Julie A. North and a plethora of "screenshots" of web-pages from MSHA's website.  Defendants contend these exhibits illustrate the manner in which data may be retrieved from MSHA's website using the MSHA Data Retrieval System ("DRS") and provide examples of reports generated from the DRS.  In Footnote 4, of the Joint Motion to Dismiss, Defendants assert that the Court "may consider MSHA's website and the data available through it, without converting the motion to one for summary judgment, because Plaintiffs' extensively relied upon MSHA's website, and the data available through it, in their Complaint."  (Joint Motion to Dismiss at 8, n.4).  Plaintiffs' move pursuant to Rules 12(d) and 12(f) of the Federal Rules of Civil Procedure to strike from the record these various "screenshots" attached to the Joint Motion to Dismiss as exhibits B-H.   The Court has considered the parties'

---

Court finds that the matters to which Plaintiffs request judicial notice are not of the nature of matters "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).  Therefore, the Court declines the request to take judicial notice of these matters.

Second, respecting the "additional facts [proffered by Plaintiffs] that could, only if necessary, be alleged in a second amended complaint," the Court finds that consideration of these "proffers" are inappropriate given the current stage of the case.  Moreover, the Court, on March 9, 2012, notified the parties of its observation of the various "qualified statements" made by Plaintiffs regarding their "request for leave to replead" their CAC and indicated that it did not locate any motion to amend the pleading in the record. (*See* Order (Document 135)).  The Court ordered Plaintiffs to provide the Court with a copy of the motion to amend, to the extent they believed such a motion had been filed, together with the proposed amended pleading by March 12, 2012.  Plaintiffs, through counsel, responded with a statement of "clarification" wherein they indicate that "the three Supplemental Proffers were not intended to serve as motions to amend [the CAC] . . . [b]ecause Plaintiffs believe their existing Complaint is sufficient they did not file such a motion[.]" (Plaintiffs' Clarification in Response to the Order Dated March 9, 2012 (Document 136).  Plaintiffs asserted that they sought to provide the Court with additional facts that were learned  after the filing of the Complaint, to "preview what additional facts or legal claims might be included in a second amended complaint (should one be allowed)." (*Id*. at 2) (citation omitted).  Therefore, in light of these representations, the Court will not consider Plaintiffs' "proffers" in its consideration of the pending motions to dismiss.

arguments, the applicable procedural rules and the Federal Rules of Evidence regarding judicial notice. The Court has also considered the posture of the current litigation, specifically that it is before the Court on a Rule 12(b)(6) motion. Upon consideration of the foregoing, and the law regarding matters which are proper for a court to consider on a motion testing the legal sufficiency of the complaint, the Court finds that Plaintiffs' motion should be granted. The Court has not considered the exhibits in question as those documents would require the Court to convert the instant motions to dismiss to motions for summary judgment. Moreover, it is undisputed that the "screenshots," provided by the Defendants, relate to web-pages and an online-search function that was not available, as represented in those exhibits, during the class period. Therefore, while the Court finds that the procedural authority upon which Plaintiffs rely, Rules 12(d) and (f), does not support their motion, the Court finds that the exhibits or extrinsic evidence should not be considered at this 12(b)(6) stage of the litigation.

*IV.*

Plaintiffs assert two causes of action: (1) a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission, against the Defendants collectively, (CAC, ¶ 381-87) and (2) a claim under Section 20(a) of the Act, against Officer Defendants Blankenship, Phillips, Tolbert and Adkins (CAC, ¶ 388-392.) Defendants argue that Plaintiffs have filed a consolidated amended class action complaint that is void of any substantive facts to support a claim under Section 10(b) and Rule 10b-5, and because the cause of action in count one is deficient, Plaintiffs' second claim is also fatally flawed.[15]

---

[15]   The Officer Defendants adopt the arguments made by Massey and the Outside Director Defendants in their Joint Motion.

### A. Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly "[t]o use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."   The implementing regulation, SEC Rule 10b-5, declares it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The Supreme Court of the United States has "implied a private cause of action from the text and purpose of [Section] 10(b)" for purchasers or sellers of securities injured by its violation.  *Matrixx Initiatives, Inc., v. Siracusano*, 563 U.S. —, —, 131 S.Ct. 1309, 1317 (2011) (citing *Telllabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196-97 (1976).  The elements of a private securities fraud claim, based on violations of § 10(b) and Rule 10b–5, are: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx*, 131 S.Ct. at 1317-18 (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Collectively, Defendants argue that Plaintiffs have filed a 165-page pleading that is void of any substantive facts to support a claim under Section 10(b) and Rule 10b-5 and assert that Plaintiffs' CAC fails as a matter of law for the following reasons: (1) The alleged misleading statements made by the Company about its safety compliance record, even if presumed to be true, lacked the requisite specificity to perpetrate a fraud on the market, given that accurate information about the Company's safety compliance record was available to the market throughout the class period on the MSHA website; (2) Plaintiffs have failed to plead scienter adequately; (3) Plaintiffs are not entitled to the presumption of reliance; and (4) Plaintiffs have failed to state a coherent theory of loss causation.  The Court will consider each of these challenges.

### (1)  A Material Misrepresentation or Omission by the Defendant

Defendants invite the Court to find that Plaintiffs' allegations--regarding the nature and extent of Massey's safety and compliance record or failure to disclose its regulatory violations--are insufficient to give rise to a claim for securities fraud, where such information was publically available to the market.

"To prevail on a [Section] 10(b) claim, a plaintiff must show that the defendant made a statement that was 'misleading as to a material fact.'"  *Matrixx*, 131 S.Ct. at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Pursuant to the PSLRA, when a plaintiff's claim is based on alleged misrepresentations or omissions of a material fact, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed."  (15 U.S.C. § 78u-4(b)(1) (emphasis added); *see also Matrixx*, 131 S.Ct. at 1318, n.4; *Teachers'*

*Retirement System of Louisiana v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007). However, "it is not enough . . . [that a plaintiff] point to a false statement – the misrepresentation must concern a material fact." *Sec. Exch. Comm'n v. Pirate Investor LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.")) "Materiality is an objective concept, 'involving the significance of an omitted or misrepresented fact to a reasonable investor.'" *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999) (citation omitted). Therefore, the Fourth Circuit has adopted the following standard for a court's consideration of the materiality of any alleged misrepresentation:

> [A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman*, 197 F.3d at 683 (citation omitted); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a [Section] 10(b) claim.") Moreover, "fraudulent corporate statements must be examined in context and in light of the 'total mix' of information made available to investors." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (citing *Basic, Inc., v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Plaintiffs, in forty-seven (47) pages of their CAC, allege statements made by Massey and Defendant Directors which they contend are "materially false and misleading statements and omissions regarding Massey's regulatory compliance, the safety of its operations, its costs of

22

production, and the ability to maintain or increase the rate of metallurgical coal production at the Company." (CAC, ¶¶ 200.)  To summarize Plaintiffs' allegations, Plaintiffs generally assert an exception to three categories of statements made by Defendants.  First, Plaintiffs allege that Defendants consistently made false and misleading statements regarding Massey's nonfatal days lost (NFDL rate) beginning on February 1, 2008, the first day of the class period, through March 24, 2010.  Second, Plaintiffs allege that during the class period, Defendants made various false and misleading statements professing Massey's commitment to and focus on safety.  For example: statements that safety is Massey's "job one every day"(CAC, ¶ 203); Massey "endeavor[s] to conduct . . . mining operations in compliance with applicable federal, state, and local laws and regulations" (CAC, ¶ 207); Massey's assertion that it is a "recognized industry leader in safety" (CAC, ¶ 230); and the statement that Massey "has a strong tradition of safety excellence because we make it a priority every day" (CAC, ¶ 247). Third, Plaintiffs allege, notwithstanding Defendants' identification of "risk factors" in its Annual SEC 10-K reporting, its statement that "violations during mining operations occur from time to time" and that Massey's costs and liabilities were impacted by "increasingly strict federal, state, and local environment, health and safety and endangered species laws, regulations and enforcement policies" were misleading given the frequency with which Defendants violated mining regulations.  (CAC, ¶¶ 208, 239, 244, 257). Plaintiffs allege that these categories of statements occurred throughout the entire class period and had an immediate impact on stock pricing.  Plaintiffs assert that these statements and omissions "created or maintained inflation in Massey's stock price during the Class Period, . . . by preventing price declines that would have resulted from complete, accurate, and truthful disclosure of information about the safety and regulatory compliance of Massey mines and other concealed

conditions of the Company's operations."  (CAC, ¶¶ 201.)

As a threshold matter, the Court finds that Plaintiffs, in their CAC, adequately identify statements alleged to have been misleading or false.  After each such statement, Plaintiffs assert the reason or reasons why the statement is misleading, and then allege a basis to support the materiality of the alleged fact. The Court will consider each category of misstatements and omissions.

As to the first category, Plaintiffs allege Defendants represented to the market that NFDL rates "are the benchmark the coal industry uses to measure safety" (CAC, ¶ 305) and reported "NFDL rates of 2.05 for the year 2007, 1.94 for the year 2008, and 1.67 for year 2009." (*See* CAC, ¶¶ 134, 203, 212, 214, 219, 233, 239, 252, 257, 263, 270, 273-274, 282, 286, 291, 294, 298, 302). Plaintiffs allege that Defendants often "touted" the NFDL rate proudly in meetings with shareholders, analysts and at investment conferences, and that the NFDL rates were disseminated to the market through various modes of communications; *i.e.*, in press releases filed with SEC Forms 8-K,  conference calls with analysts, annual proxy statements filed with the SEC on a Form DEF 14A, SEC Form 10-Q quarterly reports, presentations at Coal Investment Conferences, press releases announcing receipt of "Prestigious Safety Awards," at Massey's Annual Meeting of Shareholders, Annual 10-K SEC filing and the recently implemented Corporate Social Responsibility Report. However, on September 30, 2010, amid "a substantial amount of scrutiny arising from the Explosion [at the UBBM], Massey acknowledged and detailed the Company's false NFDL rates in a Letter to Shareholders."  (CAC, ¶ 134.)  Massey amended its previously reported NFDL rates for 2007 through 2009 to 2.63, 2.52 and 2.33, respectively.  Defendants explained that the adjustment of the security metric rates were necessary due to "lapses in its reporting procedures" determined by an independent consultant. (CAC, ¶ 30). Plaintiffs allege that the misleading nature of the NFDL rate

is borne from Defendants' failure: to explain the importance of the specific incident rate, "insofar as such rates do not measure *compliance* with any federal safety regulations;" to disclose that it had a "light duty work policy" that "discourage[d] miners from filling out the necessary paperwork to process an NFDL incident . . . [thereby] render[ing] statements like 'we have several mines which incurred zero loss time injuries for 2007' materially misleading"(CAC, ¶ 204); and to disclose the nature and extent of its federal and state regulatory violations, "significant and substantial" ("S&S") citations, enforcement actions and its "widespread early notification system to deceive MSHA safety inspectors to hide the dangerous conditions of its mines."[16]  The Court finds that Plaintiff has adequately alleged that the NFDL rates were false when the communications to the market were made.  This is so, based on Massey's disclosure of the more accurate information on September 30, 2010.  The Court has also considered the materiality of the false statements with respect to NFDL rates.  The Court finds that the  Defendants' use of the NFDL rates, in the context of its press release statements, quarterly and annual SEC filings, and in conferences with analysts, reveals the significance Defendants attached to the rate.  Defendants' various statements propounding the decline in the rate, year after year,  indicated their desire to have the market find the rate relevant to their assessment of the "safety and health" of their company.  (*See* Joint Mot. to Dismiss at 11) ("An NFDL incident rate is a 'safety-related metric' and Massey made no secret of it: 'we measure our success in safety and health primarily through the use of occupational injury and illness frequency rates.'") Consider the statement made by Defendant Blankenship at the May 13, 2008 Annual Shareholders meeting, where he stated:

> More importantly, you can see on this slide our continuing progress

---

[16]  *See supra* n.8.

> on improving safety over the past several years.  Our SI, or Safety is
> Job One Program, allowed us to achieve an NFDL rate of 2.05.  This
> was not only an all-time best for Massey.  But it was also far better
> than the industry average, just as it has been for 15 of the past 16
> years.

(CAC, ¶ 219).  Additionally, Defendants have linked the NFDL rates and "its first priority" in mine

safety to profitability in its communications with the market.  (*See* CAC, ¶ 286) (March 22, 2010

Preliminary Prospectus Supplement in which Massey described its safety strategy by asserting that

it is "[m]aintaining focus on high safety standards.  We believe a safe mine is a profitable mine. .

.  For the year ended December 31, 2009, we recorded an all-time Company best [NFDL] rate of

1.67.") Moreover, disclosures of NFDL rates and statements concerning Massey's commitment to

safety, prompted market reaction as alleged in the CAC when stock prices would increase after the

Defendants' release of  financial and safety results.  (*See* CAC, ¶¶ 205, 222, 235, 238, 256, 259,

276).  The Court finds there is a "substantial likelihood" that a reasonable purchaser or seller of a

security would consider the NFDL rate important in deciding whether to buy or sell Massey's

security, particularly after the fatalities which occurred in 2006 and Massey's stated renewed effort

and strides to improve its safety and health.  Therefore, if that rate were to be found false, a

reasonable purchaser or seller would have viewed the total mix of information made available to be

significantly altered by disclosure of that fact.  Further, Plaintiffs have pled specific facts regarding

its contention that Defendants omitted certain information about the NFDL rates each time they

highlighted the rate to investors.  Plaintiffs have alleged, through the statements of named and

unnamed miners and the President of the United Mine Workers of America, that Defendants

discouraged injured miners from completing the requisite NFDL paperwork which would have

increased NFDL reporting.  (*See* CAC, ¶¶ 31, 143- 145, 148). .

Plaintiffs also allege that the use of the NFDL was misleading to investors in that the rate did not disclose Massey's record of compliance with federal and state regulations. To that end, Plaintiffs have also pled statements indicating that Massey's S&S citation rate was worse than the national industry average during the class period. (CAC, ¶¶ 123-125.)[17] Defendants assert that the nature and extent of all citations and orders issued by MSHA to Massey were publicly available to the market, and Plaintiffs, throughout the entire class period, through MSHA's website which contains an online database of "every violation of federal mine safety regulations." (Defendant Massey and the Outside Director Defendants' Mem. at 8.) Defendants assert that a reasonable investor could have used the website during the class period to assess its violation history. Plaintiffs contest the availability of the information on the website by asserting that the website was not user friendly. Defendants contend that a failure to disclose information that is already publicly available cannot give rise to a claim for securities fraud. Defendants appear to be asserting the "truth-on-the-market" defense to the instant claim. Pursuant to that theory, "a defendant's failure to disclose material information may be excused where the information was made credibly available to the market by other sources." *Nguyen v. Radient Pharmaceuticals Corp.*, No. SA CV 11-0406, 2011 WL 5041959, at *6 (C. D. Cal. Oct. 20, 2011) (citation omitted); *see In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989)). However, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (citation omitted). "Before the truth-on-the-market defense can be applied, the defendant must prove that the information that was withheld or misrepresented 'was transmitted to the public with

---

[17] *See* n.3, *supra*.

27

a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [their previous statements.]'" *Nguyen*, 2011 WL 5041959, at *7.  The parties dispute whether the MSHA website appropriately conveyed the type of information that would have sanitized the alleged misstatements or omissions.  The Court has reviewed the contentions of each party and, assuming the facts in the CAC to be true, any consideration of the interpretation of the information provided on the MSHA website,  whether the MSHA website could tabulate the frequency, nature and extent of MSHA violations for Massey as a company or whether a reasonable investor would have utilized the website for such information, would necessarily involve considerations of fact which is wholly inappropriate at this stage of the litigation.[18]  Moreover, at this stage, the Court, on the record before it, cannot find that the "extent and nature" of Massey's safety and compliance record, measured by MSHA citations, orders and enforcement actions, were disseminated to the market, in the same manner as its NFDL rate.  This Court appreciates that Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx*, 131 S.Ct. at 1322.  However, disclosure of a balanced view of Massey's safety record is required "to make  . . . statements made [respecting NFDL rates], in the light of the circumstances under which they were made, not misleading." (*Id*.)  Further, the availability of a safety and compliance record on the MSHA website would not cure the Defendants' alleged failure to disclose to the market its practice of using an early warning system to alert miners of the presence of MSHA inspectors, which was adequately pled in the CAC.  Therefore, the Court finds that Plaintiffs allegations in this respect have been adequately pled.

The next category asserted by Plaintiffs relates to statements made by Defendants concerning

28

their commitment to safety.  The Court has previously provided several examples of the nature of these statements.  Plaintiffs allege that "statements professing that safety was the 'first priority every day' [at Massey] are "false and misleading when made because production, not safety, was the first priority at Massey during the Class Period."  (CAC, ¶ 204).  Plaintiffs allege that the falsity of the statement "is demonstrated by unsafe working conditions at Massey mines, particularly the Company's Large underground and surface mines, which had the worst fatality rate in the nation, and had a worse than national industry average performance as measured by MSHA-issued S&S citations and Elevated Enforcement Actions." (*Id.*)  In support of its allegations, Plaintiffs argue that contrary to Defendants assertions that safety at its mines were improving, there were red flags, *i.e.*, above average fatality rate, S&S citation rate, and Elevated Enforcement Actions rates, that were ignored by the Defendants.  Plaintiffs allege that Defendants' statements of being an industry leader in safety are capable of being proven false given the number of safety violations found at Upper Big Branch mine alone.  Plaintiffs allege in the first three months of 2010 alone, Upper Big Branch mine was the subject of "124 citations and 53 assessed penalties totaling $188,769." (CAC, ¶ 176.) These allegations are sufficiently plead in that they exhibit the false nature of the Defendants' statements with respect to being an "industry leader" in safety.  Defendants argue that Plaintiffs' allegations that Massey asserted false or misleading statements regarding its commitment to corporate values, or its claim of industry leadership in safety and compliance, are unavailing to the extent the statements constitute "immaterial puffery" and are not actionable in a securities fraud claim. (Joint Mot. to Dismiss at 7.)  The Fourth Circuit in *Hillson Partners LP, Adage, Inc.*, explained that "'soft,' 'puffing,' statements . . . generally lack materiality because the market price of a share is not inflated by vague statements[.]" *Hillson Partners LP, Adage, Inc.*, 42 F.3d 204, 211 (4th Cir. 1994).

However, "[w]hile opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman*, 197 F.3d. at 683.  As the Court stated above, the truth or falsity of Defendants' statements can be determined.  They are not stated in a context of a future prediction, but generally recognize the company's past achievements and current goals.  Additionally, Defendants closely aligned their statements of commitment to safety to their productivity and success as a company, thereby lending credence to the materiality of their statements.  Therefore, the Court finds that the second category of alleged misrepresentations have been sufficiently pled in the CAC.

The third category of statements identified by Plaintiffs as material misrepresentations or omissions concern the statements made by Defendants in their SEC filings with respect to the risk factor created by the mine industry and the regulation of federal and state agencies.  Defendants argue that Plaintiffs' allegations of misleading warnings, that Massey mines could be temporarily or permanently closed, or that its operations could be stopped based on Massey's failure to comply with safety laws, are insufficient.  Plaintiffs allege these warnings were misleading inasmuch as Massey had already failed to comply with the regulations.  Defendants' argument of insufficiency is based on the fact that Massey's previous failure to comply with federal safety regulations was fully disclosed through MSHA's website and through Massey's corporate filings.  Defendants acknowledge that their annual corporate filings included the following statement, "even with our substantial efforts to comply with extensive and comprehensive regulatory requirements, violations during mining operations occur from time to time." (Defendant Massey and the Outside Director Defendants' Mem. at 9 (citing CAC, ¶ 207.))  Plaintiffs have asserted that this statement is misleading because Massey violated federal law and regulations deliberately and frequently, and not

"from time to time." Defendant argues that the frequency with which they incurred mining violations was available to the market and Plaintiffs. Therefore, Defendants argue that the facts Plaintiffs claim were misrepresented in Massey's risk warnings were publicly available, and are, therefore, not actionable. Finally, Massey argues that it warned investors of the very risk that Plaintiffs now claim was not disclosed; namely, interruptions of production and regulatory risks.

The Court has previously considered the Defendants' "truth-on-the-market" defense and found that consideration of it and review of the MSHA website would require a factual determination that is not permissible at the 12(b)(6) stage of litigation. Therefore, Defendants' contention that the extent and nature of its compliance record could be found on the MSHA website will not preclude the Court from finding that Plaintiffs' allegations are sufficient to assert a Section 10(b) claim. Plaintiffs, in their allegations, are challenging the truthfulness of the statement Massey made about the frequency of its violations and the potential effect on production such violations could have. Defendants have stated that the violations occurred "from time to time," while Plaintiffs contend that Massey received MSHA violations in a frequency far more prevalent than the sporadic nature suggested in the Massey statement. Defendants' assertion that the market had accurate information about the risk of regulatory violations at Massey's operations will not carry the day. Given the current motions, this litigation is not in the posture for this Court to assess the "accuracy" of the information available on the MSHA website, the *one* place Defendants assert the market was informed about the company's compliance record. Additionally, Plaintiffs, in the CAC, have included a series of allegations regarding the nature and number of violations received at UBBM and various Massey mines, including instances in which portions of the mines were shut down, an event that only occurred upon a finding of a pattern of violations. Defendants' statement

31

that they incurred violations "from time to time" is facially inconsistent with the number of violations that MSHA reported were assessed at UBBM and other Massey mines.  While it is reasonable for an investor of a mine company to assume that there will be some regulatory violations at a given mine and that various aspects of the mining industry may require temporary shutdowns of that mine (which will impact production), it cannot be said that a reasonable investor would appreciate the regulatory risk of a mining company or its impact on production when that company consistently only discloses one safety measurement metric, and has not disclosed any details about its regulatory compliance.  The materiality of omitting facts about the alleged "widespread regulatory safety violations" at Massey's mines is readily apparent when the Court considers that Massey, in its annual 10-K filings, stated that "[f]ederal and state regulations applicable to operations increase costs and may make our coal less competitive than other coal producers." (CAC, ¶ 208) (citing Massey's 2007 10-K filing).  Massey has advised investors of the correlation between adherence to applicable federal and state regulations and its costs of doing business.  Massey's problems with complying with applicable safety regulations had not been detailed in any of its statements.  A reasonable investor would have found the omission of an accurate frequency, in which Massey's mines were cited by regulatory authorities for safety violations, significant to alter the total mix of information available about Massey as an investment.

In conclusion, the Court finds that Plaintiffs have sufficiently pled allegations to satisfy the heightened pleading standards of Rule 9(b) and the PSLRA in their identification of false and misleading statements.

*(2) Scienter*

With respect to the second element of a Section 10(b) claim, Defendants assert that Plaintiffs have failed to plead facts sufficient to support a strong inference that any of the Defendants acted with the intent to defraud.  A plaintiff seeking to establish liability under Section 10(b) and Rule 10b-5 must allege a defendant "acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 131 S.Ct. at 1323 (internal quotations and citations omitted). "Under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Matrixx*, 131 S.Ct. at 1324 (citing 15 U.S.C. § 78u-4(b)(2)(A)). The Supreme Court has instructed that "[t]his standard requires courts to take into account 'plausible opposing inferences.'" (*Id.*) (citing *Tellabs*. 551 U.S. at 323.)  To plead the necessary mental state, "negligence is not enough[,]" rather "[a] plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v. Inspire Pharmaceuticals, Inc*., 549 F.3d 618, 623 (4th Cir. 2008) (citing *Ottmann v. Hanger Orthopedic Group, Inc*., 353 F.3d 338, 343-44 (4th Cir. 2003).[18]  The Supreme Court has instructed that, "[a] complaint adequately pleads scienter under the PLSRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inferences one could draw from the facts alleged.'" *Matrixx,* 131 S.Ct. at 1324; *Tellabs*, 551 U.S. at 324; *Cozzarelli*, 549 F.3d at 624.

---

[18] The Supreme Court, in its recent case considering scienter, *Matrixx*, stated that it had "not decided whether recklessness suffices to fulfill the scienter requirement," but assumed, without deciding, that standard is sufficient to establish scienter given that the parties before it did not challenge the standard used by the Ninth Circuit Court of Appeals. *Matrixx*, 131 S.Ct. at 1323-24.

The Officer Defendants argue that Plaintiffs have failed to plead with particularity what each individual defendant knew and when each individual defendant knew it.  All of the Defendants challenge Plaintiffs' allegations that Massey or the individual directors: knew about or participated in the actions of Hughie Elbert Stover in the operation of an "early warning notification system," disregarded "red flags" that would have revealed such a scheme, knew about the "light duty work policy" and participated in any manner to encourage injured miners not to complete the NFDL paperwork, or that they knew about the "lapses in reporting" of the NFDL injury rate or had reason to suspect the reports were inaccurate prior to September 30, 2010.  Additionally, the Officer Defendants challenge whether Plaintiffs have pled adequately the "motive to defraud on behalf of any of the individual defendants."  Specifically, Defendants Blankenship and Adkins contest Plaintiffs' allegations that they had a motive to defraud the market given that they received bonuses relating to the NFDL rate.

Considering the entirety of the CAC, as the Court must in its analysis of this element, the theory serving as the basis for Plaintiffs' Section 10(b) claim is that Massey and its Directors intentionally misled the public to believe that Massey put safety before production, was operating its mines in a safe manner, with a new commitment to protecting the lives of its miners, and that its commitment to "safety first" would minimize regulatory risk to the company's costs and production, thereby artificially inflating its stock price.  In support of this theory, the Court has already found that Plaintiffs adequately pled with sufficient particularity that Defendants made false and misleading statements to investors regarding the company's safety.  The Court finds Defendants' assertions inadequate to persuade the Court that Plaintiffs did not plead particular facts giving rise to the strong inference that Massey and the Director Defendants engaged in conduct with the intent

to deceive.

The alleged facts in this case indicate Defendants made frequent statements regarding Massey's commitment to safety and detailed the Company's accomplishments of their safety goals through the use of the NFDL incident rate. The individual directors consistently signed various SEC filings and/or made direct statements to investors during presentations or in press releases applauding the company for its achievement of a lower than national average NFDL rate in 2007-2009 or applauding its use of new safety programs. The NFDL was the sole safety measurement metric used by the company to explain its commitment to safety and its safety success. Further, Defendant Blankenship and others frequently announced Massey's receipt of various "safety awards." Plaintiffs have pled facts that: the NFDL rate was misstated and Defendants did not report the accurate rates until five months after the UBBM explosion when the Company faced increasing scrutiny about their mine safety; Massey and its Board of Directors, after the deaths that occurred at Massey's Alma mine in 2006, agreed to raise the awareness of safety oversight of its mines and to enhance the authority of the SEPPC and its reporting to the Board;[19] the SEPPC was charged with receiving reports regarding mine safety and reporting to the Board of Directors: the number of mine safety incidents occurring at Massey's mines (overall and by type), findings by third-party auditors and an analysis of any causal factors contributing to safety incidents; the Defendants received such reports, as well as, other information regarding the number of MSHA violations assessed at Massey's mines; Massey performed significantly worse than the national average at its Large underground and Large surface mines, when measured by the number of significant and substantial

---

[19] Defendants Phillips, Moore, Gee, Gabrys, Crawford, Foglesong, Suboleski and Judge were members of the SEPPC during the Class Period.

("S&S") violations and elevated enforcement actions (CAC, ¶¶ 123-133); after the UBBM Explosion, MSHA released data that UBBM received more S&S citations and orders than any other mine in District 4 and the nation for the years 2008 and 2009; in 2009, UBBM received 29.67% of S&S citations when the nation received 3.31%; Massey considered safety an important component for investors to consider in view of its level of production and regulatory costs; that practices existed in Massey's mines that endangered the lives of its miners respecting ventilation and air quality; and that after the UBBM explosion Defendants Blankenship, Adkins and eighteen other senior executives invoked their Fifth Amendment rights in the investigation of the explosion. These factual allegations collectively paint a picture of the safety of Massey's mines that is a stark contrast to the statements made by the Defendants to the market.  Plaintiffs have alleged sufficient factual allegations rising to the level of a strong inference that Defendants acted intentionally or recklessly, in disregarding the nature and extent of the violations, citations, orders and elevated enhancement actions Massey received at its mines, when it made statements purporting to supports its "commitment to safety."  Plaintiffs' allegation that Massey was motivated to disclose misleading statements regarding its safety is strongly supported by the fact that Massey and its directors were in the position to know about the nature, extent and frequency of the violations.   The Defendants were in a position to determine whether their statements in their 2007-2009 SEC filings and press releases were misleading, given the Company's  mine violations.  Moreover, through the various mine safety reports received by the SEPPC and the Board, Defendants were in the position to question the relevancy and accuracy of the NFDL incident rates. The Court finds that, taken together, these allegations are sufficient to support Plaintiffs' inference that Defendants elected not to disclose more measurable safety metrics because they believed it would have an impact on the

market.

The Court's finding is further bolstered by Plaintiffs' allegations that miners made statements indicating Massey engaged in practices that risked the lives of miners (cutting coal into air supply or failing to provide proper mine ventilation), evaded regulatory violation detection (early warning notification system) and regulatory reporting (encouraging injured miners to work in a light duty capacity).  Notwithstanding Defendants' assertions that Plaintiffs failed to plead their knowledge of these practices, the Court finds that the frequency in which the NFDL incident rate was used by the Defendants and the manner in which Defendants disseminated this rate to the public supports the "stronger" inference that this metric, which did not measure a company's compliance with safety regulations, was used to defraud the public.[20] "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  The proper focus of a court's inquiry with respect to scienter is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323.  The Court so finds in this case.  Plaintiffs have not strung together a series of isolated allegations without considering the necessary context of the allegations as in *Cozzarell,* but have pled sufficient facts to suggest an inference that Defendants withheld information about the nature

---

[20]   While it is a plausible inference that Defendants did not know about the reporting lapses that led to the dissemination of inaccurate NFDL rates,  the Court finds the opposing inference that Defendants acted with an intent to defraud "stronger" in the context of the circumstances in this case.  The NFDL rates were reported consistently every quarter for three years to investors in press releases attached to SEC filings, in investor presentations, and in annual SEC forms.  Defendants often touted how the rates were continuing to decline each year.  Defendants made these statements at a time they knew or should have known the NFDL rate was not a complete indication of the "safety" of its mines, considering the many violations that they received from MSHA during the relevant class period. The Court is satisfied that Plaintiffs have pled sufficient facts that each Defendant had knowledge of the misleading nature of its statements regarding the safety of its mines.

and extent of their safety compliance record with the intent to deceive the market.[21]

### (3) Justifiable Reliance

Section 10(b) claims require a plaintiff to have relied upon the defendant's deceptive acts. *Erica P. John Fund, Inc. v. Halliburton Co.*, --- U.S. ---, ----, 131 S.Ct. 2179, 2184 -2185 (2011) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." (*Id*. at 2185.) However, the Supreme Court recognized that this limited proof of reliance would place "an unrealistic evidentiary burden" on a plaintiff trading in an "impersonal market" or in cases where a proposed class of plaintiffs is alleged. (*Id*.) (citing *Basic Inv. v. Levinson*, 485 U.S. 224, 245 (1988)). Therefore, the Supreme Court found that a plaintiff is permitted to "invoke a rebuttable presumption of reliance based on what is known as the 'fraud-on-the-market' theory[,]" which provides that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." (*Id*.) (citing *Basic*, 485 U.S. at 246).[22] The presumption is permissible

---

[21] Defendants argue that Plaintiffs rely in their amended complaint upon "confidential informants" and that according to the Seventh Circuit, such allegations do not give the court the opportunity to perform the comparative evaluation required by *Tellabs*. Defendants assert that such allegations from confidential witnesses "must be 'discounted' and 'usually that discount will be steep.'" Officer Defendants' Mem. at 7 (citing *Tellabs*, 513 f.3d at 704.) The Court has reviewed the CAC and finds that Plaintiffs largely utilize the statements of confidential witnesses to corroborate the statements of named witnesses regarding the "early notification system" and "light-duty work policy" at Massey's mines. Therefore, the Court finds any "discount" required of these statements is immaterial, in consideration of the totality of the CAC.

[22] In *Basic*, the Court explained the fraud on the market theory as being:

> [B]ased on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore

"[b]ecause the market 'transmits information to the investor in the processed form of a market price'
[and it can be presumed] "that an investor relies on public misstatements whenever he buys or sells
stock at the price set by the market."  (*Id.*) (citing *Basic*, 485 U.S. at  244, 247).  "[I]n order to
invoke Basic's rebuttable presumption of reliance, . . . [a plaintiff] must demonstrate that the alleged
misrepresentations were publicly known . . . that the stock traded in an efficient market, and that the
relevant transaction took place 'between the time the misrepresentations were made and the time the
truth was revealed.'" (*Id.*)  A review of the CAC in this case reveals that Plaintiffs have asserted
allegations sufficient to satisfy their invocation of the presumption of reliance.  The Court has
previously found that Plaintiffs adequately pled that Defendants made various alleged misleading
statements or misrepresentations in their communications with the market via SEC filings, press
releases, presentations at investor conferences, and conference calls with investors.  Although, the
Defendants do not challenge, specifically, that their stock traded in an efficient market, the Plaintiffs,
in their CAC, allege that Massey's stock "actively traded on the NYSE," Massey's common share
"had an average daily trading volume of 5,444,400 shares during the period of 2008 and 2010," and
Massey filed periodic public reports with the SEC and NYSE and "regularly communicated with
public investors via established market communication mechanisms." (CAC, ¶ 378).  Plaintiffs also
allege that Massey "was followed by securities analysts employed by major brokerage firms" during
the class period. (*Id.*)  Finally, Plaintiffs allege that their stocks were purchased during the class

---

defraud purchasers of stock even if the purchasers do not directly rely on the
misstatements. . . . The causal connection between the defendants' fraud and the
plaintiffs' purchase of stock in such a case is no less significant than in a case of
direct reliance on misrepresentations.

*Basic*, 485 U.S. 224, 241-42 (citing *Peil v. Speiser*, 806 F.2d 1154, 1160-1161 (3d Cir. 1986)).

period between February 1, 2008,  when Massey issued a press release that was filed with the SEC

on a Form 8-K, wherein Defendant Blankenship was quoted as stating that Massey "set a company

safety record for the lowest injury incident rate in our history" (CAC, ¶¶ 202, 379), and July 27,

2010, when Massey reported its 2010 second quarter earnings, which disclosed decreased coal

production and higher cost per ton of coal, and an admission that its production costs rose "due to

'increased regulatory enforcement actions and related temporary shutdowns, increased labor

turnover rates, unplanned transfers of crew and equipment,' and other factors." (CAC, ¶ 363) (citing

Massey's 2Q10 earnings release).   Defendants argue that plaintiffs are not entitled to the

presumption of reliance under the fraud on the market theory because under that theory, the

presumption is rebutted where accurate information credibly enters the market and dissipates the

effects of the misstatements.   Further, Defendants argue that dismissal for failure to establish

reliance is proper where the market is fully apprised of the truth despite the defendants' alleged

attempts to defraud the market. (Defendant Massey and the Outside Director Defendants' Mem. at

16.)   The Court finds that Defendants' argument is misplaced.   This argument, that Plaintiffs'

asserted presumption is "rebutted" by "accurate information" which is "credibly" entered into the

market, would necessarily require the Court to assess evidence, its credibility and its weight,

resulting in improper analysis, given the current posture of this case.   Moreover,  Defendants rely

on *Cooke v. Manufactured Homes, Inc*., 998 F.2d 1256, 1262 (4th Cir. 1993) for the proposition that

the presumption of reliance is rebutted.   The Court observes that the Fourth Circuit's consideration

of the presumption of reliance in *Cooke* took place at a later stage of litigation, upon motion for

summary judgment, where the court had the benefit of the parties' presentment of evidence.   In light

of the foregoing, the Court finds that Plaintiffs' pleading is sufficient to invoke the presumption of

reliance on the market, in the context of their "fraud on the market theory."

### (4) Loss Causation

The pleading practice, in this Circuit, requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint, "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists" between the defendant's alleged fraud and the plaintiff's economic harm." *Katyle*, 637 F.3d at 465-66 (quoting *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007)). The determination here is largely "fact-dependent." Therefore, "specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." (*Id.* at 471.) "[T]he facts alleged in the complaint . . . need not conclusively show that the securities' decline in value is attributed solely to the alleged fraud rather than to other intervening factors[,]". However, a party is required to allege facts to show that the misrepresentation or omission was "one substantial cause of the investment's decline in value." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009); *Katyle*, 637 F.3d at 472. Put another way, "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle*, 637 F.3d at 472 (citing *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)). Moreover, "[l]oss causation . . . requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. —, —, 131 S.Ct. 2179, 2186 (2011). To sufficiently plead loss causation under a fraud on the market theory, a party must provide a basis on which to conclude corrective disclosures revealed "new facts" suggesting the company perpetuated a fraud on the market. *Katyle*, 637 F.3d at 473 (citing *Teachers'*, 477 F.3d at 187). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, 'if

41

investors already know the truth, false statements won't affect the price.'" (*Id*. at 473 ) (citing *Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010)).  The disclosure must "*at least relate back to the misrepresentation* and not to some other negative information about the company." (*Id*.) (citing *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009)).  "Loss causation may be ple[d] on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures prompted the stock price deflation.*" Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) (citation omitted).  "Sentiment simply is not enough to sufficiently plead loss causation"; likewise,  "[s]peculation and conjecture, [or] even [a] well-educated guess, in the context of market prognostication does not suffice to establish a fact." (*Id*.) (citation omitted).

A plaintiff can successfully allege the causal connection via one of two approaches. With respect to the first approach, a plaintiff asserting a fraud on the market theory must demonstrate a causal relationship by identifying "corrective disclosures" that "revealed to the market the undisclosed truth" and causes the decline in share price. These corrective disclosures must reveal to the market, in some sense, the fraudulent nature of the practice about which plaintiff complains. The second approach by which a plaintiff can successfully allege causation is by pleading that a previously concealed risk materialized, causing the plaintiff's loss.  Defendants assert that Plaintiffs fail to allege a coherent theory of loss causation under either of the two approaches

Plaintiffs allege that the putative class was harmed when "the artificial inflation in Massey's share price was eliminated as the result of price declines accompanying news of the true state of the Company's operations[.]" (Pls.' Opp'n at 41.)  To that end, Plaintiffs allege that five specific sets of "corrective events" removed the artificial inflation of Massey's shares.  Generally, Plaintiffs

allege these "corrective events" caused Massey's stock price to decline: (1) the UBBM explosion, together with  "statements by government regulators, mineworkers and media regarding the longstanding and undisclosed safety violations," on April 6 and April 7, 2010, was an "immediate manifestation of the extent and the magnitude of the risks concealed from investors[]"; (2) inspections and investigations after the explosion, on April 13 through April 16, 2010, at Massey's other operations led to additional revelations that a "willful disregard of safety and regulatory requirements was not confined to UBB"; (3) Massey's April 22, 2010 disclosure of its First Quarter Earning Results contained statements quantifying "for the first time" the "immediate financial impact of its illegal and unsafe mining practices," together with the news that the Circuit Court of Kanawha County  issued an order to show cause why Massey should not be held in contempt for violating its settlement agreement in the derivative shareholder action that resulted from the 2006 miner tragedy; (4) revelations on April 30, 2010, and May 17, 2010, that Massey faced criminal investigations by the FBI and Department of Justice as a result of "regulatory and safety problems that had been fraudulently concealed from investors provided a further manifestation of the hidden risks arising from defendants' misconduct[]"; and (5) Massey's Second Quarter Earnings released on July 27, 2010, revealed larger corrections of earning results based on the correction of safety and regulatory violations which had a bigger impact on Massey's production rates and mining expense than previously expected.  (*See* Pls.' Opp'n at 42; CAC, ¶333.)   In sum, Plaintiffs allege its loss causation is supported by the decline in Massey's stock price which occurred after information regarding its alleged safety and compliance record became known to the public, following the UBBM explosion.  Plaintiffs also assert that its loss causation can be supported by the explosion, itself, which revealed a materialization of the risk that Massey "fraudulently concealed and

downplayed risks to the safety of miners and the extent to which Massey was in compliance with regulatory requirements, thereby concealing conditions that were likely to–and ultimately did–lead to mining accidents, reduced production, increased operating and regulatory costs, and lower profits." (Pls.' Opp'n. at 44.)

The Court finds that Plaintiffs have appropriately pled allegations sufficient to support loss causation. While the five alleged corrective disclosures provide this Court with a basis to conclude that "new facts" were revealed which would suggest that Defendants perpetrated a fraud on the market by omitting the extent of its safety compliance record, the Court finds that the materialization of the risk of Massey's misleading statements was realized in the UBBM explosion. In this case, the allegations, accepted by the Court as true, indicate that prior to the tragic UBBM explosion, Defendants did not directly disclose any facts to investors about its safety and compliance record with the exclusion of the lone safety metric of the NFDL. After the April 5, 2010 explosion at the UBBM, MSHA and various media outlets began to release data about the nature of violations cited at UBBM and other Massey mines. This data included the number of violations Massey had amassed in recent years, including at UBBM, and the extent of those violations, which included citations for ventilation and air quality of the mines. Plaintiffs have alleged that MSHA, as a result of on-site investigations of the UBBM explosion, revealed that the "cause of the Explosion largely involved basic mine safety practices that were not adhered to: inadequate water sprays, dull cutting bits, and extraordinary levels of float coal dust due to inadequate rock dusting." (CAC, ¶ 192.) Therefore, the explosion and the cause of the explosion revealed to the market the fraudulent nature of which Plaintiffs complain, specifically, that Defendants mislead the market about the safety at its mines and its commitment to put production over safety. Therefore, the Court finds that Plaintiffs

have sufficiently alleged particular facts supporting an allegation that its losses were caused by Massey's misleading and false statements about the safety of its mines.

### B.  Section 20(a)

Plaintiffs, in their second count, assert a claim under Section 20(a) of the Securities and Exchange Act of 1934 against the Officer Defendants by contending that the Officer Defendants by virtue of their positions, stock ownership, and actions were controlling persons of Massey who "had the power to, and did, directly and indirectly, exercise control over Massey, including the content and dissemination of statements that Plaintiffs' allege are false and misleading."  (Am. Compl., ¶390.)  Plaintiffs allege that these Defendants "were provided with and/or had access to reports, filings, press releases and other statements alleged to be misleading prior to and/or shortly after they were issued and had the ability to prevent the issuance or correct the statements[]" (*id*.) and had an "awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public." (*Id*. ¶ 392.) Plaintiffs allege these Defendants had the power to influence and control the decision-making of Massey, and did so, including the dissemination of the various statements alleged to be false and misleading.   Pursuant to Section 20(a) of the Securities Exchange Act of 1934:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To state a prima facie case under Section 20(a), a plaintiff must allege (1) a predicate violation of Section 10(b), and (2) control by the defendant over the primary violator.  (*In*

45

*re Mut. Funds Inv. Litig.*, 566 F.3d 111, 129-30 (4th Cir. 2009) (citing *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th  Cir. 1998)).  "Once the plaintiff establishes a prima facie case of control, the burden shifts to the defendant to show a lack of culpable participation or knowledge." (*Id*. at 130.)  "[U]ltimately, as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss, and dismissal should be granted only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person."  (*Id*.) (internal citations and quotations omitted).

All of the Defendants argue that because Plaintiffs fail to establish the predicate violation under Section 10(b), their dependent Section 20(a) claim also fails.  Plaintiffs, in a footnote to their opposition, assert that they have sufficiently pled claims for primary violations and that the Individual Defendants do not contest they were controlling persons of Massey at all relevant times, requiring this Court to "uphold the associated controlling person claims."  (Pls.' Opp'n at 49, n.65.) Defendants do not contest Plaintiffs' assertion in their replies.  Therefore, since Defendants only challenged the sufficiency of the claim with respect to the predicate violation, the Court finds that Plaintiffs' Section 20(a) claims survive the instant motions to dismiss.

## *V.*

In conclusion, for the reasons stated herein, the Court does hereby **ORDER** that Don L. Blankenship, Baxter F. Phillips, Jr., Eric B. Tolbert and Christopher Adkins' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint (Document 94) and the Joint Motion of Massey Energy Company and the Outside Director Defendants to Dismiss the Consolidated Amended Class Action Complaint (Document 96)  be **DENIED**.  Lastly, the Court **ORDERS** that

46

Plaintiffs' Motion to Strike Exhibits B-H to the Declaration of Julie A. North in Support of Defendants' Motions to Dismiss (Document 100) be **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:        March 27, 2012

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA