UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

| | | |
|---|---|---|
| In re MASSEY ENERGY CO. SECURITIES LITIGATION | ) ) ) | Civil Action No. 5:10-cv-00689-ICB |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | The Honorable Irene C. Berger |
| ALL ACTIONS. | ) ) ) | |

**JOINT DECLARATION OF JOEL H. BERNSTEIN AND JACK REISE IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION AND CO-LEAD COUNSEL'S MOTION
FOR AWARD OF ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES**

# TABLE OF CONTENTS

I.      THE OUTSTANDING RECOVERY ACHIEVED ............................................................3

II.     FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS.....................................................8

III.    RELEVANT PROCEDURAL HISTORY .......................................................................13

        A.      The Initial Investigation by Co-Lead Counsel......................................................13

        B.      Efforts to Lift Discovery Stays .............................................................................15

        C.      The Motions to Dismiss ........................................................................................16

        D.      Document Discovery .............................................................................................17

IV.     SETTLEMENT NEGOTIATIONS ...............................................................................18

        A.      Initial Discussions with Defendants Beginning December 2011 ..........................18

        B.      Resumed Discussions with Defendants .................................................................19

V.      RISKS OF CONTINUED LITIGATION ......................................................................20

        A.      Risks Concerning Loss Causation and Damages....................................................20

        B.      Risks Concerning Liability of Defendants.............................................................25

        C.      Limited Financial Resources – Likelihood of Recovery on a Litigated
                Judgment ...............................................................................................................32

VI.     COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE
        LITIGATION..............................................................................................................34

VII.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER AND CLASS REACTION TO DATE.........................................35

VIII.   PLAN OF ALLOCATION ...........................................................................................37

IX.     CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS'
        FEES .........................................................................................................................38

        A.      Lead Plaintiff Supports the Fee and Expense Application .....................................39

        B.      The Risks and Unique Complexities of the Action ...............................................40

        C.      The Work and Experience of Plaintiffs' Counsel..................................................41

D.      Standing and Caliber of Defense Counsel ..............................................................45

E.      The Reaction of the Settlement Class to the Fee and Expense Application ..........45

X.      REQUEST FOR PAYMENT OF LITIGATION EXPENSES..........................................46

XI.     THE COSTS AND EXPENSES REQUESTED BY LEAD PLAINTIFF ARE
        FAIR AND REASONABLE ............................................................................................48

XII.    MISCELLANEOUS EXHIBITS ....................................................................................49

XIII.   CONCLUSION................................................................................................................49

JOEL H. BERNSTEIN and JACK REISE declare as follows pursuant to 28 U.S.C. §1746:

1.      I, Joel H. Bernstein, am a member of the bar of the State of New York and have been admitted to appear *pro hac vice* before this Court in the above-captioned action (the "Action").[1]  I am a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), counsel for the Court-appointed Lead Plaintiff the Commonwealth of Massachusetts Pension Reserves Investment Trust ("Lead Plaintiff" or "Massachusetts PRIT") Fund.  I have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the proposed class in the Action.

2.      I, Jack Reise, am a member of the bar of the State of Florida and have been admitted to appear *pro hac vice* before this Court in the Action.  I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), counsel for named plaintiff David Wagner.  I have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the proposed class in the Action.

3.      Labaton Sucharow and Robbins Geller are the Court-appointed co-lead counsel ("Co-Lead Counsel") for the proposed class in this consolidated securities class action lawsuit.

4.      We respectfully submit this Joint Declaration in support of the motion by Lead Plaintiff and named plaintiff David Wagner (collectively, "Plaintiffs"), pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $265 million Settlement

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth and defined in the Stipulation and Agreement of Settlement, dated as of February 5, 2014 (the "Stipulation").  ECF No. 181-1.  Citations to "Ex.___" herein refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference refers to the designation of the entire exhibit attached hereto and the second reference refers to the exhibit designation within the exhibit itself.

and the proposed plan for allocating the proceeds of the Settlement to eligible Settlement Class Members (the "Plan of Allocation").  The Settlement will resolve all claims asserted in the Action against Defendants[2] on behalf of a class that consists of: all persons and entities who purchased or otherwise acquired shares of the common stock of Massey Energy Company between February 1, 2008 and July 27, 2010, inclusive (the "Class Period"), and were allegedly damaged thereby (the "Settlement Class").[3]  The Court preliminarily approved the Settlement by Order entered February 19, 2014 (the "Preliminary Approval Order") (ECF No. 182).  To date, there have been no objections to either the Settlement or the proposed Plan of Allocation and only three presumptively invalid requests for exclusion submitted by non-class members.

5.     We believe the results achieved in this case are exceptional, and were the product of creative and diligent litigation efforts and protracted settlement negotiations.  This Joint Declaration sets forth in detail how the Lead Plaintiff and Co-Lead Counsel were able to achieve this outstanding result on behalf of the Settlement Class.

6.     We also respectfully submit this Joint Declaration in support of Co-Lead Counsel's motion, on behalf of themselves and Liaison Counsel James F. Humphreys & Associates L.C. ("Plaintiffs' Counsel") that contributed to the prosecution of the Action, for (a) an award of attorneys' fees in the amount of $31,838,168, which is approximately 12% of

---

[2] Defendants are Massey and the Individual Defendants, Donald L. Blankenship, Baxter F. Phillips, Jr., Eric B. Tolbert, J. Christopher Adkins, Dan R. Moore, E. Gordon Gee, Richard M. Gabrys, James B. Crawford, Robert H. Foglesong, Stanley C. Suboleski, and Lady Barbara Thomas Judge.  Massey is now known as Alpha Appalachia Holdings ("Alpha Appalachia"), and was acquired by Alpha Natural Resources, Inc. ("ANR") through a merger transaction effective June 1, 2011.

[3] Excluded from the Settlement Class are: (i) Defendants; (ii) ANR; (iii) the officers and directors of Massey during the Class Period; (iv) all of Massey's subsidiaries during the Class Period; (v) members of the immediate families of any excluded person; (iv) the legal representatives, heirs, successors or assigns of any excluded person; (vii) any entity in which any Defendant or ANR has or had a controlling interest; and (viii) any Person who would otherwise be a Settlement Class Member but who properly excludes himself, herself, or itself by filing a valid and timely request for exclusion in accordance with the requirements set forth in the Notice.

$264,407,450.15 (the $265 million Settlement Fund less the litigation expenses which Plaintiffs' Counsel seek herein) and (b) payment of litigation expenses in the amount of $592,549.85, plus accrued interest (the "Fee and Expense Application"). The Fee and Expense Application also includes an application pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") for reimbursement of the costs and expenses incurred by the Massachusetts Pension Reserves Investment Management ("PRIM") Board in connection with Lead Plaintiff's representation of the Settlement Class in the amount of $33,889.18.

7. For the reasons set forth below and in the accompanying memoranda,[4] Lead Plaintiff and Co-Lead Counsel respectfully submit that (i) the terms of the Settlement are fair, reasonable and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair and reasonable and should be approved by the Court; and (iii) the Fee and Expense Application is supported by the facts and the law and should be granted in all respects.

## I. THE OUTSTANDING RECOVERY ACHIEVED

8. Lead Plaintiff has succeeded in obtaining a recovery of $265,000,000.00 (the "Settlement Amount") in cash for the Settlement Class. This recovery is an outstanding result that would bring to a close three years of contentious litigation between Plaintiffs and Defendants. If approved, based on Co-Lead Counsel's review of reported securities class action settlements, it would be the second largest all cash settlement in a securities class action within the Fourth Circuit and the largest within the District. Importantly, according to analyses prepared by Lead Plaintiff's consulting damages expert, Chad W. Coffman, CFA of Global

---

[4] In conjunction with this Joint Declaration, Plaintiffs and Co-Lead Counsel are also submitting (i) the Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Memorandum") and (ii) the Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Fee Memorandum").

Economics Group ("Global Economics"), the most likely aggregate damages the proposed class could have obtained at trial are estimated to be approximately $560 million, assuming that liability and certain corrective disclosure dates were proven and based on various assumptions and modeling.[5]   As such, the $265 million Settlement represents *47%* of Lead Plaintiff's consulting expert's estimated damages amount.  This percentage, particularly in view of the risks and uncertainties discussed below, is extraordinary and represents a recovery far in excess of the average amount class members receive in securities fraud cases.[6]

9.   As discussed further below, Lead Plaintiff obtained this substantial recovery for the Settlement Class through tenacity and staunch advocacy on behalf of the Settlement Class, despite the significant risks inherent in complex securities class actions generally, and the case-specific risks faced in prosecuting the claims against Defendants.  Principal among those challenges was Plaintiffs' burden to establish loss causation as to each of the alleged corrective disclosure dates, tying the trading losses in Massey common stock that Class Members incurred on those days to Defendants' alleged fraudulent misrepresentations and omissions related to Massey's health and safety record and policies.  Plaintiffs faced significant uncertainty as to whether they would be able to defeat Defendants' arguments that, among other things, the market was generally aware of Defendants' poor safety practices (an argument that Defendants also advanced to contend that none of the alleged misrepresentations and omissions were material and that the market and individual investors did not reasonably rely upon them) and that the explosion at Massey's Upper Big Branch mine ("UBB"), the precipitating event that led to

---

[5] Defendants strongly contest this estimation and believe damages to be significantly lower, assuming that liability and loss causation were established.

[6] The Settlement Amount is also far above both the median ($9.1 million) and the average ($55 million) settlement recoveries in securities class actions since the passage of the PSLRA.  *See* Renzo Comolli and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2013 Full Year Review" (NERA Jan. 21, 2014).  Ex. 1 at 28.

this lawsuit, was caused by factors other than those practices.  As to the first, Defendants were prepared to assemble a substantial array of negative press and other media coverage as to Massey's safety record and its relationship with governmental regulators, as well as the details of a government website listing citations for safety rule violations.  As to the second, Defendants were prepared for a battle of the experts based on the findings of an independent investigation that Massey had undertaken.  Also, beyond these arguments that went to the general theory of Plaintiffs' case, Defendants also raised individual challenges as to the adequacy of Plaintiffs' loss causation allegations as to each of the alleged disclosure dates.  Thus, while Plaintiffs believe steadfastly in their ability to establish the Defendants' liability in this case, the outcome of a jury trial, especially in a highly complex case such as this, could not be predicted with reasonable certainty.

10.     In addition, had Plaintiffs prevailed at trial, there is also no assurance that the recovery would have been any greater than the proposed Settlement Amount.  Further, any potential greater recovery would have been at least partially offset by the expenses incurred by Co-Lead Counsel at trial, and during the subsequent appeal process.  Further still, even a positive outcome at trial would not guarantee a positive result for the class.  There are several instances of plaintiffs' verdicts in securities fraud cases that were reversed by the trial court or on appeal. Finally, even if Plaintiffs eventually prevailed in court, issues relating to Massey's ability to pay, given, among other things, Massey's limited and wasting insurance coverage and the business environment Massey's successor, ANR, faces, including the pressures on the coal industry as a whole, were of significant concern.

11.     Plaintiffs and Co-Lead Counsel not only had a clear understanding of the practical considerations confronting it and the class, but at the time the Settlement was agreed to, also

understood the strengths and weaknesses of the case through Co-Lead Counsel's extensive investigation and prosecution of the case.  In the three years the case has been pending, Plaintiffs and Co-Lead Counsel had engaged in comprehensive and vigorous litigation in which they, *inter alia*, reviewed and analyzed: (i) over one hundred thousands of pages of documents, and other material, Massey produced pursuant to a September 28, 2011 Order partially granting Plaintiffs' motion for partial lifting of the PSLRA stay; (ii) testimony concerning Massey before various U.S. Senate and House of Representatives Committees; (iii) information and data published by the U.S. Mine Safety and Health Administration ("MSHA"); (iv) testimony given to MSHA and the West Virginia Office of Miners Health, Safety and Training ("WVOMHST") in the context of said entities' investigations regarding Massey and the UBB; (v) final investigatory reports issued by MSHA, WVOMHST, the West Virginia Governor's Independent Investigation Panel ("GIIP"), and Massey regarding the UBB explosion; (vi) the applicable law governing the claims and potential defenses; and (vii) pleadings and materials, including criminal information and a criminal indictment, filed in other pending actions that name Massey, other Defendants in the Action, or certain other Massey employees as defendants or nominal defendants.  Plaintiffs' and Co-Lead Counsel's assessment of the claims was also developed through counsel's internal investigation, which involved the identification of more than 100 potential witnesses, contact of approximately 50 witnesses, and interviews with approximately two dozen former Massey employees and other persons with relevant knowledge.  Their understanding was further honed through in-depth consultations with experts on mine safety, engineering, and regulation; valuation; damages, and causation issues, as well as Co-Lead Counsel's successful rebuttal of the two sets of Defendants' separate motions to dismiss.

12.     The prospect of settlement was discussed over the span of two years and ultimately accomplished through arm's – length settlement discussions facilitated of Professor Eric D. Green ("Prof. Green"), a well-respected and highly experienced mediator and a professor of law at Boston University School of Law.  Over the years, settlement discussions included an in-person negotiation session with high-level presentations by attorneys and experts representing each side focused on damages issues; numerous telephone discussions; and ultimately, two face-to-face mediations (one of which spanned two days) under the auspices of Prof. Green involving representatives of each side, with extended presentations by attorneys on all issues in the litigation.  The parties reached an agreement in principle on December 4, 2013.  Even after reaching the agreement in principle, the parties engaged in over two more months of negotiations over the specific terms of the Stipulation.

13.     As described in detail herein, by the time the Settlement was reached, Plaintiffs and Co-Lead Counsel had a detailed and thorough understanding of the nuances of the case.  We unequivocally believe, based on our knowledge and understanding of the claims and defenses asserted in this Action, that the $265 million all cash Settlement is an exceptional result for the Settlement Class, particularly when considered against the very substantial risk of a much smaller recovery – or, even no recovery – years in the future after a trial of the Action, and the inevitable and lengthy appeals that would follow even a successful trial.

14.     As set forth in the attached declaration of Christopher J. Supple, Deputy Executive Director and General Counsel, Massachusetts Pension Reserves Investment Management Board, dated April 29, 2014, the Board of Massachusetts PRIT has reviewed and approved the Settlement, and Lead Plaintiff strongly endorses the Settlement.  *See* Ex. 2.

15.     This Joint Declaration is divided into two main sections.  Section I addresses the motion for final approval of the Settlement and Plan of Allocation.  To put the Settlement in context, we first provide information concerning the Action itself, including describing the alleged fraud, identifying the parties, detailing the procedural history of the Action, and discussing the risks Plaintiffs faced in prosecuting the Action.  Thereafter, we discuss the Plan of Allocation.  In Section II we provide information in support of Co-Lead Counsel's Fee and Expense Application.

## II.     FACTUAL SUMMARY OF PLAINTIFFS' CLAIMS

16.     Beginning in April of 2010, two securities class action complaints were filed in the United States District Court for the Southern District of West Virginia on behalf of investors in Massey Energy Company.  On January 10, 2011, this Court consolidated the Massey related securities actions and appointed Massachusetts PRIT as Lead Plaintiff pursuant to the PSLRA, David Wagner as a named plaintiff, Labaton Sucharow and Robbins Geller as Co-Lead Counsel, and James F. Humphreys & Associates L.C. as Liaison Counsel, to represent the putative class in the Action.  ECF No. 55.

17.     Plaintiffs filed the Consolidated Class Action Complaint for Violations of the Federal Securities Laws on March 11, 2011 (the "Complaint"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  ECF No. 83.  This securities fraud class action has as its flashpoint the April 5, 2010 tragic explosion at the UBB coal mine owned and operated by a subsidiary of Massey.  It was the worst coal mine disaster in over 40 years, resulting in the deaths of 29 miners.  The Complaint alleges, *inter alia*, that Defendants made false or misleading statements or omitted to disclose material facts about Massey's health and safety practices, policies, and results.  The Complaint further alleges that Plaintiffs and other class members purchased or

acquired Massey common stock during the Class Period at artificially inflated prices and were damaged thereby following the explosion at the UBB mine. *Id.*

18.     The Complaint alleges the foregoing claims against Massey; its CEO and Chairman of the Board, Don L. Blankenship;[7] its President and Board member Baxter F. Phillips; its CFO and Vice President, Eric B. Tolbert; its COO and Senior Vice President, J. Christopher Adkins; and seven members of its Board of Directors who were also members of the Board's Safety, Environmental and Public Policy Committee ("SEPPC"). ¶¶40-54.[8]

19.     The predicate for Defendants' alleged misrepresentations and omissions relating to Massey's safety policies and procedures was allegedly laid before the beginning of the Class Period.   On January 19, 2006, a fire broke out at the Alma mine, operated by a Massey subsidiary.   Two Massey miners died of carbon monoxide poisoning.   As a result of the investigation of the Alma fire, the Department of Justice ("DOJ") filed criminal charges and shareholders filed a civil corporate derivative suit.   ¶¶4-10, 73-77.

20.     Massey pleaded guilty to ten criminal charges and paid the then largest-ever settlement in the history of the coal industry.   In settlement of the shareholder derivative suit, Defendants Blankenship, Phillips, Moore, Gabrys, Crawford, Foglesong, and Suboleski further agreed to reform safety policies by implementing corporate governance procedures aimed at enhancing mine safety monitoring processes and regulatory compliance.   In particular, Massey was ordered (and agreed) to issue an annual Corporate Social Responsibility Report regarding "safety compliance", and to establish the SEPPC as a standing committee of the Board.   During

---

[7]   On December 3, 2010, under public pressure from shareholders following corrective disclosures at issue in this case, Blankenship announced his resignation from his officer and board positions with Massey effective December 31, 2010.

[8]   All references herein to "¶__" refer to paragraph cites of the Complaint.

the Class Period, the SEPPC was charged with, among other responsibilities, providing detailed mine safety reports to the full Board.  ¶¶4, 8-9, 77-80.

21.     Plaintiffs alleged that, thereafter, from the beginning of the Class Period, the Defendants embarked on a public relations campaign using these structural Court-ordered reforms to bolster public and investor perception that, in fact, Massey had significantly changed and it now embraced a strong commitment to miner safety.  ¶¶11-13, 81-88.

22.     Defendants allegedly represented that Massey implemented "safety improvement initiatives."   They emphasized that Massey managed mine safety risks and regulatory compliance through new rigorous standards and monitoring processes.  *Id*.  Defendants portrayed these standards and processes as tightly controlled and supervised by the Board, the SEPPC, and another initiative begun as of July 29, 2009, the Hazard Elimination Committee.  Defendants also allegedly repeatedly referenced Massey's Nonfatal Day Lost ("NFDL") rate, a measurement required by the MSHA of the extent to which employees miss one or more days of work, or are restricted in the type of work they perform, because of occupational injuries. Defendants allegedly assured investors regularly that a reformed Massey had implemented a "culture of safety" and that it was compliant with federal, state, and local safety regulations.  *See, e.g.*, ¶¶11-13, 81-88, and Section V of the Complaint.

23.     Statements such as the foregoing were allegedly made in press releases, during investor and analyst conference calls, at conferences, in presentations to analysts and energy industry members and shareholders, and in letters to shareholders included with annual reports.

24.     However, by contrast, throughout the Class Period, Massey allegedly failed to disclose the actual extent and frequency with which (1) Massey was in fact violating MSHA regulations, whether known or unknown by MSHA, and (2) the extent and frequency with which

MSHA was citing Massey for such violations.  *See, e.g.*, ¶¶120-40.  Nor did Defendants disclose that Massey had a "light duty work policy" by which it discouraged injured miners from completing the necessary paperwork required to process NFDL incidents, contrary to MSHA regulations, and that its publicly reported NFDL rates were otherwise distorted.  *See, e.g.*, ¶¶141-58.

25.    On April 5, 2010, near the end of the trading session, the explosion occurred at Massey's UBB mine in Southern West Virginia.  ¶15.  Twenty-nine people died in the explosion. *Id.*  Additional news reports late on April 5, 2010 revealed that inadequate safety precautions, as reflected in Massey's poor safety record, including a host of violations and fines in the last several months prior to that date, were the root cause of the disaster.  ¶¶191-99.

26.    Plaintiffs alleged that, as the market learned of the mine accident and Massey's safety issues within its mines, the price of Massey common stock plummeted during intraday trading on April 6, 2010.  ¶337.  Likewise, after the market closed on April 6, 2010 and throughout the day on April 7, 2010, continued media and analyst reports allegedly revealed that Massey emphasized production at the expense of safety and had committed numerous safety violations.  Market participants also stressed the negative financial impact that the explosion would have on Massey, subjecting it to lower production, greater regulatory scrutiny, and litigation.  *See, e.g.*, ¶¶334-335, 338, 343-344.

27.    On the morning of April 15, 2010, President Obama gave a speech following an initial investigation into the explosion.  ¶346.  President Obama's comments allegedly informed the market that regulatory authorities had concluded that the explosion was due to management's failures, which Plaintiffs alleged stood in stark contrast with Defendants' positive Class Period statements about Massey's safety profile.  Massey's common stock declined immediately

11

following President Obama's remarks. The Huffington Post followed up with an article exposing additional safety violations committed by Massey. *Id*. These revelations allegedly caused Massey's common stock to decline even further. *Id*.

28.     On April 21, 2010, shortly before the market closed, federal mine-safety regulators disclosed a MSHA "inspection blitz" that had started over the weekend and focused on 57 mines, nine of which were owned by Massey. ¶347. After the market's close, Massey issued its financial results for the first quarter of 2010 – the Company's first earnings report since the explosion. *Id*. Massey quantified, for the first time, the financial repercussions of the explosion, explaining that it would be taking a significant charge in the next quarter related to the UBB mine explosion (estimated at between $80 and $150 million) and that the full book value of mine, equipment, development, and mineral rights impacted by the disaster was $62 million. *Id*. Plaintiffs maintain that Massey's financial revelations late on April 21 and April 22, 2010 caused Massey's common stock to fall immediately from the opening bell. ¶350.

29.     On the morning of April 30, 2010, National Public Radio ("NPR") reported that the FBI was investigating whether Massey had bribed MSHA officials and was considering criminal charges against Massey officials. ¶357. Shares of Massey common stock plunged following the NPR report. ¶358.

30.     After the close of trading on Friday, May 14, 2010, multiple news agencies allegedly revealed that Massey sources began to confirm that federal prosecutors were investigating "willful criminal activity" at UBB. ¶360. Specifically, the U.S. Attorney's office for the Southern District of West Virginia said in a letter that investigators were looking into possible criminal conduct by Massey. *Id*. When the market opened on Monday, May 17, 2010,

shares swiftly dropped and continued to fall throughout most of the day, allegedly due to the revelations about Massey since the beginning of the weekend.  ¶361.

31.     On July 27, 2010, after the market's close, Massey issued its second quarter 2010 financial results, substantially missing expectations.  ¶362.  The Company reported a $128.9 million charge related to the UBB disaster.  ¶364.  The Company allegedly admitted that heightened regulatory oversight following the UBB explosion was impacting Massey's business. ¶363.  As a result of the information contained in the earnings announcement and analyst call, shares of Massey common stock allegedly fell.  ¶365.

## III.     RELEVANT PROCEDURAL HISTORY

### A.     The Initial Investigation by Co-Lead Counsel

32.     On March 11, 2011, Plaintiffs filed the Complaint against Massey and the other Defendants.   ECF No. 83.   The Complaint was the result of a rigorous investigation, notwithstanding the mandatory PSLRA stay, which Plaintiffs sought to lift with partial success, *see* ¶¶36 - 40, below.  Co-Lead Counsel undertook, among other things, a review and analysis of: (i) documents filed publicly by Massey with the Securities and Exchange Commission (the "SEC"); (ii) press releases issued by or concerning Massey and the other Defendants; (iii) research reports issued by financial analysts concerning Massey's securities; (iv) news articles and media reports concerning Massey's operations; (v) testimony concerning Massey before the U.S. Senate Committee on Health, Education, Labor and Pensions (the "Senate HELP Committee"), the U.S. Senate Committee on Appropriations (the "Senate Appropriations Committee"), and the U.S. House of Representatives Committee on Education and Labor (the "House Labor Committee"); (vi) information and data published by MSHA; (vii) information gathered by Co-Lead Counsel from interviews with approximately two dozen former Massey employees and other persons with relevant knowledge, which were the result of the identification

13

of more than 100 potential witnesses and contact with approximately 50 witnesses; (viii) the applicable law governing the claims and potential defenses; and (ix) pleadings and materials, including a criminal indictment, filed in other pending actions that name Massey, other Defendants in the Action, or certain other Massey employees as defendants or nominal defendants.

33.     In addition, in preparing the Complaint, and thereafter at different stages of the litigation, Co-Lead Counsel consulted with experts in the areas of mine safety, engineering, and regulation; valuation; damages; and causation issues.  Notably, this case involved unique issues relating to the coal mining industry and federal mining regulations that required Co-Lead Counsel's focus.  Lead Plaintiff therefore retained Professor Robert L. Grayson, one of the country's pre-eminent authorities on mine safety, to provide expert consulting advice as to the root causes of the UBB explosion, regulatory matters, and issues raised by Defendants related to accessibility of information provided on MSHA's website.

34.     Professor Grayson has served as Chair of the West Virginia State Mine Inspectors' Examining Board; the Mine Safety Technology and Training Commission; the National Research Council Committee on Material Flows; the National Mine Safety and Health Research Advisory Committee; the Natural Resources Section of the Mineral and Energy Resources Association of the National Association of State Universities and Land Grant Colleges; as well as myriad other professional committees.  He was also the Associate Director of the Office for Mine Safety and Health Research at the National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention ("NIOSH"), where he served as the Executive Secretary of the Mine Safety and Health Research Advisory Committee.  *See* curriculum vitae of Professor Grayson, Ex. 3 hereto.

35.     Lead Plaintiff's consulting damages expert, Chad Coffman of Global Economics, provides research, analysis, and expert testimony in complex litigations, and in other contexts, on issues including materiality, causation, and damages.  *See* curriculum vitae of Chad Coffman, CFA, Ex. 4 hereto.

B.     **Efforts to Lift Discovery Stays**

36.     On February 16, 2011, Plaintiffs moved for partial lifting of the mandatory PSLRA stay of discovery (ECF No. 76), which Defendants opposed on March 7, 2011 (ECF No 81).  On March 3, 2011, the United States also filed a combined motion to intervene in the Action in light of criminal investigations then in progress with respect to certain Defendants and to stay discovery.  ECF No. 79.

37.     On April 1, 2011, Plaintiffs filed a reply brief in further support of their motion for partial lifting of the PSLRA stay of discovery and responding to the United States' combined motion.  ECF No. 90.  On April 15, 2011, the United States filed a reply relating to its combined motion, which incorporated an agreement that had been reached between the United States and Plaintiffs that provided for a partial lifting of the PSLRA discovery stay.  ECF No. 92.

38.     Defendants strenuously objected to this agreement on April 20, 2011.  ECF No. 93.  On September 28, 2011, Magistrate Judge R. Clarke VanDervort issued an Order granting Plaintiffs' motion for partial lifting of the PSLRA discovery stay, pursuant to the terms agreed to between Plaintiffs and the United States, but otherwise stayed discovery in the Action (the "September 28, 2011 Order").  ECF Nos. 127, 128.

39.     Under the terms of the September 28, 2011 Order, the Defendants were required to produce, and did produce starting on November 23, 2011, all documents concerning the safety of all Massey mines that they had produced to other litigants and government agencies, excluding documents produced to investigators or prosecutors involved in the United States

government's criminal investigation related to the UBB explosion or the government's work product. ECF No. 128.

40.     On July 9, 2012, January 17, 2013, April 19, 2013, July 16, 2013, and July 18, 2013, pursuant to periodic motions made by the United States, the Court ordered that discovery remain stayed. As a result of the July 18, 2013 order, further discovery was stayed through January 15, 2014.

### C.     The Motions to Dismiss

41.     On April 25, 2011, two sets of Defendants – (1) Massey and the non-officer director defendants (the "Massey Defendants"), and (2) the officer defendants – filed complementary motions to dismiss. ECF Nos. 94, 96.

42.     In summary, Defendants argued that the alleged misrepresentations regarding Massey's safety and compliance record were non-actionable because the alleged misrepresentations were not material to investors; Plaintiffs failed to adequately plead scienter, an intent to defraud; and Plaintiffs failed to plead a coherent theory of loss causation. ECF Nos. 95, 97.

43.     On June 9, 2011, Plaintiffs filed an opposition to Defendants' motions to dismiss and also filed a motion to strike certain exhibits that the Massey Defendants had attached to their motion in support of their argument that the market was aware of the truth as to the facts that Plaintiffs alleged Defendants had misrepresented (*i.e.,* Massey's health and safety policies and practices and its compliance with relevant regulatory requirements). ECF No. 100. Defendants opposed Plaintiffs' motion to strike on June 27, 2011. ECF No. 116. On July 7, 2011, Plaintiffs filed a reply brief in further support of their motion to strike. ECF No. 118. On July 18, 2011, Defendants filed reply briefs in further support of their respective motions to dismiss. ECF Nos.

123-24.  On March 28, 2012, the Court denied Defendants' motions to dismiss in their entirety and granted Plaintiffs' motion to strike.  ECF No. 137.

### D.  Document Discovery

44.     Defendants completed their first document production in November 2011.  In total, they produced more than 100,000 pages of documents; 300 transcripts totaling approximately 40,000 pages of testimony; and several thousand files in native format containing word documents, PDFs, excel spreadsheets, pictures, maps, and videos.

45.     To properly analyze and process this information in a cost effective and efficient manner, Co-Lead Counsel developed a document review process that encompassed a number of resources.

46.     First, in order to facilitate the cost and time-efficient nature of this process, the bulk of the documents were placed in an electronic database that was created by and maintained at Labaton Sucharow.  The database allowed Co-Lead Counsel to search for documents through Boolean-type searches, as well as by multiple categories, such as author and/or recipients, type of document (*e.g.*, emails, reports, safety procedures), date, bates number, etc.  The database also provided a streamlined way of culling and organizing documents for future use.

47.     Second, a team of attorneys was assembled, all of whom were employed by Co-Lead Counsel.  The majority of the attorneys working on the review had at least five years of legal experience and, specifically, experience with electronic document discovery in securities cases, deposition preparation, and trial preparation.  Many of these attorneys had performed similar functions for Co-Lead Counsel in other matters.  This review was structured to avoid duplicative work and to minimize, to the extent possible, the amount of hours necessary for the review.  The review was conducted in essentially three main parts.

48.     First, the bulk of the electronic document production was reviewed initially to determine the significance of the documents (Hot, Relevant, Not relevant) and to issue tag (for example, scienter of senior executives, causation of explosion, evidence of patterns of corporate behavior, etc).  A second level review was then done to extract the most significant documents for use at trial, depositions, mediation and/or negotiations.

49.     Second, the material that was produced in native format was reviewed by a select team that was well versed in the issues of the case.  The material was voluminous and largely made up of reports, listings, and analyses that all centered around the investigation into the UBB mine conditions and potential causes of the explosion.  The document types consisted of maps, citation/violation/incident reports, work logs, video surveillance, video simulations, and experiment analysis.  The reports and experiments covered subject areas such as combustible gasses and liquids, air and water flow patterns, mining equipment, ingress and egress protocols, explosion scenarios, and safety procedures/guidelines.

50.     Third, with respect to the more than 300 transcripts of Massey employees and executives, industry experts and regulators, the select team reviewed and digested each transcript On average, a transcript was more than 100 pages.

51.     All aspects of the document review were carefully supervised to eliminate inefficiencies and to ensure a high quality work-product.

## IV.     SETTLEMENT NEGOTIATIONS

### A.     Initial Discussions with Defendants Beginning December 2011

52.     Between December 2011 and the Summer of 2012, the Settling Parties engaged in various efforts to settle the Action, including a face-to-face meeting on June 1, 2012 involving counsel and the parties' consulting damages experts, in which each was permitted to freely engage with each other and exchange information, analyses and assumptions.  This meeting was

18

followed by an extensive effort by both sets of experts to incorporate the work of each other to arrive at estimates of damages that could be the basis for a common approach and view, and numerous other communications among counsel.

53.     However, the discussions were not successful and they stalled.   The parties continued to have widely divergent views as to the damages that could be established at trial, the strength of Plaintiffs' liability claims, the appropriate price range at which the case should settle, and how the settlement consideration should be structured.   Unable to make any further progress, the parties agreed to submit their differences to mediation.

**B.      Resumed Discussions with Defendants**

54.     On July 16, 2013, Plaintiffs and Defendants filed a stipulation concerning formal mediation, which the Court construed as a motion to mediate and granted on July 18, 2013.   ECF No. 171-1.

55.     The Settling Parties thereafter engaged Prof. Green to assist them in exploring a potential negotiated resolution of the claims against the Defendants.

56.     On October 7-8, 2013, Lead Plaintiff, Co-Lead Counsel, representatives of the Defendants, and Defendants' Counsel met with Prof. Green in an attempt to reach a settlement. The mediation was preceded by the exchange of extensive mediation statements on all legal and factual issues separating the parties, as well as expert reports on both damages and the causes of the UBB explosion.

57.     Following lengthy, arm's-length, and mediated negotiations under the auspices of Prof. Green, the parties reached a tentative understanding to settle the Action for $265 million, but left for further negotiation other material terms, including the form of consideration, a term on which the parties had previously expressed staunch disagreement.

58.     On December 4, 2013, after discussions between the parties as to certain proposals, representatives of the Defendants and Lead Plaintiff, as well as certain of their experts, again met with Prof. Green to build on the progress made in the prior mediation session and come to a final resolution of the Action.  As a result of the arm's-length and mediated negotiations presided over by Prof. Green, the parties reached an agreement in principle to settle the claims against the Defendants, resulting in the Term Sheet to Settle Class Action ("Term Sheet"), entered into on December 4, 2013.

59.     The Settling Parties memorialized the final terms of settlement in the Stipulation, which was filed with the Court on February 5, 2014.  ECF No. 181-1.

## V.     RISKS OF CONTINUED LITIGATION

60.     Based on publicly available documents and information; internal documents obtained through their own investigation and discovery efforts; the investigations of MSHA and the DOJ; and the analyses of consulting experts in the fields of mine safety, engineering and regulation, damages, valuation, and loss causation, Plaintiffs and Co-Lead Counsel believe they would be able to deduce compelling evidence of Defendants' liability and the class's damages to present to a jury.  They also realize, however, that Plaintiffs and the class faced considerable risks and obstacles to achieving a greater recovery than that available today, were the case to continue.  Plaintiffs and Co-Lead Counsel carefully considered these challenges during the months leading up to the Settlement and during the numerous settlement discussions with Defendants over the past several years.

### A.     Risks Concerning Loss Causation and Damages

61.     As they raised in their motions to dismiss, Defendants could be expected to vigorously challenge Plaintiffs' ability to establish loss causation and damages at every point possible had the Action continued—resulting in lengthy and expensive expert driven summary

judgment and *in limine* motion practice.  As also discussed below, Defendants' first argument would be that none of the alleged disclosures corrected any material misrepresentations because the market was already sufficiently aware of Massey's poor safety reputation.  But, by no means would Defendants stop there.  Based on Defendants' pleadings and Co-Lead Counsel's discussions with Defendants' Counsel, Defendants would likely argue that: (i) the stock price decreases after the mine explosion were not the materialization of any undisclosed safety problems at Massey; (ii) the disclosures were not actionable corrective disclosures; (iii) certain of the alleged disclosures did not result in statistically significant price declines; and (iv) portions of the alleged stock price decreases after the explosion were not attributable to the alleged fraud.

62.    First, Plaintiffs expect, based on various discussions with Defendants' Counsel, that Defendants would contest, using extensive expert testimony, the ultimate cause of the UBB mine explosion at trial.  Essentially, Defendants' expert would likely maintain that the explosion was not caused by safety lapses.  Instead, it was caused by a massive inundation of natural gas that would not have been prevented by any safety measures mandated by MSHA.  This accumulation was purportedly compounded by MSHA-ordered changes in the ventilation system, which caused the system to be less effective.  In contrast, Lead Plaintiff's expert, after consideration of all the accumulated evidence presented in the reports issued by MSHA, WVOMHST, GIIP, UMWA, and PCC based on physical inspections of the mine, would have adopted the conclusions of MSHA and other government investigators and opined that the explosion was caused by a small amount of natural gas that accumulated in the longwall area of the mine due to inadequate ventilation and roof control.  This gas ignited when sparks from a shearer bit flew during cutting and were not extinguished by poorly maintained and inoperable

water sprays on the shearer.  The fireball grew as it ignited built-up coal dust and spread throughout the mine.

63.    Clearly, these issues would involve a text-book battle of the experts on very complex matters requiring understanding of, among other things, principles of geologic science, with no guarantee as how the jury would decide them.  Plaintiffs believe that the substantial amount of testimony of former Massey miners and other evidence demonstrating significant disregard of safety rules, a fact directly related to its theory as to how the explosion occurred, would likely lead the jury to believe Lead Plaintiff's expert.  However, unlike Lead Plaintiff's expert, who necessarily relies in the main on the investigation of others, Defendants' expert not only physically investigated the mine, but did so with a team of others over an extended period of time and took many samples of evidence.  Plaintiffs cannot discount the possibility that, based on an appealing multi-media presentation of this evidence, the jury could possibly be persuaded to side with Defendants on this point.

64.    A jury determination that the explosion *was not* the result of the alleged safety lapses and practices that were purportedly not disclosed to the market could have a very significant impact on the class's damages.  The stock drop shortly after the explosion was the largest drop during the Class Period (approximately $125 million in aggregate damages).  Thus, eliminating any causative effect of the explosion could significantly reduce any possible damages that could be awarded.  If the explosion was not viewed as a causation-related event, Plaintiffs would likely find it challenging to persuade the jury as to the full causation of the rest of the alleged disclosure events.  Indeed, it is arguable that if Defendants establish that the explosion was not caused by poor safety practices that Defendants allegedly misrepresented during the Class Period, then, by extension, they will be able to establish that most if not all of

the other corrective disclosures, all of which flow from the explosion, are also unrelated to the alleged misstatements.

65.     Co-Lead Counsel also believed, based on discussions with Defendants' counsel, that Defendants would strenuously challenge, on other grounds, Plaintiffs' assertion that each of alleged disclosures were related to the alleged fraud, *i.e.*, that they revealed to the market the fraudulent nature of the practices that Plaintiffs complain about.  For instance, Defendants would argue that announcements about criminal investigations and potential criminal conduct were not corrective, because Defendants were under no duty to accuse themselves of engaging in uncharged criminal conduct.

66.     Additionally, even if material misstatements and loss causation were established, Defendants' experts were likely to present evidence that the stock price drops immediately following the explosion were only partially attributable to the explosion.  They would argue that even if Defendants had fully disclosed all of the allegedly missing information from the alleged misrepresentations and omissions during the Class Period, Massey's stock price nonetheless would have fallen after the explosion and, therefore, Plaintiffs cannot claim that the entirety of that decline was recoverable by the class.   If credited by a jury, Co-Lead Counsel's understanding is that this defense could eliminate approximately $135-$150 million in aggregate damages.  Plaintiffs would respond that the explosion was a classic manifestation of a concealed risk causing damages to investors for which they should be fully compensated. *Compare In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) ("A misrepresentation is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . . [G]eneralized investor reaction of concern causing a temporary share price decline . . . is far too tenuously connected . . . to support liability.")

(emphasis in original), *with Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 188 n.3 (4th Cir. 2007) acknowledging "the possibility that a plaintiff could successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss."  It is unclear how the Court would rule on this issue if presented as a legal issue on summary judgment or how the jury would react if the issue was presented to it for resolution.

67.    Proof of loss causation, and the technical aspects of damages, would have required significant expert testimony and analysis.  In this regard, Defendants would likely have argued that the alleged stock price drops on April 15, April 22, and July 27 were not statistically significant as a matter of law, because they purportedly did not meet a 95% confidence level. Lead Plaintiff's expert would present evidence to rebut this conclusion as to two of these dates, as well as the requirement of a 95% level of confidence.  However, the law on whether a court will find an expert's statistical analysis admissible is split.  *Compare In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (90% confidence level is below the conventional statistical measure of a 95% confidence level and therefore is not sufficient evidence of a link between the corrective disclosure and the price), *with Stone v. Advance Am.*, 278 F.R.D. 562 (S.D. Cal. 2011) (finding that a statistical analysis concluding that Spanish is spoken in 23% of payday loan transactions and including an 18% margin of error was deemed admissible; the large margin of error "goes to the weight [and not the admissibility] of the evidence.").

68.    Because most of the above issues would involve a "battle of experts" regarding whether Plaintiffs could establish causation and the extent of damages, the outcome of trial was and remains difficult to predict.  The loss of even one alleged corrective disclosure could have a very significant impact on the ultimate damages suffered by the class.  For instance, based on

Lead Plaintiff's expert's analyses and discussions with Defendants' Counsel, the loss of the April 15, April 22, and July 27 disclosure dates, for the reasons discussed above, would reduce aggregate damages by approximately $180 million.  Similarly, if Defendants' argument that the stock price drop following the UBB explosion was not solely attributable to the alleged fraud were credited by a jury, that could further reduce damages approximately $135-$150 million. These reductions would bring the class's estimated aggregate damages of $560 million down to approximately $230 million—less than the Settlement being proposed.

### B.    Risks Concerning Liability of Defendants

69.    Although Plaintiffs and Co-Lead Counsel strongly believe that Plaintiffs could amass strong probative evidence establishing the claims against Defendants, securities fraud claims are known to be difficult and complex to litigate.  The facts here also presented significant challenges, given, among other things, the highly scientific and technical nature of the alleged fraud at issue, the notoriety of Defendant Blankenship and the public history of Massey's mining practices, and the vigorous opposition advanced by Defendants.

### 1.    Risks Concerning Materiality of Statements

70.    Defendants would be expected to argue at summary judgment and trial, as they had in their motions to dismiss, that Plaintiffs could not prove the materiality of any statements or omissions, rendering it difficult to establish both a required element of a securities fraud claim and the fraud-on-the-market presumption of reliance necessary for class certification.[9] Specifically, Defendants would likely contend that (a) Massey investors did not rely on Massey's safety-related disclosures in making trading decisions; and (b) the market already knew, both before and during the Class Period, through a multiplicity of  media outlets about Massey's

---

[9]  In addition, Defendants intended to advance these arguments as yet another element in their challenge to Plaintiffs' allegations of loss causation.

safety record and run-ins with regulatory authorities.  Defendants would also maintain that they specifically warned investors in SEC filings about the risks and hazards in Massey's mining business.

71.     For example, Defendants would no doubt argue at summary judgment or before a jury that the focus of investors who purchased Massey stock was an attractive combination of its high productivity, low cost structure and valuable coal reserves—not because of what Massey said or did not say about its safety practices and regulatory compliance, which Defendants will likely characterize as "mere puffery."  As stated in conversations among counsel for the parties, Defendants could be expected to point to analyst-related evidence to support these arguments, such as their purported review of over 300 analyst reports relating to Massey that were published during the Class Period that were virtually bereft of any mention of safety-related issues, including Massey's NFDL rates.[10]

72.     Plaintiffs would argue that even if investors' primary focus with regard to mining companies was on their financial characteristics, they would nonetheless be inclined–if they had been told the truth–to stay away from any such company such as Massey that so flagrantly deviated from basic safety regulations, including by engaging in illegal practices designed to conceal from MSHA its disregard for those rules.[11]  They would have done so even if for no

---

[10] As the Complaint alleges, on September 30, 2010, Massey disclosed that it had significantly under-reported its NFDL rate during the Class Period.  ¶30.  Defendants would note at trial that there was no market reaction to this news, and therefore, they would argue, the NFDL rates were not material to shareholders.  However, Plaintiffs would counter that this disclosure had occurred almost 6 months after the UBB explosion and a slew of subsequent news stories during that entire period as to Massey's poor safety record such that more such stories were unlikely to change investors' perceptions of the company.

[11] For instance, Plaintiffs had alleged that Massey illegally intimidated miners to keep them from reporting safety and health violations and hazards to authorities and that it illegally established a practice of advance warnings of inspections to hide violations and hazards.  *See, e.g.,* ¶¶162-172.  Plaintiffs would also present evidence that Massey illegally kept two sets of books for recording hazardous conditions: (1) sanitized examination books (reviewed by MSHA); and (2) internal production and maintenance reports

other reason that such practices would risk hefty penalties, accidents causing work-stoppages and expensive litigation, and possibly a regulatory shut-down.  Nonetheless, Plaintiffs understood that these are arguments based on hypotheticals, not facts–even if supplemented by expert testimony–and that the lack of any material analyst focus on the alleged misrepresentations could be persuasive to a jury.

73.     Defendants would also likely present evidence that investors were purportedly well aware that Massey was run by Don Blankenship, who had an adversarial relationship with regulators and had caused Massey to suffer adverse legal judgments and excessive miner injuries for years.  Defendants were prepared to present to the jury a very significant number of newspaper, news service and magazine articles; editorials; books; posts from a mining-related blog that was cited as authoritative in other publications; and lawsuits, all pointing to Massey's history of safety violations and its adversarial relationship with MSHA, which Defendants would argue more than adequately counter-balanced the positive statements that Plaintiffs allege they made as to Massey's compliance with safety regulations.

74.     Defendants would also likely focus on the fact that Massey's safety record and MSHA violations history was publicly available on MSHA's website.  Seeking to undermine Plaintiffs' contention that it would be far too laborious a process to use the then existing MSHA operating system to discover the extent to which Massey's safety compliance record was one of the worst in the coal mining industry, Defendants intended to show screen shots of various aspects of that system to demonstrate the ease with which it provided information as to the number and nature of violations for which mine operators were cited during a given period as to

---

that were used by management continuously throughout the day to track conditions, but were not provided to MSHA.

each of its mines, and the extent to which news organizations made use of this website immediately after the UBB explosion to demonstrate Massey's bad safety record.

75. Notwithstanding this evidence, Plaintiffs do not believe that the standards for establishing that the "truth was on the market" could be satisfied by Defendants. "Before the truth-on-the-market defense can be applied, the defendant must prove that the information that was withheld or misrepresented 'was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by [their previous statements].'" March 28th Order, ECF No. 137 at 27-28. As the Court held, Defendants will need to prove that "the 'extent and nature' of Massey's safety and compliance record, measured by MSHA citations, orders and enforcement actions, were disseminated to the market, in the same manner as" Defendants' false and misleading representations as to the results of Massey's safety policies and procedures. *Id*. at 28.

76. As to the articles and other publicly disseminated information that Defendants were prepared to introduce into evidence, Plaintiffs would have noted the dates of publication of the articles and/or the time period they focused on (for the most part, as to both, prior to the beginning of the class period), the lack of any challenge during the Class Period in these or other publications to any of Defendants' alleged misrepresentations, and other contextual facts showing that none of the publications, alone or together, effectively counter-balanced Defendants' misrepresentations as to a purported significant and positive change in Massey's culture relating to safety and compliance issues. Nonetheless, Plaintiffs recognized that the sheer mountain of evidence that Defendants presented during settlement discussions as to these publications had the potential of overwhelming these types of distinctions.

77.     As to Defendants' MSHA website arguments, Plaintiffs would seek to establish two points.  First, Defendants ignore Plaintiffs' allegation that the most salient information for anyone wishing to learn about Massey's regulatory compliance record was its relative performance against that of all other similar American mining companies; that, as the Complaint alleges, that record was far worse than the national average (¶¶123-30), directly contrary to what Defendants had been representing during the Class Period; and that, as demonstrated by the declaration of Professor Grayson that Plaintiffs submitted in opposition to the motion to dismiss, using the MSHA website to make that comparison necessarily involved engaging in very complex and lengthy sets of procedures that would be very difficult to replicate.  Second, prior to the UBB explosion, there was little reason investors had to access even the raw data that the MSHA website arranged by mine with respect to any or each of Massey's individual mines, and there is little or no evidence that anyone did so with regard to safety compliance information.  Again, however, Plaintiffs understood that their arguments relied on the absence of evidence, what is reasonable to assume, and expert testimony.   By contrast, Defendants would have multiple opportunities—and they would make use of every one the Court permitted them so as to compound the point—to present visually appealing graphics based on screen shots showing that one need only click on certain links to obtain a variety of different types of information as to violations of safety regulations.[12]

---

[12] Plaintiffs would make the further point that, as noted by the Court in its decision denying the motion to dismiss, even if Defendants were to succeed in establishing that the market was aware of the extent to which MSHA had been citing Massey for its safety violations, such proof "would not cure the Defendants' alleged failure to disclose to the market its" illegal practices in concealing from MSHA additional violations.  ECF No. 137 at 28.  However, Plaintiffs recognized that if Defendants succeeded in establishing that the market viewed Massey as a mining company with a very poor safety record, one that acted in disregard, indeed antagonism toward regulatory requirements, rendering Defendants' alleged misstatements immaterial, it is unclear as to whether jurors would have a different view as to those statements even if it were shown that Massey's hostility toward compliance extended to illegal acts of concealment.

78.     In sum, a jury's reaction to the likely volume of information that would be presented by the defense is impossible to predict, particularly given a West Virginia jury that would undoubtedly have more exposure to mining news and Massey-related news, and so may find it difficult to believe that what was known locally was unknown nationally.  Thus, there were serious concerns about whether materiality (and, for the same reason, loss causation and reliance) could be established.

79.     Moreover, a theme of "Massey's investors were gamblers" could develop and the jury's reaction to these types of facts would be difficult to predict, particularly when the defense would be coming not from Massey *per se*, but by ANR, which has spent millions of dollars to clean up Massey's failings and turn its safety practices around.

### 2.     Risks of Proving Scienter

80.     Even if Plaintiffs established materiality, loss causation and reliance, sufficiently to either overcome a summary judgment motion or to support a jury finding of liability, Plaintiffs still would have been required to prove that each of the Defendants acted with scienter—that is, that they each knew or were severely reckless in not knowing that their statements were false or misleading when made.

81.     Although the avalanche of investigations in the aftermath of the UBB explosion have produced credible evidence of the widespread knowledge at Massey about the ongoing safety violations, NFDL rates, the hazardous conditions at Massey mines, and the illegal advance warning of inspections at Massey, as well as three convictions/guilty pleas in criminal proceedings, not all of the Defendants are implicated by this evidence.  It is likely that the former officer defendants and director defendants will testify that they believed in Massey's safety protocols and the overall safety of Massey mines and blame various underlings for any proven

violations of safety rules, which they will claim they did not order, direct or approve and as to which they will claim no contemporaneous knowledge. Indeed, after a period of three years, none of the Individual Defendants have been formally charged in any criminal proceeding. Massey, as Alpha Appalachia, did enter into a Non-Prosecution Agreement on December 6, 2011 with the U.S. Attorney's Office for the Southern District of West Virginia and the DOJ, however the agreement expressly states that it cannot be deemed to constitute an admission by Alpha Appalachia, its affiliates, or any individual, of civil liability under any law. Importantly, no securities fraud proceedings or charges have been brought as yet against the Defendants. Scienter here will have to be proven using voluminous evidence and testimony, and established throughout the whole 2.5 year Class Period if full damages are to be obtained, because (at least at this point in time) Plaintiffs cannot rely on any admissions made by the Defendants to prove the claims here.

82.     In short, Plaintiffs faced numerous obstacles to proving both liability and damages and there was no certainty, given Defendants' asserted defenses, that Plaintiffs and the class would prevail on either. Additionally, Defendants would likely appeal any verdict and damage award favorable to the class. The appeals process would likely span several years, during which time class members would have received no distribution on any award. An appeal of any verdict would also carry the risk of reversal, resulting in no recovery for the class. Because of the risks and delays associated with continuing to litigate and proceeding to trial, there was a real danger that any litigated recovery would be much less than the recovery achieved in this Settlement. Therefore, Lead Plaintiff and Co-Lead Counsel respectfully submit that the Settlement obtained is eminently fair, reasonable, adequate, and in the best interest of Settlement Class Members.

C.     **Limited Financial Resources – Likelihood of Recovery
        on a Litigated Judgment**

83.    Had the litigation continued, there was a real possibility Plaintiffs and the class would have recovered less than the amount provided for in the Settlement or nothing at all due to the financial impact of liabilities arising from the UBB explosion on Massey's merger partner ANR, the financial pressures facing ANR, the limited and wasting insurance available to the Defendants, the financial resources of the Individual Defendants, and the difficulties of enforcing litigated judgments against the Individual Defendants.  These facts strongly militated in favor of an immediate negotiated recovery now in lieu of the risk of a lesser recovery after years of fact and expert discovery (which might not even begin for another year or more given ongoing efforts of the United States to stay discovery in the Action), dispositive motion practice, a trial, and the inevitable appeals regardless of who wins at trial.

84.    Massey is now known as Alpha Appalachia Holdings after the merger transaction in which ANR acquired Massey.  According to ANR's 2013 Form 10-K (filed Feb. 28, 2014), ANR has estimated that its range of *future* loss related to the UBB explosion was up to $350 million.  This was in addition to "accrued" liabilities, such as this $265 million Settlement and the $209 million paid in connection with the Non-Prosecution Agreement.  Accordingly, ANR has had considerable additional costs associated with the explosion that could have impacted its ability to pay a larger settlement or judgment in the future.

85.    ANR also operates in a business sector (coal production), that has been subjected to significant constraints in recent years because of, among other things, declining coal prices, increased government regulation, and increased environmental concerns.  Thus, while it is Plaintiffs' understanding, according to ANR's most recently filed Form 10-Q announcing financial results for the quarter ending September 30, 2013, that ANR has sufficient cash and

cash equivalents on hand at the present time to deal with liabilities arising from the UBB explosion and to fund this Settlement, Plaintiffs were cognizant of significant business risks to the ability of ANR to satisfy a litigated judgment years into the future.  Indeed, ANR's share price went from $57.23 per share on January 28, 2011—the last trading day before it announced that it had entered into a merger agreement with Massey—to roughly $6 per share as of the time Prof. Green was retained.  Its common stock is now trading at approximately $4.50 per share, currently *available at* http://finance.yahoo.com/q?s=ANR.   Similarly,  ANR's  market capitalization has gone from $12 billion on June 1, 2011, the day the Massey merger closed, to approximately $964 million as of yesterday—a 90% drop.  *Id.*  (Plaintiffs also considered the fact that ANR is not presently a defendant in this Action and it is not at all certain that Plaintiffs could have successfully asserted successor liability claims against it.)

86.     If ANR or Massey (*i.e.* Alpha Appalachia) were to become severely financially distressed and seek bankruptcy protection down the road, even with a litigated judgment in hand, claims arising from the purchase of Massey common stock would lose essentially all value and be subordinated below tiers of other creditors, pursuant to Bankruptcy Code Section 510(c).

87.     With respect to insurance, according to ANR's 3Q2013 Form 10-Q (filed Nov. 8, 2013), it disclosed that it had $70 million in insurance that could be used to resolve the claims of investors, significantly less than both the total damages class members allegedly incurred as calculated by Lead Plaintiff's damages expert and the amount of the proposed Settlement. Moreover, if the parties continued to litigate, these insurance funds were available for payment of attorneys' fees and costs arising out of litigation and would quickly diminish.  The parties had not completed document discovery nor commenced depositions, which would have considerably increased defense costs.  Accordingly, there was a real threat that at the point of a judgment

33

favorable to the class, the Defendants would have no, or only limited, insurance funds to satisfy the judgment.  Thus, Plaintiffs could not rely upon insurance coverage to ensure payment of a jury award.

88.    Finally, although the Action involves claims against several Individual Defendants, research into their individual assets indicated that none of them would be able to satisfy a judgment totaling hundreds of millions of dollars and enforcing judgments against them would take additional time consuming litigation, with an uncertain outcome.

## VI.    COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE LITIGATION

89.    During the course of the Action, a period of three years, Plaintiffs and Co-Lead Counsel engaged in motion practice on Defendants' motions to dismiss, countered the discovery stays repeatedly pursued by the United States given the criminal investigations; reviewed key documents concerning the various investigations of the UBB explosion; worked closely with a wide variety of experts to analyze the claims and defenses; and undertook significant analyses in connection with the various negotiations leading to the Settlement.  Nonetheless, despite all of that effort, because of the multiple stays, formal discovery, including depositions had yet to begin. Indeed, for the same reason, there was not yet even a designation of testifying experts, let alone discovery of the basis for their views.  It is likely that there would have been a multiple number of different types of designated experts, including experts in mine safety, the causes of mine explosions, market analysis and valuations of mining companies, loss causation and damages, regulatory practices, and possibly in other fields.  Thus, further litigation against Defendants would have likely consumed significant time and money related to additional fact discovery, expert discovery, class certification, summary judgment proceedings, trial, and likely appeals.  In contrast, a settlement at this juncture results in an immediate recovery without the considerable risk, expense, and delay of further litigation.

## VII.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND CLASS REACTION TO DATE

90.     Pursuant to the Preliminary Approval Order, the Court appointed A.B. Data as Claims Administrator in the Action and instructed A.B. Data to disseminate copies of the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively "Notice Packet") by mail and to publish the Summary Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses.

91.     The Notice, attached as Ex. A to the Declaration of Adam D. Walter on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Potential Class Members and Publication of Summary Notice ("Mailing Decl.") (attached as Ex. 5 hereto), provides potential Settlement Class Members with information on the terms of the Settlement and, among other things: their right to exclude themselves from the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.  The Notice also informs Settlement Class Members of Co-Lead Counsel's intention to apply for an award of attorneys' fees of no more than 12.2% of the Settlement Fund (counsel's request is actually for less than this) and for payment of litigation expenses in an amount not to exceed $950,000.

92.     As detailed in the Mailing Declaration, on March 5, 2014, A.B. Data began mailing Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be Class Members.  Mailing Decl. ¶¶2-5.  In total, to date, A.B. Data has mailed 217,446 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid.  *Id.* ¶10.  To disseminate the Notice, A.B.

Data obtained the names and addresses of potential Settlement Class Members from listings provided by Alpha Appalachia and ANR of Alpha Appalachia's transfer agent and from banks, brokers and other nominees.  *Id.* ¶¶3-4, 7.

93.     On March 19, 2014, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over *PR Newswire*.  *Id.* ¶11, and Exs. B and C.

94.     A.B. Data also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.MasseySecuritiesSettlement.com, to provide interested persons with information concerning the Settlement, as well as downloadable copies of the Notice Packet and the Stipulation.  *Id.* ¶14.  In addition, Co-Lead Counsel have made relevant documents concerning the Settlement available on their firms' websites.

95.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the fee and expense application, or to request exclusion from the Settlement Class is May 14, 2014. To date, Co-Lead Counsel have not received any objections to the Settlement, Plan of Allocation, or fee and expenses application from Settlement Class Members and the Claims Administrator has only received three presumptively invalid requests for exclusion from non-class members.  *Id*. Exhibit D.[13]  (One of these invalid exclusion requests states that the fee request is "outrageous" but provides no further explanation.)  Should any objections or additional requests for exclusion be received, Plaintiffs will address them in their reply papers, which are due May 28, 2014.

---

[13] Specifically, one individual did not purchase any Massey common stock and two individuals sold their purchases before the first alleged corrective disclosure.

## VIII.   PLAN OF ALLOCATION

96.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Settlement proceeds must submit a valid Proof of Claim and all required information postmarked no later than July 3, 2014.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and applicable Taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation approved by the Court.

97.     The Plan of Allocation, which is set forth in full in the Notice (Ex. 5 - A at 7-10), is designed to achieve an equitable and rational distribution of the Net Settlement Fund to eligible claimants, but it is not a formal damages analysis that would be submitted at trial.  Co-Lead Counsel developed the Plan of Allocation in close consultation with Global Economics, Lead Plaintiff's consulting damages expert, and believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

98.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages.  Mr. Coffman analyzed the movement of Massey's share price and took into account the portion of the stock drops allegedly attributable to the challenged statements. The Plan of Allocation ensures that the net settlement proceeds will be fairly and equitably distributed based upon the amount of inflation in the price of Massey's common stock during the Class Period that was allegedly attributable to the alleged wrongdoing.  In this respect, an inflation table was created for Massey's common stock.  *See* Ex. 5 - A at 9.

99.     The Plan of Allocation provides formulas for calculating a claimant's "Recognized Loss" for each acquisition/purchase of Massey common stock during the Class

Period.  Calculation of Recognized Loss will depend upon several factors, including when the Authorized Claimant's shares were purchased during the Class Period and whether these shares were sold during the Class Period, and if so, when.

100.    As recognized in the Plan of Allocation, beginning April 6, 2008, alleged inflation in the prices of Massey common stock was reduced sequentially, as corrective disclosures were allegedly made on, or after the close of the prior trading day to, April 6, 2010, April 7, 2010, April 15, 2010, April 22, 2010, April 30, 2010, May 17, 2010, and July 27, 2010.

101.    A.B. Data, Ltd., as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claims compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated in accordance with the Plan of Allocation.

102.    To date, there have been no objections to the Plan of Allocation and Lead Plaintiff and Co-Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable, and should be approved.

## IX.    CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

103.    In addition to seeking final approval of the Settlement and the Plan of Allocation, Co-Lead Counsel is making an application for a fee award of $31,838,168, which is approximately 12% of $264,407,450 (the $265 million Settlement Fund less the litigation expenses which Plaintiffs' Counsel seek below) on behalf of all Plaintiffs' Counsel that contributed to the prosecution of the Action.  This request is supported by Lead Plaintiff, through the Office of the Attorney General of the Commonwealth of Massachusetts ("OAG").  *See* Declaration of Matthew Gendron, dated April 30, 2014.  Ex. 6 ¶¶6-8, hereto.  Co-Lead Counsel also request payment of expenses incurred in connection with the prosecution of the Action from

the Settlement Fund in the amount of $592,549.85, plus accrued interest.  This amount is well below the $950,000 maximum expense amount that the Settlement Class was advised could be requested.  The legal authorities supporting the requested fees and expenses are set forth in Co-Lead Counsel's separate Fee Memorandum, filed herewith.  Below is a summary of the primary factual bases for Co-Lead Counsel's request.

### A.    Lead Plaintiff Supports the Fee and Expense Application

104.    Lead Plaintiff is a sophisticated institutional investor that has steadfastly pursued its fiduciary responsibilities to the Settlement Class.  Massachusetts PRIT is a pooled investment fund established by the Massachusetts Legislature with a mandate to invest Massachusetts' pension assets and also to invest pension assets on behalf of local participating retirement systems.  Massachusetts PRIT alleges that it purchased shares of Massey common stock during the Class Period and suffered damages as a result of the alleged fraud.  *See* Complaint ¶38.

105.    Lead Plaintiff played a central role in monitoring and participating in the Action, including reviewing and revising pleadings, motions and other court filings; participating in the discovery process related to the production of documents resulting from Plaintiffs' successful motion to lift the stay of discovery; attending and participating in mediation sessions in-person and advocating on behalf of the class; participating in the formulation of litigation and settlement negotiation strategy; and participating in frequent conference calls and/or in-person meetings with Co-Lead Counsel.  Part of Lead Plaintiff's monitoring involved the review of Co-Lead Counsel's bi-monthly reporting of time and expenses during the course of the Action, including dozens of emails concerning follow-up questions and substantiation of the reported figures.

106.    Lead Plaintiff, through the OAG, has carefully reviewed the Fee and Expense Application and believes it is reasonable and warranting consideration and approval by the Court.  Ex. 6 ¶6.  It also assisted the OAG and the Treasurer and Receiver General of the

Commonwealth of Massachusetts in negotiating a fee agreement with Labaton Sucharow, on behalf of Co-Lead Counsel, Ex. 2 ¶7, and this request is consistent with the fee agreement, Ex. 6 ¶6.  In coming to the conclusion that the Fee and Expense Application was reasonable, Lead Plaintiff considered the fee agreement, the work conducted, the size of the recovery obtained, and the considerable risks of litigation.  Ex. 6 ¶¶6-7.  Lead Plaintiff has taken its role in this representative action very seriously, particularly in order to ensure that Co-Lead Counsel's fee and expense request would be fair and reasonable to the class.  Ex. 2 ¶7, Ex. 6 ¶¶4, 8.

**B.      The Risks and Unique Complexities of the Action**

107.    The Action presented substantial challenges from the outset of the case.  The specific risks Plaintiffs faced in proving Defendants' liability, including establishing critical elements of their claims such as materiality, loss causation and scienter are detailed in ¶¶61-88, above.    These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action was undertaken on a contingent basis.

108.    From the outset, Co-Lead Counsel understood that they were embarking on a complex, expensive, risky, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking this responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the course of the Action and have incurred $592,549.85 in expenses in

prosecuting the Action for the benefit of the Settlement Class (*see* Section X, below, for further detail on counsel's incurred expenses).

109.    Co-Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part).   Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.   To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

110.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.   If this important public policy is to be carried out, courts should award fees that adequately compensate Plaintiffs' Counsel, taking into account the risks undertaken in prosecuting a securities class action.

111.    Here, Co-Lead Counsel's persistent efforts in the face of substantial risks and uncertainties have resulted in an excellent immediate recovery for the benefit of the Settlement Class.   In circumstances such as these, and in consideration of Co-Lead Counsel's hard work and the very favorable result achieved, the requested fee of $31,838,168 and reimbursement of $592,549.85 in expenses is reasonable and should be approved.

### C.    The Work and Experience of Plaintiffs' Counsel

112.    The work undertaken by Plaintiffs' Counsel, who acted at the direction of Lead Plaintiff, in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles has been time-consuming and challenging.   As more fully set forth above, the Action was prosecuted for three years and settled only after Co-Lead Counsel overcame multiple legal and factual challenges.   Among other efforts, Co-Lead Counsel conducted a

41

comprehensive investigation into the class's claims; researched and prepared a detailed amended complaint; briefed an extensive opposition to Defendants' separate motions to dismiss; successfully lifted, in part, the mandatory PSLRA discovery stay to allow the production of important probative material; attempted to rebuff repeated requests by the United States to stay discovery in the case in light of the pending criminal investigation; consulted with numerous experts in the fields of mine safety, engineering, and regulation, economic valuation, damages, and causation issues; obtained and reviewed more than 100,000 pages of key documents from Massey; and engaged in two years of hard-fought settlement negotiations with experienced defense counsel and the input of experts on valuation and damages.

113.   At all times throughout the pendency of the Action, Co-Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial, by the most efficient means necessary.

114.   Attached hereto are declarations from Plaintiffs' Counsel to support Co-Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses.  *See* Declaration of Joel H. Bernstein on behalf of Labaton Sucharow LLP, dated April 30, 2014 (Ex. 7 hereto); Declaration of Jack Reise on behalf of Robbins Geller Rudman & Dowd LLP, dated April 29, 2014 (Ex. 8 hereto); and Declaration of James A. McKowen on behalf of James F. Humphreys & Associates, L.C., dated April 11, 2014 (Ex. 9 hereto).

115.   Included with these declarations are schedules that summarize the number of hours worked by each attorney and each professional support staff employed by the firms and the value of that time at current billing rates, *i.e.* the "lodestar" of the firms, as well as the expenses incurred by category.[14]   As set forth in each declaration, the declarations were prepared from

---

[14]   Attached hereto as Exhibit 10 is a summary table reporting the lodestars and expenses of counsel.

contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

116.    The hourly billing rates of Plaintiffs' Counsel here range from $640 to $975 for partners, $680 to $750 for of counsel, and $250 to $690 for other attorneys.  *See* Exs. 7 - 9.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary.  Exhibit 11, attached hereto, is a table of billing rates for law firms that handle bankruptcy matters, which is compiled annually by paralegals and research analysts at Labaton Sucharow from fee applications filed by law firms in federal bankruptcy proceedings across the county. Fee application data is collected from a wealth of internet sources, such as PACER, Bloomberg, and the law firms' websites themselves.  The table indicates, among other things, that the median partner billing rate was $975, the median of counsel rate was $790, and the median associate rate was $595.  Similarly, the *National Law Journal's* annual survey of law firm billing rates in 2013 shows that average partner billing rates among the Nation's largest firms ranged from $930 to $1,055 per hour and average associate billing rates ranged from $590 to $670 per hour.  (According to the *National Law Journal* report, Defendants' Counsel in this case did not participate in the survey.)  *See* www.nationallawjournal.com/id = 1202637587261 (last accessed April 30, 2014.)

117.    Plaintiffs' Counsel have collectively expended more than 21,800 hours in the prosecution and investigation of the Action.  *See* Exs. 7 - B, 8 - B, 9 - B, 10.  The resulting collective lodestar is $11,085,145.50.  *Id.*  Pursuant to a lodestar "cross-check," the requested fee

of $31,838,168 results in a "multiplier"[15] of less than 2.9 on the lodestar, which does not include any time that will necessarily be spent from this date forward administering the Settlement.

118.    Co-Lead Counsel are highly experienced in prosecuting securities class actions and worked diligently and efficiently in prosecuting the Action.  Labaton Sucharow, as demonstrated by the firm resume attached to its declaration, is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases.  *See* Labaton Fee Decl. Ex. 7 - A.  Labaton Sucharow has served as lead counsel in a number of high profile matters, for example: *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); and *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts PRIT and reaching a settlement of $473 million—the largest securities fraud settlement with a pharmaceutical company).

119.    Robbins Geller has 200 lawyers in 10 offices nationwide and, in its capacity as lead counsel, has successfully obtained some of the largest recoveries in history including, *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (the firm represented, among others, Amalgamated Bank, Regents of the University of California, Washington State Investment

---

[15]  The multiplier is calculated by dividing the $31,838,168 fee request by the $11,085,145 lodestar of Plaintiffs' Counsel.

Board, and San Francisco City and County Employees' Retirement Fund Systems and secured a $7.3 billion recovery, which is largest ever in a securities class action); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, MDL No. 1720 (E.D.N.Y.) ($5.7 billion settlement is largest ever in antitrust class action); *Jaffe v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill.) ($2.46 billion judgment is largest ever jury trial verdict in securities class action); and *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-cv-01691 (D. Minn.) (the firm represented California Public Employees' Retirement System and others in recovering $925 million in the largest stock option backdating settlement). *See* Robbins Geller Fee Decl. Ex. 8 - A.

120.   *See also* Ex. 9 - A, for the firm resume of James F. Humphreys & Associates L.C, which assisted Co-Lead Counsel, under its direction, in fulfilling the duties of Local Counsel.

### D.   Standing and Caliber of Defense Counsel

121.   The quality of the work performed by Co-Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Certain of the Defendants are represented by Cleary Gottlieb Steen & Hamilton LLP and Cravath, Swaine & Moore LLP, well-known and respected law firms with attorneys who vigorously represented the interests of their respective clients.  In the face of this experienced, formidable, and well-financed opposition, Co-Lead Counsel were nonetheless able to achieve a settlement very favorable to the Settlement Class.

### E.   The Reaction of the Settlement Class to the Fee and Expense Application

122.   As mentioned above, consistent with the Preliminary Approval Order, 217,446 Notice Packets have been mailed to potential Settlement Class Members advising them that Co-Lead Counsel would seek an award of attorneys' fees that would not exceed 12.2% of the Settlement Fund, and payment of expenses in an amount not greater than $950,000.  *See* Mailing

Decl. Ex. 5 - A at 2, 6.   Additionally, the Summary Notice was published in *The Wall Street Journal*, and disseminated over *PR Newswire*.   Mailing Decl. ¶11.   The Notice and the Stipulation have also been available on the settlement website maintained by A.B. Data and Co-Lead Counsel's websites.   *Id.* ¶14.   While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, as discussed above, to date no objections by Settlement Class Members have been received.   Co-Lead Counsel will respond to any objections received in our reply papers, which are due May 28, 2014.

## X.   REQUEST FOR PAYMENT OF LITIGATION EXPENSES

123.   Co-Lead Counsel seek, on behalf of Plaintiffs' Counsel, payment from the Settlement Fund of $592,549.85, plus accrued interest, in litigation expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against Defendants.   *See* Exs. 10, 7 ¶¶8-11 & Ex. C thereto, 8 ¶¶6-8, 9 ¶8.

124.   From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.   Thus, counsel were motivated to take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.   Co-Lead Counsel maintained strict control over the litigation expenses.   Indeed, many of the litigation expenses were paid out of a litigation fund created and maintained by Labaton Sucharow.   *See* Ex. 7 ¶11 - C.

125.   As set forth in the fee and expense schedules, Plaintiffs' Counsel have incurred a total of $592,549.85 in litigation expenses in connection with the prosecution of the Action.   As attested to, these expenses are reflected on the books and records maintained by each firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.   These expenses are set forth in

detail in each firm's declaration, which identifies the specific category of expense—*e.g.*, online/computer research, experts' fees, travel costs, duplicating, telephone, fax and postage expenses, and other costs incurred for which counsel seek payment.  These expense items are billed separately and such charges are not duplicated in the respective firms' billing rates.

126.   Of the total amount of expenses, $401,599.17, or approximately 68%, was expended on experts and consultants.   Early in the litigation, Co-Lead Counsel retained consultants in the areas of mine safety, engineering, and regulation; damages; and loss causation to assist in drafting the detailed and extensive Complaint and investigating the claims, as well as to provide assistance at, and draft submissions for, settlement discussions and mediation sessions.  Co-Lead Counsel also worked with one of its consulting damages experts to assist in developing a fair and reasonable Plan of Allocation, and consulted with valuation and damages experts in connection with the settlement negotiations.  Ex. 7 - C.

127.   Another large component of the litigation expenses relates to travel to different states in connection with this case.  For instance, Co-Lead Counsel traveled to West Virginia on several occasions to attend court proceedings and interview witnesses, and to Boston to meet with Lead Plaintiff and/or hold settlement negotiations.

128.   Counsel also incurred expenses related to online legal and factual research.  In addition to researching the law pertaining to such complex areas such as, *inter alia*, falsity of statements, scienter, and causation, Co-Lead Counsel necessarily spent considerable time and expense performing factual research.

129.   The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed

by the hour.  These expenses include court fees, duplicating costs, long distance telephone and facsimile charges, and postage and delivery expenses.

130.    All of the litigation expenses incurred, which total $592,549.85, were necessary to the successful prosecution and resolution of the claims against Defendants.

## XI.    THE COSTS AND EXPENSES REQUESTED BY LEAD PLAINTIFF ARE FAIR AND REASONABLE

131.    Additionally, Lead Plaintiff seeks reasonable lost wages and expenses, pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(4), that PRIM directly incurred in connection with Lead Plaintiff's representation of the class in the amount of $33,889.18.  The amount of time and effort devoted to this Action on behalf of the Lead Plaintiff is detailed in the Supple Declaration. *See generally* Ex. 2.

132.    As set forth is the Fee Memorandum and in the supporting declaration submitted on behalf of the Lead Plaintiff, Lead Plaintiff has been fully committed to pursuing the class's claims against the Defendants for three years.  This large institution has dedicated numerous resources to actively and effectively fulfilling its obligations as a representative of the class, complying with all of the many demands placed upon it during the litigation and settlement of this Action, and providing valuable insight and assistance to Co-Lead Counsel.  The efforts expended by the representatives for Lead Plaintiff during the course of this Action are precisely the types of activities Courts have found to support reimbursement to class representatives, and fully support Lead Plaintiff's request for reimbursement of costs and expenses.  *See* Fee Memorandum at § III.

133.    Co-Lead Counsel respectfully submit that this award, which will be paid directly to Lead Plaintiff, is fully consistent with Congress's intent, as expressed in the PSLRA, of

encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.

134.    The Notice apprised the Settlement Class that Co-Lead Counsel might seek payment of Lead Plaintiff's expenses and lost wages in an amount not to exceed $100,000.  *See* Ex. 5 - A at 2.  The amount requested herein is well below this cap. To date, no objection to the request by Lead Plaintiff has been raised.

135.    In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.  Accordingly, Co-Lead Counsel respectfully submit that the expenses incurred by Co-Lead Counsel, additional Plaintiffs' Counsel, and Lead Plaintiff should be reimbursed in full from the Settlement Fund.

## XII.    MISCELLANEOUS EXHIBITS

136.    Attached hereto as Exhibit 12 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Memorandum.

## XIII.    CONCLUSION

137.    In view of the significant recovery to the Settlement Class and the substantial risks of lesser recovery years into the future, as described above and in the accompanying memorandum of law, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the exceptional recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Co-Lead Counsel, as described above and in the accompanying memoranda of law, Co-Lead Counsel respectfully submit that a fee in the amount of $31,838,168 be awarded, that the requested litigation expenses in the amount of $592,549.85,

plus accrued interest be paid, and that Lead Plaintiff's expenses in the amount of $33,889.18 be paid.

   We each declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on April 30, 2014.

_____
JOEL H. BERNSTEIN

_____
JACK REISE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2014, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

- **Jonathan L. Anderson**
  jlanderson@jacksonkelly.com,ecooper@jacksonkelly.com

- **Eric J. Belfi**
  ebelfi@labaton.com

- **Joel H. Bernstein**
  jbernstein@labaton.com,rviczian@labaton.com,cboria@labaton.com,nzeiss@labaton.com,electroniccasefiling@labaton.com,ewierzbowski@labaton.com,fmann@labaton.com,sauer@labaton.com

- **Stephen L. Brodsky**
  sbrodsky@zsz.com

- **Ricklin Brown**
  rbrown@baileyglasser.com,missyddennis@gmail.com,jmarks@baileyglasser.com,mdennis@baileyglasser.com,mchapman@baileyglasser.com

- **John F. Dascoli**
  johnfdascoli@hotmail.com,Pamdc519@aol.com

- **Eric R. Delinsky**
  edelinsky@zuckerman.com

- **Alan I. Ellman**
  aellman@labaton.com

- **AL Emch**
  aemch@jacksonkelly.com,adsmith@jacksonkelly.com,jcrawford@jacksonkelly.com

- **Thomas V. Flaherty**
  tflaherty@fsblaw.com,cmontague@fsblaw.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Brian A. Glasser**
  bglasser@baileyglasser.com,missyddennis@gmail.com,mchapman@baileyglasser.com,
  pwilson@baileyglasser.com,mhatcher@baileyglasser.com,mdennis@baileyglasser.com,
  lsadler@baileyglasser.com,ttanner@baileyglasser.com

- **Stuart W. Gold**
  sgold@cravath.com

- **David J. Goldsmith**
  dgoldsmith@labaton.com,electroniccasefiling@labaton.com

- **Tammy R. Harvey**
  tharvey@fsblaw.com,cmontague@fsblaw.com

- **Dennis J. Herman**
  DennisH@rgrdlaw.com

- **Steven N. Herman**
  sherman@zuckerman.com

- **Victor L. Hou**
  vhou@cgsh.com

- **Christopher J. Keller**
  ckeller@labaton.com

- **Laurie L. Largent**
  LLargent@rgrdlaw.com, triciam@rgrdlaw.com

**Manual Notice List**
The following is the list of attorneys who are not on the list to receive e-mail notices for this
case.

**Nicole  Zeiss**
Labaton Sucharow
140 Broadway
New York, NY 10005

By:  /s/ Joel H. Bernstein
Joel H. Bernstein